Marc E. Kasowitz (mkasowitz@kasowitz.com)
Albert Shemmy Mishaan (amishaan@kasowitz.com)
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Tel.:   (212) 506-1700
Fax:   (212) 506-1800

*Attorneys for Plaintiff Andres Scaminaci*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANDRES SCAMINACI,<br><br>                  Plaintiff,<br><br>                  v.<br><br>OMAR JAFFREY,<br><br>                  Defendant. | Civil Action No. 21-CV-321 |

**<u>COMPLAINT</u>**

Plaintiff Andres Scaminaci ("Scaminaci" or "Plaintiff"), for his complaint against defendant Omar Jaffrey ("Jaffrey" or "Defendant"), upon knowledge as to Scaminaci and otherwise upon information and belief, alleges as follows:

## INTRODUCTION

1.     This action arises out of a brazen scheme by Omar Jaffrey, part owner of the Melody Capital family of investment funds (together, "Melody"), to unilaterally hijack Melody's operations and exclude his joint venture partner, Andres Scaminaci, from Melody's management and governance, so that Jaffrey can use Melody and its assets for his own personal enrichment, to the detriment of Scaminaci, Melody and Melody's investors.  In furtherance of that scheme, Jaffrey has made false and scurrilous allegations of misconduct against Scaminaci, causing enormous damage, and has unilaterally prevented Scaminaci from exercising his rights to participate fully in Melody's management.

2.     Melody is a private investment vehicle that is jointly managed by Scaminaci and Jaffrey.  Melody has two primary platforms (the "Melody Funds"):  a group of funds that make opportunistic credit-related investments (the "Credit Funds"), and funds that hold a portfolio of wireless communication assets (the "Telecom Funds").  Scaminaci and Jaffrey are equal partners in Melody's management companies, Investment Committees and general partner entities that ultimately control the Melody Funds' governance, management and investment strategy.

3.     In accordance with its governing documents, Melody is now in its "harvest" period -- meaning that it is not raising additional funds or making new investments, and the focus of Melody's management and investment teams is on monetizing Melody's assets, including the Telecom Funds, in a way that will maximize their value and provide the highest returns to Melody's investors.

4.     Scaminaci has been working diligently on the profitable harvest of the Melody Funds' assets for the benefit of investors.  Last summer, Scaminaci obtained a $1.3 billion offer for Melody Wireless Infrastructure Inc. ("Melody Wireless"), the company through which the Telecom Funds own their valuable wireless infrastructure assets, from Digital Colony, a $20 billion private equity fund.  Digital Colony's offer included a role for Scaminaci after the transaction, which Scaminaci in good faith immediately disclosed and agreed he would not take part in Melody's consideration of the Digital Colony transaction.

5.     By contrast to Scaminaci's diligent efforts to harvest Melody's assets, Jaffrey has been staunchly opposed to selling Melody Wireless, notwithstanding Melody's obligation to monetize the Telecom Funds' assets for the benefit of Melody's investors.  In late 2018 and early 2019, Jaffrey launched his own fund outside of the Melody umbrella -- Melody Investment Advisors LP ("MIA") -- that competes directly with Melody Wireless for investors and investment opportunities in the telecommunication infrastructure space.  In order to launch and grow MIA, Jaffrey has relied heavily on Melody Wireless's reputation and resources, misleadingly referring to MIA as "Melody," and intentionally commingling Melody Wireless and MIA operations and track record in order to make MIA appear larger and more established in presentations to investors and when exploring investment opportunities.  Jaffrey and MIA also coopted Melody Wireless's management and investment professionals -- in some cases, without paying for them.

6.     Jaffrey's resistance to harvesting the Melody Funds' assets has been directly tied to his desire to continue the charade that MIA and Melody are part of one unified enterprise and operation.  If Melody Wireless was sold, as it must be under the Telecom Funds' governing documents, Jaffrey would no longer be able to pretend that MIA is four times larger than it

2

actually was, and would be forced to cover the entire costs of the professionals it has been "borrowing" from Melody Wireless.  In order to prevent that from happening -- at least until MIA has an opportunity to grow into a self-sustaining company -- Jaffrey has done everything within his power to avoid selling Melody Wireless, regardless of the fact that such a sale is both mandated by Melody's governing documents and in the interests of Melody's investors.

7.      Jaffrey's competing personal interests explain why, when confronted with a billion-dollar offer from Digital Colony, Jaffrey did not congratulate Scaminaci, suggest a counter, utilize the Digital Colony offer as the basis for starting a sale process, or consider Digital Colony's offer in any meaningful way.  Instead, Jaffrey rejected the Digital Colony offer out of hand, excluded Digital Colony from any future sales process for Melody Wireless, and retained conflicted outside counsel at Hogan Lovells US LLP ("Hogan Lovells") to launch a sham "investigation" of Scaminaci's efforts as an equal managing partner to obtain for Melody a valuable offer from Digital Colony.

8.      Jaffrey then used the preordained results of Hogan Lovells' bogus investigation, which he had directed, to gin up ludicrous allegations that Scaminaci launched a "clandestine" "scheme" to "acquire" Melody for himself -- notwithstanding that Scaminaci's efforts were fully transparent, were consistent with Melody's goals and the interests of its investors, were squarely within Scaminaci's rights as co-manager of Melody, and were assisted by numerous other Melody professionals.  Moreover, Scaminaci was at all times clear and unambiguous in disclosing that his dealings with Digital Colony were part of an effort to start the necessary sales process that Jaffrey had been impeding, whether or not any ultimate sale provided for a post-transaction role for Scaminaci.  Scaminaci made full disclosure of his potential personal interest

in a Digital Colony sale, and immediately offered to sideline himself from consideration of the Digital Colony proposal once it was presented to Melody.

9.      As was his intention all along, Jaffrey immediately used the Hogan Lovells report that he had commissioned to defame Scaminaci to investors and other third parties -- harming Scaminaci's reputation and threatening Scaminaci's livelihood -- and to exclude Scaminaci completely from the governance and management of the Telecom Funds (and not just consideration of the Digital Colony offer, which was withdrawn months ago).  Despite repeated demands, Jaffrey and his lawyers at Hogan Lovells have refused to permit Scaminaci to participate in the management of the Telecom Funds and Melody Wireless -- notwithstanding that he is a Managing Director of Melody Wireless, a member of the relevant Melody Investment Committee, and an equal owner with Jaffrey of the Melody advisory business.

10.      Jaffrey's misconduct in hijacking the entirety of the Telecom Funds' operations violates not only the fiduciary duties he owes as a joint venture partner with Scaminaci, as well as the Melody entities' governing documents, but also a separate agreement (the "2020 Agreement") that Jaffrey and Scaminaci entered into on March 30, 2020 to set forth their agreement concerning the governance of the Melody Funds during their harvest period.  The 2020 Agreement expressly provides that Jaffrey is not "authorized to cause [any of the Melody entities, including the Telecom Funds and Melody Wireless] to enter into any legally binding agreement or arrangement without the prior consent" of Scaminaci.  Yet Jaffrey has completely disregarded those commitments and taken full unilateral control of the Telecom Funds, completely excluding Scaminaci from their operations and decision-making.  Jaffrey is therefore in direct breach of the 2020 Agreement, and Scaminaci is entitled to relief to restore his rights.

11.     Accordingly, Scaminaci brings this action seeking a preliminary and permanent injunction, and an order of specific performance, prohibiting Jaffrey from further violating the 2020 Agreement and his fiduciary obligations by managing Melody and the Telecom Funds as his personal fiefdom, without the consent or meaningful participation of Scaminaci, Jaffrey's equal partner.  Scaminaci further seeks to recover the damages he has suffered as a result of Jaffrey's misconduct, including his fiduciary breaches and his egregious defamation of Scaminaci's character.

## THE PARTIES

12.     Plaintiff Andres Scaminaci is an individual domiciled in the State of Connecticut.

13.     Defendant Omar Jaffrey is an individual domiciled in the State of New Jersey.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  This action is between citizens of one or more States and a citizen of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     This Court has personal jurisdiction over Jaffrey since, among other things, on information and belief, (i) the 2020 Agreement was executed in New York, and provides for the application of New York law; and (ii) a substantial portion of Jaffrey's misconduct described herein occurred in New York.

16.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b), since a substantial part of the events giving rise to the claims occurred in this District, and because Section 11.17(a) of the Second Amended and Restated Agreements of Limited Partnership for both of the Telecom Funds provide for exclusive jurisdiction in this District for disputes "arising out of or concerning . . . the [Telecom Funds'] affairs."

## BACKGROUND

**A.     ANDRES SCAMINACI AND OMAR JAFFREY**

17.     Andres Scaminaci is an experienced investor and attorney.  He began his career as an attorney at various major law firms, with a focus on corporate and project finance.  He ultimately left the law and joined the Emerging Markets Structured Credit Team at Deutsche Bank, and was the Head of Illiquid Credit Structuring for Latin America at Merrill Lynch before serving as a Managing Director at UBS Investment Bank, most recently serving as Americas Co-head of the Special Situations Group and head of the New York office.

18.     Scaminaci left UBS to form Melody in 2012, alongside Jaffrey, whom he met while Jaffrey was a Managing Director at UBS Investment Bank.  After leaving UBS, Jaffrey joined the financial advisory firm TAP Advisors, where he served as a consultant and held the role of Senior Advisor and then Vice Chairman, before founding Melody with Scaminaci.

**B.     THE MELODY FUNDS**

**1.     Scaminaci, Jaffrey and Cesar Gueikian Form the Melody Funds**

19.     The Melody Funds were founded by Scaminaci, Jaffrey and Cesar Gueikian, a fellow executive at UBS, in 2012.  Currently, the Melody Funds are divided into two primary areas:  the Telecom Funds and the Credit Funds.

**2.     The Telecom Funds**

20.     The Telecom Funds are private investment funds that focus on telecommunications assets.  The Telecom Funds have invested in easement and ground lease interests, easements, leased real estate, and owned real estate underlying wireless communications towers, structures, and rooftops.  These assets are then leased to one or more of the nation's major wireless carriers, which utilize the assets to provide wireless networks to their customers.

21.     The Telecom Funds are managed by Melody Capital Management LLC ("MCM").  As a managing partner at MCM, and as a member of MCM's Investment Committee, Scaminaci has been actively involved in the management of the Telecom Funds since their inception, and has personally approved (along with Omar Jaffrey, the other member of the Telecom Funds' Investment Committee) each and every investment made by the Telecom Funds.

22.     The Telecom Funds' assets are owned through Melody Wireless, a Delaware corporation that the Telecom Funds wholly own.  Melody Wireless has over 3,000 assets, including over 2,000 land leases, over 500 rooftop and building rights, and over 100 independent structures and towers.  The nature of Melody Wireless's assets makes them highly and dependably profitable, and therefore significantly valuable, with predictable cash flows from investment grade counterparties (such as Verizon, AT&T and T-Mobile) and minimal operating costs.

### 3.     The Credit Funds

23.     The Credit Funds are private investment funds that make opportunistic investments with a focus on loan origination and direct lending.  The Credit Funds have made investments in five different industry sectors (Telecom, Media and Technology, Real Estate, Financial Institutions, Liquid Credit and Energy).  Each of these sector teams is led by a different individual, with each individual reporting up to the Investment Committee and Melody's founders, Scaminaci and Jaffrey.

24.     The performance of the Credit Funds' investments has varied significantly.  For example, the Credit Funds' real estate and financial institutions investments have performed very well, while the Credit Funds' investments in telecommunications assets (all of which were

sourced by Omar Jaffrey) and the Credit Funds' energy investments generally have performed poorly.

25.     Jaffrey and Scaminaci both participated in and approved every single investment made by Melody, including each of the investments made by the Credit Funds.

**4.     Melody's Structure and Management**

26.     Like most private equity funds, Melody's structure is complex.  The Telecom Funds are owned by Melody's investors (the "Limited Partners"), as well as the Telecom Funds' shared general partner, Melody Telecom Land Fund GP, LLC ("Melody Telecom GP").  The Credit Funds likewise are owned by the Limited Partners and the Credit Funds' general partners, Melody Capital Partners GP, LLC and Melody Special Situations GP, LLC (together, "Melody Credit GPs").

27.     The sole member of both Melody Telecom GP and the Melody Credit GPs is Tradewinds GP Holdings LLC ("Tradewinds").  The managing member of Tradewinds is Las Palmas GP LLC ("Las Palmas"), whose sole managing members are Scaminaci, Jaffrey and Gueikian.  MCM and MCP are also both ultimately owned by Scaminaci, Jaffrey and Gueikian, and managed by Scaminaci and Jaffrey.

28.     A few years after Melody was founded, Gueikian and Jaffrey had a falling out, which ultimately led to a buyout of Gueikian in 2017.  Pursuant to that transaction, among other things, Gueikian retained a declining minority residual interest in the Melody Funds and relinquished all of his management rights.

29.     An abbreviated organizational chart for Melody is as follows:



*As noted above, Gueikian has a declining minority residual indirect interest in Las Palmas GP LLC.
The above reflects the distribution percentage to which he was entitled on December 31, 2019.

30.     Although governance of the Telecom Funds and the Credit Funds ultimately lies

with Scaminaci and Jaffrey, through their ownership and control of Las Palmas and its indirect

subsidiaries that serve as the Telecom Funds' and Credit Funds' general partners, the Melody

Funds' investment decisions are made by MCM's and MCP's investment committees.  MCM's

Investment Committee is comprised of Scaminaci and Jaffrey, with unanimous consent required

for all decisions.  The Investment Committee of MCP is comprised of Scaminaci, Jaffrey and

between one and three Managing Directors, with decisions requiring majority approval.

###     5.     The Relationship Between Jaffrey and Scaminaci Deteriorates, and the Two Founders Agree to Permit Each Other to Launch Competing Funds

31.     In the years after Melody's founding in 2012, Scaminaci and Jaffrey successfully

managed more than $1 billion in assets.  However, their personal and professional relationships

deteriorated during that time, with Jaffrey improperly and baselessly taking credit for Melody's

success, blaming Scaminaci for Melody's problems, and becoming increasingly hostile to

Scaminaci's participation in the management of the Melody Funds.  In September 2018, Jaffrey

and Scaminaci agreed to pursue investment strategies separately going forward.

32.     On or about September 2, 2018, Jaffrey and Scaminaci executed the "Melody

Flagship Business Plan" (the "2018 Business Plan").  The 2018 Business Plan provided for a

number of marketing and investment goals for Melody, and also provided that Melody would

create a separate investment company for each of Scaminaci and Jaffrey (as Melody's

"founders"), through which they would be permitted to build separate businesses, subject to

certain limitations, including that investments and expenses would be appropriately allocated

between Melody and the separate businesses.

33.     Following execution of the 2018 Business Plan, Jaffrey launched his own

investment fund, managed by MIA, a Jaffrey-owned investment vehicle.  The funds managed by

MIA invest in the exact same type of assets -- wireless telecommunications infrastructure -- as

Melody Wireless and the Telecom Funds.  Since launching the fund, Jaffrey has preferred MIA

(in which he holds a 100% ownership interest) over Melody (in which he holds a 50%

ownership), diverting corporate opportunities and resources from Melody to MIA.

34.     Indeed, in some cases, MIA has invested in specific assets in which Melody

Wireless would have invested had Jaffrey not usurped the opportunity from Melody Wireless

and diverted it to MIA.  For example, in early 2019, Jaffrey diverted the opportunity to purchase

a portfolio of telecommunications infrastructure assets to MIA -- a portfolio that would have

generated a profit of more than $4 million.  Melody's Chief Compliance Officer (who also serves

as MIA's general counsel, in a gross conflict of interest) ultimately concluded that the usurpation

was not improper, even though it was a clear-cut example of Jaffrey placing his own personal

interests ahead of the interests of Melody and its investors, based on a series of falsehoods told to

him by Jaffrey.  For example, Jaffrey claimed that the investment had an internal rate of return

("IRR") of 14%, which was below the Telecom Funds' targeted return of 19%, but

contemporaneous MIA investor presentation materials describe the portfolio as having projected

returns as high as 20%, and as presenting an "attractive price relative to recent transactions in the

easement space," and further acknowledge that the Telecom Funds' "targeted gross IRR" was

15%, not 19%.

35.     Jaffrey has also wrongfully diverted the time and attention of Melody's personnel

to his personal MIA project.  While Scaminaci has agreed that MIA may use the time of Melody

personnel, MIA is required to pay for that time.  In notable instances, MIA has not done so --

particularly for the time of David Bacino, Melody Wireless's president, who also serves as an

"Operating Partner" for MIA.  Recently, Jaffrey demanded that Melody Wireless pay Bacino a

sizeable bonus, even though Bacino has devoted much of his time and attention to MIA, and is

already well-compensated by Melody.

### 6.    Melody's Harvest Period

36.     Melody's various governing documents specify for each fund when the

"investment period" will end and the "harvest period" -- the period during which the focus of the

fund's managers and Investment Committee will be to monetize the fund's assets and return the

proceeds to investors -- will begin.  The harvest period for the Telecom Funds began on July 1,

2019.  Under the Telecom Funds' current governing documents, the harvest period must be

completed by July 1, 2021 (a date that originally was July 1, 2020, but was extended by MCM).

37.     On March 30, 2020, Scaminaci and Jaffrey entered into the 2020 Agreement,

which was intended to govern the operations of Melody during the harvest period.  In addition to

documenting a critical understanding concerning the governance of the Melody Funds (as

described further below), the 2020 Agreement provides for certain salaries and bonuses to be paid to the Melody Funds' employees, and provides a mechanism for Jaffrey's and Scaminaci's independent funds (should they opt to launch them) to share in those employees' expenses if and to the extent -- and *only* if and *only* to the extent -- Jaffrey's and Scaminaci's funds utilized Melody's employees' time.

## C.   SCAMINACI ATTEMPTS TO MONETIZE THE TELECOM FUNDS FOR THE BENEFIT OF ALL MELODY INVESTORS

### 1.   Scaminaci's Initial Efforts to Monetize the Telecom Funds During the Harvest Period

38.    As discussed above, the Telecom Funds are not open-ended, and have a finite investment life -- a life that is now coming to an end.  Recognizing this, and believing that the market for Melody Wireless's assets is primed for a value-maximizing sale, Scaminaci began his efforts in 2020 to monetize the Telecom Funds' assets, through a sale of Melody Wireless.

39.    Scaminaci repeatedly approached Jaffrey to discuss these efforts, but Jaffrey refused to engage.  Specifically, Scaminaci raised the requirement that the Telecom Funds be monetized, and his plans for such monetization, on a number of calls with Jaffrey, but Jaffrey ignored Scaminaci's requests to discuss the actions that they needed to take to monetize Melody Wireless.  This is because Jaffrey did not wish to sell Melody Wireless, since maintaining control over the company and its assets is critical to growing Jaffrey's personal fund, MIA.

40.    Indeed, Jaffrey regularly references Melody Wireless in MIA's marketing materials, in many instances commingles Melody Wireless and MIA as if they were a single entity, and often refers to MIA (or the combination of Melody Wireless and MIA) simply as "Melody."  For example, in a September 2019 marketing presentation, Jaffrey referred to MIA as "Melody," the Telecom Funds and Melody Wireless as "Fund I," and the funds to be managed by MIA as "Fund II" -- as if they were simply related funds managed by the same management

12

company, when in fact MIA is an entirely new entity. And in May 2020, MIA completed a purchase of 500 cell towers. Its press release announcing the purchase defined MIA as "Melody," and stated that (i) "[t]he acquisition enhances Melody's position as a leading owner and operator of wireless infrastructure assets"; (ii) "[w]ith the addition of Uniti's towers, Melody and its affiliates now own and market more than 4,000 towers, ground leases and structure and rooftop leases, including pipeline sites"; (iii) "Melody and its affiliates are a top five independent owner of national wireless infrastructure assets and one of the largest privately owned telecom landowners in the U.S."; and (iv) "[t]ogether with its affiliates, the Melody team has deployed over $1 billion in capital in this sector over the past six years." The vast majority of assets and capital referenced in MIA's press release belong not to MIA, but to Melody Wireless -- a completely separate business with different investors and different owners, including Scaminaci.

41.     Jaffrey's efforts to blur the lines between Melody Wireless and MIA are intentional: by portraying himself as an active manager of more than 4,000 telecom-related assets, Jaffrey will be (and has been) able to attract capital and source investment transactions that would be unavailable to him if he were simply starting and growing a fund from scratch. Because Jaffrey will be unable to leverage Melody Wireless's assets to grow MIA once Melody Wireless belongs to someone else, Jaffrey hopes to maintain control over the company for as long as possible, and has been staunchly opposed to any potential sale until MIA has grown to a size such that it can be self-sustaining.

42.     Given Jaffrey's self-serving intransigence and the Telecom Funds' fast-approaching harvest date, Scaminaci was left no choice but to spearhead Melody's efforts to monetize the Telecom Funds. To that end, during the summer of 2020, Scaminaci worked with a number of Melody employees and outside advisors to prepare materials to present to potential

buyers.  Through these efforts, Scaminaci ultimately identified a bona fide potential purchaser

for Melody Wireless and its assets, and obtained a billion-dollar offer from that purchaser,

Digital Colony.

### 2.      The Digital Colony Offer

43.      Digital Colony is the world's largest digital infrastructure investment firm, with

over $20 billion in assets under management spread across the telecommunications infrastructure

network, including land, towers and rooftops -- the same types of assets in which Melody

Wireless invests.  Given its substantial holdings in the telecom infrastructure space, and its

substantial financial resources, Digital Colony was a natural candidate to purchase Melody

Wireless.

44.      In an effort to achieve the most beneficial result for the Telecom Funds' investors,

Scaminaci worked to obtain an initial offer of $1.3 billion from Digital Colony for Melody

Wireless and its assets.  During the course of those discussions, Digital Colony negotiated a post-

transaction role for Scaminaci with the business, which also contemplated that Scaminaci would

"roll over" a portion of his interest in the Telecom Funds into the new business; based on advice

from one of the Telecom Funds' investors, Scaminaci negotiated with Digital Colony to ensure

that all of the Telecom Funds' investors would have an opportunity roll over a portion of their

investment into the new business as well.

45.      On July 30, 2020, Scaminaci presented Digital Colony's initial offer to Jaffrey

and Melody's Advisory Board, which is comprised of representatives of Melody's largest

investors.  Demonstrating the extent of his transparent good faith, Scaminaci forthrightly

disclosed that the Digital Colony offer contemplated that he would have a role and financial

interest in the business after the transaction, offered to provide detailed information concerning

his contemplated role and potential financial interest, and stated that, as a result of that proposed role and financial interest, he would not take part in Melody's evaluation of the Digital Colony offer.  As detailed below, Jaffrey immediately seized upon Scaminaci's act of good faith in removing himself from decision making concerning the Digital Colony offer as a pretext to try to remove Scaminaci from the Telecom Funds' management and governance entirely, in flagrant violation of Jaffrey's obligations under the 2020 Agreement and his fiduciary duties.

### D.    JAFFREY'S DEFAMATION, DISINFORMATION AND IMPROPER EXCLUSION OF SCAMINACI FROM THE MELODY FUNDS

#### 1.    Jaffrey Ignores Digital Colony's Billion-Dollar Offer to Purchase Melody Wireless

46.    As outlined above, Jaffrey has consistently refused to harvest the Telecom Funds' assets, since he believes that doing so, as provided by the Funds' governing documents, could harm his efforts to grow his own competing funds under the MIA banner.  Accordingly, after directing Melody's Chief Compliance Officer, Jonathan Cole, to send a one-paragraph "placeholder" response to Digital Colony's offer, Jaffrey caused Melody to refuse to further consider or respond to Digital Colony's $1.3 billion offer.  Without any counter-offer or other meaningful response from Melody, Digital Colony ultimately withdrew its offer on or about September 15, 2020.

#### 2.    Jaffrey Retains Conflicted Outside Counsel and Directs a Sham "Investigation"

47.    Rather than properly evaluate the billion-dollar offer in his hands for the benefit of the Telecom Funds' investors, or even use the Digital Colony offer as a "floor" for a robust sales process (as Scaminaci intended), Jaffrey seized on the Digital Colony offer as a pretext to launch a full frontal assault on Scaminaci, unleashing a campaign of disinformation and defamation -- with the goal of permanently excluding Scaminaci from the sale process and the

management of Melody Wireless, where Scaminaci currently serves as Managing Director -- so that Jaffrey could continue exploiting Melody Wireless in his fundraising and marketing efforts for MIA.

48.     The first step in Jaffrey's scheme was causing Melody to retain outside counsel, which would give his efforts to exclude Scaminaci the patina of independent decision-making. Jaffrey carefully selected outside counsel he knew he could control and, over Scaminaci's objection, Jaffrey retained the law firm of Hogan Lovells, a law firm that Jaffrey personally had retained to work with Melody numerous times, and that was beholden to, and worked solely at the direction of, Jaffrey.  Indeed, Hogan Lovells has subsequently admitted that they are acting at the direction of Jaffrey, who serves as their primary client contact and whose views they believe constitute the views of the "company" (notwithstanding that Jaffrey and Scaminaci are equal owners and managers of the "company" that Hogan Lovells claims to represent).

49.     Hogan Lovells purportedly was retained to help Melody evaluate the Digital Colony offer, but Jaffrey immediately directed Hogan Lovells to simply ignore Digital Colony and its billion-dollar offer, and instead commence a sham "investigation" into Scaminaci, which would conclude that Scaminaci acted improperly in obtaining Digital Colony's offer to purchase Melody Wireless.  That investigation was baseless, and the outcome preordained from the start: Hogan Lovells did not interview Scaminaci to hear the chronology of events that led to the Digital Colony offer, and instead relied upon Jaffrey's self-serving version of events and out-of-context snippets from Scaminaci's emails.

50.     Given Hogan Lovells' inescapable conflict of interest and clear bias in favor of the individual that retained them, and from whom they take direction, it is no surprise that Hogan Lovells' superficial work and predetermined conclusions were fundamentally flawed:

- First, while Hogan Lovells characterizes Scaminaci's efforts to sell the Telecom Funds' assets during the funds' harvest period as a "clandestine . . . scheme," the reality is it was anything but that.  In fact, procuring an offer for the Telecom Funds was mandated by the Telecom Funds' documents; the offer Scaminaci procured was an excellent one -- for over a billion dollars, when Jaffrey has not been able to procure any offer at all; and all of this was done with the knowledge and participation of key Melody employees and advisors.

- Second, while Hogan Lovells unquestioningly adopted Jaffrey's concocted claim that Scaminaci was trying to acquire Melody for himself, contemporaneous documents demonstrate that Scaminaci's sole interest was to ensure that the Telecom Funds' assets are monetized in a reasonable and timely fashion, during the Telecom Funds' harvest period and at a critical time in the market.  Those documents further confirm that the Digital Colony offer was merely the first step in that process.  For example, Scaminaci told Jaffrey the same day that Digital Colony made its offer, "[W]e should have a process to sell the Company to make a distribution to our investors . . . I think we would be fulfilling our fiduciary duties and doing the right thing for our investors if we started a sale process of the Company now."  A week later, he told Jaffrey that the Digital Colony "offer can lead to a dialogue between the Company and Digital Colony leading to a sale or to an independent process leading to a sale.  *Either approach is acceptable* . . . .  In the event you and I cannot reach consensus on process, we could seek guidance or recommendation from the Advisory Board.  Such recommendation could include pursuing the Digital Colony path *or the designation of a financial and a legal advisor to run an independent process leading to the*

*Company sale*, or both." Hogan Lovells had access to all of this material, but willfully ignored the contemporaneous documentation confirming Scaminaci's good-faith efforts to further the harvest process in the face of Jaffrey's intransigence.

- Finally, while Hogan Lovells claimed that Scaminaci inappropriately disseminated Melody's confidential information, any information that Scaminaci provided was appropriately protected by NDAs and shared in order to benefit Melody and its investors -- in stark contrast to *Jaffrey's* conduct in marketing his own fund, MIA, whose marketing materials are replete with Melody Wireless's confidential information, which has been shared numerous times with the sole goal of furthering Jaffrey's individual interests (*i.e.*, fundraising for MIA).

### 3.   Jaffrey Engages in a Campaign of Defamation in an Effort to Solidify His Control Over Melody and Derail the Telecom Fund Sale Process

51.    As was always his plan, Jaffrey has utilized the results of Hogan Lovells' bogus "investigation" to exclude Scaminaci from the Melody Funds and derail the sale process for the Telecom Funds. Accordingly, Jaffrey has repeated Hogan Lovells' false statements -- as well as a host of other misrepresentations and untruths -- to various third parties, including Melody's investors, in an effort to smear and discredit Scaminaci, and exclude Scaminaci from the Telecom Funds.

52.    First, on information and belief, Jaffrey told most or all of Melody's investors -- themselves sophisticated investment funds with whom Scaminaci has (and reasonably expects to have in the future) valuable business relationships -- that Scaminaci acted improperly and for his own benefit in working to secure the Digital Colony offer for Melody Wireless, when the exact opposite was true.

53.     Second, on information and belief, Jaffrey also has repeated to Melody's investors a number of lies and half-truths contained in a November 18, 2020 letter from his personal counsel at Kirkland & Ellis, which copied a third party, Jonathan Cole.  In that letter, Jaffrey's counsel falsely stated (among other things) that: (i) Jaffrey (and not Scaminaci) "crafted" the Telecom Funds business; (ii) Scaminaci "runs" the Energy business, and is "responsible" for the Energy business's poor performance; and (iii) Scaminaci's "primary day-to-day role at Melody" was "transaction counsel" until early 2016.

54.     Each of these statements was false:  (i) the Telecom Funds' unique business model was pitched to Melody by a third-party consultant, was pursued and funded through the efforts of Jaffrey and Scaminaci, and is overseen by both Jaffrey and Scaminaci; (ii) Scaminaci is "responsible" for Melody's investments in the energy sector in the same proportion as Jaffrey, who participated in and approved every single investment decision in Melody's Credit Funds; and (iii) as the Melody Wireless website itself still makes clear, Scaminaci was an active founding partner of the Melody business, was "instrumental in the launch and management of the Melody Companies," and also utilized his background as a transactional lawyer to add value (and save substantial cost) by assisting with papering deals.

55.     Indeed, the second and third of these false statements are internally contradictory: because the majority of Melody's Energy loans were made prior to 2016, the statement by Jaffrey's counsel that, "[u]ntil early 2016, Mr. Scaminaci's primary day-to-day role at Melody was transaction counsel," and its statement that "Mr. Scaminaci was responsible for sponsoring and bringing to the Investment Committee ('IC') for approval effectively every investment in Melody's Energy sector," cannot possibly both be true.

56.     Jaffrey's defamation and management coup d'état culminated in an October 30, 2020 letter that Jaffrey personally sent to three executives at Digital Colony and a partner at TAP Advisors, purportedly on behalf of MCM and MCP.  In that letter, Jaffrey not only repeated his false statements about Scaminaci's conduct -- falsely stating that he had "launched" a "disturbing" and "unauthorized and flawed sales process . . . in an attempt to acquire the Company preemptively at a price below a reasonable range of expected outcomes" -- but also stated that Digital Colony and TAP now would be "excluded" from the sale process for Melody Wireless.  While Jaffrey claimed that this was necessary to "protect [the] integrity" of the sale process, the only thing that Jaffrey could hope to accomplish by excluding a primary bidder for Melody Wireless -- a bidder that had already submitted a written offer of more than a billion dollars -- would be dooming the sale process before it began.  Indeed, that was Jaffrey's plan all along:  by hamstringing the sale process from the start, he could further delay the day when Melody Wireless was sold and he would have to stop pretending that Melody Wireless and MIA were the same company in MIA's marketing materials.  Jaffrey intentionally tanked any effort to sell Melody Wireless, in gross violation of his contractual and fiduciary duties.

E.      **JAFFREY'S ACTIONS CONSTITUTE A FLAGRANT BREACH OF THE 2020 AGREEMENT**

57.     As noted above, the purpose of the 2020 Agreement was to set forth Scaminaci's and Jaffrey's binding understanding concerning Melody's governance during the remainder of the harvest period -- not only with regard to compensation of Melody employees, but also with regard to the overall governance and management of Melody and its funds.

58.     Accordingly, Scaminaci and Jaffrey agreed to the following provision in Section 3(c) of the 2020 Agreement:

> Neither Omar Jaffrey nor Andres Scaminaci nor any entities controlled by either partner shall be authorized to cause Melody Capital Partners, LP or Melody Capital Management, LLC or any Investment Fund, Easement Fund, Melody Wireless, Inc. or other entity controlled or managed by Melody Capital Partners, LP or by Melody Capital Management, LLC to enter into any legally binding agreement or arrangement without the prior consent of the other partner; provided that the partners may jointly delegate to managers of Melody Capital Partners, LP the authority to enter into certain agreements on behalf of such entities.

59.     Through his actions, Jaffrey has flagrantly breached this provision, as well as his fiduciary duties.

60.     First, Jaffrey has excluded Scaminaci from participating in the sale process for Melody Wireless.  While Scaminaci voluntarily recused himself from participating in Melody's consideration of the Digital Colony offer, that offer was withdrawn more than three months ago, after Jaffrey simply ignored it because it was contrary to his personal interests.  There is no impediment to Scaminaci's full participation in all aspects of the management of the Melody Funds, including the harvest of the Telecom Funds assets.  While Jaffrey and Hogan Lovells have made much of certain NDAs that Scaminaci entered into with potential purchasers or other parties, which contained a provision requiring such parties to contact Melody only through Scaminaci, Scaminaci has expressly waived all such provisions.

61.     Jaffrey is required to include Scaminaci in the sale process and, as the 2020 Agreement provides, Jaffrey is prohibited from causing Melody Wireless or the Telecom Funds to enter into any "legally binding agreement or arrangement" relating to the sale process. However, Jaffrey recently admitted that he had entered into at least eight contracts relating to the sale of Melody Wireless, all without Scaminaci's consent.  Such "agreements or arrangements" plainly include the retention of transactional counsel and investment bankers.  Jaffrey has done

both, unilaterally and without Scaminaci's input (and, with respect to the retention of Hogan

Lovells as counsel, over Scaminaci's objection), in breach of their agreement.

62.     Second, Jaffrey has not only excluded Scaminaci from the Melody Wireless sale

process, but also from *all* aspects of management and governance relating to the Telecom Funds.

Based on Hogan Lovells' false accusations and absurd conclusions, Jaffrey has taken the position

that Scaminaci may not participate at all in the Telecom Funds' business.  Accordingly, since at

least as early as July 30, 2020, Jaffrey has been making decisions and directing corporate actions

-- and causing the Telecom Funds and Melody Wireless to enter into "legally binding

agreement[s] or arrangement[s]" -- without any input whatsoever from Scaminaci, much less his

"prior consent."  Jaffrey's actions are particularly dangerous since he now has sole control over

two direct competitors (with the same business model, the same customers and overlapping

assets), allowing Jaffrey to engage in further diversions of business opportunities and resources

from Melody Wireless (in which he has a 50% interest) to MIA (in which he has a 100%

interest).

63.     By depriving Scaminaci of his bargained-for rights, Jaffrey is in breach of his

contractual obligations under the 2020 Agreement, and Scaminaci is entitled to his relief.  But

Jaffrey's actions are injuring more than just Scaminaci -- since he excluded Scaminaci from

Melody's governance and management, Jaffrey has been running roughshod over the interests of

Melody and its investors in favor of his personal interests and the interests of investors in

Jaffrey's separate MIA-managed funds.  Absent relief from this Court in the form of an

injunction prohibiting Jaffrey from taking unilateral actions relating to Melody, Scaminaci and

Melody's investors will suffer significant harm as Jaffrey disregards their interests in favor of his

own.

## COUNT 1
**(Breach of Contract)**

64.     Scaminaci repeats and realleges each and every allegation contained in paragraphs 1 through 63 herein.

65.     The 2020 Agreement is a valid and binding agreement between Scaminaci and Jaffrey.

66.     Scaminaci has performed and is ready, willing, and able to continue to perform his obligations under the 2020 Agreement.

67.     Jaffrey has breached the 2020 Agreement by causing Melody to enter into binding agreements relating to the sale of Melody Wireless, including the retention of legal counsel and investment bankers, without soliciting or obtaining Scaminaci's "prior consent."

68.     Jaffrey has further repudiated the 2020 Agreement by refusing to permit Scaminaci to be involved in pending and future decisions concerning the management of Melody's business, in total disregard of the 2020 Agreement's prohibition on Jaffrey causing any of the Melody entities to enter into legally binding agreements or arrangements without Scaminaci's prior consent.

69.     Jaffrey's conduct, as described above, is outrageous, intentional, malicious, willful, and in blatant or reckless disregard of Scaminaci's rights.

70.     Scaminaci is entitled to an order requiring Jaffrey to specifically perform his obligations under the 2020 Agreement, and enjoining Jaffrey from causing any of the Melody entities to enter into any binding agreement without Scaminaci's prior consent.

71.     Further, as a result of Jaffrey's bad faith and predatory conduct, Scaminaci has been damaged in an amount to be determined at trial, as well as punitive and exemplary damages, interest, costs and attorneys' fees.

23

## COUNT 2
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

72.     Scaminaci repeats and realleges each and every allegation contained in paragraphs 1 through 71 herein.

73.     The 2020 Agreement is a valid and binding agreement between Scaminaci and Jaffrey.

74.     Implicit in every contract, including the 2020 Agreement, is an implied covenant of good faith and fair dealing.

75.     Jaffrey breached this implied covenant by taking actions that were designed to, and did, deprive Scaminaci of the benefits to which he is entitled under the 2020 Agreement, including by unilaterally directing Melody's operations and strategy, and refusing to permit Scaminaci to participate in the management of the Melody entities.

76.     Scaminaci is entitled to an order requiring Jaffrey to specifically perform his obligations under the 2020 Agreement, and enjoining Jaffrey from causing any of the Melody entities to enter into any binding agreement without Scaminaci's prior consent.

77.     Further, as a result of Jaffrey's bad faith and predatory conduct, Scaminaci has been damaged in an amount to be determined at trial, as well as punitive and exemplary damages, interest, costs and attorneys' fees.

## COUNT 3
### (Breach of Fiduciary Duty)

78.     Scaminaci repeats and realleges each and every allegation contained in paragraphs 1 through 77 herein.

79.     The Melody companies together comprise a joint venture between Scaminaci and Jaffrey, as equal managers and owners, with a community of interest in the performance of a common purpose, joint control or right of control, a joint proprietary interest in the subject

24

matter, a right to share in the profits, and a limited duty to share in any losses, subject to the limited liability nature of the entities that comprise the Melody joint venture.

80.     As joint venturers, Jaffrey and Scaminaci owe each other fiduciary duties of utmost good faith, fairness and honesty.

81.     Jaffrey breached his duties to Scaminaci by, among other things, (i) intentionally hamstringing the sale process for Melody Wireless by excluding one of the largest and most viable potential purchaser, and by simply ignoring (and failing to consider in good faith) that purchaser's $1.3 billion offer for the company; (ii) excluding Scaminaci from the governance and management of Melody without just cause; (iii) spreading lies and disinformation about Scaminaci -- one of Melody's two co-managers -- throughout the market, thereby harming the image and reducing the value of Melody to potential purchasers and other counterparties; and (iv) preferring his own business, MIA, at the expense of Melody, including by diverting time, attention and potential opportunities away from Melody and to MIA.

82.     Scaminaci is entitled to an order prohibiting Jaffrey from excluding Scaminaci from the governance and management of the Melody joint venture, and requiring that Jaffrey run (with Scaminaci's full participation) a full and fair sale process for Melody's assets.

83.     Further, as a result of Jaffrey's breach of his fiduciary duties, Scaminaci has been damaged in an amount to be determined at trial, as well as punitive and exemplary damages, interest, costs and attorneys' fees.

## COUNT 4
### (Defamation and Defamation Per Se)

84.     Scaminaci repeats and realleges each and every allegation contained in paragraphs 1 through 83 herein.

85.     As detailed above, beginning at least in August 2020, Jaffrey published or caused to be published multiple false statements of fact about Scaminaci that are defamatory.

86.     The false and defamatory statements about Scaminaci included statements that Scaminaci had engaged in a "clandestine" "scheme"; had launched a "disturbing" and "unauthorized and flawed sales process . . . in an attempt to acquire the Company preemptively at a price below a reasonable range of expected outcomes"; was not involved in or responsible for Melody's successful investments in the Telecom Funds; was responsible for Melody's logics in the energy sector; and his "primary day-to-day role at Melody" was "transaction counsel" until early 2016.  Each of these statements was false when made.

87.     Jaffrey caused these false statements to be repeated to third parties including, among others, executives of Digital Colony and a partner at TAP Advisors, as well as third parties as yet unnamed, and continues to do so.

88.     The foregoing statements are per se defamatory because they accuse Scaminaci of wrongdoing and impugn his reputation in his profession, business, and/or trade.

89.     The defamatory statements expose Scaminaci to public contempt, hatred, ridicule, aversion, disgrace, and/or deprivation of friendly intercourse in society.

90.     Every defamatory statement identified herein is categorically false, and contained, or created the impression of, facts that are false and which malign Scaminaci's honesty, ethics, trustworthiness, dependability and/or professional or business abilities.

91.     Jaffrey's publication of these false and defamatory statements was neither privileged nor authorized in any way, and these statements were published or caused to be published maliciously, knowingly, and/or with extreme recklessness, and without justification.

92.    Scaminaci has suffered and will continue to suffer extensive economic and reputational damages by reason of Jaffrey's defamation.  Jaffrey's defamatory statements have harmed and/or have a likelihood of harming Scaminaci by causing, among other things, third parties to refuse to engage in any new business dealings with Scaminaci, lost revenue and profits, increased expenses, legal fees, and costs expended to mitigate the impact of Jaffrey's dishonesty. As a direct and proximate result of the publication of these false and defamatory statements, Scaminaci has suffered millions of dollars of monetary damages, in an amount to be determined at trial.

93.    Because Jaffrey's conduct in publishing the defamatory statements cited herein was undertaken knowingly and in conscious disregard of their falsity, Scaminaci is entitled to an award of punitive damages, in an amount to be determined at trial.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Scaminaci demands judgment against Jaffrey, awarding Scaminaci:

(a)    a judgment preliminarily and permanently enjoining and restraining Jaffrey, all of Jaffrey's agents, and any entities, employees and all persons controlled by or acting in concert with Jaffrey, from causing any Melody entity, including but not limited to the Telecom Funds and Melody Wireless, to enter into any legally binding agreement or arrangement without Scaminaci's prior consent;

(b)    compensatory and punitive damages in amounts to be determined at trial, but at least $20 million;

(c)    Scaminaci's costs in the prosecution of this action, including reasonable attorneys' fees; and

(d)      such other and further relief as is just and proper.

## **<u>TRIAL BY JURY</u>**

Trial by jury is demanded on all issues so triable.

Dated:  New York, New York
        January 14, 2021

                    KASOWITZ BENSON TORRES LLP

                    By:   _/s/ Marc E. Kasowitz_____
                          Marc E. Kasowitz
                          (mkasowitz@kasowitz.com)
                          Albert Shemmy Mishaan
                          (amishaan@kasowitz.com)

                    1633 Broadway
                    New York, New York 10019
                    Tel.:  (212) 506-1700
                    Fax:   (212) 506-1800

                    *Attorneys for Plaintiff Andres Scaminaci*