# EXHIBIT 50

# EXHIBIT  29

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   --------------------------------------X

5   ANDRES SCAMINACI,

6          Plaintiff/Counterclaim-Defendant,

7                -against-

8   OMAR JAFFREY,

9          Defendant/Counterclaim-Plaintiff.

10  No. 21-cv-00321-MKV

11  --------------------------------------X

12                   February 6, 2024

13                   9:45 a.m.

14

15    *** C O N F I D E N T I A L ***

16

17          VIDEOTAPED DEPOSITION of

18      JONATHAN COLE, a non-party witness,

19      held at the offices of Holwell Shuster

20      & Goldberg LLP, 425 Lexington Avenue,

21      New York, New York before Erica

22      Ruggieri, a Notary Public of the

23      States of New York and New Jersey.

24

25

1
2 A P P E A R A N C E S:
3
4 KASOWITZ BENSON TORRES LLP
5 Attorneys for
6 Plaintiff/Counterclaim Defendant
7    1633 Broadway
8    New York, New York 10019
9 BY: GAVIN D. SCHRYVER, ESQ.
10    gschryver@kasowitz.com.
11    ANDREW C. BERNSTEIN, ESQ.
12    abernstein@kasowitz.com
13
14 QUINN EMANUEL URQUHART & SULLIVAN, LLP
15 Attorneys for
16 Defendant/Counterclaim Plaintiff
17    51 Madison Avenue
18    New York, New York 10010
19 BY: DANIEL BROCKETT, ESQ.
20    danielbrockett@quinnemanuel.com
21    MELISSA FU, ESQ.
22    melissafu@quinnemanuel.com
23
24
25

1
2 A P P E A R A N C E S: (Cont'd)
3
4 HOLWELL SHUSTER & GOLDBERG LLP
5 Attorneys for the Witness
6    425 Lexington Avenue
7    New York, New York 10017
8 BY:  SCOTT DANNER, ESQ.
9    sdanner@hsgllp.com
10    PRISHIKA RAJ, ESQ.
11    praj@hsgllp.com
12
13
14 ALSO PRESENT:
15 ANTON EVANGELISTA, Videographer
16
17
18
19
20
21
22
23
24
25

1
2       THE VIDEOGRAPHER:  Good
3 morning.  We are going on the record
4 at 9:45 a.m. on February 6, 2024.
5       Please note that the
6 microphones are sensitive and may
7 pick up whispering and private
8 conversations.  Please mute your
9 phones at this time.  Audio and
10 video recording will continue to
11 take place unless all parties agree
12 to go off the record.
13       This is media unit one of the
14 video recorded deposition of
15 Jonathan Cole taken by counsel for
16 plaintiff in the matter of Andres
17 Scaminaci versus Omar Jaffrey, Case
18 No. 1:21-cv-00321-MKV(SDNY).
19       The location of the deposition
20 is Holwell Shuster & Goldberg, 425
21 Lexington Avenue in New York City.
22       My name is Anton Evangelista
23 representing Veritext and I am the
24 videographer.  The court reporter is
25 Erica Ruggieri from Veritext.  I'm

1
2 not authorized to administer an
3 oath, I'm not related to any party
4 in this action nor am I financially
5 interested in the outcome.
6       If there are any objections to
7 proceeding, please state them at the
8 time of your appearance.
9       Counsel and all present will
10 now state their appearances and
11 affiliations for the record
12 beginning with the noticing
13 attorney.
14       MR. BROCKETT:  Dan Brockett
15 from Quinn Emanuel on behalf of
16 Omar Jaffrey.
17       MS. FU:  Melissa Fu from Quinn
18 Emanuel on behalf of Omar Jaffrey.
19       MR. SCHRYVER:  Gavin Schryver
20 from Kasowitz Benson Torres, as
21 well as Andrew Bernstein, both on
22 behalf of Andres Scaminaci.
23       MR. DANNER:  Scott Danner on
24 behalf of the witness.  With me is
25 my colleague Prishika Raj.

2 (Pages 2 - 5)

COLE - CONFIDENTIAL

1 COLE - CONFIDENTIAL
2 THE VIDEOGRAPHER: And will
3 the court reporter please swear in
4 the witness and then counsel may
5 proceed.
6 J O N A T H A N  C O L E, called
7 as a witness, having been duly sworn
8 by a Notary Public, was examined and
9 testified as follows:
10 EXAMINATION BY
11 MR. BROCKETT:
12 Q. Good morning, Jon.
13 A. Good morning.
14 Q. As you know, I'm Dan
15 Brockett and I represent Mr. Jaffrey
16 in this matter.
17 Have you ever been deposed
18 before?
19 A. I have.
20 Q. How many times?
21 A. Once.
22 Q. So you understand the
23 procedure here; is that correct?
24 A. Yes.
25 Q. And you understand I'll be

COLE - CONFIDENTIAL

1 COLE - CONFIDENTIAL
2 asking a series of questions?
3 A. Yes.
4 Q. And you understand you are
5 under oath?
6 A. Yes.
7 Q. Is there any reason you
8 can't give accurate and truthful
9 testimony as you sit here today?
10 A. No.
11 Q. I know you have a long and
12 illustrious career but a couple of
13 questions about your background
14 first. Graduated NYU School of Law
15 in '98?
16 A. 1993.
17 Q. '93. Okay. And did you --
18 what was your first job out of law
19 school?
20 A. I worked at Reid & Priest.
21 MR. SCHRYVER: I think we are
22 having audio issues. Do you want
23 to go off the record for just a
24 second?
25 THE VIDEOGRAPHER: We are now

COLE - CONFIDENTIAL

1 COLE - CONFIDENTIAL
2 off the record. The time on the
3 video monitor is 9:49 a.m.
4 (Whereupon, there is a recess
5 in the proceedings.)
6 THE VIDEOGRAPHER: We are now
7 back on the record. The time on
8 the video monitor is 9:50 a.m.
9 Q. How long were you at Reid &
10 Priest?
11 A. About six years.
12 Q. You were doing corporate
13 work there?
14 A. Yes.
15 Q. And then in '99 you joined
16 Akin Gump; is that right?
17 A. That's correct.
18 Q. And you were at Akin Gump
19 from '99 to 2005?
20 A. Correct.
21 Q. Also doing corporate
22 transaction work?
23 A. Yes.
24 Q. Where did you go after you
25 left Akin Gump?

COLE - CONFIDENTIAL

1 COLE - CONFIDENTIAL
2 A. I went to Marison Company
3 or Marison Worldwide, which is a
4 consumer products company, and
5 served as the general counsel and
6 secretary of that company.
7 Q. That was from 2005 through?
8 A. 2015.
9 Q. And you were responsible
10 for all of the legal matters of the
11 company?
12 A. Correct.
13 Q. Where did you go next?
14 A. I went to Melody Capital
15 Partners.
16 Q. What month in 2015 did you
17 join Melody?
18 A. I worked as a consultant
19 from August until Jan- --
20 August 2005 till -- 2015, sorry.
21 2015 until January of 2016 when I
22 was, became a full-time employee.
23 Q. Why did you go to Melody?
24 A. It was an opportunity. A
25 friend of mine, Andres Scaminaci,

1   COLE - CONFIDENTIAL
2   suggested that I talk to the firm
3   and they needed someone to work as
4   internal counsel.
5       Q.   Did you know Mr. Scaminaci
6   from Akin Gump?
7       A.   From Reid & Priest.
8       Q.   Did he then also go to Akin
9   Gump?
10      A.   He did.
11      Q.   So you've known
12  Mr. Scaminaci for a good 20 years?
13      A.   Yes.
14      Q.   All right.  What was your
15  title when you became a full-time
16  employee in January of 2016?
17      A.   At first I was managing
18  director legal.
19      Q.   And did that title change
20  at all?
21      A.   It did.
22      Q.   When did it change and into
23  what?
24      A.   It changed in September of
25  2018 to general counsel and chief

1   COLE - CONFIDENTIAL
2   compliance officer.
3       Q.   And do you know why your
4   title changed in '18, was that a
5   promotion of some kind or...
6       A.   A change in title.  My
7   scope of work certainly changed with
8   taking on the CCO role.
9       Q.   What Melody entity were you
10  employed by?
11      A.   Melody Capital Partners --
12  Melody Capital Partners.  There was
13  a -- I hesitated only because many
14  of the full-time employees were
15  employed by a subsidiary company.
16  That changed over time.
17      Q.   And you are still employed
18  by Melody today?
19      A.   Yes, I am.
20      Q.   Okay.  And are you still
21  general counsel and chief compliance
22  officer?
23      A.   Yes, I am.
24      Q.   Have you had any other
25  titles or roles at Melody from the

1   COLE - CONFIDENTIAL
2   time you joined in 2016 to the
3   present?
4       A.   No.  Just those three,
5   three titles.
6       Q.   And your client during that
7   entire period was Melody Capital
8   Partners and affiliated companies?
9       A.   Yes.
10      Q.   Have you ever represented
11  Mr. Scaminaci individually?
12      A.   No.
13      Q.   Have you ever represented
14  Mr. Jaffrey individually?
15      A.   No.
16      Q.   Now, you also had a role at
17  some point with a company called
18  Melodeon; is that correct?
19      A.   Correct.
20      Q.   What role or title did you
21  hold with Melodeon?
22      A.   Chief compliance officer.
23      Q.   And what were the -- during
24  what time period were you the chief
25  compliance officer at Melodeon?

1   COLE - CONFIDENTIAL
2       A.   I forget when the affiliate
3   company was registered as an
4   investment advisor, but I think it
5   was probably in the 2019 range.
6       Q.   When you say the affiliate
7   company, are you referring to
8   Melodeon Capital Partners?
9       A.   Yes, I am.
10      Q.   And at some point Melodeon
11  Capital Partners became a registered
12  investment advisor with the FCC?
13      A.   Yes.
14      Q.   Do you know when that was?
15      A.   I believe it was 2019.
16      Q.   And did you -- were you
17  ever employed by Melodeon Capital
18  Partners?
19      A.   Yes, I was.  As the chief
20  compliance officer.
21      Q.   So that started in 2019
22  when Melodeon Capital Partners
23  became a registered investment
24  advisor?
25      A.   To the best of my

1        COLE - CONFIDENTIAL
2    recollection.  I'm not sure if it
3    was the end of 2018 or the beginning
4    of 2019, but it would have been
5    right around the time that the
6    company became a registered
7    investment advisor or leading up to
8    that.
9        Q.   Okay.  All right.  And how
10   long were you employed by Melodeon
11   Capital Partners?
12       A.   I resigned -- well, Sam
13   Wathen assumed the role of chief
14   compliance officer, I'm not exactly
15   sure, I think it was -- may have
16   been 2021.
17       Q.   At that point you resigned?
18       A.   Yes.
19       Q.   And who was your client
20   when you were employed by Melodeon
21   Capital Partners?
22       A.   I was the CCO.  I was not
23   the general counsel of that entity.
24       Q.   Okay.  So you weren't
25   acting as a lawyer?

1        COLE - CONFIDENTIAL
2        A.   No.  I was acting as the
3    CCO.
4        Q.   Okay.  So you had no client
5    when you were the CCO?
6        A.   I had other clients, yes.
7        Q.   Okay.  Have you ever
8    represented any Melodeon entity as a
9    lawyer?
10       A.   No.
11       Q.   Have you ever represented
12   Palistar Capital?
13       A.   Yes.
14       Q.   And what work did you do
15   for Palistar?
16       A.   I served as the general
17   counsel and chief compliance
18   officer.
19       Q.   And Palistar is an entity
20   owned in part by Mr. Jaffrey; is
21   that correct?
22       A.   Correct.
23       Q.   And you were the chief
24   compliance officer of Palistar from
25   March of 2019 to April 2022; is that

1        COLE - CONFIDENTIAL
2    correct?
3        A.   Correct, yes.
4        Q.   And did you also have a
5    legal title or a legal role for
6    Palistar?
7        A.   I did -- yes, certainly I
8    was the general counsel of what was
9    then Melody Investment Advisors
10   which became, the name changed to
11   Palistar.
12       Q.   Okay.  So just to be clear,
13   you never represented Melodeon or
14   any Melodeon entity as a lawyer; is
15   that correct?
16       A.   That's correct.
17       Q.   And you've never
18   represented Mr. Scaminaci as a
19   lawyer; is that correct?
20       A.   Correct.
21       Q.   And you've never
22   represented Mr. Jaffrey as a lawyer;
23   is that correct?
24       A.   That's correct.
25       Q.   What involvement, if any,

1        COLE - CONFIDENTIAL
2    did you have in the document that's
3    been referred to as the 2018
4    agreement between Mr. Jaffrey and
5    Mr. Scaminaci?
6        A.   Can you elaborate?
7        Q.   Sure.  I can show you the
8    document if that would be helpful.
9        A.   Yes.
10       MR. BROCKETT:  Let's mark as
11   Exhibit 1 a document entitled
12   Melody Flagship Business Plan.  It
13   doesn't have Bates stamps but it's
14   from an exhibit filed in this
15   action.  It's otherwise known as
16   the 2018 agreement.
17       (Exhibit 1, Melody Flagship
18   Business Plan, marked for
19   identification, as of this date.)
20       Q.   Take a moment to look at
21   this, please.
22       A.   Yes, I'm familiar with
23   this.
24       Q.   Okay.  So back to my
25   question.  What involvement, if any,

COLE - CONFIDENTIAL

1       COLE - CONFIDENTIAL
2 did you have in the negotiation or
3 drafting of this agreement?
4    A. None.
5    Q. Okay. And when did this
6 agreement first come to your
7 attention?
8    A. I believe probably close to
9 final or after it was signed.
10    Q. Okay. And how did it come
11 to your attention?
12    A. Mr. Jaffrey showed it to me
13 together with Terri Lecamp, I
14 believe, in a meeting.
15    Q. And were you asked to
16 comment on it?
17    A. No. The -- no.
18    Q. And what was their purpose
19 in showing it to you?
20    A. To show that I would be
21 having a title change and I would be
22 assuming the CCO role.
23    Q. Okay. And did you read
24 this document when you --
25    A. I have read it.

1       COLE - CONFIDENTIAL
2    Q. You have read it, okay.
3 And did you ever discuss with
4 Mr. Jaffrey the terms of the
5 agreement?
6    A. I don't believe so. In
7 terms of just our conversation
8 about, initially about my role
9 change, and I -- it's possible that
10 there were conversations subsequent
11 to that with Mr. Jaffrey and others
12 about the meaning, but I don't, I
13 don't recall.
14    Q. Did you have discussions
15 with Mr. Scaminaci about this
16 document?
17    A. I don't recall.
18    Q. Did you ever ask questions
19 of Mr. Scaminaci or Mr. Jaffrey
20 about the meaning of this agreement?
21    A. I did not.
22    Q. Did you understand that
23 this document allowed Mr. Jaffrey to
24 create his own TMT fund?
25    A. Yes.

1       COLE - CONFIDENTIAL
2    Q. And did you understand that
3 this document allowed Mr. Scaminaci
4 to build a parallel business from
5 time to time?
6    A. Yes.
7    Q. And do you know of any
8 parallel business that Mr. Scaminaci
9 built at any point in time when you
10 were at Melody?
11    A. Yes.
12    Q. What parallel business did
13 he build?
14    A. That was the Melody, MCG,
15 Melody Capital Group.
16    Q. And you believe that was a
17 business that was built by
18 Mr. Scaminaci?
19    A. Yes.
20    Q. And do you believe that
21 Melodeon was a business that was
22 built by Mr. Scaminaci?
23    A. Yes.
24    Q. Okay. And what was the
25 business of Melody Capital Group?

1       COLE - CONFIDENTIAL
2    A. It was going to be a credit
3 fund -- an investment advisor
4 managing credit fund.
5    Q. And what was the business
6 of Melodeon?
7    A. Melodeon was another
8 investment advisor that would
9 control a portfolio company involved
10 in specialty finance.
11    Q. Was that the litigation
12 finance fund?
13    A. Well, the portfolio company
14 was          also called Law Cash.
15    Q. Well, we will get into
16 this, but you understand that the
17 litigation finance fund, the
18 litigation finance opportunity, was
19 something that was developed at
20 Melody?
21    MR. SCHRYVER: Objection. You
22 can answer.
23    A. Yes. It was. It was
24 developed out of the -- Halle Benett
25 developed that out of the

6 (Pages 18 - 21)

COLE - CONFIDENTIAL

1  origination of the loan to ████
2
3     Q.   And Mr. Benett developed
4  this while he was an employee at
5  Melody?
6     A.   Correct.
7     Q.   And Sam Wathen helped him
8  develop it while he was an employee
9  at Melody, correct?
10    A.   That is correct.
11    Q.   They solicited investors to
12 this fund while they were employees
13 at Melody, correct?
14    MR. SCHRYVER:  Objection.
15    A.   Yes, that's right.
16    Q.   And while Melody was paying
17 their salary and benefits, correct?
18    MR. SCHRYVER:  Objection.
19    A.   I assume that they were
20 being paid, yes.
21    Q.   They developed this
22 litigation fund using the Melody
23 track record, correct?
24    MR. SCHRYVER:  Objection.
25    A.   I don't know that they used

COLE - CONFIDENTIAL

1
2  the track record.
3     Q.   And then Mr. Benett and
4  Mr. Scaminaci moved the litigation
5  finance fund under the Melodeon
6  platform in February of 2019; is
7  that correct?
8     MR. SCHRYVER:  Objection.
9     A.   I don't think that's quite
10 accurate.
11    Q.   Okay.  Can you explain to
12 me what I said that's not accurate?
13    A.   Sure.  Melodeon was the
14 investment advisor that controlled
15 funds that controlled the portfolio
16 company.  I don't believe that there
17 was a Melody litigation fund that
18 had been created and then moved
19 over.
20    Q.   Okay.  Well, there's
21 certainly the litigation finance
22 fund was being developed at Melody
23 and then that opportunity, that
24 corporate opportunity was moved over
25 to the Melodeon platform, isn't that

COLE - CONFIDENTIAL

1
2  true?
3     MR. SCHRYVER:  Objection.
4     A.   Melodeon was a Melody,
5  under the Melody umbrella.
6     Q.   And in what sense was
7  Melodeon under the Melody umbrella?
8     A.   It was an affiliate
9  investment advisor partially
10 controlled by one of the principals
11 of Melody Capital Partners.
12    Q.   Okay.  Melodeon was owned
13 by Halle Benett and Andres
14 Scaminaci; isn't that correct?
15    A.   That's correct.
16    Q.   And did Mr. Jaffrey have
17 any interest in any Melodeon entity?
18    A.   I don't believe so.
19    Q.   And in what respect was
20 Melodeon affiliated with legacy
21 Melody?
22    A.   It was affiliated in that
23 it was partially controlled by
24 Mr. Scaminaci.
25    Q.   So the only affiliation was

COLE - CONFIDENTIAL

1
2  that Mr. Scaminaci had ownership
3  both in legacy Melody and in
4  Melodeon; is that correct?
5     A.   To, I mean I -- no,
6  actually.  There was a contribution
7  agreement where the, I believe --
8  well, the agreement was that it
9  would be contributed underneath MCG
10 or Melody Capital Group so that
11 Melodeon would be an advisor
12 underneath Melody Capital Group and,
13 therefore, ultimately MCG would
14 control the portfolio.
15    Q.   We will take a look at that
16 in a minute here.  Now, did you help
17 set up Melodeon entities?
18    A.   Yes, I was somewhat
19 involved.  But from Melody's
20 perspective, Melody Capital
21 Partner's perspective.
22    Q.   Okay.
23    MR. BROCKETT:  Let's mark as,
24 call Exhibit 2 a contribution
25 commitment agreement, bears Bates

COLE - CONFIDENTIAL

1           COLE - CONFIDENTIAL
2    stamp MCP7560 through 7565.
3      (Exhibit 2, Contribution
4    Commitment Agreement, Bates MCP7560
5    through 7565, marked for
6    identification, as of this date.)
7    Q.  Do you recognize this
8    document?
9    A.  It looks familiar, yeah.
10    Q.  And is this a document you
11   drafted?
12    A.  I don't recall actually
13   drafting it, but...
14    Q.  You were aware of the
15   existence of this document?
16    A.  Yes.
17    Q.  Did you -- were you asked
18   to review this document?
19    A.  I believe I reviewed this
20   document.
21    Q.  Did you review this
22   document while you had a position at
23   Melodeon?
24    A.  My position at MCP, Melody
25   Capital Partners.  I had no legal

COLE - CONFIDENTIAL

1           COLE - CONFIDENTIAL
2    role at Melodeon.
3    Q.  And this agreement requires
4   Mr. Benett to contribute Melodeon to
5   either Melody Capital Group or to
6   another affiliate controlled by
7   Andres Scaminaci, is that fair?
8      MR. SCHRYVER:  Objection.
9    A.  Yes, I believe that was the
10   agreement.
11    Q.  And was there a time limit
12   set on when Mr. Benett had to
13   achieve this?
14    A.  I'd have to review the
15   document.  I don't recall.
16    Q.  And do you know, as you sit
17   here today, whether Mr. Benett ever
18   made this contribution?
19    A.  It was not contributed to
20   MCG, Melody Capital Group, because
21   that entity, that advisor was
22   deregistered and dissolved.  I don't
23   know if it was contributed to
24   another entity controlled by
25   Mr. Scaminaci.

COLE - CONFIDENTIAL

1           COLE - CONFIDENTIAL
2    Q.  Are you aware of Mr. Benett
3   contributing Melodeon to any entity
4   controlled by Mr. Scaminaci?
5    A.  No.
6      MR. SCHRYVER:  Objection.
7    Q.  Has there been a breach of
8   this contribution, sir?
9      MR. SCHRYVER:  Objection.
10    A.  I don't have the facts.  If
11   you are asking for a legal
12   conclusion, I'm not prepared to do
13   that.
14    Q.  Did you at one point
15   express the view that there was a
16   breach of this agreement?
17    A.  I don't believe so.  I
18   don't think it came up.
19    Q.  We will look at some
20   emails.
21    As far as you know, as you sit
22   here today, you know of no situation
23   where Mr. Benett has contributed
24   Melodeon to any entity controlled by
25   Mr. Scaminaci, correct?

COLE - CONFIDENTIAL

1           COLE - CONFIDENTIAL
2      MR. SCHRYVER:  Objection.
3    A.  I am not aware.
4    Q.  As far as you sit here
5   today, your understanding is, is
6   that Melodeon is owned and
7   controlled by Mr. Benett, and
8   Mr. Scaminaci has only a 5 percent
9   interest, correct?
10    A.  I don't -- I know that it's
11   controlled by Mr. Benett.  I'm not
12   sure what percentage ownership
13   Mr. Scaminaci has.
14    Q.  Well, you understand at one
15   point Mr. Scaminaci had a 5 percent
16   interest?
17    A.  No.  I thought it was 9
18   percent.
19    Q.  Are you still in touch with
20   Mr. Scaminaci, as you sit here
21   today?
22    A.  As I sit here today, I talk
23   to Mr. Scaminaci once in a while.
24    Q.  And have you asked him how
25   is it going with Melodeon?

COLE - CONFIDENTIAL
1
2      A.  I have not.  We don't talk
3  about business.
4      Q.  And let's go back to the
5  first exhibit, Exhibit A.  You said
6  that you believed that both Melodeon
7  and Melody Capital Group were new
8  businesses that were started by
9  Mr. Scaminaci; is that correct?
10      MR. SCHRYVER:  Objection.
11      A.  Melody Capital Group was
12  started by Mr. Scaminaci and several
13  of the managing directors.  And
14  Mr. Scaminaci was involved in the
15  creation, the formation of Melodeon.
16      Q.  But what I'm trying to
17  understand is whether you think that
18  Melodeon or any Melodeon entity was
19  a parallel business that was built
20  by Mr. Scaminaci within the meaning
21  of this agreement.
22      MR. SCHRYVER:  Objection,
23   form.
24      A.  I don't know.  I mean I'm
25  not here -- I could, within the

COLE - CONFIDENTIAL
1
2  meaning of this contract do you want
3  me to give a legal interpretation of
4  that?  I'm not prepared to do that
5  without some review and thought at
6  the time.  Certainly I thought that
7  Melody was a Melodeon fund and
8  within -- under the umbrella of
9  Melody, which is why I served as
10  CCO.
11      Q.  All right.  Do you believe
12  that Melodeon is required to pay
13  Mr. Jaffrey 5 percent carry share
14  within the meaning of this
15  agreement?
16      MR. SCHRYVER:  Objection.
17      A.  Again, I could spend time
18  reviewing the contract and the facts
19  but I haven't come to that legal
20  conclusion.
21      Q.  Well, you understand that
22  Mr. Scaminaci is claiming that he's
23  entitled to a 5 percent carry
24  interest in Mr. Jaffrey's separate
25  TMT fund, right?

COLE - CONFIDENTIAL
1
2      A.  Yes.
3      Q.  Right.  And if you look on
4  page 3 of this document under Roman
5  VIII it says:  "Jaffrey will have a
6  5 percent carry share of all future
7  businesses created by Scaminaci,"
8  right?
9      A.  Yes, it does.  It says
10  that.
11      Q.  That's pretty clear, isn't
12  it?
13      MR. SCHRYVER:  Objection.
14      A.  It states that.
15      Q.  Now, did you ever state to
16  anyone in words or substance that
17  this was just a term sheet and not a
18  binding contract?
19      A.  No, I don't believe so.
20      Q.  Did you ever express the
21  view to either Mr. Scaminaci or to
22  Mr. Jaffrey that this was more in
23  the nature of a term sheet than a
24  binding agreement?
25      MR. SCHRYVER:  Objection.

COLE - CONFIDENTIAL
1
2      A.  No.
3      Q.  Did you ever hold that
4  view?
5      A.  No.
6      Q.  And again, why was this not
7  contributed to Melody Capital Group?
8      MR. SCHRYVER:  Objection.
9      A.  I think that the history is
10  that Melody Capital Group was
11  deregistered and dissolved.
12      Q.  Why was it deregistered and
13  dissolved?
14      MR. SCHRYVER:  Objection,
15   foundation.
16      A.  My understanding is the
17  partners of that advisor were unable
18  to raise funds or they decided not
19  to raise the funds and as a result
20  the entity was deregistered with the
21  SEC and ultimately dissolved.
22      Q.  Okay.  And Mr. Scaminaci
23  was attempting to use Melody Capital
24  Group to raise a series of credit
25  funds; is that correct?

COLE - CONFIDENTIAL

1
2      MR. SCHRYVER: Objection.
3      A.   Yes.  The advisor was going
4   to launch credit funds.
5      Q.   Okay.  And were they going
6   to attempt to execute the same
7   strategy that was developed that at
8   Melody otherwise known as Credit
9   2.0?
10      MR. SCHRYVER: Objection.
11      A.   It was going to be a credit
12   fund, yes.  So they -- the funds
13   would -- or the originating entity
14   controlled by the advisor would
15   originate loans that would be sold
16   to the funds or they would do
17   secondary credit transactions as
18   well.
19      Q.   If you look at this 2018
20   agreement and the first two -- the
21   first page and a half is all about
22   the Melody Flagship Business Plan,
23   right?
24      A.   Yes.
25      Q.   And it goes on to set forth

COLE - CONFIDENTIAL

1
2   in detail exactly what the parties'
3   goals and strategy will be with
4   respect to the second generation of
5   credit funds, right?
6      A.   Yes.
7      MR. SCHRYVER: Objection.
8      Q.   And Mr. Scaminaci and his
9   partners were attempting to execute
10   through Melody Capital Group the
11   exact same business plan that's set
12   out in this agreement, isn't that
13   true?
14      MR. SCHRYVER: Objection.
15      A.   Yeah, credit -- yeah, loan
16   originations and secondary credit
17   transactions.
18      Q.   Well, they were interested
19   in generating loans in the exact
20   same verticals, right?
21      A.   Yes.  Because in real
22   estate, specialty finance and
23   potentially energy.
24      Q.   Well, this business plan
25   sets out the marketing goals, right?

COLE - CONFIDENTIAL

1
2      A.   It does.
3      Q.   Sets out targets for
4   deploying capital, right?
5      A.   It does.
6      Q.   And it sets out what
7   sectors the parties are going to
8   focus on, right?
9      A.   Yes.
10      Q.   Sets out the portfolio risk
11   guidelines, right?
12      A.   Yes.
13      Q.   Sets forth the leverage,
14   right?
15      A.   Yeah, states that.
16      Q.   Sets forth the business
17   profit targets, right?
18      A.   Yes.
19      Q.   These are all things that
20   Mr. Scaminaci and Mr. Jaffrey agreed
21   to in September of 2008 [sic],
22   correct?
23      MR. SCHRYVER: Objection.
24      A.   That's what the agreement
25   says, yes.

COLE - CONFIDENTIAL

1
2      Q.   I'm sorry.  Melissa points
3   out I said September of 2008.  I
4   meant 2018.
5      A.   I understood.
6      Q.   Okay.  And this agreement
7   sets forth the plan, the business
8   plan for Mr. Scaminaci and
9   Mr. Jaffrey to manage Melody going
10   forward; isn't that correct?
11      MR. SCHRYVER: Objection.
12      A.   That's what it states.
13      Q.   Then it separately states
14   that either partner can have its own
15   side business, right?
16      A.   Correct.
17      Q.   And litigation finance was
18   a fund that Mr. Benett and
19   Mr. Wathen were working on at Melody
20   when this business plan was put in
21   place; isn't that correct?
22      MR. SCHRYVER: Objection.
23      A.   I'm not sure exactly of the
24   timing, but there was discussion
25   about a litigation fund.

COLE - CONFIDENTIAL
1
2      Q.   And Mr. Scaminaci and
3   Mr. Jaffrey were working on a second
4   generation of credit funds at the
5   time this business plan was agreed
6   to; isn't that correct?
7          MR. SCHRYVER:  Objection.
8      A.   I don't know the timing of
9   marketing materials, when the
10  marketing materials were produced.
11     Q.   Okay.
12     A.   There were marketing
13  materials.
14     Q.   But you do know at some
15  point Mr. Jaffrey and Mr. Scaminaci
16  agreed to move forward with a second
17  generation of credit funds, right?
18         MR. SCHRYVER:  Objection.
19     A.   Yes, that's what the
20  agreement.
21     Q.   And they agreed in this
22  document, the 2018 agreement,
23  exactly what the business plan for
24  that second generation of credit
25  funds would be, correct?

COLE - CONFIDENTIAL
1
2          MR. SCHRYVER:  Objection.
3      A.   Yes.  It lays forth a
4   business plan.
5      Q.   Okay.  And it's your view
6   that Mr. Scaminaci could -- strike
7   that.
8          MR. BROCKETT:  Let's mark as
9   Exhibit 3 a two-page email JAF0064
10  through 0065.
11         (Exhibit 3, Email, Bates
12   JAF0064 through 0065, marked for
13   identification, as of this date.)
14     Q.   Mr. Cole, have you had a
15  chance to look at this email?
16     A.   I have.
17     Q.   This is an email between
18  yourself and Mr. Jaffrey and others
19  at Melody, correct?
20     A.   Correct.
21     Q.   And starts with an email
22  from Mr. Jaffrey to you on July 12th
23  of 2020, correct?
24     A.   It actually starts with an
25  email from me to Mr. Jaffrey.

COLE - CONFIDENTIAL
1
2      Q.   Yes, you are correct, on
3   the second page.  But let's focus on
4   the email from Mr. Jaffrey to you on
5   July 12, 2020 at 1:22 p.m.
6          Are you with me?
7      A.   Yes.
8      Q.   Mr. Jaffrey says:  "I am
9   confused about the representations
10  being made in here around Melodeon
11  and MCG.  I was told that Melodeon
12  issues were all resolved and that
13  Melodeon was now tucked under MCG
14  and controlled by Andres.
15  Otherwise, I have issues with the
16  formation and structure of
17  Melodeon/MCG; as does █████████
18         Have I read that correctly?
19     A.   That's correct.
20     Q.   Do you recall getting this
21  email from Mr. Jaffrey asking you
22  these questions?
23     A.   Not specifically, but as I
24  read it, obviously it happened.
25     Q.   Then you respond to

COLE - CONFIDENTIAL
1
2   Mr. Jaffrey and you say:  "There is
3   a contribution agreement that
4   requires Melodeon to be contributed
5   to MCG or another entity controlled
6   by Andres."
7          That's what you wrote, right?
8      A.   Yes, it is.
9      Q.   Then you go on to say:
10  "This has not happened yet because
11  MCG has not closed and they had to
12  withdraw their 120-day registration.
13  This is factually accurate."
14         Have I read that correctly?
15     A.   You have.
16     Q.   That's what you wrote in
17  response to Mr. Jaffrey, right?
18     A.   Yes.
19     Q.   This is all happening
20  against the background of an SEC
21  inspection, right?
22     A.   Yes.
23     Q.   And Mr. Jaffrey then asks
24  you:  "And what happens if Melodeon
25  is not contributed to MCG for

11 (Pages 38 - 41)

COLE - CONFIDENTIAL

1      COLE - CONFIDENTIAL
2 whatever reason?"
3     Do you see that?
4    A.  Yes, I do.
5    Q.  Then you say: "Then there
6 is a contractual breach."
7    A.  Correct.
8    Q.  So is it your view, as you
9 sit here today, if Melodeon has not
10 been contributed to an entity owned
11 by Mr. Scaminaci there's been a
12 contractual breach?
13     MR. SCHRYVER:  Objection.
14    A.  Yeah, that was my
15 conclusion then.
16    Q.  Do you have any facts to
17 suggest that conclusion is wrong, as
18 we sit here today?
19    A.  No.
20    Q.  Then you go on to say at
21 the top that: "A more precise
22 answer is it has to be contributed
23 to MCG or another entity controlled
24 by Andres Scaminaci," correct?
25    A.  Correct.

1      COLE - CONFIDENTIAL
2    Q.  I'm correct, am I not, that
3 originally Melody had three founding
4 partners?
5    A.  Melody Capital Partners,
6 yes.
7    Q.  And --
8    A.  More precisely Melody
9 Capital Management.
10    Q.  Melody Capital Management
11 was a registered SEC investment
12 advisor, right?
13    A.  That's correct.
14    Q.  And Melody Capital Partners
15 was also a registered investment
16 advisor, right?
17    A.  It was a relying advisor
18 and became a registered advisor.
19    Q.  What does a relying advisor
20 mean?
21    A.  Means that it's controlled
22 by the, Melody in this instance
23 because it's controlled by Melody
24 Capital Management and so the
25 registration covers the relying

1      COLE - CONFIDENTIAL
2 advisor.
3    Q.  And the third partner's
4 name was Cesar Gueikian?
5    A.  Gueikian.
6    Q.  And when he left, you
7 drafted a written agreement to set
8 forth the parties economic and other
9 agreements with respect to his
10 departure, correct?
11    A.  That's correct.
12    Q.  And Mr. Jaffrey and
13 Mr. Scaminaci wanted to have a
14 written agreement when Mr. Gueikian
15 left, right?
16    A.  Yes, the parties wanted a
17 contract.
18    Q.  And after Mr. Gueikian left
19 the authority to manage the business
20 of Los Palmas was vested solely in
21 Mr. Jaffrey and Mr. Scaminaci; is
22 that correct?
23    A.  That's correct because by
24 the terms of the termination
25 Mr. Gueikian had no governance

1      COLE - CONFIDENTIAL
2 authority.
3    Q.  Are you aware of any
4 written agreement between
5 Mr. Jaffrey and Mr. Scaminaci
6 concerning the economics of the
7 litigation finance fund?
8     MR. SCHRYVER:  Objection.
9    A.  I'm sorry, can you repeat.
10    Q.  Sure.
11    A.  With respect to Melodeon or
12 litigation finance fund.
13    Q.  No.  I'm asking you are you
14 aware of any written agreement
15 between Mr. Jaffrey and
16 Mr. Scaminaci that sets forth the
17 parties perspective economics into
18 the litigation finance fund?
19    A.  I don't recall.
20    Q.  Are you aware of any
21 written agreement that sets forth --
22 strike that.
23     Are you aware of any written
24 agreement between Mr. Scaminaci and
25 Mr. Jaffrey with respect to the

COLE - CONFIDENTIAL

1      COLE - CONFIDENTIAL
2  economics of the second generation
3  of credit funds?
4    A.  The economics, solely the
5  business plan that I'm aware of.
6    Q.  The agreement between the
7  partners as to how they were going
8  to share the profits.
9    A.  I think it would have been
10  governed by the same governance
11  documents as the fund one.
12    Q.  Okay.  But that wasn't true
13  under Melody Capital Group, right?
14    A.  No.  That was different.
15    Q.  Right.  And to the extent
16  Melody Capital Group was pursuing
17  the second generation of credit
18  funds, Mr. -- are you aware of any
19  agreement between Mr. Jaffrey and
20  Mr. Scaminaci as to the sharing of
21  the profits of that venture?
22    A.  No.  Only as set forth
23  perhaps in the 2018 agreement.
24    Q.  Are you aware of any other
25  agreement besides the 2018 agreement

1      COLE - CONFIDENTIAL
2  that dealt with the economics as
3  between Mr. Scaminaci and
4  Mr. Jaffrey concerning either the
5  litigation finance opportunity or
6  the second generation of credit
7  funds?
8    MR. SCHRYVER:  Objection.
9    A.  Other than 2018, the
10  agreement, no.  There's a 2020
11  agreement but that doesn't -- I
12  don't recall that that went into the
13  economics.  It's more of how to --
14  dealt mainly with the management of
15  Melody Capital Partners.
16    Q.  And as the chief compliance
17  officer at Melody, if there had been
18  a written agreement between
19  Mr. Jaffrey and Mr. Scaminaci with
20  respect to the profits of litigation
21  finance or Credit 2.0, that's
22  something that you would have known
23  about, correct?
24    MR. SCHRYVER:  Objection.
25    A.  Not necessarily.  I don't

1      COLE - CONFIDENTIAL
2  -- depending on the terms, whether
3  it would be folded underneath Melody
4  or not, I don't know.
5    Q.  Well, it would have been in
6  your duty to know as the chief
7  compliance officer, wouldn't it?
8    MR. SCHRYVER:  Objection.
9    A.  Not necessarily.
10    Q.  Can you tell me when it was
11  that Mr. Scaminaci and Mr. Benett
12  decided to move the litigation
13  finance opportunity from the legacy
14  Melody platform to Melodeon?
15    MR. SCHRYVER:  Objection,
16  mischaracterizes.
17    A.  I'm not aware of like a
18  date or that that's a fair
19  characterization.
20    Q.  What's unfair about that
21  characterization?
22    A.  Because I don't think the
23  litigation fund was pursued
24  underneath -- ultimately was pursued
25  just as the legacy business was no

1      COLE - CONFIDENTIAL
2  longer pursued under the umbrella of
3  Melody Capital Partners.  Your
4  question was more precise, what date
5  did they agree to take the business?
6    Q.  Yeah, I'm going to move to
7  strike the last answer as not
8  responsive to the question.
9    My question is when was it --
10  at what time, what date was the
11  litigation finance opportunity moved
12  from the legacy Melody platform to
13  Melodeon?
14    MR. SCHRYVER:  I'm going to
15  interject and object to the
16  preposterous motion to strike which
17  isn't a real thing and object to
18  the question as asked, answered,
19  mischaracterizing prior testimony
20  as well.
21    Q.  You can answer.  You can
22  just...
23    A.  So ▇▇▇▇ the portfolio
24  of ▇▇▇▇ Company was taken into,
25  acquired by a -- acquired and became

COLE - CONFIDENTIAL

1    COLE - CONFIDENTIAL
2    a portfolio of entities controlled
3    by Melodeon. Funds controlled by
4    Melodeon. I'm not -- I don't
5    remember the date of that
6    arrangement, but it certainly was a
7    transaction that came before --
8    presented certain conflict,
9    potential conflicts and was
10   disclosed to the advisory boards and
11   discussed at the IC meetings.
12       Q. Well, let's take a look at
13   this.
14       MR. DANNER: Okay if we take a
15   break after this document? It's
16   been about an hour.
17       MR. BROCKETT: Yeah. We have
18   been going about an hour, really?
19       MR. DANNER: Just about.
20       MR. BROCKETT: This is
21   Exhibit 4. It's Scaminaci 2236
22   through 2272.
23       (Exhibit 4, Memorandum to the
24   New Business Investment Committee,
25   Bates Scaminaci 2236 through 2272,

1    COLE - CONFIDENTIAL
2    marked for identification, as of
3    this date.)
4        Q. So I can take a look
5    through this, but I'm just going to
6    ask you generally, this is a
7    memorandum to the New Business
8    Investment Committee on October 30th
9    of 2018, correct?
10       A. It is.
11       Q. And this has to do with the
12   litigation finance opportunity at
13   Melody, right?
14       A. That's correct.
15       Q. And it's dated October 30th
16   of 2018, right?
17       A. It is.
18       Q. And it sets forth in some
19   detail financial information and
20   other information that Melody
21   employees had been working on for
22   quite some time; isn't that correct?
23       MR. SCHRYVER: Objection.
24       A. Well, yeah. Melody
25   employees put this together.

1    COLE - CONFIDENTIAL
2        Q. And so can we agree that at
3    least as of October 30th of 2018 the
4    litigation finance opportunity was
5    still something being actively
6    pursued by Melody?
7        MR. SCHRYVER: Objection.
8        A. Yes. This is an NBC, New
9    Business Investment Committee memo
10   from 2018 and it contemplates the
11   formation of Melody Litigation
12   Finance, LP, a specialty financed
13   fund and that ██████ would be
14   acquired by that fund.
15       Q. And, in fact, you are
16   listed here as one of the authors of
17   the document.
18       A. Yes.
19       Q. Do you recall being
20   involved in the drafting of this
21   document?
22       A. I would have been involved,
23   yes.
24       Q. And you would have been
25   involved because you were a Melody

1    COLE - CONFIDENTIAL
2    employee, right?
3        A. Correct.
4        MR. SCHRYVER: Objection.
5        Q. In fact, you were the
6    Melody chief compliance officer at
7    this point, right?
8        A. I was the Melody general
9    counsel and chief compliance
10   officer. Oh, I'm sorry, at that
11   point I was -- this is October.
12   Yeah, I would have been GC at that
13   point and CCO.
14       MR. BROCKETT: You want to
15   take a break now?
16       MR. DANNER: Sure.
17       MR. BROCKETT: Fine.
18       THE VIDEOGRAPHER: We are now
19   off the record. The time on the
20   video monitor is 10:43 a.m.
21       (Whereupon, there is a recess
22   in the proceedings.)
23       THE VIDEOGRAPHER: We are now
24   back on the record. The time on
25   the video monitor is 11:02 a.m.

14 (Pages 50 - 53)

COLE - CONFIDENTIAL

1
2    Q.   Are you ready to resume
3    your deposition, Mr. Cole?
4        A.   Yes, that's fine.
5        Q.   You understand that you are
6    still under oath?
7        A.   Yes.
8        Q.   Okay.  All right.  Let's
9    mark as Exhibit 5 a one-page email
10    JAF5790.
11        (Exhibit 5, Email, Bates
12     JAF5790, marked for identification,
13     as of this date.)
14        Q.   Now, is this an email that
15    you wrote to Halle Benett and
16    Mr. Scaminaci and Mr. Jaffrey and
17    others on January 12th of 2020?
18        A.   It is.
19        Q.   And is this a letter of
20    resignation?
21        A.   It is.
22        Q.   And you are resigning from
23    your position at Melodeon Capital
24    Partners; is that correct?
25        A.   Yes.

COLE - CONFIDENTIAL

1
2    Q.   And you state -- first of
3    all, this is addressed to Halle and
4    Sam, right?
5        A.   It is.
6        Q.   Why was it addressed to
7    just to Halle and Sam?
8        A.   Because Halle was the
9    principal of Melodeon, and Sam was
10    also a principal I think at the
11    time, principally involved and the
12    main business heads for that
13    business.
14        Q.   Now, you state in the first
15    sentence that you understand that
16    you, meaning Halle and Sam, intend
17    that "Melodeon Capital Partners will
18    not be affiliated with Melody
19    Capital Group or any other Melody
20    entity."
21        You see that?
22        A.   That's correct.
23        Q.   And where did you learn
24    that and from whom?
25        A.   I was sailing on the Nile

COLE - CONFIDENTIAL

1
2    in January of 2020 and I believe I
3    heard it from Mr. Jaffrey.
4        Q.   So you were sailing on the
5    Nile and you got a call from
6    Mr. Jaffrey; is that correct?
7        A.   That's correct.
8        Q.   And what did Mr. Jaffrey
9    tell you?
10        A.   He -- I don't remember the
11    exact words, but the substance was
12    that Halle intended to spin off the
13    Melodeon outside of Melody.
14        Q.   Did he say anything else?
15        A.   I'm sure he did, but I
16    don't recall.
17        Q.   And what was your reaction
18    to this?
19        A.   Surprise.
20        Q.   Why?
21        A.   Because Melodeon was
22    supposed to be under the Melody
23    umbrella.
24        Q.   Now, did you have a
25    subsequent conversation about this

COLE - CONFIDENTIAL

1
2    with Mr. Benett?
3        A.   I don't recall.
4        Q.   Did you confirm this with
5    Mr. Benett before you issued your
6    letter of resignation?
7        A.   I don't recall if there was
8    a conversation.
9        Q.   Do you remember anything
10    else surrounding the circumstances
11    of this letter of resignation?
12        MR. SCHRYVER:  Objection.
13        A.   The reason for the
14    resignation?
15        Q.   Yeah.
16        A.   Because I was serving in
17    that capacity of CCO only because
18    Melodeon was under the umbrella of
19    Melody.
20        Q.   Under the umbrella of
21    legacy Melody or under the umbrella
22    of a new Melody that had been
23    created by Mr. Scaminaci?
24        A.   Of a Melody fund more so
25    affiliated with one of the

COLE - CONFIDENTIAL

1 principals.
2 Q. And the principal is
3 Mr. Scaminaci, correct?
4 A. Yes.
5 Q. Now, did Mr. Benett -- did
6 you try to discourage Mr. Benett
7 from spinning off Melodeon outside
8 of the Melody platform?
9 A. No. Because I didn't know
10 about it.
11 Q. Well, when you did know
12 about it, did you attempt to
13 discourage Mr. Benett?
14 A. I don't recall. I
15 resigned.
16 Q. Now, am I correct that
17 after you resigned Mr. Benett agreed
18 to the contribution agreement?
19 A. I believe that's the
20 chronology, but it was -- that's it,
21 yeah, I believe that's the
22 chronology.
23 Q. And the contribution
24 agreement, which we marked earlier I
25

COLE - CONFIDENTIAL

1 believe was in January -- I'm sorry,
2 February of 2020, correct?
3 A. That's correct.
4 Q. And so after Mr. Benett
5 agreed to the contribution agreement
6 did you agree to stay?
7 A. Yes. I agreed to stay as
8 the CCO.
9 Q. For how long?
10 A. I don't recall exactly when
11 Sam Wathen assumed the role of CCO
12 but it may have been late 2020 or
13 '21. I stayed in the role also
14 because we were under examination by
15 the SEC.
16 MR. BROCKETT: All right.
17 Let's mark as Exhibit 6, Cole
18 Exhibit 6, a one-page email Jaffrey
19 0239.
20 (Exhibit 6, Email, Bates
21 Jaffrey 0239, marked for
22 identification, as of this date.)
23 Q. Okay. Do you recognize
24 this as an email exchange between
25

COLE - CONFIDENTIAL

1 yourself and Mr. Jaffrey in late
2 July of 2020?
3 A. Yes.
4 Q. And this starts with an
5 email from Mr. Jaffrey to you on
6 July 31st of 2020 at 10:39 a.m.,
7 right?
8 A. Yes.
9 Q. Mr. Jaffrey says, first of
10 all, that he was chatting with
11 Celine and he's concerned about your
12 role at Melodeon, right?
13 A. Yes.
14 Q. And then there's some
15 reference to the September 18th,
16 2020 agreement, right?
17 A. Yes.
18 Q. And then you respond and
19 say: "I serve as chief compliance
20 officer of Melodeon. I have never
21 served as counsel to Melodeon. I
22 resigned as CCO when Halle and Sam
23 tried to take the business."
24 Do you see that?
25

COLE - CONFIDENTIAL

1 A. Yes, that's what I wrote.
2 Q. What business are you
3 referring to?
4 A. The LBS business, the
5 portfolio company under Melodeon.
6 Q. That's also known as the
7 litigation finance opportunity,
8 right?
9 A. At this time it was the,
10 the company was Litigation Business
11 Services.
12 Q. They were operating a
13 company that was involved in
14 litigation finance?
15 A. Yes, that's right,
16
17 Q. What do you mean when you
18 say that they tried to take the
19 business?
20 A. When they tried to spin it
21 out from underneath the Melody
22 entities.
23 Q. What did they do to try to
24 achieve that, what specific steps
25

16 (Pages 58 - 61)

COLE - CONFIDENTIAL

1 did they take?
2
3 MR. SCHRYVER: Objection.
4 A. I don't know. I don't
5 recall.
6 Q. So you don't recall what
7 the basis was for your statement
8 here that they, namely Halle and
9 Sam, tried to take the business?
10 MR. SCHRYVER: Objection.
11 A. Yeah. I --
12 THE WITNESS: I'm sorry.
13 MR. SCHRYVER: You can answer
14 I just objected. It's okay.
15 A. I don't recall how they
16 planned to structure it, but I
17 understood that it would be managed
18 by a different investment advisor
19 not affiliated with either
20 Mr. Scaminaci or Mr. Jaffrey.
21 Q. You then say that you
22 agreed to continue to serve as CCO
23 when Halle agreed to contribute
24 Melodeon to MCG or another entity
25 controlled by Andres, right?

COLE - CONFIDENTIAL

1
2 A. True. Correct, yeah.
3 Q. And you say that you've
4 served in this role for continuity's
5 sake on the assumption that Melodeon
6 would be foldered under a Melody
7 entity, right?
8 A. That's correct.
9 Q. And that would either be a
10 legacy Melody entity or some Melody
11 entity affiliated with Melody
12 Capital Group, right?
13 MR. SCHRYVER: Objection.
14 A. Sure, yeah, that's. I
15 believe the intent.
16 Q. Am I understanding
17 correctly that Mr. Benett was
18 resisting doing that?
19 MR. SCHRYVER: Objection.
20 A. I don't know that he was
21 resisting.
22 Q. Well, this is 2024 and, as
23 we sit here today, are you aware of
24 any facts that Mr. Benett has
25 contributed Melodeon to any Melody

COLE - CONFIDENTIAL

1
2 entity?
3 MR. SCHRYVER: Objection.
4 A. I'm not.
5 Q. You then say: "The SEC
6 examination complicates matters."
7 What does that mean?
8 A. It means that all of the
9 advisors were being examined by the
10 SEC at the time and to, I believe
11 my, what I meant there was that and
12 because I sat in the seat for, of
13 CCO, and I was managing the
14 examination for the legacy fund --
15 the legacy manager as well as the
16 new managers, that if I were to
17 resign, that would potentially have
18 a ripple effect on the examination.
19 Q. What does Mr. Scaminaci do
20 today?
21 MR. SCHRYVER: Objection.
22 A. I don't know.
23 Q. You never ask him what his
24 business is these days?
25 A. No.

COLE - CONFIDENTIAL

1
2 Q. Do you meet for drinks or
3 dinner from time to time?
4 A. We have met for lunch once
5 or twice, maybe three times.
6 Q. And he's never told you
7 what kind of business he's either
8 engaged in or seeking to engage in?
9 A. We don't talk about
10 business.
11 Q. And then you go on to say:
12 "I would happily resign from my CCO
13 role at Melodeon and I believe that
14 Celine would as well, but we stay on
15 to get it through the examination."
16 Have I read that correctly?
17 A. Yes.
18 Q. And is that what happened?
19 A. Yes. Ultimately I resigned
20 and Sam Wathen took the CCO role.
21 And that happened after the SEC
22 examination concluded.
23 Q. Well, it says here that you
24 will resign as GC of Melody Capital
25 Group but continue to serve as CCO

17 (Pages 62 - 65)

```
1        COLE - CONFIDENTIAL
2  of Melody Capital Group, right?
3      A.  Yes.
4      Q.  And did you do that
5  effective in July of 2020?
6      A.  No.  I resigned from both
7  Melody Capital Group and Melody
8  Investment Advisors in August of
9  2020.
10     Q.  In your view where did
11 Mr. Benett and Mr. Scaminaci get the
12 right to move the litigation finance
13 opportunity to the Melodeon
14 platform?
15         MR. SCHRYVER:  Objection.
16     A.  I don't know.
17     Q.  Do you believe that the
18 litigation finance opportunity was
19 an asset of Melody?
20         MR. SCHRYVER:  Objection.
21     A.  It was something that was,
22 the documentation in terms of
23 marketing materials, preliminary
24 marketing materials and what was
25 presented to the, as new business
```

```
1        COLE - CONFIDENTIAL
2  opportunity to the Investment
3  Committee in 2018, at that time,
4  yeah, it was part of the, going
5  about to be part of -- under the
6  umbrella of the legacy advisor.
7      Q.  And do you believe that the
8  business plan in the 2018 agreement
9  for the second generation of credit
10 funds was an asset of legacy Melody?
11         MR. SCHRYVER:  Objection.
12     A.  It was -- it's certainly
13 part of the business plan set forth
14 in the 2018 agreement.
15     Q.  And do you consider that an
16 asset of the legacy Melody?
17         MR. SCHRYVER:  Objection.
18     A.  In terms of investor lists
19 or?
20     Q.  No, just do you consider
21 the business plan and the strategy
22 that was developed for the second
23 generation of credit funds was an
24 asset of legacy Melody?
25         MR. SCHRYVER:  Objection.
```

```
1        COLE - CONFIDENTIAL
2      A.  I'm not sure the
3  origination of the loans is
4  proprietary.  There may be some
5  structuring that is proprietary,
6  it's part of the legacy.
7      Q.  You didn't consider that
8  business plan set forth in the 2020
9  agreement to be a proprietary asset
10 of legacy Melody?
11         MR. SCHRYVER:  Objection.
12     A.  The business plan itself?
13 I'm sorry, I'm not...
14     Q.  The business plan.
15     A.  The business plan.
16         MR. SCHRYVER:  Objection.
17     A.  Yeah, to the extent they
18 pursued it, sure.
19     Q.  And do you consider the
20 relationships with the LPs of legacy
21 Melody to be an asset of legacy
22 Melody?
23         MR. SCHRYVER:  Objection.
24     A.  I believe those are
25 certainly assets of the principals.
```

```
1        COLE - CONFIDENTIAL
2      Q.  Do you know of any document
3  or agreement that gave Mr. Scaminaci
4  the right to create his own GP and
5  move under it the entire business
6  plan developed at Melody for the
7  pursuit of the second generation of
8  credit funds?
9          MR. SCHRYVER:  Objection.
10     A.  I'm not aware of a written
11 agreement, no.
12     Q.  Are you aware of any
13 document that gave Mr. Scaminaci the
14 right to do that?
15         MR. SCHRYVER:  Objection.
16     A.  I don't -- I don't believe
17 so.
18         MR. BROCKETT:  Let's mark
19 these two together as Cole 7.  One
20 is a cover email, two-page AS_5881
21 through 5882 and then there's a
22 memorandum attached, Investment
23 Memorandum, Bates stamp 5883
24 through 5890.
25         (Exhibit 7, Email, Bates
```

18 (Pages 66 - 69)

COLE - CONFIDENTIAL

1       AS_5881 through 5882, marked for
2  identification, as of this date.)
3      (Exhibit 8, Memorandum, Bates
4  AS_5883 through 5890, marked for
5  identification, as of this date.)
6     Q.  Okay.  So let's see, to
7  make sense of this, first of all,
8  you recognize the attachment that's
9  an Investment Memorandum, right?
10     A.  It's actually, it says
11  Investment Memorandum but it's
12  really a function of disclosure to
13  advisory boards and independent fund
14  representatives.
15     Q.  And who is the advisory
16  board and independent fund
17  representatives?
18     A.  Each of the -- each of the
19  funds has an Advisory Board with
20  representatives from certain LPs.
21  And the independent fund
22  representatives are appointed by --
23  for one of the offshore funds.
24     Q.  And this is dated July 16th

*(Page 70, lines 1-25 with COLE - CONFIDENTIAL heading)*

---


**Page 70**

```
1            COLE - CONFIDENTIAL
2      AS_5881 through 5882, marked for
3      identification, as of this date.)
4        (Exhibit 8, Memorandum, Bates
5      AS_5883 through 5890, marked for
6      identification, as of this date.)
7        Q.   Okay.  So let's see, to
8      make sense of this, first of all,
9      you recognize the attachment that's
10     an Investment Memorandum, right?
11       A.   It's actually, it says
12     Investment Memorandum but it's
13     really a function of disclosure to
14     advisory boards and independent fund
15     representatives.
16       Q.   And who is the advisory
17     board and independent fund
18     representatives?
19       A.   Each of the -- each of the
20     funds has an Advisory Board with
21     representatives from certain LPs.
22     And the independent fund
23     representatives are appointed by --
24     for one of the offshore funds.
25       Q.   And this is dated July 16th
```

**Page 71**

```
1            COLE - CONFIDENTIAL
2      of 2019, right?
3        A.   Yes, it is.
4        Q.   And who would have drafted
5      this, do you know?
6        A.   I probably drafted some of
7      it.  Certainly would have reviewed
8      it.
9        Q.   Now, I want to focus your
10     attention on the second page of the
11     memorandum.
12       A.   Of the memo.
13       Q.   Okay.  There's a statement
14     in the second-to-last paragraph
15     that: "Mr. Jaffrey has no economic
16     interest in the general partner and
17     the investment manager of funds
18     investing in LBS and will have no
19     economic interest in Melody Capital
20     Group, LP.  Mr. Jaffrey has no
21     conflict of interest."
22        Do you see that?
23       A.   Yes.
24       Q.   Okay.  Do you remember
25     putting that statement in here?
```

**Page 72**

```
1            COLE - CONFIDENTIAL
2        A.   I put it in here to --
3      because this is a memo in part
4      identifying potential conflicts of
5      interest.
6        Q.   And the Advisory Board has
7      nothing to do with determining the
8      rights as between Mr. Jaffrey and
9      Mr. Scaminaci to the profits of any
10     fund, including the litigation
11     finance fund, right?
12       MR. SCHRYVER:  Objection.
13       A.   Correct, no.
14       Q.   And the same is true with
15     respect to the independent fund
16     representatives?
17       MR. SCHRYVER:  Objection.
18       A.   That's correct.
19       Q.   Now after this memo was
20     circulated did you have some
21     conversations with Mr. Jaffrey about
22     the statement in here that he has no
23     economic interests in this matter?
24       A.   I don't recall.
25       Q.   Do you recall having some
```

**Page 73**

```
1            COLE - CONFIDENTIAL
2      conversations with Mr. Jaffrey in
3      which it was indicated that he very
4      well may have an economic interest
5      in --
6        MR. SCHRYVER:  Objection.
7        Q.   -- this matter?
8        A.   I don't recall.
9        Q.   On the cover email here
10     there, it starts at the bottom with
11     an email from Sam Wathen to yourself
12     and others circulating this
13     Investment Memorandum.
14        Do you see that?  At the
15     bottom of the second and third page.
16       A.   Yes.
17       Q.   And then there's an email
18     chain that goes all the way up to
19     the first page where Mr. Wathen
20     says: "Please find the revised memo
21     attached."
22        Do you see that?
23       A.   Yes.
24       Q.   And there were comments
25     made by you and there were comments
```

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

COLE - CONFIDENTIAL
1
2   made by Mr. Jaffrey, right?
3       A.   Appears so, yeah.
4       Q.   Now, let's look at Exhibit
5   Cole 9, which is AS_5952 through
6   AS_5954.
7          (Exhibit 9, Email, Bates
8       AS_952 through AS_5954, marked for
9       identification, as of this date.)
10      Q.   Okay.  So if you look at
11  the bottom of this email chain,
12  there's an email that says:  "All,
13  please find the revised memo
14  attached.  Please distribute to the
15  IFRs."
16         And that's the same email as
17  we find in the prior exhibit at
18  10:54 a.m., correct?
19      A.   I believe so.
20      Q.   So if you look in the prior
21  email --
22      A.   Yes.
23      Q.   -- on the first page at the
24  top there's an email from Wathen at
25  11:46 a.m. on July 16th.

COLE - CONFIDENTIAL
1
2       Do you see that?
3       A.   Yes.
4       Q.   And then if you see the
5   bottom of the exhibit I have just
6   given you, you see the same email at
7   11:54 a.m., right, from Sam Wathen?
8       All the way at the bottom.
9   All the way at the bottom on the
10  first page.
11      A.   On 46?
12      Q.   Yes.
13      A.   Yeah.
14      Q.   And then the new email,
15  Exhibit 9 I believe --
16      A.   Okay.
17      Q.   -- has another chain that
18  continues up the first page.
19      Do you see that?
20      A.   Yes.
21      Q.   And there's an email at the
22  top where you say:  "Omar, did you
23  want to make the change regarding
24  your potential conflict before the
25  document goes out again?  This was

COLE - CONFIDENTIAL
1
2   discussed with the IFRs.  Jon."
3       Do you see that?
4       A.   Yes.
5       Q.   That's what you wrote to
6   Mr. Jaffrey, correct?
7       A.   Yes.
8       Q.   And then Mr. Jaffrey says:
9   "It's fine as you presented it.  We
10  can voice over the issues like we
11  discussed today."
12      Do you see that?
13      A.   Yes.
14      Q.   Now, does that refresh your
15  recollection that you had a
16  conversation with Mr. Jaffrey
17  subsequent to Mr. Wathen sending out
18  this memo in which you discussed
19  that Mr. Jaffrey very well may have
20  a financial interest in the outcome
21  of this transaction?
22      MR. SCHRYVER:  Objection.
23      A.   As I read this, yes, that
24  must have been the conversation.
25      Q.   And do you have an

COLE - CONFIDENTIAL
1
2   understanding of what Mr. Jaffrey
3   meant when he said we can voice over
4   the issues?
5       A.   I believe that we would
6   speak to the -- speak to it verbally
7   at the meeting.
8       Q.   Speak it to verbally to
9   the --
10      A.   To the Advisory Board.
11      Q.   To the Advisory Board.
12  Okay, thank you.
13      All right, let's mark as
14  Exhibit 10 a document that is an
15  email chain, three-page email,
16  doesn't have Bates stamps but it
17  apparently was filed as an exhibit
18  to Mr. Scaminaci's motion in New
19  York County, or maybe we filed it, I
20  don't know.  But it was an exhibit,
21  Exhibit 21 that was filed in
22  connection with motions in New York
23  State Court.  So this will be Cole
24  10.
25         (Exhibit 10, Email chain,

COLE - CONFIDENTIAL
1
2   marked for identification, as of
3   this date.)
4       Q.  Okay.  So do you recognize
5   this as an email chain involving
6   yourself and some people from
7   ████████
8       MR. SCHRYVER:  Objection.
9       A.  I don't believe it's with
10  -- it's not -- our anchor investor
11  representatives are not on this.
12      Q.  So these are
13  representatives of ████; is that
14  correct?
15      A.  No, they are not.
16      Q.  Okay.  Who is
17  Mr. Zakutansky?
18      A.  I'm not sure, but based
19  upon the email address it would be
20  one of the LPs.
21      Q.  Okay.  Let's focus on the
22  email on the left, first page, from
23  you to Mr. Scaminaci, Mr.
24  Zakutansky and others at 1:32 p.m.
25      Do you see that?

COLE - CONFIDENTIAL
1
2       A.  Yes, I do.
3       Q.  Okay.  And you are
4   addressing, first of all, why Eric
5   and Carras have potential conflicts
6   of interest, right?
7       A.  Yes, that's correct.
8       Q.  You then go on to say that
9   you: "...also note that we had
10  discussed at the meeting that we had
11  identified that Omar might have a
12  potential conflict of interest if he
13  and Andres formalized any sharing of
14  economics between their new
15  investment fund effort."
16      Correct?
17      A.  That's correct.
18      Q.  And that again refers to
19  the conversation you had with
20  Mr. Jaffrey about a potential
21  economic interest that he might have
22  in the litigation finance
23  opportunity, correct?
24      MR. SCHRYVER:  Objection.
25      A.  I believe so.

COLE - CONFIDENTIAL
1
2       Q.  And as a result of that
3   there were efforts to -- were made
4   in writing and verbally to modify
5   the statement that appeared in the
6   memo to the -- memo to the
7   investment fund representatives.
8       MR. SCHRYVER:  Objection.
9       A.  Yes.  We voiced over, spoke
10  to the issue at the meeting.
11      MR. BROCKETT:  What time do
12  you guys want to take lunch?
13  What's your preference, Jon?
14      MR. SCHRYVER:  Lunch is
15  probably not ready now.  You mean
16  in an hour or so, right?
17      MR. BROCKETT:  Whenever you
18  want.
19      MR. SCHRYVER:  Lunch is
20  probably not ready.
21      MR. DANNER:  It will probably
22  arrive at around 12 but we can
23  break before then.
24      Q.  Do you recall having
25  discussions with Mr. Benett and

COLE - CONFIDENTIAL
1
2   others about trying to structure
3   Melodeon to avoid paying a ████
4   tax?
5       MR. SCHRYVER:  Objection.
6       A.  I think there were
7   discussions about how the agreements
8   with the anchor investor worked in
9   terms of what a Melody fund -- what
10  constitutes a Melody fund.
11      Q.  And are you aware of
12  efforts by Mr. Benett to structure
13  Melodeon in such a way that it would
14  avoid having to pay ████
15  anything?
16      MR. SCHRYVER:  Objection.
17      A.  I'm not aware specifically,
18  but I know that there was obviously
19  review of the agreement with the
20  anchor investor in terms of what
21  constituted a Melody fund.
22      Q.  All right.  This is Cole
23  11.  A one-page email, AS0218.
24      (Exhibit 11, Email, Bates
25  AS0218, marked for identification,

COLE - CONFIDENTIAL

1  as of this date.)
2  Q.  Is this an email that you
3  drafted on February 4th of 2019?
4  A.  It is.
5  Q.  And this is to Todd Kaplan
6  at Cloudbreak, right?
7  A.  That's correct.
8  Q.  Who is Cloudbreak?
9  A.  Cloudbreak is our outside
10 compliance consulting firm.
11 Q.  And you say:  "Todd, could
12 you dupe and revise the consulting
13 agreement to provide the same
14 services for Melodeon Capital
15 Partners, LP, a Delaware partnership
16 that will be registered investment
17 advisor for the litigation fund?"
18     What services are you
19 referring to?
20 A.  So Cloudbreak provides a
21 lot of the administrative function
22 for compliance.  There is a lot of
23 the, a lot of the heavy lifting of
24 the administrative function for

COLE - CONFIDENTIAL

1  meeting our compliance requirements.
2  So making sure that certificates or
3  certifications are filed on time and
4  helping me manage the compliant --
5  the compliance function.
6  Q.  Let's go with Cole
7  Exhibit 12.  One-page email,
8  JAF1304.
9     (Exhibit 12, Email, Bates
10    JAF1304, marked for identification,
11    as of this date.)
12 Q.  All right.  This is an
13 email from Mr. Jaffrey to yourself
14 and Terri Lecamp, right?
15 A.  Yes.
16 Q.  And Terri was the chief
17 operating officer of the company; is
18 that correct?
19 A.  She was.
20 Q.  And this is dated
21 February 5th of 2019, correct?
22 A.  It is.
23 Q.  And Mr. Jaffrey is writing
24 to you and to Terri, right?

COLE - CONFIDENTIAL

1  A.  He is.
2  Q.  And he says:  "Please
3  inform Halle/Sam that all go-forward
4  efforts at Melody and by Melody
5  personnel and resources for LBS need
6  to be approved by Andres.  That way
7  there's no confusion and Andres is
8  in charge and custodian of that
9  effort."
10    Do you see that?
11 A.  I do.
12 Q.  It then goes on to say:
13 "This way Andres is in the loop on
14 what his GP is doing."
15    Right?
16 A.  Yes.
17 Q.  And this has to do with the
18 LBS or the litigation finance
19 matter, right?
20 A.  Correct.
21 Q.  Now does it say anywhere in
22 this email that Mr. Jaffrey has no
23 economic interest in litigation
24 finance?

COLE - CONFIDENTIAL

1  MR. SCHRYVER:  Objection.
2  A.  It does not.
3  Q.  Does this email address in
4  any way shape or form the economics
5  as between Mr. Jaffrey and
6  Mr. Scaminaci in the litigation
7  finance fund?
8  MR. SCHRYVER:  Objection.
9  A.  It does not.
10 Q.  Now, Mr. Jaffrey's
11 instructions were not carried out,
12 were they?
13 MR. SCHRYVER:  Objection.
14 A.  I don't know.
15 Q.  Well, this says that
16 everything regarding litigation
17 finance was supposed to be done by
18 Andres and approved by Andres,
19 right?
20 MR. SCHRYVER:  Objection.
21 A.  That's what it says.
22 Q.  That's not what happened,
23 is it?
24 A.  I don't know.

COLE - CONFIDENTIAL

1    COLE - CONFIDENTIAL
2        MR. SCHRYVER:  Objection.
3    Q.  Well, litigation finance is
4    now controlled by Halle Benett,
5    right?
6        MR. SCHRYVER:  Objection.
7    A.  It is controlled by Halle
8    Benett.
9    Q.  Not controlled by Andres
10   Scaminaci, correct?
11       MR. DANNER:  Objection.
12   A.  It is not controlled.
13   Q.  All right.  This is Cole
14   13, AS_4219 through 4220.
15       (Exhibit 13, Email, Bates
16   AS_4219 through 4220, marked for
17   identification, as of this date.)
18   Q.  All right.  This is an
19   email chain involving yourself and
20   some others at Melody; is that
21   correct?
22   A.  It is.
23   Q.  And the first email is from
24   you to -- I'm sorry, from Halle
25   Benett to Celine and Scaminaci,

1    COLE - CONFIDENTIAL
2    right?
3    A.  Yes.
4    Q.  And then Celine Hannett
5    responds by saying:  "Melodeon is
6    controlled by Benett.  Scaminaci is
7    not actively involved in the
8    operation management."
9        Do you see that?
10   A.  Yes.
11   Q.  Now was that a true
12   statement?
13   A.  Probably.
14   Q.  You are the chief
15   compliance officer and so I assume
16   that you would know the answer to
17   that.
18   A.  I was the chief compliance
19   officer and not the GC.
20   Q.  But the chief compliance
21   officer should know who was involved
22   in operational management and who
23   wasn't, right?
24       MR. SCHRYVER:  Objection.
25   A.  To some extent, but the

1    COLE - CONFIDENTIAL
2    role of the chief compliance officer
3    is really, functions as the
4    relationship between the manager and
5    the investors, not the management
6    company.
7    Q.  To your knowledge, was
8    Mr. Scaminaci ever actively involved
9    in the management of Melodeon?
10   A.  He may have been, but I
11   don't know.
12   Q.  Well, can you answer just
13   with respect to the time you were
14   affiliated with Melodeon?
15       MR. SCHRYVER:  Objection.
16   A.  I didn't -- never got
17   direction from Andres with respect
18   to Melodeon.
19   Q.  And do you believe it's a
20   true statement that he takes only
21   insignificant economics and has no
22   involvement in operational
23   management?
24   A.  It may be the case.
25   Probably.

1    COLE - CONFIDENTIAL
2    Q.  Then it goes on to say:
3    "Litigation business finance funds
4    are neither managed nor controlled
5    by Scaminaci."
6        Right?
7    A.  I'm sorry, can you -- which
8    paragraph is that?
9    Q.  It's at the bottom.
10   A.  Okay, yeah.
11   Q.  Now, would you agree that's
12   a true statement?
13       MR. SCHRYVER:  Objection.
14   A.  In terms of management and
15   control?
16   Q.  Yeah.
17   A.  Yeah.  Probably, yeah.
18   Q.  Now, this discussion was
19   all about whether the ███████
20   letter agreement applied to
21   Melodeon, right?
22       MR. SCHRYVER:  Objection.
23   A.  It addresses -- it
24   addresses provisions in that the
25   anchor investor agreement with

COLE - CONFIDENTIAL

1      COLE - CONFIDENTIAL
2  respect to what constitutes a Melody
3  fund.
4     Q. And on Thursday of May 2,
5  2019 at 5:03 p.m. you wrote an email
6  stating your views, right?
7     A. I did.
8     Q. And you say: "If Jaffrey
9  or Scaminaci is actively involved in
10  operational management of Melody
11  Capital Management, they will be
12  deemed to be an affiliate of Los
13  Palmas GP LLC, i.e. managing member.
14  Any private equity or hedge fund
15  investment fund that is managed and
16  controlled by an entity that is in
17  turn controlled by Jaffrey and
18  Scaminaci as the case may be while
19  such founder is still actively
20  involved in the operational
21  management of Melody Capital
22  Management LLC, such new fund will
23  be deemed to be a Melody fund
24  subject to restrictions set forth in
25  2A and 3A of the letter agreement."

1      COLE - CONFIDENTIAL
2     Have I read your advice
3  properly?
4     A. Yes, that's correct. Yes,
5  that's correct.
6     Q. Okay. And so as far as you
7  were concerned, Melodeon would be
8  deemed a Melody fund within the
9  meaning of the ▇▇▇ letter
10  agreement?
11    MR. SCHRYVER: Objection.
12     A. Again, this is 2019. And
13  under the facts presented that
14  Andres has no operational control or
15  management of the fund and pursuant
16  to the provisions of the letter
17  agreement it might fall outside of
18  the definition of Melody fund.
19     Q. Well, that's not what you
20  said here, is it?
21    MR. SCHRYVER: Objection.
22     A. It says it's not a Melody
23  fund.
24     Q. Okay. So your view was
25  that Melodeon potentially was not a

1      COLE - CONFIDENTIAL
2  core Melody fund within the meaning
3  of the ▇▇▇ fund?
4    MR. SCHRYVER: Objection.
5  Mischaracterizes the agreement.
6     A. Yeah, the agreement --
7  there were -- maybe there's some
8  distinctions between core fund and
9  other funds, but I believe I was
10  addressing what is a Melody fund.
11  And I believe based upon the facts
12  as presented it might fall outside
13  of being a Melody fund under the
14  anchor investor letter agreement.
15     Q. Okay. Did ▇▇▇ agree
16  with your assessment?
17     A. I don't believe so.
18     Q. What were the restrictions
19  that you refer to in sections 2A and
20  3A of the letter agreement?
21     A. I don't have those
22  provisions in front of me, but one
23  of the main functions of that
24  agreement was, with the anchor
25  investor, that they would not have

1      COLE - CONFIDENTIAL
2  their economics taken away by moving
3  a Melody fund outside -- from
4  underneath the holding company's
5  structure.
6     Q. Eventually it was
7  determined by Melodeon to pay
8  ▇▇▇ its 20 percent; is that
9  correct?
10     A. Yeah. I believe that
11  that's true, yeah. And Halle said
12  so. And I believe that Celine had
13  spearheaded documentation with
14  outside counsel for that to happen.
15     Q. Okay. All right. Let's
16  look at Cole 14. It will be
17  JAF6293.
18    (Exhibit 14, Email, Bates
19  JAF6293, marked for identification,
20  as of this date.)
21     Q. All right. Do you
22  recognize this as an email from
23  Mr. Jaffrey to yourself and Terri
24  Lecamp?
25     A. Yes, that's what it is.

COLE - CONFIDENTIAL

1    Q.   And it's dated June 6th of
2
3    2019, right?
4    A.   Yes.
5    Q.   Was that when you were on
6    the Nile?
7    A.   No.
8        MR. SCHRYVER:  Objection.
9    Q.   What were the dates of your
10   trip down the Nile?
11   A.   January of 2020 I believe.
12   I may have that, the year wrong,
13   sorry.  It was January.
14   Q.   Mr. Jaffrey says: "I was
15   surprised to hear the claim today
16   that none of the four musketeers are
17   involved in litigation finance
18   business and it's only Halle."
19       Do you see that?
20   A.   Yes.
21   Q.   Then goes on to say: "If
22   it's that, then how is it being
23   built at Melody using Melody
24   resources, track record, name and
25   cash accounts?  Who is on the hook

COLE - CONFIDENTIAL

1
2    for all the of the expenses and
3    under which manager is this going to
4    be done?"
5        Do you see that?
6    A.   Yes.
7    Q.   And did you understand from
8    these statements that Mr. Jaffrey
9    believed at this time that
10   litigation finance was going to be
11   developed and built on a Melody
12   platform?
13       MR. SCHRYVER:  Objection.
14   A.   Well, through all cash
15   business, yeah.
16   Q.   And Mr. Jaffrey then goes
17   on to ask you to look into the
18   details, right?
19   A.   Yes.
20   Q.   And highlight all the
21   issues, correct?
22   A.   Yes.
23   Q.   Now, did you do that?
24   A.   I don't recall.
25   Q.   Are you aware of any

COLE - CONFIDENTIAL

1
2    written document you prepared for
3    Mr. Jaffrey addressing his
4    questions?
5    A.   I'm not aware.
6    Q.   Would you agree that in
7    June of 2019 Mr. Jaffrey seems
8    unaware that the litigation finance
9    business is not going to be built on
10   a Melody platform?
11       MR. SCHRYVER:  Objection.
12   Mischaracterizes.
13   A.   I think the reference is to
14   Melody Capital Group, yeah.  So yes.
15   Q.   Let's mark as Exhibit 15
16   JAF5520 through JAF5522.
17       (Exhibit 15, Email, Bates
18   JAF5520 through JAF5522, marked for
19   identification, as of this date.)
20   Q.   I'm going to ask you to
21   focus on the first page on the email
22   from Mr. Jaffrey dated June 7th of
23   2019.
24       I'd like to direct your
25   attention to the paragraph at the

COLE - CONFIDENTIAL

1
2    bottom.  This is in Mr. Jaffrey's
3    email dated June 7th of 2019 at
4    7:10 a.m.
5        Do you see that?
6    A.   Yes.
7    Q.   And Mr. Jaffrey says:
8    "It's time that everything about MCG
9    and LBS is put on the table so that
10   I could understand where the
11   conflicts are and who is making what
12   decisions with Melody assets and our
13   fund's capital.  So far I am
14   completely blind and am going to get
15   jammed.  I will not allow that."
16       Do you see that?
17   A.   Yes.
18   Q.   Now, did you have
19   discussions with Mr. Jaffrey about
20   his confusion over what was going on
21   with MCG and LBS in June of 2019?
22   A.   I don't recall specific
23   conversations.
24   Q.   Do you believe it likely
25   that you had conversations with him

COLE - CONFIDENTIAL

1      COLE - CONFIDENTIAL
2 about these matters?
3      MR. SCHRYVER: Objection.
4      A. Yes. If my boss is writing
5 to me, I'm sure that Terri, Celine
6 and I had conversations with him.
7 I'm sure it's likely that we did.
8      MR. DANNER: Dan, I think the
9 lunch is being brought up and set
10 up. Do you want to take the break
11 now or keep going a little longer?
12      MR. BROCKETT: I mean it's --
13 I meant convenience to the witness.
14 It's really up to Jon.
15      THE WITNESS: We can keep
16 going.
17      MR. BROCKETT: Okay. What
18 about others, you want to keep
19 going for what, another 15,
20 20 minutes and then have lunch, is
21 that all right?
22      MR. SCHRYVER: All right with
23 me.
24      Q. Do you know how the SEC
25 exam came about?

1      COLE - CONFIDENTIAL
2      A. The reasons why the SEC
3 examines an advisor is never
4 disclosed but Melody Capital
5 Management had been a registered
6 investment advisor for I think more
7 than seven years at that point and
8 it was a priority of the SEC at the
9 time to examine advisors. And
10 again, I won't speculate, but
11 because all the advisors were
12 related it made sense that all would
13 be examined.
14      Q. Did you ever express a view
15 that Mr. Scaminaci was in part
16 responsible for having the -- having
17 triggered the SEC exam?
18      MR. SCHRYVER: Objection.
19      A. I thought that some of the
20 questions that the examiners asked
21 were out of the routine -- out of
22 routine and would -- might have been
23 raised because of someone within
24 Melody but that's certainly within
25 everyone's right.

1      COLE - CONFIDENTIAL
2      Q. Did you ever express the
3 view that the SEC exam was triggered
4 in part by Mr. Scaminaci's behavior
5 with respect to attempting to
6 purchase Melody Wireless?
7      MR. SCHRYVER: Objection.
8      A. I don't think so, no. I'm
9 not sure. I don't think so given
10 the chronology of the exam.
11      Q. You never said that?
12      MR. SCHRYVER: Objection.
13      A. I don't recall saying that.
14      MR. BROCKETT: Well, why don't
15 we go off the record for now and
16 just kind of regroup and figure out
17 what we are going to do. I may be
18 moving to another topic. I just
19 need a few minutes to kind of
20 figure that out and we can come
21 back.
22      THE VIDEOGRAPHER: We are now
23 off the record. The time on the
24 video monitor is 12:07 p.m.
25      (Luncheon recess: 12:07 p.m.)

1      COLE - CONFIDENTIAL
2 A F T E R N O O N   S E S S I O N
3      (Time noted: 12:48 p.m.)
4 J O N A T H A N   C O L E,
5 resumed and testified as follows:
6      THE VIDEOGRAPHER: We are now
7 back on the record. The time on
8 the video monitor is 12:48 p.m.
9 EXAMINATION BY (Cont'd.)
10 MR. BROCKETT:
11      Q. Are you ready to resume
12 your deposition, sir?
13      A. Yes.
14      Q. You understand that you are
15 still under oath?
16      A. Yes.
17      Q. Okay. So this will be Cole
18 16. It's Melodeon 93 through 97.
19      (Exhibit 16, Email, Bates
20 Melodeon 93 through 97, marked for
21 identification, as of this date.)
22      Q. Now, this starts with a
23 cover email from you to a number of
24 people within Melody, correct?
25      A. Yes.

26 (Pages 98 - 101)

COLE - CONFIDENTIAL

1
2    Q.   And it has to do with the
3    SEC examination that was then going
4    on?
5    A.   Yes.
6    Q.   This is dated July 8th of
7    2020?
8    A.   Yes, it is.
9    Q.   And you say: "Attached are
10   revised slides that provide an
11   overview of Melody.  I thought that
12   a version of these slides will go
13   into each deck."
14      Do you see that?
15   A.   Yes.
16   Q.   And that's what you tried
17   to achieve with the slides that you
18   created, right?
19   A.   Yes.
20   Q.   Okay.  Now, if you turn to
21   the slides, the first one is an
22   overview of Melody Capital, right?
23   A.   Yes.
24   Q.   And so it says that:
25   "Melody had two strategies.  One was

COLE - CONFIDENTIAL

1
2    a credit strategy and one was a
3    telecom strategy."
4       Right?
5    A.   Yes.
6    Q.   And who ran the telecom
7    fund at Melody?
8    A.   It would have been --
9       MR. SCHRYVER:  Objection to
10   form.
11   A.   -- Mr. Jaffrey,
12   Mr. Scaminaci and at one point
13   Mr. Gueikian, all of whom were
14   principals.
15   Q.   Who among the partners had
16   the most subject matter expertise in
17   the telecom fund?
18      MR. SCHRYVER:  Objection,
19   foundation.
20   A.   I would -- I believe that
21   Omar Jaffrey probably.
22   Q.   And Mr. Jaffrey was also
23   the CEO of the telecom business, was
24   he not?
25   A.   He was the CEO of Melody

COLE - CONFIDENTIAL

1
2    Wireless, yes.
3    Q.   And what was
4    Mr. Scaminaci's principal role in
5    Melody?
6       MR. SCHRYVER:  Objection to
7    form.
8    A.   In Melody or in the -- in
9    Melody Wireless or?
10   Q.   Yeah, in Melody in general.
11   A.   In general?  He was a
12   partner.
13   Q.   Right.  But was he more
14   involved with the credit strategy or
15   the telecom strategy?
16      MR. SCHRYVER:  Objection.
17   A.   He was involved in both.
18   Q.   All right.  If we look at
19   page 3 or slide 3, there's a
20   statement in here:  "In
21   November 2018 Mr. Jaffrey and
22   Mr. Scaminaci agreed to pursue
23   investment strategies separately."
24      Do you see that?
25   A.   Yes.

COLE - CONFIDENTIAL

1
2    Q.   Now, is that something you
3    wrote?
4    A.   Yes.
5    Q.   And who told you that?
6    A.   It would have been -- I
7    don't know who told me that, but it
8    was conversations with the team,
9    including Mr. Jaffrey and
10   Mr. Scaminaci.
11   Q.   So November 2018 was
12   approximately two months after the
13   parties had entered into the 2018
14   agreement, right?
15   A.   Correct.
16   Q.   And in that agreement they
17   had set forth their business plans
18   on a go-forward basis, correct?
19      MR. SCHRYVER:  Objection.
20   A.   That's correct.
21   Q.   And in this slide you are
22   saying, two months later, in
23   November of 2018, they agreed not to
24   pursue that business plan; is that
25   correct?

COLE - CONFIDENTIAL

1
2  A.  No.  I said that they
3  pursue investment strategies
4  separately, meaning that they could
5  create their own investment advisors
6  to pursue strategies.
7     Q.  Okay.  So in November '18
8  the parties did not agree to stop
9  pursuing the business plan they had
10  agreed to in the September 2018
11  agreement; is that correct?
12        MR. SCHRYVER:  Objection.
13  Mischaracterizes the document.
14     A.  Don't -- I'm sorry.  If you
15  can repeat it, your question.
16     Q.  I'm trying to understand
17  what you mean by the statement here,
18  you say: "Mr. Jaffrey,
19  Mr. Scaminaci agreed to pursue
20  investment strategies separately."
21  I take it by that you are referring
22  to the agreement they made in the
23  2018 agreement?
24     A.  Yes.  And they were forming
25  separate investment advisors.

COLE - CONFIDENTIAL

1
2     Q.  It doesn't say in the
3  sentence that the parties agreed not
4  to pursue the 2018 business plan
5  jointly, correct?
6        MR. SCHRYVER:  Objection.
7     A.  It does not.
8     Q.  Why didn't you write here a
9  disclosure to the SEC that the
10  parties were continuing to pursue
11  certain business strategies jointly?
12        MR. SCHRYVER:  Objection to
13  form.
14     A.  In 20 -- this would have
15  been 2020?
16     Q.  That's correct.  It speaks
17  as of 2018, right?
18     A.  Because -- right.  But by
19  2020 the legacy funds would have
20  been effectively in wind down and no
21  new funds were created under the
22  advisor MCM.
23     Q.  Right.  But you were
24  speaking in this slide historically
25  as to what happened or what the

COLE - CONFIDENTIAL

1
2  state of affairs was in November
3  of 2018, correct?
4        MR. SCHRYVER:  Objection.
5     A.  Yeah, it may have been
6  shorthand.
7     Q.  Are you aware of any
8  agreement by Mr. Jaffrey or
9  Mr. Scaminaci in November of 2018
10  not to execute the joint business
11  plan they had agreed to in the 2018
12  agreement?
13     A.  No.  In 2018, no.
14     Q.  All right.  If we continue
15  down on this slide it says that two
16  new registered investment advisors
17  were subsequently formed in 2019 to
18  pursue these strategies, correct?
19     A.  Yes.
20     Q.  And the strategies were
21  telecom and credit, right?
22        MR. SCHRYVER:  Objection to
23  form.
24     A.  Well, I suppose that's the
25  implication, yeah.

COLE - CONFIDENTIAL

1
2     Q.  And Melody Investment
3  Advisors, MIA, was Mr. Jaffrey's
4  separate advisor under which he
5  pursued the telecom strategy, right?
6     A.  Yes.  MIA was controlled by
7  Mr. Jaffrey, which pursued a telecom
8  strategy.
9     Q.  And Melody Capital Group
10  was Mr. Scaminaci's registered
11  investment advisor under which he
12  planned to pursue a credit strategy,
13  right?
14     A.  Yes.
15     Q.  And then it says:
16  "Mr. Jaffrey" control -- "jointly
17  controls Melody with Mr. Scaminaci
18  and he controls MIA."
19     Right?
20     A.  Yes.
21     Q.  That's a reference to the
22  fact that Mr. Jaffrey controls MIA,
23  correct?
24     A.  Yes.
25     Q.  Then you say it's

28 (Pages 106 - 109)

1      COLE - CONFIDENTIAL
2  anticipated that Mr. Scaminaci will
3  be a control person of Melodeon?
4      A.  Yes.
5      Q.  What did that refer to?
6      A.  I believe, again, looking
7  at a document that I wrote years
8  ago, I believe that Melodeon would
9  have been folded underneath Melody
10  Capital Group as a reliant advisor.
11      Q.  So are you referring here
12  to the contribution agreement?
13      A.  I'm not sure that's --
14  probably, but again, the chronology
15  is not clear to me.
16      Q.  What you told the SEC here
17  never happened; is that correct?
18      MR. SCHRYVER:  Object.
19  Objection to form.
20      A.  Well, I don't think that
21  Mr. Scaminaci does control and it
22  wasn't contributed so.
23      Q.  So what is stated here
24  never happened, correct?
25      A.  It was a true statement at

1      COLE - CONFIDENTIAL
2  the time.
3      Q.  Okay.  But what you
4  anticipated happening didn't happen,
5  fair enough?
6      A.  Correct.
7      Q.  All right.  Let's mark as
8  our next exhibit, which is Cole 17,
9  and it's a document bears Jaffrey
10  Bates stamp 0266 through 0276.
11      (Exhibit 17, 2020 Agreement,
12  Bates Jaffrey 0266 through 0276,
13  marked for identification, as of
14  this date.)
15      Q.  Do you recognize this, sir?
16      A.  I do.
17      Q.  Is this a document that you
18  drafted?
19      A.  It is.
20      Q.  And is this what is known
21  as a 2020 agreement?
22      A.  It was -- it was executed
23  in 2020 so yeah.
24      Q.  What was the background of
25  this agreement?  In other words,

1      COLE - CONFIDENTIAL
2  what was the purpose that the
3  partners wanted this agreement to be
4  executed?
5      MR. SCHRYVER:  Objection.
6      A.  Well, the agreement dealt
7  with compensation for employees from
8  the investment group, investment
9  professionals for 2019 I think
10  bonuses and going forward what the,
11  essentially the allocation of
12  compensation would be for those
13  investment professionals in 2020.
14  It also dealt with governance issues
15  and -- yeah, we addressed governance
16  issues as well.
17      Q.  Is this something
18  Mr. Jaffrey and Mr. Scaminaci wanted
19  you to put together?
20      MR. SCHRYVER:  Objection.
21      A.  I don't -- it was agreed
22  that this would be put together.  I
23  don't know who directed me.  If it
24  was both of them or one of them.
25      Q.  Who specifically directed

1      COLE - CONFIDENTIAL
2  you to create this agreement?
3      A.  I don't recall.
4      Q.  Now, with respect to
5  governance, if you look at page 4
6  and 5, there's some directions to
7  you as general counsel of Melody
8  Capital Partners, right?
9      A.  Yes.
10      Q.  And you are instructed to
11  make some amendments to the limited
12  liability company agreements, right?
13      A.  To some upper tier
14  agreements controlled by the two
15  principals, yeah.
16      Q.  And why were you directed
17  to take -- to make these amendments?
18      MR. SCHRYVER:  Objection.
19      A.  It was to make sure that
20  the governance matters addressed in
21  this agreement were also reflected
22  in the governing documents of those
23  entities.
24      Q.  Okay.  And one of the
25  governing matters that were agreed

1    COLE - CONFIDENTIAL
2  to in this document is set forth in
3  paragraph 3C on page 5?
4    A.   Yes.
5    Q.   And this provision
6  essentially says that neither
7  Mr. Jaffrey nor Mr. Scaminaci nor
8  any entities either controls can
9  enter into any legally binding
10  agreement without the prior consent
11  of the other partner?
12    MR. SCHRYVER:  Objection.
13    Q.   Is that a fair
14  characterization?
15    MR. SCHRYVER:  Objection.
16    A.   Right.  With respect to the
17  Melody Capital Partners and the
18  entities that that advisor controls,
19  yes.
20    Q.   And why was this -- why did
21  the partners want this provision to
22  be inserted in this agreement?
23    MR. SCHRYVER:  Objection,
24  foundation.
25    A.   To ensure that neither

1    COLE - CONFIDENTIAL
2  partner would take action without
3  the consent of the other, including,
4  for instance, firing employees.  I
5  think we -- that was -- may have
6  been addressed too.  But, yeah.
7    Q.   Was there something that
8  precipitated the need by one or both
9  partners to include provision 3C?
10    MR. SCHRYVER:  Objection.
11    A.   I think generally a
12  deterioration in their business
13  relationship.  But I can't think of
14  any specific incidents where this
15  was required.
16    Q.   Was there one of the
17  partners in particular who wanted
18  this provision to be inserted?
19    MR. SCHRYVER:  Objection.
20    A.   I don't recall
21  specifically.  I know that Omar may
22  have requested this.
23    Q.   Let's mark as Cole 18 a
24  three-page letter bearing Bates
25  AS_7777 through 7779.

1    COLE - CONFIDENTIAL
2    (Exhibit 18, Letter from
3  Kirkland & Ellis to
4  Andres Scaminaci, Bates AS_ 7777
5  through 7779, marked for
6  identification, as of this date.)
7    Q.   This is a three-page letter
8  from Kirkland & Ellis to
9  Mr. Scaminaci and you are cc'd on it
10  as the general counsel and chief
11  compliance officer of Melody Capital
12  Group, right?
13    A.   Yes.
14    Q.   And you can scan this, but
15  it has to do with a claim by
16  Mr. Jaffrey that Mr. Scaminaci
17  interfered with an opportunity for
18  the potential acquisition of a
19  company called ███████
20    A.   Yes.
21    Q.   Do you recall this?
22    A.   Yes, I do.
23    Q.   Now, were you asked to do
24  anything with respect to looking
25  into this claim that Mr. Jaffrey had

1    COLE - CONFIDENTIAL
2  that Mr. Scaminaci was interfering
3  with his opportunities?
4    MR. SCHRYVER:  I'm going to
5  actually caution the witness at
6  this point.  And Dan, if you want
7  to narrow your question, do you
8  mean on behalf of Melody Capital
9  Partners or Melody Capital Group?
10    MR. BROCKETT:  I mean the
11  document is produced.
12    MR. SCHRYVER:  Yeah.
13    MR. BROCKETT:  And quite
14  frankly, I don't see any privilege
15  issue anywhere here.
16    MR. SCHRYVER:  You just asked
17  him if he was asked to look into
18  something that he was sent as the,
19  quote, general counsel and chief
20  compliance officer of Melody
21  Capital Group.  So it sounded like
22  you were about to ask him were you
23  asked to provide legal advice.
24    MR. BROCKETT:  I am.  If you
25  have a problem with it, you can --

COLE - CONFIDENTIAL

1  COLE - CONFIDENTIAL
2  MR. SCHRYVER: I sure do. And
3  you can ask him --
4  I direct you, Mr. Cole, to
5  answer yes or no and then we will
6  take it from there.
7  MR. BROCKETT: Well, whose
8  privilege are you asserting?
9  MR. SCHRYVER: Melody Capital
10  Group. I think we all have
11  obligations as lawyers to not
12  breach the privilege.
13  MR. BROCKETT: What privilege
14  would Melody Capital Group have
15  that my client would not be able to
16  share in?
17  MR. SCHRYVER: All of it.
18  MR. BROCKETT: No, I don't
19  think so.
20  Q. Let's see. Where were we
21  here. So here's my question. Were
22  you asked to do anything with
23  respect to looking into this claim
24  that Mr. Jaffrey had that
25  Mr. Scaminaci was interfering with

1  COLE - CONFIDENTIAL
2  this opportunity regarding █████
3  MR. SCHRYVER: Same
4  objections.
5  A. I don't recall being asked.
6  Q. Were you aware that MIA was
7  pursuing a potential TMT acquisition
8  opportunity involving a company
9  called █████
10  A. I believe that I did know
11  that.
12  Q. And did it come to your
13  attention that Mr. Scaminaci had
14  paid a visit to █████ prior to
15  Mr. Jaffrey being able to discuss
16  the potential acquisition with them?
17  MR. SCHRYVER: Objection to
18  form.
19  A. No.
20  Q. What, if anything, do you
21  recall about this dispute involving
22  Mr. Jaffrey's claim that
23  Mr. Scaminaci interfered with an
24  opportunity involving █████
25  A. I don't have any firsthand

1  COLE - CONFIDENTIAL
2  knowledge of it. Just aware --
3  became aware of it, was aware that
4  there was, a group was trying to
5  pursue an opportunity with █████
6  but later on found out like through
7  this letter certainly that there was
8  an allegation at least of
9  interference.
10  Q. And were you asked to do
11  anything in terms of looking into
12  this matter?
13  MR. SCHRYVER: Same caution.
14  A. In which capacity?
15  Q. Your capacity of general
16  counsel or chief compliance officer,
17  either?
18  A. Of which entity?
19  Q. Melody Capital Group?
20  MR. SCHRYVER: Same caution.
21  I also object --
22  A. I don't recall. I just
23  don't recall --
24  MR. SCHRYVER: Asked and
25  answered.

1  COLE - CONFIDENTIAL
2  A. -- that coming up. I think
3  the answer is no.
4  Q. Were you asked to do
5  anything on behalf of legacy Melody?
6  A. I was not. I can tell you
7  the action I took which was to
8  resign.
9  Q. To resign what position?
10  A. Both my positions as
11  general counsel of Melody Capital
12  Group and, which was Mr. Scaminaci's
13  advisor as well as Mr. Jaffrey's
14  advisor MIA. I think I have that
15  chronology right.
16  Q. And you did that because of
17  conflict issues?
18  A. Yes.
19  Q. Did you discuss this matter
20  at all with Mr. Jaffrey?
21  MR. SCHRYVER: Objection,
22  vague.
23  A. I don't recall specifically
24  discussing the █████ transaction.
25  Q. Okay. Do you recall

31 (Pages 118 - 121)

COLE - CONFIDENTIAL
1
2    discussing it with Mr. Scaminaci?
3        A.  I do not.
4        Q.  Do you recall anything else
5    about this matter, this dispute,
6    other than what you've told me?
7        A.  No.  Just this obviously
8    prompted me -- not obvious.  This
9    prompted me to resign from my
10   positions as both of the advisors
11   because of the conflict.
12       Q.  So would it be fair to say
13   this letter heightened your
14   awareness that the conflict issues
15   existed with respect to your
16   position as both advisor?
17       A.  Yes.
18       MR. SCHRYVER:  Objection.
19       Q.  Do you know what role, if
20   any, TAP, T-A-P, advisors were
21   providing in terms of advising
22   Mr. Scaminaci in connection with
23   his -- in connection with Melody
24   Capital Group?
25       MR. SCHRYVER:  Objection.

1        COLE - CONFIDENTIAL
2    Lacks foundation.
3        A.  Specifically, no.  I don't
4    recall any engagement letter
5    actually that I reviewed.
6        Q.  When did it first come to
7    your attention that Mr. Scaminaci
8    was talking to third parties about a
9    potential acquisition of the assets
10   of Melody Wireless?
11       A.  I believe there was a short
12   discussion early in maybe 2020 and
13   that was a discussion that evidently
14   Mr. Scaminaci had with Blackstone I
15   believe.
16       Q.  And how did this come to
17   your attention that Scaminaci had
18   had a discussion with Blackstone?
19       A.  I was made aware of it by
20   Mr. Jaffrey and Terri Lecamp.
21       Q.  What specifically did they
22   tell you?
23       A.  I don't know the specifics
24   but the substance was exactly as I
25   said, that Mr. Scaminaci had talked

1        COLE - CONFIDENTIAL
2    to Blackstone about potentially
3    buying the portfolio.
4        Q.  And as general counsel were
5    you asked to do anything with
6    respect to Scaminaci's actions?
7        A.  I spoke with him.
8        Q.  And what did you say to
9    him?
10       A.  I advised him that any such
11   transaction would be a principal
12   transaction, it would require
13   consent from the Advisory Board.
14       Q.  Did you tell him that such
15   a transaction would require consent
16   from his partner, Mr. Jaffrey?
17       A.  No.  I believe I was
18   focused on the fund documents.
19       Q.  Was Mr. Scaminaci
20   authorized to approach Blackstone to
21   discuss a potential transaction at
22   this time?
23       MR. SCHRYVER:  Objection.
24       A.  I don't know the
25   conversations that he may have had

1        COLE - CONFIDENTIAL
2    with Mr. Jaffrey.  I'm not aware of
3    any authorization.
4        Q.  Okay.  As general counsel
5    do you believe that Mr. Scaminaci
6    was authorized to discuss a
7    potential transaction or potential
8    purchase of Melody Wireless without
9    first consulting Mr. Jaffrey?
10       MR. SCHRYVER:  Objection,
11   form.
12       A.  I don't think he's
13   prohibited from having the
14   conversation.  He could not enter
15   into any agreements effectuating
16   that, and any transaction would have
17   to ultimately be approved by the
18   Advisory Board and potentially our
19   anchor investor too as a related
20   party transaction, I'm not sure.
21       Q.  And was Mr. Scaminaci
22   authorized to provide confidential
23   financial information to Blackstone
24   and would be purchasers of Melody
25   Wireless?

32 (Pages 122 - 125)

COLE - CONFIDENTIAL

1     COLE - CONFIDENTIAL
2         MR. SCHRYVER:  Objection.
3     A.   Again, under the March 2020
4   agreement he would have to get the
5   consent of his partner to sign a
6   contract on behalf of any of the
7   entities.
8     Q.   Let's look at this letter.
9   It's Cole 19 and it's JAF0359
10  through JAF0365.
11      (Exhibit 19, Email, Bates
12   JAF0359 through JAF0365, marked for
13   identification, as of this date.)
14     Q.   You see this is a cover
15  email from Mr. Jaffrey to you asking
16  you to look at a draft letter?
17     A.   Yes.
18     Q.   And this letter had to do
19  with Mr. Scaminaci's discussions
20  with Digital Colony about a
21  potential purchase of Melody
22  Wireless, right?
23         MR. SCHRYVER:  Objection to
24   form.
25     A.   Yes.

1     COLE - CONFIDENTIAL
2     Q.   And at this time you were
3   the general counsel?
4     A.   I was.
5     Q.   And you were also the chief
6   compliance officer, right?
7     A.   I was.  Of Melody Capital
8   Partners, Melody Capital Management,
9   and Melody Wireless.
10     Q.   And Mr. Jaffrey says to you
11  in this email:  "Jon and Terri,
12  attached is a final draft letter I
13  intend to send to Andres, Colony and
14  TAP.  Let me know if you have any
15  comments or thoughts."
16         Correct?
17     A.   Yes.
18     Q.   And this is dated
19  August 3rd of 2020, correct?
20     A.   Yes.
21     Q.   Now, if you look at the
22  third page of this, the first full
23  paragraph says that Mr. Scaminaci's
24  actions were -- strike that.
25         The first full paragraph

1     COLE - CONFIDENTIAL
2   states:  "Mr. Scaminaci's actions
3   here are a continuation of
4   misconduct that began months ago.
5   Approximately four months ago I
6   learned that Mr. Scaminaci was
7   engaged in unauthorized discussions
8   with Blackstone to secure an
9   unsanctioned bid for our business
10  where Mr. Scaminaci would have an
11  ongoing role with Blackstone and
12  receive compensation that would not
13  be shared with the fund or its
14  investors."
15         It then says:  "Our
16  COO/general counsel and chief
17  compliance officer immediately
18  instructed him to cease and desist
19  these unauthorized sales efforts."
20         Have I read that correctly?
21     A.   Yes.
22     Q.   Now, is that true, that you
23  were instructed to tell
24  Mr. Scaminaci to cease and desist
25  these activities?

1     COLE - CONFIDENTIAL
2     A.   We weren't instructed to
3   but the substance was that what I
4   had testified before is that I
5   advised Mr. Scaminaci that it would
6   be a principal transaction requiring
7   consent.  And I believe his response
8   to me at that time was he's not
9   going forward with it.
10     Q.   That was the Blackstone
11  transaction he was not going forward
12  with?
13     A.   Yes, correct.
14     Q.   Did it come to your
15  attention that he had spoken to
16  anyone else other than Blackstone?
17     A.   About Melody Wireless?
18     Q.   Yeah.  I'm talking about
19  prior to the Digital Colony offer.
20     A.   Yes.
21     Q.   And who else had he spoken
22  to?
23         MR. SCHRYVER:  Objection.
24   Well, actually I'm sorry about the
25   chronology because it's a matter of

COLE - CONFIDENTIAL

1    days here. But we were -- after we
2    received the offer I conducted my
3    own internal investigation into
4    what had been done, who had been
5    contacted in order to help assess
6    where we were in terms of the offer
7    and -- so, yeah.
8       Q.   So just to be clear, you
9    are saying that after you received
10   the offer from Mr. Scaminaci and
11   Digital Colony or DigitalBridge, you
12   conducted an investigation into
13   Mr. Scaminaci's activities, is that
14   fair?
15      A.   Yes.
16      Q.   Okay. And what did that
17   investigation consist of?
18         MR. SCHRYVER:  Objection.
19      A.   I reviewed all emails
20   during -- not all emails, the emails
21   that I could find based upon
22   searches because I have access to
23   all the emails, and determined which
24   NDA -- which parties had signed

COLE - CONFIDENTIAL

1    NDAs, what had been done internally
2    to put, you know, to basically who
3    was involved -- I'm trying to
4    understand what the process was
5    internally and how large the net was
6    that had been cast.
7       Q.   Okay. And what did you
8    find out?
9       A.   I found out that Mr. Kang,
10   David Kang, an analyst, had worked
11   with Mr. Scaminaci to set up a
12   virtual data room, that potential
13   buyers had been contacted and signed
14   nondisclosure agreements, I forget
15   the number but it was probably, I
16   think I found maybe five,
17   potentially six NDAs. And as well
18   as communications between
19   Mr. Scaminaci and Digital Colony.
20      Q.   On the five or six NDAs do
21   you remember the names of the
22   entities that these were signed by?
23      A.   I don't, but they were
24   financial institutions.

COLE - CONFIDENTIAL

1       Q.   And under these NDAs did
2    Mr. Scaminaci agree to provide
3    confidential information of Melody
4    Wireless?
5          MR. SCHRYVER:  Objection.
6       A.   Yeah. That was the basis
7    for the NDA.
8       Q.   And this data room that
9    Mr. Kang set up did you discover
10   that the data room contained
11   confidential financial information
12   of Melody Wireless?
13      A.   I believe either during
14   that weekend or subsequently I found
15   the taxonomy for it so understood
16   what items would be in there.
17      Q.   Who had signed these NDAs,
18   what entity had signed them from
19   Melody?
20         MR. SCHRYVER:  Objection.
21      A.   I believe it was an entity
22   under the Melody Capital Partner
23   MCM. It may have been Melody
24   Wireless.

COLE - CONFIDENTIAL

1       Q.   Was it an entity under
2    Melody Capital Group?
3       A.   No.
4       Q.   Was it an entity within the
5    Melody affiliated companies?
6       A.   Yes. Under the MCM, Melody
7    Capital Management, Melody Capital
8    Partners. I believe it was Melody
9    Wireless, but I don't recall.
10      Q.   Was it an entity that had
11   proper access to confidential
12   information of Melody Wireless?
13         MR. SCHRYVER:  Objection,
14   form.
15      A.   It would have had access to
16   the information. It would have had
17   access to confidential information.
18   It was within the group of
19   affiliated companies.
20      Q.   You'll agree with me
21   Mr. Scaminaci was not authorized to
22   enter into binding NDAs pursuant to
23   which he provided confidential
24   financial information of Melody

COLE - CONFIDENTIAL
1
2  Wireless to third parties?
3      MR. SCHRYVER: Objection.
4      A. Under the 2020 agreement
5  terms, no.
6      Q. And did you confront
7  Mr. Scaminaci with the results of
8  your investigation?
9      A. I don't think I confronted
10  him, but I provided the results to
11  Mr. Jaffrey. I'm sure we discussed
12  them.
13      Q. What was your reaction to
14  Mr. Scaminaci's behavior?
15      MR. SCHRYVER: Objection.
16      A. I was -- either through the
17  weekend review or subsequent review
18  of the documentation that had been
19  presented, in the small field of
20  potential buyers I came to the
21  conclusion that it was not a well
22  run process. Not something that
23  Melody would typically do.
24      Q. Do you believe he was
25  authorized to attempt to make these

COLE - CONFIDENTIAL
1
2  efforts to sell the company without
3  the consent or approval of
4  Mr. Jaffrey?
5      MR. SCHRYVER: Objection.
6      A. Well, this a difficult
7  area. They are both general
8  partners but under the terms in the
9  2020 agreement I would say no.
10  Signing agreements to -- on behalf
11  of one of the Melody entities to
12  sell the assets, no.
13      Q. All right. So let's look
14  at this letter. Now you were asked
15  to look at this letter and comment
16  on it, right?
17      A. Evidently.
18      Q. And did you do so?
19      A. If I was asked to do so, I
20  would have done so.
21      Q. And did you find anything
22  inaccurate in this letter?
23      A. I don't recall.
24      MR. SCHRYVER: Objection.
25      Q. Would it have been your

COLE - CONFIDENTIAL
1
2  practice if you found something
3  inaccurate to inform Mr. Jaffrey of
4  that?
5      A. Yes.
6      Q. So if you look at the first
7  page, second paragraph, it says:
8  "Under the plain language of the
9  various agreements to which he is a
10  party Mr. Scaminaci was not and is
11  not authorized to initiate a sales
12  process with respect to any of the
13  fund's investments without my
14  knowledge, involvement and consent."
15      Do you see that?
16      A. Yes.
17      Q. When you saw that
18  statement, did you tell Mr. Jaffrey
19  that was incorrect?
20      A. I did not.
21      Q. So I assume you agreed with
22  it?
23      A. Yes, the sale of assets
24  would have to be approved by the
25  Investment Committee.

COLE - CONFIDENTIAL
1
2      Q. Well, that's not what this
3  says here. What it says here is
4  that he's not authorized to initiate
5  a sales process without
6  Mr. Jaffrey's consent, correct?
7      A. New business, you know, I
8  think the partners would agree to
9  sell one of the biggest, you know,
10  assets of the group.
11      Q. All right. When you
12  reviewed this letter, at no point
13  did you say to Mr. Scaminaci --
14  sorry, to Mr. Jaffrey that that
15  sentence I just read is incorrect,
16  right?
17      A. I don't recall.
18      MR. SCHRYVER: Objection.
19      Q. And there's a footnote to
20  this sentence. Do you see that,
21  footnote 1?
22      A. Yes.
23      Q. And it refers to all the
24  agreements that Mr. Jaffrey asserts
25  precluded Mr. Scaminaci from

COLE - CONFIDENTIAL

1 initiating a sales process, right?
2 A. Yes.
3 Q. And did you tell him that
4 anything in this footnote, anything
5 stated in this footnote was
6 incorrect?
7 MR. SCHRYVER: Objection.
8 A. I don't recall. If I read
9 it, reviewed it and there was
10 something incorrect, I would have
11 said something.
12 Q. Now, if you look on page 2
13 the sentence continues. "He is
14 certainly not authorized to disclose
15 the funds or MCM's collectively with
16 anyone affiliates hereof, Melody,
17 confidential information to third
18 parties including but not limited to
19 Colony and TAP."
20 Did you assert any
21 disagreement with that statement?
22 A. I don't recall. I don't
23 think so.
24 Q. "By disclosing Melody's

*(Note: line numbers 1-25 shown on left margin)*

---

COLE - CONFIDENTIAL

1 A. Yes.
2 Q. Now, this offer also gave
3 Mr. Scaminaci an interest in the
4 post acquisition entity; is that
5 correct?
6 A. That's my understanding,
7 yes.
8 Q. And he did offer to recuse
9 himself from consideration, right?
10 A. Yes.
11 Q. And did you discuss with
12 Mr. Jaffrey what steps Melody needed
13 to take to deal with Mr. Scaminaci's
14 conflicts?
15 A. It was, I believe it was my
16 view that he needed to be walled off
17 from the process, No. One, that we
18 had to run a process, and No. Two,
19 that he, Mr. Scaminaci had a
20 conflict and, therefore, could not
21 be on both sides of the transaction.
22 So would have to be walled off from
23 our process to maintain the
24 integrity of the process.

---

COLE - CONFIDENTIAL

1 internal valuations, its data tape
2 and other confidential information
3 Mr. Scaminaci has breached his
4 contractual confidentiality
5 obligations and misappropriated
6 Melody's trade secrets."
7 Have I read that correctly?
8 A. Yes.
9 Q. You take any disagreement
10 with that statement?
11 MR. SCHRYVER: Objection.
12 A. No.
13 Q. Then it goes on to say
14 that: "Mr. Scaminaci's actions were
15 inconsistent with the best interest
16 of the fund's investors and had put
17 the fund at a competitive
18 disadvantage if it tries to run a
19 legitimate sales process now for
20 Melody Wireless."
21 Do you see that?
22 A. Yes.
23 Q. Did you believe that at the
24 time?

---

COLE - CONFIDENTIAL

1 Q. And did you implement
2 provisions walling off Mr. Scaminaci
3 from any involvement or knowledge of
4 the investment process that you were
5 running with Mr. Jaffrey?
6 A. I believe that we -- I had
7 certain files restricted. Files
8 meaning on our network, certain
9 files that would have contained
10 information about the process for,
11 I'm quite sure that I would have
12 restricted that and we have a small
13 management team so the team knows
14 that they are not going to discuss
15 the sale process with Mr. Scaminaci.
16 Q. Did you also restrict his
17 access to financial and other
18 confidential information?
19 A. Not all. I mean he
20 certainly had the right to other
21 confidential information about the
22 funds. He continued as a partner so
23 he had the right to all our
24 projections, estimates, in terms of

1      COLE - CONFIDENTIAL
2  and reporting to our investors on
3  the credit side.
4      Q.  Now, if you look at page 3
5  of the letter, at the bottom it
6  talks about the offer being --
7  greatly undervaluing the assets of
8  Melody Wireless.
9      Do you see that?
10     A.  Yes.
11     Q.  And specifically the letter
12  says that the offer is only
13  1.3 billion, which is 20.5X of
14  ground cash flow, right?
15     A.  Yes.
16     Q.  And were you privy to
17  conversations with Mr. Jaffrey and
18  others at Melody Wireless about what
19  their hopes and expectations were in
20  terms of the sales price they hoped
21  to achieve?
22     MR. SCHRYVER:  Objection.
23  Vague as to time.
24     A.  Yes.  We discussed -- I
25  don't know exactly the multiple but

1      COLE - CONFIDENTIAL
2  we had been engaged in a process to
3  reorient the assets to not be valued
4  at ground cash flow but at tower
5  cash flow.  And in the market those
6  assets can achieve higher multiples.
7      Q.  Page 4, in the second full
8  paragraph there's a statement that
9  Mr. Jaffrey says that:  "The company
10  had learned that Mr. Scaminaci was
11  attempting with Digital Colony to
12  buy the assets cheaply and then mark
13  them up and resell them at 29 times
14  cash flow."
15     Do you see that?
16     A.  Yes.
17     Q.  Did you have discussions
18  about that?  Do you know what the
19  basis for that statement was?
20     MR. SCHRYVER:  Objection.
21     A.  I believe it was based upon
22  marketing materials.
23     Q.  What marketing materials?
24     A.  Materials that -- I believe
25  it was materials that we found that

1      COLE - CONFIDENTIAL
2  had been used to reach out to
3  potential buyers.
4      Q.  Marketing materials that
5  Mr. Scaminaci himself had created?
6      A.  He or Mr. Kang.
7      Q.  And in the marketing
8  materials they were promoting the
9  investment as something they could
10  flip for a profit, is that
11  essentially right?
12     MR. SCHRYVER:  Objection.
13     A.  My recollection is yes.
14     Q.  Now, also on page 4 the
15  second-to-last paragraph says:  "In
16  summary, the entire process that led
17  to the offer is tainted and flawed
18  and undermines our plan to maximize
19  value."
20     Do you see that?
21     A.  Yes.
22     Q.  And did you agree with that
23  statement?
24     A.  Well, yeah.  I mean it
25  could have the effect of undermining

1      COLE - CONFIDENTIAL
2  maximization of value for our
3  investors.
4      Q.  Then on page 5 in the
5  penultimate paragraph there's a
6  statement that Mr. Jaffrey has asked
7  you "to assess legal claims against
8  Mr. Scaminaci, TAP, Colony, based on
9  the foregoing."
10     Do you see that?
11     A.  Yes.
12     Q.  And what, if anything, did
13  you do to assess legal claims
14  against Mr. Scaminaci?
15     A.  Well, we -- I engaged Hogan
16  Lovells to assess the -- to assess
17  the conflicts, to really validate
18  the work that I had done over the
19  weekend.  So I initiated that
20  process.
21     Q.  And is Hogan -- Hogan
22  Lovells, was that a firm that had
23  done work for Melody before?
24     A.  Yes.
25     Q.  And were they corporate

37 (Pages 142 - 145)

1  COLE - CONFIDENTIAL
2  counsel for Melody?
3      A.   They were corporate counsel
4  on some other transaction, yes.
5      Q.   And who at Hogan Lovells
6  did you engage?
7      A.   I interacted primarily with
8  Steve Kaufman who was our
9  relationship partner there.
10     Q.   And what specifically did
11 you ask Mr. Kaufman to do?
12     A.   We asked that they review,
13 they do an investigation to
14 understand the conflicts.
15 Ultimately -- and that was his,
16 Steve's partners Jon Talotta and
17 David Dunn did that work and then
18 Steve and his M&A team ultimately
19 represented us in the sale of Melody
20 Wireless and in the process that we
21 were -- we ran.
22     Q.   Did you tell Hogan Lovells
23 that you wanted to achieve a certain
24 result?
25     A.   No.

1  COLE - CONFIDENTIAL
2      Q.   Do you believe that Hogan
3  Lovells carried out an independent
4  investigation?
5      MR. SCHRYVER: Objection.
6      A.   I think they presented the
7  facts that they found.  The
8  characterization of some things may
9  have, you know, been exaggerated or
10 -- not exaggerated, but I would have
11 shaded it differently.
12     Q.   How long did it take Hogan
13 Lovells to carry out their work and
14 prepare a report?
15     A.   Longer than it took me.  I
16 think it was weeks.  I don't recall
17 when their report was ultimately
18 produced.
19     Q.   But you do recall that they
20 produced a written report?
21     A.   Yes, they did.
22     Q.   Okay.  And do you recall
23 how much Melody had to pay Hogan
24 Lovells to carry out this work?
25     A.   I do not recall.

1  COLE - CONFIDENTIAL
2      Q.   Was it hundreds of
3  thousands of dollars?
4      A.   I don't think it was
5  hundreds of thousands but it was,
6  you know -- law firms are not cheap.
7      Q.   And but-for Mr. Scaminaci's
8  actions Melody would not have had to
9  engage Hogan Lovells to carry out
10 this investigation, right?
11     MR. SCHRYVER: Objection.
12     A.   That's correct.
13     Q.   Are there other things that
14 Melody was required to do as a
15 result of the actions of
16 Mr. Scaminaci?
17     MR. SCHRYVER: Objection to
18 form.
19     A.   I think it was important
20 that we initiate a fulsome process
21 to sell the assets.
22     Q.   But-for Scaminaci's
23 behavior would Melody have been
24 forced to hire ▌▌▌▌ and run an
25 auction process to sell the company?

1  COLE - CONFIDENTIAL
2      MR. SCHRYVER: Objection.
3      A.   Ultimately we would have
4  hired a very good investment banker
5  like ▌▌▌▌ to run the process.  We
6  probably moved up our schedule.
7      Q.   By how much?
8      A.   I'm not sure.  Maybe six
9  months.  But it does take time to
10 run a proper process in terms of
11 getting the modeling correct,
12 working with the investment bankers,
13 boiling the oceans to get all the
14 potential investors that are out
15 there.
16     Q.   And eventually
17 DigitalBridge, Digital Colony was
18 precluded from participating in the
19 bidding, correct?
20     A.   Had they come in with a
21 higher bid we would have entertained
22 it, but I believe based upon the
23 advice of the investment bankers,
24 Digital Colony was viewed in the
25 industry as very disruptive in sale

38 (Pages 146 - 149)

COLE - CONFIDENTIAL

1. processes. But again, if they came
2. in with a much higher, the highest
3. and best we obviously would have
4. taken that for our investors.
5. Q. Do you believe that Digital
6. Colony's offer and Mr. Scaminaci's
7. behavior impacted the process that
8. Melody had to run?
9. MR. SCHRYVER: Objection,
10. vague.
11. A. It potentially polluted the
12. market with a, with models that
13. didn't reflect true value of the
14. assets and the filing of a lawsuit
15. on the eve of launching the process
16. was not helpful.
17. Q. When you say polluted the
18. market with false models, did
19. Mr. Scaminaci provide a financial
20. model to Digital Colony or to other
21. would be acquirers?
22. A. Yeah. If I said false, I
23. misspoke. A model that didn't
24. reflect what we thought the business

COLE - CONFIDENTIAL

1. model should be for the assets.
2. Again, we were changing the business
3. model from a ground cash flow to a
4. tower cash flow model and didn't
5. take into account, I believe, the
6. agreements that we had to
7. renegotiate with some of the major
8. tower companies that formed the
9. basis for that change in model.
10. So to the extent that Digital
11. Colony is out there saying we valued
12. this at 20.5X of ground cash flow
13. and that's out in the market. That
14. potentially could be detrimental to
15. a sale process where we are actually
16. showing a higher -- the reason --
17. the basis for a much higher
18. valuation.
19. MR. BROCKETT: Take a quick
20. break and see where I am and I'll
21. be ready to pass the witness.
22. THE VIDEOGRAPHER: We are now
23. off the record. The time on the
24. video monitor is 1:50 p.m.

COLE - CONFIDENTIAL

1. Whereupon, there is a recess
2. in the proceedings.)
3. THE VIDEOGRAPHER: We are now
4. back on the record. The time on
5. the video monitor is 2:08 p.m.
6. Q. Are you ready to resume
7. your deposition, Mr. Cole?
8. A. I am.
9. Q. Okay. You understand you
10. are still under oath?
11. A. Yes.
12. Q. Just a couple more
13. documents I want to put on the
14. record and ask you a few questions
15. and then I'll pass the witness.
16. So this is a document produced
17. by DigitalBridge. It's 459 through
18. 464.
19. (Exhibit 20, NDA, Bates 459
20. through 464, marked for
21. identification, as of this date.)
22. Q. So this is an NDA that
23. Mr. Scaminaci executed with Digital
24. Colony allowing Digital Colony to

COLE - CONFIDENTIAL

1. have access to a data room.
2. Do you see that?
3. A. Yes.
4. Q. And if you look in the
5. agreement, the party executing the
6. NDA was Melody Capital Group,
7. correct?
8. A. Correct.
9. Q. And Melody Capital Group
10. was a Scaminaci-controlled entity,
11. correct?
12. A. That is correct.
13. Q. And Melody Capital Group
14. didn't own any financial information
15. pertaining to Melody Wireless,
16. correct?
17. MR. SCHRYVER: Objection.
18. A. That's correct.
19. Q. Okay. And in fact, and I
20. know you testified to the contrary
21. earlier, but in fact, every one of
22. the NDAs that Mr. Scaminaci entered
23. into with third parties were with
24. Melody Capital Group, correct?

COLE - CONFIDENTIAL

1     COLE - CONFIDENTIAL
2     MR. SCHRYVER: Objection.
3     A. I misrecollected, but this
4    is signed by Melody Capital Group.
5     Q. And Melody Capital Group
6    had no affiliation with legacy
7    Melody, correct?
8     MR. SCHRYVER: Objection.
9     A. It was affiliated through
10   Andres Scaminaci.
11    Q. Other than the fact that
12   Mr. Scaminaci was a member of both,
13   Melody Capital Group had no
14   affiliation, correct?
15    MR. SCHRYVER: Objection.
16    A. It did not control Melody
17   Wireless.
18    Q. And if you look at what
19   I'll mark next as Exhibit 21, which
20   is a one-page email from your --
21   two-page email from yourself to RBC
22   Capital Markets. That's Exhibit 21.
23    (Exhibit 21, Email, Bates
24   RBCCM1928, marked for
25   identification, as of this date.)

1     COLE - CONFIDENTIAL
2     Q. If you look at the second
3   page of this, this is you sending an
4   email to Mr. Erwin Van Der Voort,
5   right?
6    A. Yes.
7    Q. And Mr. Van Der Voort was
8   at RBC Capital Markets?
9    A. Evidently, yes.
10    Q. And you refer to a
11  nondisclosure agreement with Melody
12  Capital Group, right?
13    A. Yes.
14    Q. So looks like Mr. -- or RBC
15  entered into a nondisclosure
16  agreement with Melody Capital Group
17  as well, correct?
18    MR. SCHRYVER: Objection.
19    A. It appears so, yes.
20    Q. And once again, Melody
21  Capital Group had access to no
22  confidential financial information
23  belonging to Melody Wireless,
24  correct?
25    MR. SCHRYVER: Objection.

1     COLE - CONFIDENTIAL
2   Asked and answered.
3    A. That's correct.
4    Q. And these NDAs that
5   Mr. Scaminaci entered into with all
6   these third parties, they all had
7   lock-up provisions requiring the
8   party to give Mr. Scaminaci a role
9   in the post acquisition entity,
10   correct?
11    MR. SCHRYVER: Objection.
12    A. I believe there was -- my
13   recollection is that they had a
14   noncircumvent provision. I'm
15   looking for it. Yeah, there's a
16   noncircumvent provision on page 2.
17    Q. Did Mr. Scaminaci ever make
18   any threats to you regarding your
19   career in 2020?
20    MR. SCHRYVER: Objection.
21    A. In 2020, I think he may
22   have made some, I don't know,
23   threats, but I think he was pretty
24   upset with one transaction where
25   there was an allocation of assets

1     COLE - CONFIDENTIAL
2   that could have been theoretically
3   purchased by Melody Wireless but was
4   acquired by an MIA fund. And out of
5   that and out of the 20 -- out of
6   this process he may have said, you
7   know, you have a conflict, this is
8   not going to end very well for you
9   or words to that effect, I don't
10   recall exactly, but I think that was
11   the substance of it.
12    Q. Did he ever threaten you
13   with respect to your career at any
14   point in time?
15    MR. SCHRYVER: Objection.
16    A. Threaten me, no, I don't
17   think he threatened me, my career.
18    MR. BROCKETT: Okay. We will
19   stop now and pass the witness.
20    THE WITNESS: Okay.
21    MR. SCHRYVER: Can we get a
22   time check on the record.
23    THE VIDEOGRAPHER: I have to
24   go off to give you precise.
25    MR. SCHRYVER: We can do it

COLE - CONFIDENTIAL
1      COLE - CONFIDENTIAL
2 quickly.
3     THE VIDEOGRAPHER: It's
4 roughly maybe three hours and
5 10 minutes or so.
6     MR. SCHRYVER: I mean what
7 time is it? What time is it on the
8 video monitor?
9     THE VIDEOGRAPHER: Well, we
10 went on at 2:08.
11     MR. SCHRYVER: No, right now
12 what time is it?
13     THE VIDEOGRAPHER: 2:17.
14     MR. SCHRYVER: We will give
15 Dan 15 just to give you two minutes
16 back.
17     MR. BROCKETT: I think it's
18 20 minutes.
19 EXAMINATION BY
20 MR. SCHRYVER:
21    Q. Nice to formally meet you
22 on the record at least. My name is
23 Gavin Schryver and I represent
24 Andres Scaminaci.
25    I want to start kind of going

1      COLE - CONFIDENTIAL
2 backwards in time, you know,
3 starting with the Melody Wireless
4 offer just because that's what we
5 just touched upon and it's probably
6 fresh in everyone's mind.
7    And if I could ask
8 Mr. Brockett to pass this to the
9 reporter.
10    (Exhibit 22, Email, Bates
11   AS_00224271, marked for
12   identification, as of this date.)
13    Q. And for the record, while
14 you take a look at that email, it's
15 Exhibit 22 is an email with
16 attachment Bates stamped
17 AS_00224271.
18    And do you see this is an
19 email from Mr. Scaminaci to Omar
20 Jaffrey copying a number of folks
21 including yourself?
22    A. Yes.
23    Q. And it's dated July 30,
24 2020, right?
25    A. Yes, it is.

1      COLE - CONFIDENTIAL
2    Q. And the subject is "Melody
3 Telecom Land Funds"?
4    A. Yes.
5    Q. And if you look at the
6 attachment, and feel free to take as
7 long as you'd like to look at it, as
8 long as you need to look at it to
9 answer my question. And my question
10 is, is this attachment the letter in
11 which Mr. Scaminaci communicated the
12 Digital Colony offer to Melody?
13    A. Yes, it is.
14    Q. And you indicated earlier I
15 think that you had a discussion with
16 Mr. Scaminaci about a potential
17 Blackstone transaction in early
18 2020?
19    A. I believe it was
20 February 2020 but, yeah, it was a
21 short conversation.
22    Q. And do you recall just
23 generally what were the details of
24 the contemplated transaction at that
25 time?

1      COLE - CONFIDENTIAL
2    A. I believe that it was an
3 acquisition of the Melody Wireless
4 portfolio -- oh, I'm sorry, no.
5 Yes, the Melody Wireless portfolio
6 by Blackstone.
7    Q. And in that contemplated
8 transaction was it, or rather let me
9 start again. In the transaction
10 that you discussed with
11 Mr. Scaminaci relating to
12 Blackstone, was it contemplated that
13 Mr. Scaminaci would be a participant
14 in that -- on the buy-side?
15    A. Yes, I believe so because
16 my conversation, my very short
17 conversation was that, the
18 information I had would be that it's
19 a principal transaction requiring
20 consent from the Advisory Board.
21    Q. So you told Mr. Scaminaci
22 that in order to do that he'd have
23 to get consent from the Advisory
24 Board?
25    A. The trans -- it would

41 (Pages 158 - 161)

COLE - CONFIDENTIAL

1       COLE - CONFIDENTIAL
2 ultimately be something that would
3 go to the Advisory Board for
4 sign-off, yeah.
5    Q.  Can I ask you the
6 individuals that are copied on this
7 email that attaches the letter, go
8 to the cover email --
9    A.  Yes.
10    Q.  -- are those the members of
11 Melody Wireless's Advisory Board?
12    A.  Yes.
13    Q.  So Mr. Scaminaci sent this
14 offer to the members of the Advisory
15 Board?
16    A.  They were copied on it,
17 yes.
18    Q.  And in the third paragraph
19 of the letter he says: "If Colony
20 is the successful purchaser, I
21 expect to have a role at the company
22 going forward. Given that conflict,
23 I will refrain from participating in
24 company decisions that relate to
25 this proposal but, of course, I am

1       COLE - CONFIDENTIAL
2 available to discuss the situation
3 with you, our investors and others."
4    Do you see that?
5    A.  Yes, I do.
6    Q.  So he didn't just offer to
7 recuse himself, he affirmatively
8 said he was recusing himself when he
9 presented the offer?
10    A.  That's correct.
11    Q.  The Advisory Board, do you
12 understand whether this offer that
13 was -- the offer that is discussed
14 in this offer letter, was
15 Mr. Scaminaci proposing that it be
16 accepted without the consent of the
17 Advisory Board?
18    A.  No. There's no request
19 here. I mean no.
20    Q.  He didn't agree on behalf
21 of Melody Wireless to be sold
22 without consulting the Advisory
23 Board, right?
24    A.  Correct.
25    Q.  And when he recused

1       COLE - CONFIDENTIAL
2 himself, who was the other -- who
3 was remaining at Melody who would
4 have the authority to decide what to
5 do with Digital Colony's offer?
6    A.  It would be Mr. Jaffrey.
7    Q.  So Mr. Jaffrey at that
8 point, from this point on, had sole
9 authority as to whether to accept
10 the offer, renegotiate the offer or
11 decline the offer, right?
12    A.  Yeah, of course, I think
13 that's right, that's the
14 implication.
15    Q.  And, in point of fact,
16 Mr. Jaffrey did not accept this
17 offer?
18    A.  It was ultimately not
19 accepted.
20    Q.  Well, that could only have
21 been done with Mr. Jaffrey's
22 consent, right? If it wasn't
23 accepted it was because he didn't
24 either accept it or recommend to the
25 Advisory Board that it be accepted?

1       COLE - CONFIDENTIAL
2    A.  Right. We hadn't run a
3 process.
4    Q.  I think you also indicated
5 earlier that when you spoke with
6 Mr. Scaminaci about the Blackstone
7 transaction, you indicated to him
8 that he was not prohibited from
9 having a conversation about a
10 potential transaction involving
11 Melody Wireless?
12    A.  Yeah, that wasn't my view,
13 that he could not have a
14 conversation.
15    Q.  Just because there's double
16 negatives just so the record is
17 clear. It was your view that he
18 could have such conversations?
19    A.  Yes. But I mean, again, my
20 very short message was that this
21 transaction ultimately has to be
22 approved as a principal transaction
23 by the Advisory Board.
24    Q.  By the Advisory Board. But
25 as we just saw, Mr. Scaminaci never

COLE - CONFIDENTIAL

1       COLE - CONFIDENTIAL
2   -- when he presented the Digital
3   Colony offer he actually copied the
4   Advisory Board and he never took the
5   position that it could be approved
6   without the advisory board's
7   consent?
8     A. Correct.
9     Q. Now, were you aware that
10  Mr. Scaminaci discussed this Digital
11  Colony, potential Digital Colony
12  transaction with at least one member
13  of the Advisory Board before it was
14  presented?
15    A. At the time, no.
16    Q. But you are aware of that
17  now?
18    A. I believe -- I believe it
19  may have been discussed with
20  Mr. Steed, but I'm not sure.
21    Q. And Mr. Steed is a
22  representative of the ▮▮▮ one
23  of the ▮▮▮ retirement system --
24  systems?
25    A. Yes, that's correct.

1       COLE - CONFIDENTIAL
2     Q. And that particular ▮▮▮
3  retirement system of which Mr. Steed
4  is a representative was an investor
5  within the Melody telecom funds?
6    A. Yes. All of these members of
7  the Advisory Board are
8  representatives of large investors
9  in the telecom fund.
10    Q. Were you aware that
11  Mr. Scaminaci -- well, let me step
12  back.
13    Are you familiar with the law
14  firm of Paul Weiss?
15    A. Yes.
16    Q. And from time to time did
17  Paul Weiss serve as counsel to
18  Melody?
19    A. Yes.
20    Q. Are you aware -- are you
21  familiar with an individual named
22  Marco at Paul Weiss?
23    A. Yes.
24    Q. And do you recall Mr. Marco
25  -- Marco's last name?

1       COLE - CONFIDENTIAL
2     A. Masotti.
3     Q. Masotti. Mr. Masotti --
4  was Mr. Masotti at Paul Weiss, did
5  he serve as counsel from time to
6  time to Melody?
7    A. Yes. Paul Weiss was our
8  outside fund counsel.
9    Q. Well, are you aware that
10  Mr. Scaminaci discussed this Digital
11  Colony offer and requested advice
12  from Paul Weiss before he presented
13  it to Melody?
14    MR. BROCKETT: Objection to
15  form. Assumes facts not in
16  evidence. Go ahead.
17    MR. SCHRYVER: That's why I'm
18  asking questions, Dan.
19    Q. Go ahead.
20    A. I was not aware.
21    Q. We talked a little bit
22  earlier about Hogan Lovells and
23  their bills, right?
24    A. Um-hmm.
25    Q. Did Melody pay Hogan

1       COLE - CONFIDENTIAL
2   Lovells or did Mr. Jaffrey
3  personally?
4    A. It would have been Melody.
5    Q. Did Mr. Jaffrey reimburse
6  Melody for those bills?
7    A. No.
8    Q. Did any -- now, Hogan
9  Lovells was Melody's M&A counsel in
10  connection with the sale of Melody
11  Wireless?
12    A. Yes.
13    Q. And M&A is short for
14  mergers and acquisitions, just for
15  the record?
16    A. Yes.
17    Q. Did Melody typically retain
18  outside counsel when it entered into
19  sizeable M&A transactions?
20    A. Yes.
21    Q. So would you have expected
22  Melody to have retained outside
23  counsel for the sale of Melody
24  Wireless regardless of when it
25  occurred?

COLE - CONFIDENTIAL

1    A.  Yes.
2    Q.  I think you indicated
3    earlier that as a result of the
4    Digital Colony offer Melody
5    accelerated the timeline of its sale
6    process?
7    A.  Yeah, I think we had to
8    move to prepare a sales -- another
9    process -- a process with an
10    investment banker, yeah.
11    Q.  Now, in fact, at the time
12    that the Digital Colony offer was
13    presented Melody had not retained an
14    investment banker for the sale of
15    Melody Wireless?
16    A.  Not at that point, no.
17    Q.  And Melody hadn't retained
18    M&A counsel for the sale of Melody
19    Wireless?
20    A.  That's correct.
21    Q.  And you indicated earlier
22    that you thought there was a
23    possibility -- well, let me try it
24    -- let me ask you this.  You

COLE - CONFIDENTIAL

1    testified earlier about models
2    relating to the financial
3    projections of future financial
4    performance for Melody Wireless?
5    A.  That's correct.
6    Q.  And you indicated that you
7    thought there was a possibility that
8    a model used by Mr. Scaminaci that
9    valued the assets lower than the
10    other models being used at the time
11    might "pollute the market"?
12    MR. BROCKETT:  Objection.
13    Hold on.  Objection, misstates the
14    testimony.
15    A.  So there was the model that
16    ultimately we found in the VDR had a
17    number of flaws in it.  I don't --
18    my recollection is that it didn't
19    accurately reflect the data tape and
20    did not give credit to TCF modeling.
21    Again, I'm not an investment banker
22    but being part of the team that was
23    I think the conclusion that the
24    model that was in the VDR did not

COLE - CONFIDENTIAL

1    accurately -- would not accurately
2    reflect the value of the assets.
3    Q.  So I want to parse it out,
4    break that out a bit.  You said you
5    are not an investment banker.  So
6    you didn't draw the conclusion that
7    this model undervalued the assets,
8    that conclusion was made by the
9    investment team?
10    MR. BROCKETT:  Objection to
11    form.
12    A.  The investment team pointed
13    out the fact that it didn't, the
14    model didn't reflect the data tape,
15    did not reflect the change in the
16    business model that we'd been
17    working, me as part of the
18    investment team had been working on
19    to achieve.  But yes, I take their
20    word for it that it didn't
21    accurately reflect the value that we
22    were trying to achieve.
23    Q.  And who were the members of
24    the investment team that you were

COLE - CONFIDENTIAL

1    referring to in your answer?
2    A.  Sure.  It would be Omar
3    Jaffrey, Josh Oboler and Zak- --
4    sorry, Spencer Zakerin.
5    Q.  Mr. Zakerin and Mr. Oboler,
6    they work for Mr. Jaffrey?
7    A.  They do work for him now.
8    They were a part of the TMT team at
9    Melody.
10    Q.  And I just want to be very
11    careful about this.  Did you review
12    the models yourself to determine the
13    accuracy of the representations that
14    you were receiving from the
15    investment team or did you rely on
16    their representations?
17    A.  No.  I relied on Josh and
18    Spencer's assessment.
19    Q.  Now, is that the model --
20    this model that we are describing
21    here that you found in the VDR,
22    that's shorthand for virtual data
23    room?
24    A.  That's right.

44 (Pages 170 - 173)

COLE - CONFIDENTIAL

1
2    Q.   And was that model
3    ultimately the one that Melody
4    Wireless used during the sale
5    process run by ███████?
6    A.   No.
7    Q.   So it gave a different
8    model to potential bidders?
9    A.   Yes.
10    Q.   And did that model that was
11    given to potential bidders fix any
12    -- fix all of the alleged flaws that
13    were identified by the investment
14    team?
15    A.   Yes.  It would have
16    reflected the data tape and would
17    have reflected more of the TCF
18    modeling of the business.
19    Q.   And was the model that we
20    have just been discussing that you
21    found in the VDR, was that given
22    all, did Melody give that to
23    potential investors -- potential
24    bidders at all during the sale
25    process or only give this corrected

COLE - CONFIDENTIAL

1
2    model?
3    A.   We wouldn't have used --
4    yeah, it would not have been used.
5    I don't know specifically but no,
6    there was a new model that was built
7    and was used by ███████.
8    Q.   So potential bidders
9    receiving the information from
10    Melody unless they received it --
11    let me this, ask a question.
12    So the model that you found in
13    the virtual data room, that would
14    have been given to the potential
15    counterparties with whom
16    Mr. Scaminaci interacted pursuant to
17    NDA, right?
18    A.   Correct.
19    Q.   So if they were to
20    disseminate that model, that would
21    be a breach of the NDA?
22    MR. BROCKETT:  Objection.
23    A.   Presumably, yeah.
24    Q.   And if -- so for any of the
25    many, many, many, many entities that

COLE - CONFIDENTIAL

1
2    were contacted during the actual
3    bidding or the bidding -- sorry.
4    For any of the bidders that
5    were contacted during the sale
6    process for Melody Wireless that
7    took place after the Digital Colony
8    bid was, offer was received, they
9    would not have seen this model that
10    you found in the VDR unless somebody
11    breached their NDA and gave it to
12    them?
13    MR. BROCKETT:  Objection.
14    Calls for speculation.  Assumes
15    facts not in evidence.
16    A.   In any process there's
17    always the risk that a participant
18    is going to disseminate information
19    and sometimes that's done to kill a
20    process.
21    Q.   Have you seen firsthand any
22    evidence that that model was
23    disseminated to the bidders for
24    Melody Wireless?
25    MR. BROCKETT:  Objection.

COLE - CONFIDENTIAL

1
2    A.   The process that Melody ran
3    or the one that MCG ran?
4    Q.   The one that Melody ran.
5    A.   No, I don't have any
6    firsthand knowledge of that.
7    Q.   And you indicated earlier
8    when you were testifying that if
9    Digital Colony, I think you said, in
10    sum or substance, I don't want to
11    put words in your mouth, but if
12    Digital Colony was out there saying
13    they valued the assets at 20.5X that
14    could have an impact on the -- if
15    Digital Colony was out in the market
16    saying that they valued the Melody
17    Wireless assets at 20.5X that could
18    have an impact on the sales process?
19    A.   Yes.
20    MR. BROCKETT:  Objection.
21    Q.   If Digital Colony did that,
22    it would be violating an NDA, right?
23    MR. BROCKETT:  Objection.
24    Hypothetical.  Calls for a legal
25    conclusion.  Calls for speculation.

45 (Pages 174 - 177)

COLE - CONFIDENTIAL
1          MR. SCHRYVER:  I think that
2   might be a record, Dan.
3       Q.   You can answer.
4       A.   Yes.
5       Q.   And have you seen any
6   evidence that that occurred?
7          MR. BROCKETT:  Same objection.
8       A.   There are players in the
9   telecom market who are very
10  aggressive in these processes and
11  will sometimes have conversations
12  and try to kill off the competition.
13  At the very least it sets a floor on
14  valuation.  A floor that's, my
15  recollection, is just, you know, not
16  close to the valuation that we are
17  hoping to achieve.
18      Q.   I want to unpack that a
19  little bit.  Because I think what
20  you were saying is there are players
21  in the telecom market who are very
22  aggressive and will sometimes have
23  conversations and try to kill off
24  the competition.  Are you aware,

COLE - CONFIDENTIAL
1   sitting here today, firsthand
2   knowledge, of any such
3   conversations?
4       A.   No.  Just very aware of the
5   risk.
6       Q.   The risk.  Fair enough
7   there was a risk but you don't know
8   whether that risk actually occurred?
9          MR. BROCKETT:  Objection.
10  Asked and answered.  Argumentative.
11      A.   I'm not aware, yeah.
12      Q.   And when you said floor --
13  withdrawn.
14      We talked a little bit earlier
15  about the NDAs that Melody Capital
16  Group entered into in connection
17  with a potential transaction
18  involving Melody Wireless.
19      A.   Yes.
20      Q.   And you were asked about
21  certain, I think they were called,
22  Mr. Brockett referred to them as
23  lock-up provisions in those
24  agreements?

COLE - CONFIDENTIAL
1       A.   Yeah.  There's a
2   noncontravention provision.
3       Q.   Do you recall that
4   Mr. Scaminaci waived those markups?
5          MR. BROCKETT:  Objection.
6       A.   I think ultimately he may
7   have.  I think that's my
8   recollection.
9       Q.   And he offered to assign
10  all the NDAs to Melody?
11         MR. BROCKETT:  Objection.
12      A.   I believe that's true.
13      (Exhibit 23, Email, Bates
14   AS_00224476, marked for
15   identification, as of this date.)
16      Q.   And while you review that
17  email, Mr. Cole, for the record,
18  Exhibit 23 is an email Bates stamped
19  AS_00224476 from Mr. Scaminaci to
20  Mr. Jaffrey copying Mr. Cole dated
21  August 7, 2020.
22      Once you've had a chance to
23  review, just let me know and we can
24  walk through a couple questions.

COLE - CONFIDENTIAL
1       A.   Okay.
2       Q.   So this is an email to you
3   -- to Mr. Jaffrey copying yourself
4   from Mr. Scaminaci in early August
5   of 2020, right?
6       A.   Yes.
7       Q.   And so this occurred, you
8   know, about a week after the Digital
9   Colony offer was presented to
10  Melanie?
11      A.   Yes.
12      Q.   And Mr. Scaminaci writes to
13  Omar, and I want to look at the
14  third paragraph in this email.  He
15  says: "I sought to achieve the best
16  result for our investors by
17  generating liquidity amidst an
18  uncertain context.  This offer can
19  lead to a dialogue between the
20  company and Digital Colony leading
21  to a sale or to an independent
22  process leading to a sale.  Either
23  approach is acceptable."
24      Do you see that?

46 (Pages 178 - 181)

COLE - CONFIDENTIAL

1
2      A.   Yes.
3      Q.   Now is that a sentiment
4  that Mr. Scaminaci communicated to
5  you at the time?
6          MR. BROCKETT:  Objection.
7      A.   Well, it's in this email.
8      Q.   Did he communicate it to
9  you orally or otherwise?
10         MR. BROCKETT:  Objection.
11     A.   I don't recall --
12         MR. BROCKETT:  Hold on a
13  second.  Just give me a chance.
14  Objection to form.
15     A.   I don't recall.  I don't
16  recall that.  I did have lunch with
17  Andres I think soon after this.  It
18  may have been after this letter or
19  my -- I encouraged Andres to let the
20  process work through to get -- to
21  achieve the highest price.  But I
22  don't know if that conversation
23  happened before or after, you know,
24  how it occurred -- whether it was
25  contemporaneous with this email or

COLE - CONFIDENTIAL

1
2  not.
3      Q.   Got it.  Either with way in
4  this email he's telling Mr. Jaffrey
5  that it's acceptable to him whether
6  there's a dialogue between Melody
7  Wireless and Digital Colony or an
8  independent process leading to a
9  sale.
10         MR. BROCKETT:  Objection.
11     A.   Correct.  That's what it
12  says.
13     Q.   Would you agree that
14  following this, in the months
15  following this there was an
16  independent process leading to a
17  sale?
18         MR. BROCKETT:  Objection to
19  the form.
20     A.   Yes, there was.
21     Q.   Now if you look at the last
22  paragraph -- sorry, the paragraph
23  that begins "I believe both you and
24  I are conflicted."
25         Do you see that?

COLE - CONFIDENTIAL

1
2      A.   Yes.
3      Q.   He says:  "I have disclosed
4  my conflicts in the letter sent to
5  you and the Advisory Board.  In the
6  event you and I cannot reach
7  consensus on process, we could seek
8  guidance or recommendation from the
9  Advisory Board."
10         Do you see that?
11     A.   Yes.
12     Q.   So there he's -- again,
13  he's saying the Advisory Board can
14  weigh in?
15     A.   Correct.
16     Q.   And then he continues:
17  "Such recommendation can include
18  pursuing the Digital Colony path or
19  the designation of a financial and
20  legal advisor to run an independent
21  process leading to the company's
22  sale, or both."
23         Do you see that?
24     A.   Yes.
25     Q.   So there again, he's

COLE - CONFIDENTIAL

1
2  telling Mr. Jaffrey if you want to
3  do a deal with Digital Colony,
4  great, or if you want to do an
5  independent sale process, great,
6  right?
7          MR. BROCKETT:  Objection to
8  form.
9      A.   Well, the words speak for
10  themselves, yes.
11     Q.   And so Mr. Scaminaci was
12  open to a process to sell Melody
13  Wireless even if it didn't end up
14  being sold to a buyer group of which
15  he -- in which he had an interest?
16         MR. BROCKETT:  Objection to
17  form.  Calls for speculation.
18         MR. SCHRYVER:  Please let me
19  finish.
20         MR. BROCKETT:  Objection to
21  form.  Calls for speculation.
22     A.   So he states in this email.
23         MR. SCHRYVER:  Dan, if you can
24  hand it to the reporter so she can
25  mark it.

47 (Pages 182 - 185)

COLE - CONFIDENTIAL

1       MR. BROCKETT: Oh, yeah, I'm
2  sorry.
3       (Exhibit 24, Email, Bates
4  AS_00258164, marked for
5  identification, as of this date.)
6       Q. For the record, Mr. Cole,
7  while you review Exhibit 24 is an
8  email string Bates stamped
9  AS_00258164 dated August 5th, 2020
10  between Mr. Cole, Mr. Scaminaci and
11  Steven Pesner.
12       Just let me know when you've
13  had a chance to review.
14       A. Sure, yeah.
15       Q. So this is an email a
16  couple days before the email we just
17  looked at. It's August 5th, 2020,
18  right?
19       A. Yes, it is.
20       Q. And the email starts with
21  an email between you and
22  Mr. Scaminaci regarding retaining
23  counsel, correct?
24       A. Correct, yes.

COLE - CONFIDENTIAL

1       Q. And what you say is: "I'm
2  going to engage independent legal
3  counsel on behalf of Melody Capital
4  Management LLC to evaluate the
5  process and offer and to advise on
6  an independent process. I believe
7  that this is imperative that we
8  start an independent and objective
9  process in order to maximize value
10  for our investors which will inure
11  to the benefit of everyone
12  involved."
13       Do you see that?
14       A. Yes.
15       Q. And is that, in fact, what
16  happened, that Melody started an
17  independent and objective process in
18  order to maximize value for its
19  investors?
20       A. Yes, I think that's true.
21  Yeah, for sure.
22       Q. And then we saw a couple
23  days later Mr. Scaminaci himself is
24  saying to Mr. Jaffrey, let's start a

COLE - CONFIDENTIAL

1  process?
2       A. Yes.
3       Q. Were you involved -- so
4  after the process starts to sell
5  Melody Wireless, you know, guided by
6  ████████ and Hogan Lovells, what was
7  your involvement in that process?
8       A. General counsel and part of
9  really helping from a legal side on
10  the sale process, so reviewing --
11  yeah, reviewing all documents,
12  helping guide the process.
13       Q. Did you correspond with
14  potential bidders?
15       A. I don't believe -- yes, I
16  corresponded with Digital Colony
17  recognizing that they had made an
18  offer, we are still evaluating the
19  offer and so we had to obviously --
20  not obviously, we are trying to run
21  a process of boil the ocean, as they
22  say, to find more bidders so we
23  couldn't respond and accept or
24  reject their offer.

COLE - CONFIDENTIAL

1       (Exhibit 25, Email, Bates
2  JAF0288647, marked for
3  identification, as of this date.)
4       Q. So while you review,
5  Mr. Cole, for the record, Exhibit 25
6  is a single page email string that's
7  Bates stamped JAF0288647. It's
8  dated January 12, 2021.
9       And just let me know when
10  you've had a chance to review.
11       A. Okay.
12       Q. So this email is a few
13  months later, January 12, 2021. So
14  it's further into the sales process,
15  right?
16       A. Yes.
17       Q. And in fact, it's a little
18  more than five months after the
19  Digital Colony offer was first
20  presented to Melody at the very,
21  very end of July 2020?
22       A. Yes.
23       Q. So the email starts, email
24  string starts with an email from

COLE - CONFIDENTIAL

1    Mr. Jaffrey to yourself saying: "I
2    think there is merit," and it says
3    "is," but I think you meant in,
4    "speaking with Andres and asking him
5    if he/Colony want to enter into our
6    bidding."
7        Do you see that?
8    A.   Yes.
9    Q.   And you respond:  "I think
10   having both of them under our
11   process NDA achieves our goals of
12   protecting the integrity of the
13   process while solving the near term
14   governance matters as it relates to
15   the process."
16       Do you see that?
17   A.   Yes.
18   Q.   What did you mean by that?
19   A.   It assures that Colony is
20   under an NDA that we can enforce.
21   Q.   When he -- when Mr. Jaffrey
22   said asking him, meaning Andres, if
23   he/Colony want to enter into our
24   bidding, is it fair to say that at

COLE - CONFIDENTIAL

1    this point Colony, Digital Colony
2    had been excluded from the bidding
3    process?
4    A.   I don't recall if they had
5    been excluded.  It took time to
6    start the process, getting the
7    information together, modeling,
8    engaging ██████████  I don't
9    recall if they had been specifically
10   excluded from the process by this
11   time.
12   Q.   Just to be clear, did you
13   -- you believed at this time that it
14   would be reasonable to permit
15   Digital Colony to make a bid?
16       MR. BROCKETT:  Objection to
17   form.
18   A.   Yeah.  I thought as long as
19   they were under our NDA they could
20   participate.  I think that's what
21   I'm saying here.
22   Q.   Understood.
23       (Exhibit 26, Email, Bates
24   JAF0282081, marked for

COLE - CONFIDENTIAL

1    identification, as of this date.)
2    Q.   So while you review that
3    document, Mr. Cole, for the record,
4    Exhibit 26 is a multipage email
5    string Bates stamped JAF0282081
6    dated May 5th, 2021.
7        As before just let me know
8    when you've had a chance to review
9    and then we can discuss.
10   A.   Okay.
11   Q.   So ultimately Melody
12   Wireless was sold to Diamond
13   Capital; is that right?
14   A.   Communications.
15   Q.   Apologies, Diamond
16   Communications and Sculptor Capital
17   Management, correct?
18   A.   Correct.
19   Q.   And that agreement was
20   entered into in May of 2021, the
21   agreement to sell Melody Wireless?
22   A.   I believe it was May or
23   June.
24   Q.   Okay.  Now, this email

COLE - CONFIDENTIAL

1    string starts with an email to you
2    from Mr. Jaffrey to Mr. -- sorry,
3    from Mr. Jaffrey to you May 5th,
4    2021 at 4:53 p.m.  And he says:  "I
5    sent the following note to our LPAC
6    and most of our LPs, including key
7    LPs and credit."
8        Do you see that?
9    A.   Yes.
10   Q.   Was LPAC, L-P-A-C, a common
11   shorthand used at Melody?
12   A.   Yes.  It refers to the
13   Advisory Board.
14   Q.   So the Advisory Board of
15   the Melody telecom funds?
16   A.   Presumably, yes, the
17   telecom funds.
18   Q.   And then he said:  "Most of
19   our LPs, including key LPs and
20   credit."
21       LP, is that a reference to
22   investors in Melody?
23   A.   I believe it's a reference
24   to limited partners in the telecom

49 (Pages 190 - 193)

COLE - CONFIDENTIAL

1       COLE - CONFIDENTIAL
2  funds and also limited partners in
3  the credit funds.
4     Q.  And for those not, you
5  know, as familiar with funds, a
6  limited partner, is that another
7  word for investor?
8     A.  Yes.
9     Q.  He then says: "Please let
10  the SEC know."
11    Do you see that?
12     A.  Yes.
13     Q.  Okay.  And I want to get
14  into the body of this email a little
15  bit.  Before I do your response
16  says: "As a first step, I'm going
17  to share the press release with the
18  staff."
19    Do you see that?
20     A.  Yes.
21     Q.  Is that a reference to the
22  staff at the SEC?
23     A.  Yes.
24     Q.  Why -- were you in a
25  dialogue with the SEC about

1       COLE - CONFIDENTIAL
2  something at this time?
3     A.  We were in -- we were being
4  reviewed.  We were in the middle of
5  an examination with the SEC.
6     Q.  Was this the same or
7  different examination --
8     A.  The same.
9     Q.  So it continued for almost
10  a year?
11     A.  Yes.
12     Q.  Did you know -- do you have
13  an understanding one way or the
14  other as to why Mr. Jaffrey asked
15  you to let the SEC know?
16     A.  Well, it's something I
17  would have done anyway because the
18  SEC was very interested in making
19  sure -- about the process.  They had
20  seen the litigation and I had been
21  apprising the staff of developments
22  in the litigation but also in the
23  process so that -- it's better to be
24  up front with the staff of the SEC
25  when you are in examination.

1       COLE - CONFIDENTIAL
2     Q.  Got it.  Going back to his
3  first sentence he says: "I sent the
4  following note to our LPAC and most
5  of our LPs."
6    Let me ask you this.  At the
7  time of this email were you general
8  counsel and chief compliance officer
9  of Melody Wireless?
10     A.  There's no compliance
11  officer at Wireless, which is a
12  portfolio company.
13     Q.  It's not a fund?
14     A.  It's not a fund.  But it
15  was officially the GC of Wireless.
16     Q.  And you were the GC and CCO
17  of Melody Capital Partners and
18  Melody Capital Management?
19     A.  Yes.
20     Q.  And in those roles were
21  communications with investors
22  something that you were involved in?
23     A.  Yes.  Typically.  Though
24  there might be an instance where one
25  of the partners had communications

1       COLE - CONFIDENTIAL
2  with investors that I'm not on the
3  call or there are emails to them
4  that I'm not copied on or have not
5  reviewed.
6     Q.  What was the nature of,
7  aside from those instances, what was
8  the nature of your involvement in
9  communications with investors while
10  GC and CCO at Melody?
11     A.  Well, as CCO I review all
12  -- I would review reports given to
13  investors.  We were not -- we were
14  not raising funds at this point.  We
15  are in wind down, but I would have
16  reviewed all marketing materials.  I
17  would have reviewed one-off slide
18  decks, presentations, to investors.
19     Q.  Because he says: "I sent
20  the following note to our LPAC and
21  most of our LPs," and then he has a
22  note.  Is the note that follows
23  something that you would have
24  typically at least reviewed either
25  before or after it was sent in your

COLE - CONFIDENTIAL

1        COLE - CONFIDENTIAL
2  role as GC and CCO of Melody?
3    A.  Not necessarily.  It is a
4  communication about an event, the
5  sale of or the entering into the
6  agreement with a buyer.
7    Q.  As CCO did you have a view
8  as to the importance of the accuracy
9  of communications with investors?
10    A.  Yes.  And as GC.
11    Q.  And what's that view?
12    A.  That our communications
13  should be accurate.
14    Q.  Are there potential
15  consequences to Melody if it engages
16  in communications with investors
17  that contain inaccuracies?
18    A.  Well, in marketing
19  materials any offer of securities,
20  absolutely.  We are fiduciaries and
21  I think under the rubric of being a
22  fiduciary you need to be accurate in
23  your communications.
24    Q.  Was Mr. -- did you have an
25  understanding as to whether

1        COLE - CONFIDENTIAL
2  Mr. Jaffrey was a fiduciary to
3  Melody's investors?
4    A.  He was.
5    Q.  And so when he wrote this
6  note to investors he did so as a
7  fiduciary of those investors?
8       MR. BROCKETT:  Objection to
9  form.
10    A.  Yes.
11    Q.  And in your view would he
12  have a duty of candor, a duty to be
13  honest to those investors?
14    A.  That is one of the duties
15  of -- under the umbrella of
16  fiduciary duties, yes.
17    Q.  So the note there says that
18  Melody Wireless was sold for an
19  enterprise value of $1.625 billion.
20  That's the second line of the note.
21    Do you see that?
22    A.  Yes.
23    Q.  Is that accurate as far as
24  you understand it?
25    A.  I don't recall, but it

1        COLE - CONFIDENTIAL
2  sounds familiar because I think we
3  achieved more than $300 million
4  above what digital had offered.
5    Q.  So you were able to sell
6  or, not you, Melody was able to sell
7  Melody Wireless for more than
8  Digital Colony offered?
9    A.  Yes, it was successful.
10    Q.  Would you say it was
11  substantially more than what Digital
12  Colony offered?
13       MR. BROCKETT:  Objection to
14  form.
15    A.  For me personally
16  $300 million is a lot of money.
17    Q.  Same here.
18    A.  Yeah.
19    Q.  Let me ask you or let me
20  direct your attention to the
21  paragraph that begins:  "The
22  transaction equity value."
23    A.  Okay.
24    Q.  And right in the middle
25  there's the sentence that begins:

1        COLE - CONFIDENTIAL
2  "This equity value."
3    Do you see that?
4    A.  Yes.
5    Q.  So it says:  "This equity
6  value represents a $362 million
7  increase or about 38 percent premium
8  over the Digital Colony offer."
9    And that's what you were just
10  referring to before, you got more
11  money than Digital Colony had
12  offered?
13    A.  Yes.
14    Q.  And then it continues:
15  "...and is in line with our exit
16  goals for value of MWI."
17    Do you see that?
18    A.  Yes.
19    Q.  And MWI, that's a shorthand
20  for Melody Wireless?
21    A.  Yes.  Melody Wireless
22  Infrastructure.
23    Q.  And do you have any reason
24  to dispute the accuracy of that
25  statement that the equity value was,

COLE - CONFIDENTIAL

1      quote, in line with our exit goals
2      for value of MWI?
3          A.  I don't recall.  I don't
4      recall actually what the model was
5      but certainly I thought it was
6      viewed as a success.
7          Q.  And in fact, the next
8      paragraph begins:  "This transaction
9      is Melody's most successful
10     transaction and is a culmination of
11     a significant persistent seven-year
12     effort to grow the scale over assets
13     and reposition our assets and to
14     drive strategic value and growth."
15         Do you see that?
16         A.  Yes.
17         Q.  Would you agree with that
18     statement?
19         A.  Yeah.  I think it was
20     probably the most successful
21     transaction.  It took a long time to
22     build the pool of assets and to do
23     the work that it took to achieve
24     this value so.
25

COLE - CONFIDENTIAL

1          Q.  And the next paragraph
2      begins:  "The sales process we ran
3      was exhaustive and global."
4          Do you see that?
5          A.  Yes.
6          Q.  And do you agree with that?
7          A.  Yes.
8          Q.  And that paragraph
9      continues in the sentence that goes
10     over the two pages.  It starts with
11     "Our round one bids."  It's on the
12     prior page, the last few words.
13         A.  Yes.
14         Q.  And says:  "Our round one
15     bids were centered around
16     $1.5 billion enterprise value and we
17     were able to drive value and
18     certainty to $1.625 billion through
19     the second round."
20         Do you see that?
21         A.  Yes.
22         Q.  Is that consistent with
23     your recollection that through the
24     rounds of bidding Melody Wireless
25

COLE - CONFIDENTIAL

1      was able to increase the bids?
2          A.  I don't have a specific
3      recollection of that.  As typical
4      you would have two rounds.  And to
5      get to the second round bidders need
6      to come in with a number and ███████
7      ████  or the other -- another
8      investment banker would create
9      competitive tensions to try to get
10     to a higher number.
11         Q.  Was there any fairness
12     opinion issued in connection with
13     the Melody Wireless transaction?
14         A.  No.
15         Q.  And why is that?
16         A.  Because it was not a
17     related-party transaction.
18         MR. SCHRYVER:  We have been
19     going about 55 minutes.  Let's just
20     take a quick break.
21         THE VIDEOGRAPHER:  We are now
22     off the record.  The time on the
23     video monitor is 3:02 p.m.
24         (Whereupon, there is a recess
25

COLE - CONFIDENTIAL

1      in the proceedings.)
2          THE VIDEOGRAPHER:  We are now
3      back on the record.  The time on
4      the video monitor is 3:15 p.m.
5          Q.  Mr. Cole, good afternoon.
6      So I want to ask a few questions
7      about the ████████  transaction.  And
8      when I'm referring to that, I'm
9      referring to the purchase of the
10     legal business services or LBS of
11     ████████  from ████████  Management.
12     Are you familiar with what I'm
13     referring to?
14         A.  Yes.
15         (Exhibit 27, Email with
16     attachment, Bates AS_00246429,
17     marked for identification, as of
18     this date.)
19         Q.  And for the record,
20     Exhibit 27 is an email with
21     attachment or rather an email string
22     with attachment Bates stamped
23     AS_00246429 dated July 15, 2019.
24         Have you had a moment to just
25

COLE - CONFIDENTIAL

1    at least look at the cover email?
2        A.   Yes.
3        Q.   And so this is an email
4    string between yourself, Mr. Wathen,
5    Mr. Scaminaci and Mr. Benett, right?
6        A.   Yes, that's right.
7        Q.   And the subject line of the
8    email I think is also the name of
9    the file that's attached.  It's
10   ████████ IC Memo LP and IFR Consent
11   7-15-19.
12       Do you see that?
13       A.   Yes, yes.
14       Q.   And Mr. Wathen appears to
15   have sent you an initial draft,
16   right?
17       A.   Yes.
18       Q.   And then you provide your
19   comments?
20       A.   Yes.
21       Q.   Now, is it fair to say that
22   the attached is a blackline or a
23   redline?  I'm not sure which is the
24   right term for something like this.

COLE - CONFIDENTIAL

1        A.   Yeah, it's a redline.
2        Q.   It's a redline?  So the
3    change -- the text that you see
4    either struck through or with an
5    underline under it generally
6    reflects a change made?
7        A.   Yes.
8        Q.   And are the changes
9    reflected in the redline in this
10   document, are those your changes?
11       A.   It appears so.
12       Q.   And so this is a copy of
13   the investment -- of an investment
14   memorandum that was to be sent to
15   the Advisory Board and IFRs, right?
16       A.   Yes.
17       Q.   And relating to the ████████
18   transaction?
19       A.   Yes.  This is a transaction
20   -- yeah.  Please go ahead.  Yes.
21       Q.   And the transaction, it was
22   a purchase by LBS of ███████h from
23   ████████ right?
24       A.   Well, this investment memo

COLE - CONFIDENTIAL

1    that's going to the Advisory Board
2    and independent fund representatives
3    does address that acquisition.  But
4    from the fund, the credit fund
5    perspective we had originated a loan
6    to ████████ in which was the ████████
7    business.  And that loan would have
8    been repaid in connection with the
9    acquisition of the ████████ business.
10       But there was a request, as I
11   recall, that either there would be
12   an extension of time to repay the
13   loan in full and some other
14   concessions.  Had we given those
15   concessions and not been repaid in
16   full in cash there's the obvious,
17   not obvious, but there's potential
18   for a conflict of interest.  Because
19   Halle Benett and Andres Scaminaci or
20   with Melodeon that controls ████████
21   on that side and the Melody credit
22   funds on the other side.
23       Q.   And Melody's -- as the
24   transaction was contemplated at this

COLE - CONFIDENTIAL

1    time the sign-off of Melody as
2    lender was required for it to be
3    consummated, right?
4        A.   We would have had to -- if
5    had any of the -- had the terms of
6    the loans been amended either
7    through an extension or, of a stub
8    piece of the loan, it would have
9    required the consent of the lenders,
10   which is controlled, the lenders are
11   controlled by Melody Capital
12   Partners.
13       Q.   Well, if you look at page
14   4, and I'll go back to some stuff at
15   the beginning, but page 4 of the
16   memo, the first kind of high level
17   bullet that begins Melody's.  It
18   says:  "Melody's loan contains
19   certain covenants which would cause
20   the transaction with LBS absent a
21   waiver to trigger an event of
22   default."
23       Do you see that?
24       A.   Yes.

COLE - CONFIDENTIAL

1          Q.   So unless Melody waived
2     these conditions, then the
3     transaction that was being
4     contemplated here would trigger an
5     event of default in the agreement
6     governing Melody's loan to ▮▮▮▮▮▮
7          A.   Yeah, that's right, because
8     there would have been a change in
9     control which is an event of default
10    unless waived or amended it, the
11    loans would accelerate.  So yeah, I
12    hadn't read this in full but, yeah.
13         Q.   Got it.  And just to be
14    clear, just so the record is clear,
15    when you say you hadn't read it
16    before, you mean now?
17         A.   As you presented this to me
18    I, you know, hadn't -- my
19    recollection was that there were
20    amendments but, in fact, one of the
21    issues was had any of the loans
22    remained outstanding the change of
23    control would have been an event of
24    default.

COLE - CONFIDENTIAL

1          Q.   Got it.  And so I want to
2     walk through a couple of your edits.
3     First, you, on page 2, and there's,
4     about three-quarters of the way down
5     the page you replace a bullet point
6     that begins "▮▮▮▮▮▮ with a new
7     bullet point that says:  "It is
8     anticipated."
9          Do you see that?
10         A.   Yes.
11         Q.   The bullet point you added
12    says:  "It is anticipated that LBS
13    will be affiliated with Melody
14    Capital Group's LP, a newly formed
15    registered investment manager, and
16    its affiliated general partner
17    entity that together will be
18    controlled by Andres Scaminaci,
19    Halle Benett, Eric Tanjeloff and
20    Carras Holmstead."
21         Do you see that?
22         A.   Yes.
23         Q.   So this makes clear that
24    Melody Capital Group will be

COLE - CONFIDENTIAL

1     controlled by those four individuals
2     not Omar Jaffrey, right?
3          A.   Yes.
4          Q.   And it then says, you added
5     the next bullet that says:  "Omar
6     Jaffrey has no economic" -- let me
7     read the next bullet.  It says:
8     "Omar Jaffrey has no economic
9     interest in the general partner, an
10    investment manager of funds
11    investing in LBS and will have no
12    economic interest in Melody Capital
13    Group LP."
14         Do you see that?
15         A.   Yes.
16         Q.   And did you add that
17    language to this draft?
18         A.   Yes, I clearly did.
19         Q.   And why did you add that
20    language to this draft?
21         A.   Because I felt -- I was --
22    I believed that he had no conflict
23    with respect to this transaction.
24    Obviously -- not obviously -- but my

COLE - CONFIDENTIAL

1     recollection now is that I hadn't
2     recalled the 2018 agreement which
3     would have implicated -- the
4     implication would be that
5     Mr. Jaffrey would have economics in
6     this.
7          Q.   And you are referring to
8     the 5 percent?
9          A.   Yes.
10         Q.   So it's not -- you are not
11    saying that Mr. Jaffrey will have a
12    50 percent ownership in this, in
13    Melodeon here, you are saying at
14    most 5 percent?
15         MR. BROCKETT:  Objection.
16         A.   So yeah, I think we then
17    spoke to the issue of his potential
18    economic interest in MCG.
19         Q.   In MCG.  The next page it
20    says Mr. -- the Investment Committee
21    designated, and I'm reading what is
22    changed in your redline, the
23    Investment Committee designated
24    Mr. Jaffrey, Mr. Tanjeloff and

COLE - CONFIDENTIAL
1    COLE - CONFIDENTIAL
2    Mr. Holmstead to evaluate the
3    transaction and to negotiate
4    directly with ███████
5        Do you see that?
6        A.   Yes.
7        Q.   So you added Mr. Jaffrey to
8    this?
9        A.   Yes.
10       (Exhibit 28, Email with
11    attachment, Bates AS_00215856,
12    marked for identification, as of
13    this date.)
14       Q.   And for the record,
15    Exhibit 16 is an email -- oh,
16    Exhibit 28, apologies, Exhibit 28 is
17    an email with attachment, Bates
18    stamped AS_00215856.
19       When you've had a chance to
20    review the email string, let me know
21    and I'll ask you a few questions.
22       A.   Okay.
23       Q.   So this is an email string
24    between yourself, Mr. Jaffrey,
25    Mr. Scaminaci and a number of other

1    COLE - CONFIDENTIAL
2    folks from July 15/16, 2019, right?
3        A.   Yes.
4        Q.   And this email relates to
5    comments from various folks to the
6    ████████ memo to the Advisory Board
7    and the IFRs that we were just
8    discussing?
9        A.   Yes.
10       Q.   And I want to look at your
11    comments at 12:05 a.m., burning the
12    midnight oil literally and
13    figuratively I guess.  And you say:
14    "Since this is a pdf, here are my
15    comments."
16       And then you have comments to
17    page 2.
18       Do you see that?
19       A.   Yes.
20       Q.   And you say:  "Jonathan
21    Cole serves as the chief compliance
22    officer of each of Melodeon Capital
23    Partners, Melody Capital Partners,
24    and Melody Investment Advisors.
25    Mr. Cole serves as general counsel

1    COLE - CONFIDENTIAL
2    of Melody Capital Partners and
3    Melody Investment Advisors.  He
4    receives no compensation from
5    Melodeon, does not represent
6    Melodeon in a legal capacity and has
7    not represented Melodeon in the LBS
8    transaction."
9        Do you see that?
10       A.   Yes.
11       Q.   And so you reference
12    Melodeon four times in that edit,
13    right, in that proposed edit?
14       A.   Yes.
15       Q.   Did Mr. Jaffrey ever say to
16    you in words or substance who the
17    heck is Melodeon?
18       MR. BROCKETT:  Objection to
19    form.
20       A.   I don't recall.  I don't
21    think so.
22       Q.   Was it your understanding
23    at the time that Mr. Jaffrey knew
24    what Melodeon was?
25       MR. BROCKETT:  Objection.

1    COLE - CONFIDENTIAL
2    Calls for speculation.
3    Speculative.
4        A.   Well, it's written here.
5        Q.   Well, sorry, I'm laughing
6    at the objection.  It's written here
7    but what do you mean by it's written
8    here.  Are you saying that because
9    you reference Melodeon you did so on
10    the -- based on the understanding
11    that Mr. Jaffrey would know what you
12    are talking about?
13       MR. BROCKETT:  Same objection,
14    calls for speculation as to someone
15    else's state of mind.
16       MR. SCHRYVER:  And
17    speculative, right.
18       A.   It's a fact.  I mean it's a
19    factual -- it's a fact.  To disclose
20    any potential conflicts I may have
21    too.  That's why it was added, to
22    understand -- to have the Advisory
23    Board understand my relationship
24    with ███████
25       Q.   When you say it's a fact.

COLE - CONFIDENTIAL
1          COLE - CONFIDENTIAL
2    I mean I guess I just wanted --
3        A.  I'm sorry, maybe I
4    misunderstood your question.
5        Q.  I'm just trying to
6    understand, when you wrote this, did
7    you believe that Mr. Jaffrey, and
8    you reference Melodeon all these
9    times, did you believe that
10   Mr. Jaffrey understood what you were
11   referencing?
12        MR. BROCKETT:  Objection to
13   form.  Calls for speculation.  I'm
14   not sure what you mean by this
15   either.  If you can be more clear
16   about --
17        MR. SCHRYVER:  Mr. Brockett.
18        MR. BROCKETT:  Excuse me.  If
19   you could be more clear about what
20   language you are referring to, it
21   might help the questions.
22        MR. SCHRYVER:  Mr. Brockett,
23   you know the federal rules as well
24   as I do and you are breaching them
25   egregiously.  Please stop.  I

1          COLE - CONFIDENTIAL
2    didn't do this to you.  I never do
3    this to you.  Just cut it out, man.
4        MR. BROCKETT:  I'm just trying
5    to help your question.
6        Q.  Mr. Cole, do you need me
7    to --
8        A.  No.  I have no reason to
9    believe that he didn't understand
10   what Melodeon was.
11        Q.  Okay.  Sorry, Mr. Cole.  I
12   want to look at the edit.  Attached
13   there's an email from Mr. Jaffrey,
14   at the top there's an email from
15   Mr. Jaffrey and he says:  "My
16   comments attached."
17        Do you see that?
18        A.  Yes.
19        Q.  And attached are a series
20   of handwritten edits, right?
21        A.  Yes.
22        Q.  And do you see the
23   paragraph that you had added that
24   says:  "Omar Jaffrey has no economic
25   interest in a general partner," et

1          COLE - CONFIDENTIAL
2    cetera?
3        A.  I'm sorry?
4        Q.  I'm sorry, in the
5    attachment page 2 at the bottom --
6        A.  Yeah.
7        Q.  -- there's a paragraph that
8    says:  "Omar Jaffrey has no economic
9    interest in the general partner and
10   investment manager of funds
11   investing in LBS?
12        A.  Yes, I see that.
13        Q.  And just to be clear, the
14   general partner and investment
15   manager of funds investing in LBS,
16   that's Melodeon, right?
17        MR. BROCKETT:  Objection to
18   form.
19        A.  Well, Melodeon, ultimately
20   MCG, yeah.
21        Q.  Well, it says --
22        A.  Yeah, it does.
23        Q.  It separates those out,
24   right.  It says no economic interest
25   in the general partner and

1          COLE - CONFIDENTIAL
2    investment manager of funds
3    investing in LBS and will have no
4    economic interest in Melody Capital
5    Group?
6        A.  That is correct.
7        Q.  And that first part, the
8    general partner and investment
9    manager of funds investing in LBS,
10   that's Melodeon?
11        A.  That is correct.
12        Q.  And this is the paragraph
13   that you had added in that last
14   draft that we had looked at?
15        A.  Yes.
16        Q.  And Mr. Jaffrey, he didn't
17   make any handwritten edits to that
18   paragraph?
19        MR. BROCKETT:  Objection to
20   form.  Calls for speculation.
21   Assumes facts not in evidence.
22   Misstates the testimony.
23        MR. SCHRYVER:  Mr. Brockett, I
24   don't want to have to call the
25   court.  I don't want to have to

56 (Pages 218 - 221)

COLE - CONFIDENTIAL

1 write the court, but you need to
2 stop. I don't know what's going on
3 over there on your side of the
4 table but it needs to stop.
5 Q. Mr. Cole, Mr. Jaffrey
6 didn't make any handwritten edits to
7 that paragraph right here?
8 A. Did not.
9 MR. BROCKETT: Same objection.
10 (Exhibit 29, Email with
11 attachment, Bates AS_00215923,
12 marked for identification, as of
13 this date.)
14 Q. So for the record,
15 Exhibit 29 is an email with an
16 attachment Bates stamped
17 AS_00215923.
18 And I see this is an email
19 from Ms. Hannett to Mr. David Bree
20 copying other folks, including
21 yourself?
22 A. Yes.
23 Q. And it's dated July 16,
24 2019, right?

COLE - CONFIDENTIAL

1 A. Yes, it is.
2 Q. And Celine Hannett, she was
3 the CFO of the Melody funds?
4 A. She was.
5 Q. And Mr. Bree, he was one of
6 the IFRs?
7 A. He was.
8 Q. And are some of these other
9 folks like Mr. and -- Mrs. Perez,
10 Ms. Melen and Mr. Groome, they are
11 also IFRs?
12 A. Mr. Groome was.
13 Q. Mr. Groome was?
14 A. Was and continues to be.
15 Q. Got it. And is this -- is
16 it fair to say that this is the
17 transmittal of the investment
18 memorandum relating to the ███
19 transaction to the IFRs?
20 A. It appears to be, yes.
21 Q. And just one question about
22 it. If you look at page 2 of that
23 memo, the second-to-last paragraph
24 reads: "Omar Jaffrey has no

COLE - CONFIDENTIAL

1 economic interest in the general
2 partner and registered investment
3 advisor of funds investing in LBS
4 and will have no economic interest
5 in Melody Capital Group, LP."
6 Q. Do you see that?
7 A. Yes.
8 Q. So that was included in the
9 memo sent to the IFRs?
10 A. Yeah, that was in the final
11 memo.
12 Q. And it was also --
13 Mr. Jaffrey was copied on that
14 email?
15 A. Yes, he was.
16 Q. Okay.
17 (Exhibit 30, Email, Bates
18 AS_00216083, marked for
19 identification, as of this date.)
20 Q. Exhibit 30, for the record,
21 is an email Bates stamped
22 AS_00216083. It's from Mr. Cole to
23 a number of folks dated July 24th,
24 2019.

COLE - CONFIDENTIAL

1 Just let me know when you've
2 had a chance to review it and I'll
3 ask you a few questions.
4 A. Okay. Yes.
5 Q. So this is email is about a
6 week after the memo was sent out to
7 the IFRs?
8 A. Yes.
9 Q. And you say in the body of
10 the email: "We have a notice of
11 consent from all IFRs and consents
12 from ███████████ and
13 ███████████, so we have the needed
14 consents to the ███████
15 transaction."
16 Q. Do you see that?
17 A. Yes.
18 Q. And the import of that is
19 that the IFRs and the Advisory Board
20 signed off on whatever they were
21 asked to sign off on in that memo to
22 the IFR relating to the ███████
23 transaction?
24 A. Yes. Again, they are asked

57 (Pages 222 - 225)

COLE - CONFIDENTIAL
1 COLE - CONFIDENTIAL
2 to consent to the transaction given
3 the potential conflicts.
4    Q.   Now, you can put that
5 document aside.  Are you familiar --
6 are you familiar with agreements
7 entered into between Melody, Capital
8 Partners and Melodeon relating to
9 the reimbursement of certain
10 expenses?
11    A.   Yes, I'm aware.
12    Q.   And did you review those
13 agreements prior to their execution?
14    A.   I probably did.  I don't
15 have a specific recollection.  I
16 know the agreements.
17    Q.   And what generally do the
18 agreements provide?
19    A.   They provide for
20 reimbursement of expenses related to
21 Melodeon use of that personnel and
22 space, computers.  I think there's a
23 per -- I seem to recall there may be
24 a per desk charge.
25    Q.   You indicated reimbursement

1 COLE - CONFIDENTIAL
2 of expenses relating to Melodeon use
3 of personnel.  Do the personnel for
4 whom Melodeon provided reimbursement
5 to Melody include Halle Benett and
6 Sam Wathen?
7    A.   Yes, I believe so.
8    Q.   Did they include --
9 apologies.
10    A.   Yeah.
11    Q.   So Melodeon paid Melody
12 Capital Partners for the time that
13 Mr. Wathen and Mr. Benett spent
14 working on Melodeon-related matters?
15       MR. BROCKETT:  Objection to
16    form.
17    A.   I believe so, yes.
18    Q.   And in fact, Melodeon, you
19 were one of the individuals whose
20 time was also reimbursed when it was
21 used for Melodeon?
22    A.   That's correct.
23    Q.   So Melodeon reimbursed
24 Melody Capital Partners for the time
25 that you spent working on

1 COLE - CONFIDENTIAL
2 Melodeon-related matters?
3       MR. BROCKETT:  Objection to
4    form.
5    A.   Yes.
6    Q.   So Mr. Cole, do you recall
7 earlier today Mr. Brockett asked you
8 some questions about a draft,
9 handful of slide pages for a
10 presentation to be made to the SEC
11 in connection with the SEC's
12 Scaminaci?
13    A.   Yes.
14    Q.   Okay.
15    (Exhibit 31, Email with
16    attachment, Bates JAF0300068,
17    marked for identification, as of
18    this date.)
19    Q.   For the record, Exhibit 31
20 is an email with attachment Bates
21 stamped JAF0300068.
22    Mr. Cole, when you've had a
23 moment to review the email, just let
24 me know.
25    A.   Okay, yes.

1 COLE - CONFIDENTIAL
2    Q.   So this an email from
3 yourself to Mr. Jaffrey copying
4 Ms. Lecamp and Ms. Hannett on
5 July 12, 2020, right?
6    A.   Yes.
7    Q.   And the subject is "MCM:
8 SEC presentation," right?
9    A.   Yes.
10    Q.   And MCM, is that shorthand
11 for Melody Capital Management?
12    A.   It is.
13    Q.   And you, if you look at the
14 attachment the row in the header of
15 the email it says:  "SEC first day
16 presentation"?
17    A.   Yes.
18    Q.   What's the first day
19 presentation?
20    A.   So during an SEC exam the
21 staff asked the advisor to make a
22 presentation to the staff to give
23 them an overview of the advisor, the
24 history of the advisor and other
25 information to, I guess, ground or

COLE - CONFIDENTIAL

1    to provide a foundation for further
2    questions.
3        Q.  Got it.  Just to put us in
4    the right chronology, I think you
5    were asked a question earlier about,
6    you know, whether Mr. Scaminaci's
7    presentation of an offer for Digital
8    Colony may have precipitated the SEC
9    exam.  This is dated a couple weeks
10   before that offer was presented,
11   right, or three weeks rather?
12       A.  This is --
13       Q.  July 12, 2020.
14       A.  Yeah.  This draft was prior
15   to July 30th.
16       Q.  Got it.  And this is a
17   draft you are sending to
18   Mr. Jaffrey, right?
19       A.  Yes.
20       Q.  Why are you sending it to
21   Mr. Jaffrey?
22       A.  I would have sent it to
23   Mr. Scaminaci as well for review as
24   a managing partner of the advisor

COLE - CONFIDENTIAL

1    being examined.
2        Q.  And the point of this
3    presentation, and I don't mean to
4    point deep deep, the intended use of
5    this presentation was to be
6    presented to the Securities and
7    Exchange Commission, right?
8        MR. BROCKETT:  Objection,
9    leading.
10       A.  Yes.
11       Q.  And was it important that
12   the contents of this presentation to
13   the SEC be accurate?
14       MR. BROCKETT:  Objection to
15   form.  Leading.
16       A.  Yes, yeah.
17       Q.  Would you -- if you thought
18   there was anything inaccurate about
19   this presentation, would you have
20   done anything?
21       MR. BROCKETT:  Objection to
22   form.
23       A.  If there were inaccuracy in
24   a draft I would have changed it.

COLE - CONFIDENTIAL

1        Q.  Would you have expected
2    Mr. Scaminaci and Mr. Jaffrey to do
3    the same if they identified an
4    inaccuracy in this presentation?
5        MR. BROCKETT:  Same objection.
6        A.  Yeah, I would expect them
7    to.
8        Q.  So I want to turn to the,
9    few pages in the deck starting with
10   slide 3.
11       A.  Okay.
12       Q.  Now, the first bullet in
13   slide 3 it defines Melody.
14       Do you see that?
15       A.  Yes.
16       Q.  And as defined that
17   includes -- it's defined as both
18   Melody Capital Management and Melody
19   Capital Partners, right?
20       A.  Yes.
21       Q.  And so that's the advisors
22   for all of the legacy funds at
23   Melody, including the credit funds
24   and the telecom funds, right?

COLE - CONFIDENTIAL

1        A.  That is correct.
2        Q.  And so in the third bullet
3    it says:  "In September 2018
4    Mr. Jaffrey and Mr. Scaminaci agreed
5    to pursue investment strategies
6    separately going forward."
7        Do you see that?
8        A.  Yes.
9        Q.  And so that language is
10   actually different than what you had
11   seen before which said November.
12   This now actually says September.
13   Do you see that?
14       A.  Okay.
15       Q.  And is that consistent --
16   is that sentence accurate as far as
17   you know?
18       A.  Yeah.  It's a reference to
19   the 2018 agreement.
20       Q.  And then the next sentence
21   talks about a different time period.
22   It says:  "Further, in
23   November 2018, they determined not
24   to launch future credit funds

COLE - CONFIDENTIAL
1
2    jointly."
3        I want to pause there.  Is
4    that accurate to the best of your
5    recollection?
6        A.  Yes.
7        Q.  What do you recall about
8    that determination by Mr. Jaffrey
9    and Mr. Scaminaci not to launch
10   future credit funds jointly in
11   November of 2018?
12       A.  I believe that prior to
13   this time there had been work done
14   on Credit Funds II, PE II, marketing
15   materials that never launched.  And
16   I believe after this, must have been
17   in November, they determined not to
18   move forward with a second set of
19   credit funds, for instance.
20       Q.  And instead they decided to
21   go their separate ways?
22       A.  Yes.
23       Q.  And it then says:
24   "Although marketing efforts to
25   launch a fund pursuing a litigation

COLE - CONFIDENTIAL
1
2    finance strategy continued through
3    February 2019."
4        Do you see that?
5        A.  Yes.
6        Q.  Is that accurate?
7        A.  If I put it here, I must
8    have thought it was accurate at the
9    time.
10       Q.  And the next bullet says:
11   "Following such decisions Melody
12   ceased its fund-raising activities
13   and has no plans to fund raise in
14   the future."
15       Do you see that?
16       A.  Yes.
17       Q.  Was that an accurate
18   statement?
19       A.  Yes.  The funds were going
20   to be, at this point would have been
21   -- the PE funds were past their
22   terms even as extended, it says July
23   and the, what is called the
24   evergreen fund, the limited partners
25   were withdrawn.  So effectively an

COLE - CONFIDENTIAL
1
2    evergreen fund doesn't have a term
3    but effectively it is not then not
4    going to deploy more capital.  So --
5    and they weren't raising a new fund.
6        Q.  So when the decision was
7    made not to launch a new fund --
8    launch future credit funds jointly
9    or pursue litigation finance
10   strategy, Melody ceased its
11   fund-raising operations?
12       A.  It hadn't started -- okay.
13   Sorry.  I'm not -- I'm just trying
14   to -- so, yeah, typically when funds
15   are close to their term and almost
16   fully deployed, the advisor would
17   start the marketing for a second
18   fund or a third fund, other funds.
19   That didn't happen.
20       Q.  And that's because the
21   principals of Melody had decided
22   they didn't want to launch another
23   fund together?
24       A.  I believe that's accurate.
25       Q.  I want to go to page 9.  In

COLE - CONFIDENTIAL
1
2    the first bullet -- let me know when
3    you are there.
4        A.  Yes.
5        Q.  And this slide is entitled
6    Melody Affiliates and Other
7    Entities.
8        A.  Yes.
9        Q.  And it says: "Following
10   the decision by Mr. Jaffrey and
11   Mr. Scaminaci to pursue investment
12   strategies separately going forward,
13   they determined to organize separate
14   investment advisors for that purpose
15   while retaining their positions as
16   the control persons of Melody."
17       Do you see that?
18       A.  Yes.
19       Q.  And then it references MIA
20   and MCG.  Were those the separate
21   investment advisors that each of
22   Mr. Jaffrey and Mr. Scaminaci formed
23   to pursue their investment
24   strategies separately going forward?
25       A.  Yes.

COLE - CONFIDENTIAL

1

2　　Q.　It then says: "A

3　co-founder of MCG is also a

4　principal of Melodeon Capital

5　Partners, LP an SEC registered

6　investment advisor formed in 2019."

7　　　Do you see that?

8　　A.　Yes.

9　　Q.　And the co-founder, are you

10　referencing Halle Benett there?

11　　A.　Yes.

12　　Q.　And then you say:

13　"Mr. Scaminaci is a minority owner

14　at Melodeon.　He and Melodeon's

15　principal entered into an agreement

16　pursuant to which Melodeon is

17　expected to be contributed to and

18　become wholly-owned by an entity

19　controlled by Mr. Scaminaci."

20　　　Do you see that?

21　　A.　Yes.

22　　Q.　And there's no reference

23　there to any ownership interest that

24　Mr. Jaffrey would have in Melodeon,

25　correct?

COLE - CONFIDENTIAL

1

2　　A.　Correct.

3　　Q.　So let's go to -- I'm just

4　going to introduce it again because

5　I don't want to have you go all

6　through your stack.　I'm going to

7　limit you going through your stack

8　as much as possible.　So let me give

9　you a document you've seen before.

10　　(Exhibit 32, Email, Bates

11　JAF0300064, marked for

12　identification, as of this date.)

13　　Q.　And so Exhibit 32, for the

14　record, is an email string Bates

15　stamped JAF0300064.　It's dated

16　July 12, 2020.

17　　You've already reviewed this

18　document earlier but if you'd like,

19　you are welcome to refresh and just

20　let me know when you are ready.

21　　A.　That's fine.

22　　Q.　So this email string if you

23　look at the second page it actually

24　begins with the same email that we

25　just looked at, right?

COLE - CONFIDENTIAL

1

2　　A.　Yes.

3　　Q.　So the next email, and

4　Mr. Brockett asked you some

5　questions about this, from

6　Mr. Jaffrey at 1:22 p.m. on

7　July 12th, he's responding to your

8　email and draft presentation to the

9　SEC?

10　　A.　Yes.

11　　Q.　And he says: "I am

12　confused about the representations

13　being made in here around Melodeon

14　and MCG.　I was told that Melodeon

15　issues were all resolved."

16　　Do you see that?

17　　A.　Yes.

18　　Q.　Do you know -- did you tell

19　him that the Melodeon issues were

20　all resolved or do you know if

21　somebody else told him that?

22　　A.　I don't know.

23　　Q.　And he continues: "And

24　that Melodeon was now tucked under

25　MCG and controlled by Andres.

COLE - CONFIDENTIAL

1

2　Otherwise I have issues with the

3　formation and structure of

4　Melodeon/MCG."

5　　Do you see that?

6　　A.　Yes.

7　　Q.　Now, so he says only if

8　Melodeon is not tucked under MCG and

9　controlled by Andres would he have

10　any issue?

11　　MR. BROCKETT:　Objection to

12　form.　Mischaracterizes the

13　document.　Calls for speculation.

14　No foundation.

15　　A.　That's what he states,

16　yeah, that he has no problem.

17　　Q.　And I want to go to the

18　middle of the page where it says:

19　"Then there's a contractual breach."

20　　Do you see that?

21　　Mr. Jaffrey asks: "What

22　happens if Melodeon is not

23　contributed to MCG for whatever

24　reason."

25　　And you respond: "Then

COLE - CONFIDENTIAL

1         COLE - CONFIDENTIAL
2   there's a contractual breach."
3     Do you see that?
4     A. Yes.
5     Q. And you are referring to
6   the contribution agreement, right, a
7   breach of the contribution
8   agreement, correct?
9     A. Probably, yeah.
10     Q. And Mr. Jaffrey was not a
11   party to the contribution agreement,
12   correct?
13     A. I don't -- I don't recall.
14   I don't think so.
15     Q. Well, let's just make
16   absolutely certain since we have it.
17   I said I don't want to make you dig
18   but I'll try to be -- it's actually
19   the second document. So if you
20   flip, I don't know which order you
21   have them in, but it would be the --
22   it's the one --
23     A. I have it.
24     Q. Perfect. And do you see
25   that the parties -- that's

1         COLE - CONFIDENTIAL
2   Exhibit 2, correct?
3     A. Yeah. Mr. Jaffrey is not a
4   party to this.
5     Q. Okay. Now, Ms. Hannett
6   corrects you. She says: "If not to
7   MCG, it is still contractually bound
8   to be contributed to an entity of
9   Andres's choosing."
10     Do you see that?
11     A. Yes.
12     Q. And you agree with her.
13   You say: "Correct. That is a more
14   precise answer. It is MCG or
15   another entity controlled by AS."
16     Do you see that?
17     A. Yes.
18     Q. And Mr. Jaffrey's response
19   is: "Okay, then, thanks. Am good."
20     Do you see that?
21     A. Yes.
22     (Exhibit 33, Email, Bates
23   JAF0281139, marked for
24   identification, as of this date.)
25     Q. While you review that

1         COLE - CONFIDENTIAL
2   email, Mr. Cole, Exhibit 33 is a
3   single page email string Bates
4   stamped JAF0281139.
5     Just let me know when you've
6   had a moment to review and I'll ask
7   you a couple questions.
8     A. Okay.
9     Q. So the first email is to
10   yourself and then copying some folks
11   at Cloudbreak. Sorry. It's from
12   yourself to Mr. Jaffrey copying some
13   folks from Cloudbreak and the
14   subject is "MCM; ADV part 2B
15   supplement."
16     Do you see that?
17     A. Yes.
18     Q. And MCM, that's Melody
19   Capital Management?
20     A. That's correct.
21     Q. What is an ADV and if it's
22   pronounced "adva" or something, let
23   me know?
24     A. It's an ADV, it's advisors
25   annual report to the SEC.

1         COLE - CONFIDENTIAL
2     Q. To the SEC.
3     A. And there are different
4   parts to it. The 2B is a -- what's
5   available to investors and gives the
6   biographical information about the
7   principals.
8     Q. At this time in April of
9   2021 you were the, still general
10   counsel. And it says in your email
11   signature general counsel and chief
12   compliance officer of Melody Capital
13   Management?
14     A. Yes.
15     Q. Did you have the authority
16   or did you believe you had the
17   authority to file the submission to
18   the SEC without consent of
19   Mr. Jaffrey and Mr. Scaminaci?
20     A. Certainly within my
21   mandate, but I would have asked,
22   would have asked, you know, their
23   review and approval of disclosures
24   made.
25     Q. If one of either

1    COLE - CONFIDENTIAL
2    Mr. Scaminaci or Mr. Jaffrey
3    disapproved of something that was in
4    the ADV form to be submitted to the
5    SEC, would you have nevertheless
6    submitted it?
7         MR. BROCKETT: Objection,
8    hypothetical. Speculative.
9         A. This is a firm brochure.
10   This was not submitted to the SEC.
11        Q. So when you say "firm
12   brochure," what do you mean?
13        A. This is the biolog- -- not
14   biologic -- biographical information
15   about the principals. This is
16   available to investors.
17        Q. So this was submitted
18   potential investors or --
19        A. This is available to them
20   to review.
21        Q. So would you have made it
22   available to investors -- would you
23   have made available to investors the
24   ADV for Melody Capital Management if
25   one of either Mr. Scaminaci or

1    COLE - CONFIDENTIAL
2    Mr. Jaffrey disagreed with the
3    contents?
4         MR. BROCKETT: Same
5    objections. Speculative,
6    hypothetical.
7         A. I don't think it happened.
8    I don't know. The 2A would have
9    been filed. The 2B would have
10   probably been available.
11        Q. Well, let me -- I guess --
12   no. I want to unpack that a little
13   bit. I think you've -- you asked
14   yourself in a way better question
15   than I asked. I apologize for my
16   poor question.
17        Do you ever recall a
18   circumstance in which you released
19   to the investors the ADV form
20   for Melody Capital investment over
21   the objection of Mr. Jaffrey?
22        MR. BROCKETT: Objection,
23   hypothetical. Speculative.
24        MR. SCHRYVER: It's not. He
25   can answer.

1    COLE - CONFIDENTIAL
2         A. I don't believe -- I can't
3    recall an instance.
4         Q. And then so maybe I want to
5    divide part 2A and 2B. Are those
6    used separately, part 2A and 2B?
7         A. 2A is filed with the SEC.
8    The brochure is available to
9    investors.
10        Q. So part 2B is the brochure
11   you referenced that's released to
12   investors. Part 2A is the one filed
13   with the SEC. I see.
14        And Mr. Jaffrey asked you a
15   question about the part 2B. He
16   says: "In Andres's section should
17   MCG and Melodeon not appear there?"
18        Do you see that?
19        A. Yes.
20        Q. And there you then respond
21   and explain: "MCG has been
22   deregistered and is dormant. My
23   understanding is that the entity
24   will be dissolved after the SEC
25   examination concludes. He is not a

1    COLE - CONFIDENTIAL
2    controlled person of Melodeon and we
3    did not list Melodeon in response to
4    item 4 last year. In the MCM's ADV
5    part 2A we disclosed that he shares
6    in the economics of Melodeon and
7    that employees of MCP provide
8    services to Melodeon."
9         Do you see that?
10        A. Yes.
11        Q. And what did you mean there
12   in that last sentence?
13        A. So the disclosure to the
14   SEC is with respect to affiliates.
15   If he's not a control person, then
16   in the item I don't believe you
17   would list him as an affiliate or
18   show the affiliate relationship.
19   But I think what I'm reading here is
20   that we do disclose that
21   Mr. Scaminaci had economics in
22   Melodeon and that employees of MCP
23   and the other advisor provided
24   services to Melodeon.
25        Q. Do you know why you would

COLE - CONFIDENTIAL

1    COLE - CONFIDENTIAL
2 have disclosed that in the part 2A?
3    A.  For complete disclosure and
4 accuracy.
5    Q.  Is that important for a
6 part 2A?
7    A.  It's important, yes, in
8 disclosures to the SEC.
9        (Exhibit 34, Email with
10    attachment, Bates JAF0057555,
11    marked for identification, as of
12    this date.)
13    Q.  Do you have the document in
14 front of you?
15    A.  Yes.
16    Q.  So for the record,
17 Exhibit 34 is an email with
18 attachment Bates stamped JAF0057555.
19        Have you had a chance to
20 review the cover email?
21    A.  Yes.
22    Q.  And I'll represent to you
23 that we have, for sake of saving a
24 few trees we have only included part
25 2A, not 1A, apparently 1A is a lot

1    COLE - CONFIDENTIAL
2 longer.  But this is an email in
3 which you attach parts 1A and 2A of
4 the ADV for Melody Capital
5 Management and an email to
6 Mr. Scaminaci and Mr. Jaffrey,
7 correct?
8    A.  Yes.
9    Q.  And if you turn the page
10 you see part 2A of form ADV, right?
11    A.  Yes.
12    Q.  And so part 2A, is this
13 something that is submitted to the
14 SEC?
15    A.  Yes.
16    Q.  Now, I want to turn to page
17 3.  And it's the last paragraph
18 under item 4, Advisory Business.
19        Once you've had a moment to
20 read that paragraph let me know.
21    A.  I'm sorry, where are you?
22    Q.  Page 3 of the attachment,
23 the last paragraph under item 4,
24 Advisory Business.
25    A.  Yes, I have read it.

1    COLE - CONFIDENTIAL
2    Q.  So this says:  Melody
3 Investment Advisors, LP, a
4 registered investment advisor MIA is
5 ultimately controlled by Omar
6 Jaffrey, one of our founders.
7 Andres Scaminaci, our other founder,
8 shares in the economics of Melodeon
9 Capital Partners, LP, another
10 registered investment advisor," and
11 then in parentheses "Melodeon."
12        Do you see that?
13    A.  Yes.
14    Q.  So it said that
15 Mr. Scaminaci shares in the
16 economics of Melodeon.  It doesn't
17 say that Mr. Scaminaci controls
18 Melodeon, right?
19    A.  That's correct.
20    Q.  And it also doesn't mention
21 Mr. Jaffrey having any share in the
22 economics of Melodeon, correct?
23    A.  That's correct.
24    Q.  And if you look at page 6
25 under item 10, Other Financial

1    COLE - CONFIDENTIAL
2 Industry Activities and
3 Affiliations.  And let me know when
4 you are there.
5    A.  Okay.
6    Q.  So there it says:
7 "Relationships with MIA, Melodeon
8 and their respective affiliates."
9        And it says:  "As noted above,
10 MIA is ultimately controlled by Omar
11 Jaffrey, one of our founders, and
12 Andre Scaminaci, our other founder,
13 shares in the economics of
14 Melodeon."
15        Do you see that?
16        MR. BROCKETT:  I don't.  Where
17 are you?
18        MR. SCHRYVER:  Item 10 on page
19 6.
20    A.  Yes.
21    Q.  You see that?
22    A.  Yeah.
23    Q.  And there's no reference
24 there to Mr. Jaffrey having any
25 share in the economics of Melodeon,

COLE - CONFIDENTIAL

1 correct?
2     A.   That's correct.
3     Q.   Okay.  What was the purpose
4 of this section under item 10?
5     A.   It's responsive to the
6 disclosure requirements of item 10.
7     Q.   And what are the disclosure
8 requirements of item 10?
9     A.   I could take the form out
10 and tell you and read it to you, but
11 effectively we are showing the
12 activity -- the activities of
13 principals and of the advisor and
14 their affiliate relationships.
15     Q.   And one last question on
16 this document.  Is it important for
17 the information provided to the SEC
18 under item 10 to be true and
19 accurate?
20     A.   Yes.
21     Q.   Is it important for the
22 information provided under item 10
23 to be complete?
24     A.   Yes.

COLE - CONFIDENTIAL

1     Q.   Okay.
2          (Exhibit 35, Email with
3     attachment, Bates AS_00229506,
4     marked for identification, as of
5     this date.)
6     Q.   So for the record,
7 Exhibit 35 is an email with an
8 attachment Bates stamped
9 AS_00229506.
10          And when you've had a moment
11 to review the email, let me know and
12 I'll ask you some questions.
13     A.   Okay.
14     Q.   I'm sorry, you've had a
15 moment to review, I apologize?
16     A.   Yes.
17     Q.   So this is an email from
18 you to a couple -- three folks at
19 Sema4 USA.
20          Do you see that?
21     A.   Yes.
22     Q.   And Sema4, they're --
23 that's the company that ultimately
24 took over as liquidator for the

COLE - CONFIDENTIAL

1 Melody funds?
2     A.   Well, yeah, they are, I
3 guess, technically liquidators,
4 yeah.  They take over the management
5 and control of the advisor.
6     Q.   In your capacity today as
7 general counsel and chief compliance
8 officer of Melody, do you report to
9 individuals at Sema4?
10     A.   Well, they control the
11 ultimate GP, yes.  So yes.
12     Q.   Any of the individuals on
13 this email?
14     A.   Mark DiSalvo.
15     Q.   Your email -- you email
16 them and then you copy Mr. Jaffrey,
17 Ms. Scaminaci, Ms. Lecamp and
18 Ms. Hannett, right?
19     A.   Yes.
20     Q.   And the date is February 8,
21 2022.  Do you see that?
22     A.   Yes.
23     Q.   And this is prior to an
24 agreement being entered into in July

COLE - CONFIDENTIAL

1 of 2022 whereby Sema4, it was agreed
2 that Sema4 would actually take over
3 management of the investment
4 advisors?
5     A.   That's correct.
6     Q.   So at this time you are
7 still in negotiations with Sema4?
8     A.   Yes.
9     Q.   And so you say:  "I have
10 attached a copy of the first day
11 presentation that I made to the SEC
12 staff during the SEC's examination
13 of Melody Capital Management LLC.
14 There have been a number of key
15 developments since making that
16 presentation but I think it will
17 provide you with a good overview."
18          Do you see that?
19     A.   Yes.
20     Q.   So I want to ask a couple
21 questions about the deck but before
22 I get to that if you look at the
23 last bullet, Melodeon Capital
24 Partners, LP was effectively spun

1       COLE - CONFIDENTIAL
2  out of the Melody group."
3     Do you see that?
4    A.  Yes.
5    Q.  What does that mean?
6    A.  It was no longer an
7  affiliate of Melody Capital
8  Partners.
9    Q.  And how did that
10  transaction occur?
11    A.  I don't know that the
12  transaction occurred.  What didn't
13  happen was MCG dissolved and Andres,
14  to my knowledge, had not formed an
15  entity that would have controlled
16  Melodeon.
17    Q.  I think you indicated
18  earlier that the contribution
19  agreement between Mr. Benett and
20  Mr. Scaminaci doesn't have any time
21  limit by which the contribution has
22  to be made?
23     MR. BROCKETT:  Objection to
24   form.  He didn't say that at all.
25   Misstates the testimony.

1       COLE - CONFIDENTIAL
2    A.  I don't recall that, but I
3  can read the contract for you.
4    Q.  It's fine.  It's fine.  Let
5  me just skip ahead to asking about
6  this deck.  I don't want to take up
7  much time.
8    So the deck that you attached,
9  is this -- you represent this as the
10  presentation you made to the SEC
11  staff during the SEC's examination
12  of Melody Capital Management, right?
13    A.  Yes.
14    Q.  So is this the
15  presentation, to the best of your
16  understanding, that you actually
17  presented to the SEC?
18    A.  I believe so.  Hopefully I
19  got the right version.
20    Q.  And if you look at slide,
21  what is now slide 4, before it was
22  slide 3 in what we were looking at
23  as to what was sent to Mr. Jaffrey
24  in draft form.  But slide 4 you see
25  the third bullet it says: "In

1       COLE - CONFIDENTIAL
2  September 2018 Mr. Jaffrey and
3  Mr. Scaminaci agreed to pursue
4  investment strategies separately
5  going forward.  Further, in
6  November 2018 they determined not to
7  launch future credit funds jointly
8  although marketing efforts to launch
9  a fund pursuing a litigation finance
10  strategy continued through
11  February 2019.  Following such
12  decisions Melody ceased its
13  fund-raising activities and has no
14  plans to fund raise in the future."
15    Do you see that?
16    A.  Yes.
17    Q.  So that is the same
18  language we saw earlier in the draft
19  as presented to Mr. Jaffrey,
20  correct?
21    A.  I believe so, yes.
22    Q.  And that's the -- those are
23  the facts that were presented to the
24  SEC by Melody?
25     MR. BROCKETT:  Objection to

1       COLE - CONFIDENTIAL
2  form.
3    A.  I believe so, yes.
4    Q.  And if you look at slide,
5  what's now 10, it was 9.
6    A.  Okay.
7    Q.  It says: "Following the
8  decision by Mr. Jaffrey and
9  Mr. Scaminaci to pursue investment
10  strategies separately going forward
11  they determined to organize separate
12  investment advisors for that purpose
13  while retaining their positions as
14  the control persons of Melody."
15    Do you see that?
16    A.  Yes.
17    Q.  And that's the same
18  language we saw before that was
19  presented to Mr. Jaffrey in the
20  draft presentation, right?
21    A.  Yes.
22    Q.  And so this is what -- the
23  fact that was represented to the SEC
24  by Melody?
25     MR. BROCKETT:  Objection to

COLE - CONFIDENTIAL

1    form.
2    A.  I believe so, yes.
3    Q.  And then if you look down:
4  "Mr. Scaminaci is a minority owner
5  of Melodeon.  He and Melodeon's
6  principal entered into an agreement
7  pursuant to which Melodeon is
8  expected to be contributed to and
9  become wholly opened by an entity
10  controlled by Mr. Scaminaci."
11    Do you see that?
12    A.  Yes.
13    Q.  And that's the fact that
14  was represented to the SEC by
15  Melody?
16    A.  Yes.
17    Q.  If you have it in front of
18  you, if you could turn to slide 10
19  again.
20    A.  Sure.
21    Q.  And the last bullet says:
22  "Certain Melody personnel are also
23  employees of or otherwise provide
24  services to MIA, MCG and Melodeon."

COLE - CONFIDENTIAL

1    Do you see that?
2    A.  Yes.
3    Q.  So that was a fact that was
4  represented to the SEC by Melody,
5  correct?
6    A.  Yes.
7    Q.  Did you see at the time
8  that you, that this fact was
9  represented to the SEC, did you see
10  anything wrong with Melody personnel
11  providing services to MIA, MCG and
12  Melodeon?
13    A.  No.  I mean -- yeah.  No.
14  I provided services to all of those
15  entities.
16    Q.  Did you understand -- when
17  you provided services to Melodeon,
18  for example, did you understand that
19  Mr. Jaffrey knew about it?
20    MR. BROCKETT:  Objection to
21  form.  Calls for speculation.
22  Assumes facts not in evidence.
23  Hypothetical.
24    A.  I presumed that he knew.

COLE - CONFIDENTIAL

1    Q.  In fact, he approved the
2  agreement through which your time at
3  Melodeon was reimbursed, right?
4    MR. BROCKETT:  Objection.
5  Assumes facts not in evidence.
6  Misstates the testimony.  Go ahead.
7    A.  There was a reimbursement
8  agreement specifically between MCP
9  and -- MCM or MCP and Melodeon on
10  that.
11    Q.  And do you believe, sitting
12  here today, that that agreement was
13  entered into by MCP or MCM without
14  Mr. Jaffrey's approval?
15    MR. BROCKETT:  Objection.
16  Calls for speculation.
17  Hypothetical question.
18    A.  I don't think so.
19    Q.  At the time that the
20  reimbursement and services
21  agreements were entered into between
22  Melodeon and Melody you were the
23  chief compliance officer and general
24  counsel for Melody?

COLE - CONFIDENTIAL

1    A.  For Melody, yes.
2    Q.  You were also the general
3  counsel and chief compliance
4  officer, at least for a time, at
5  Melody Investment Advisors, right?
6    A.  That's correct.
7    Q.  And that's also known as --
8  also known as MIA?
9    A.  Correct.
10    Q.  And it's currently known as
11  Palistar, right?
12    A.  That is correct.
13    Q.  And that's the fund that
14  was launched by Mr. Jaffrey under
15  the 2018 agreement, correct?
16    A.  Yes, it was launched by
17  Mr. Jaffrey.
18    Q.  But is it -- to the best of
19  your understanding did he do so
20  under the auspices of the 2018
21  agreement?
22    A.  Yes.
23    Q.  Now, do you know -- what
24  kind of investments does MIA make?

COLE - CONFIDENTIAL

1
2    A.   MIA invests in telecom
3 assets.
4    Q.   Are the telecom assets in
5 which MIA invests similar to the
6 telecom assets that Melody Wireless
7 invested -- in which Melody Wireless
8 invested when it was a part of
9 Melody?
10       MR. BROCKETT:  Objection.  No
11   foundation.  Calls for speculation.
12    A.   Yes.
13    Q.   And do you know if MIA's
14 investment strategy is similar
15 to the one employed by Melody
16 Wireless --
17       MR. BROCKETT:  Same objection.
18       MR. SCHRYVER:  Can I finish my
19   question, Dan?  You have your
20   improper objections I'm going to
21   live with it.  But let me finish,
22   all right, that's all I ask.
23       MR. BROCKETT:  I thought you
24   were finished.
25       MR. SCHRYVER:  No, you didn't.

COLE - CONFIDENTIAL

1
2    Q.   Are the telecom and assets
3 in which MIA invests -- do you know
4 if MIA's investment strategy was
5 similar to the one employed at
6 Melody Wireless Infrastructure when
7 it was part of Melody?
8       MR. BROCKETT:  Objection.  No
9   foundation.  Calls for speculation.
10    A.   The same class of assets.
11    Q.   Do you know if any of the
12 investors in MIA were also investors
13 in Melody Wireless?
14    A.   I don't recall.
15    Q.   Do you know when MIA's
16 investment thesis was developed?
17    A.   Thesis probably in the
18 2018-2019 time frame.  I mean I
19 think 2019 is when it was launched.
20    Q.   Do you know if there are
21 communications about a potential
22 second telecom infrastructure fund
23 called Easements II at Melody?
24    A.   I don't recall.
25    Q.   Okay.  At points in time

COLE - CONFIDENTIAL

1
2 did, and we can look at the SEC
3 presentation on this, but at points
4 in time did Melody employees perform
5 work for MIA?
6    A.   Yes.
7    Q.   Did MIA compensate Melody
8 for those employees' time?
9    A.   I believe so.
10    Q.   And did you believe there's
11 anything wrong with the fact that
12 Melody employees were performing
13 work for MIA as long as it was
14 disclosed and MIA was compensated --
15 MIA compensated Melody for its time?
16    A.   Yeah, so long as it was at
17 the management level.  Meaning the
18 investors in the Melody Credit funds
19 were not paying the expenses of
20 another advisor.  So long as it's at
21 the management company and it's the
22 management company money, you know,
23 that's between the partners.
24    Q.   Mr. Jaffrey and
25 Mr. Scaminaci can agree to split

COLE - CONFIDENTIAL

1
2 that how they like?
3    A.   Yes.
4    Q.   Now, while you were -- for
5 at least some period of time while
6 you were the general counsel and
7 chief compliance officer of MIA, you
8 were also the general counsel and
9 chief compliance officer of Melody
10 Capital Partners and Melody Capital
11 Management, right?
12    A.   That's correct.
13    Q.   Did you think there was
14 anything wrong with that?
15    A.   There was no conflict at
16 that time.
17    Q.   Did you think there was
18 anything wrong with you providing
19 services to Omar Jaffrey's side fund
20 while you were employed by Melody
21 Capital Partners and Melody Capital
22 Management?
23    A.   No.
24    Q.   You also served as the
25 general counsel, at least for a

COLE - CONFIDENTIAL

1      COLE - CONFIDENTIAL
2 period of time, and chief compliance
3 officer of Melody Capital Group,
4 right?
5    A. That's correct.
6    Q. And you did so while you
7 were also the general counsel and
8 chief compliance officer of Melody
9 Capital Partners and Melody Capital
10 Management, right?
11    A. That's correct.
12    Q. Did you think there was
13 anything wrong with that?
14    A. No, there was no conflict.
15    Q. Did you think there was
16 anything wrong with you providing
17 services to Melody Capital Group
18 while you were an employee of Melody
19 Capital Management and Melody
20 Capital Partners?
21    A. No.
22    Q. And even though -- you
23 didn't think there was anything
24 wrong with that even though Melody
25 Capital Group was controlled by

1      COLE - CONFIDENTIAL
2 Andres Scaminaci, right?
3    A. Correct.
4    Q. You didn't think there was
5 anything wrong with providing
6 services to MIA even though MIA was
7 controlled by Omar Jaffrey, right?
8    A. That's correct.
9    Q. Now you also served for a
10 time as the chief compliance officer
11 of Melodeon, right?
12    A. Yes.
13    Q. And you did so while you
14 were also the general counsel and
15 chief compliance officer of Melody
16 Capital Partners and Melody Capital
17 Management, right?
18    A. Yes.
19    Q. And you didn't think there
20 was anything wrong with that, right?
21    A. No.
22    Q. And you didn't think there
23 was anything wrong with providing
24 services to Melodeon which was
25 controlled by Halle Benett even

1      COLE - CONFIDENTIAL
2 while you were an employee of Melody
3 Capital Management and Melody
4 Capital Partners?
5    A. That's right. In fact, it
6 was optimal because all of the
7 employees shared the same physical
8 space and all of the compliance
9 programs were effectively the same.
10    Q. It was more efficient that
11 way?
12    A. Yes. Until -- yeah. For
13 that time it was more efficient.
14    Q. There were some questions
15 asked earlier about the Melody
16 umbrella, you know, whether fund or
17 manager is under the Melody
18 umbrella. Do you recall generally
19 that phrase being used?
20    A. Yes.
21    Q. Would you agree that MIA
22 when it was launched was under the
23 Melody umbrella?
24    A. Yes.
25    Q. Would you agree that MIA,

1      COLE - CONFIDENTIAL
2 even though it was controlled by
3 Omar Jaffrey and even though Omar
4 Jaffrey held the, you know, vast
5 majority of the interest in the
6 fund, MIA was launched on the Melody
7 platform?
8    A. It was an affiliate of
9 Melody. And we are getting into
10 areas of contracts where Melody fund
11 is defined under a contract with an
12 anchor investor, falls under --
13 would fall under that definition.
14 But yes, it's an affiliated advisor.
15    Q. Let me ask -- and thanks
16 for being precise. Let me ask about
17 that specific point. You would
18 agree that MIA is a capital M
19 capital F Melody Fund under the
20 agreement that Mr. Jaffrey and
21 Mr. Scaminaci reached with ████
22    A. The fund is under that
23 advisory, yes.
24    Q. That advisory being MIA?
25    A. Yes.

**69 (Pages 270 - 273)**

COLE - CONFIDENTIAL

1      Q.  I'm a little loose between
2  the advisor and the funds, I
3  apologize.  Try to keep me honest if
4  you can.  I'll try myself but...
5          MIA is now known as Palistar,
6  right?
7      A.  Yes.
8      Q.  Is Palistar affiliated with
9  Melody Capital Management currently?
10     A.  It is, yes.
11     Q.  What's its affiliation?
12     A.  To -- I'm sorry, I
13  misspoke.  It's no longer affiliated
14  with Palistar because Mr. Jaffrey no
15  longer has management and control of
16  the Melody Capital Partners.
17     Q.  So is it fair to say that
18  Palistar has been spun out of
19  Melody?
20     A.  It's no longer an
21  affiliate.  But it is -- it's still
22  under the anchor investor agreement.
23  So those economics haven't gone
24  away.  Palistar is no longer an

Page 274
1        COLE - CONFIDENTIAL
2     Q.  I'm a little loose between
3  the advisor and the funds, I
4  apologize.  Try to keep me honest if
5  you can.  I'll try myself but...
6        MIA is now known as Palistar,
7  right?
8     A.  Yes.
9     Q.  Is Palistar affiliated with
10  Melody Capital Management currently?
11    A.  It is, yes.
12    Q.  What's its affiliation?
13    A.  To -- I'm sorry, I
14  misspoke.  It's no longer affiliated
15  with Palistar because Mr. Jaffrey no
16  longer has management and control of
17  the Melody Capital Partners.
18    Q.  So is it fair to say that
19  Palistar has been spun out of
20  Melody?
21    A.  It's no longer an
22  affiliate.  But it is -- it's still
23  under the anchor investor agreement.
24  So those economics haven't gone
25  away.  Palistar is no longer an

1        COLE - CONFIDENTIAL
2  affiliate of Melody Capital
3  Partners.
4    Q.  And it's no longer an
5  affiliate of Melody Capital
6  Management either, right?
7    A.  That's correct.
8    Q.  And when you refer to the
9  anchor █████ has its 20 percent
10  piece in Palistar, that's what you
11  are referring to, right?
12    A.  I believe that's right.
13    Q.  But otherwise Palistar is
14  not affiliated with Melody Capital
15  Partners or Melody Capital
16  Management today?
17    A.  That is correct.
18    Q.  Is that a breach of the
19  2018 agreement in your view?
20    MR. BROCKETT:  Objection.
21    A.  No.
22    Q.  Why not?
23    A.  Because Mr. Jaffrey was
24  entitled to form his own advisor as
25  was Mr. Scaminaci.  The issues are

1        COLE - CONFIDENTIAL
2  with respect to an anchor investor.
3    MR. SCHRYVER:  Let's take a
4  break.
5    THE VIDEOGRAPHER:  We are now
6  off the record.  The time on the
7  video monitor is 4:21 p.m.
8    (Whereupon, there is a recess
9  in the proceedings.)
10    THE VIDEOGRAPHER:  We are now
11  back on the record.  The time on
12  the video monitor is 4:37 p.m.
13    Q.  So Mr. Cole, before we
14  broke we were talking a little bit
15  about your role at MIA.  Did you
16  believe at any time that Omar
17  Jaffrey launching MIA as a fund
18  which he solely controlled was
19  prohibited by any agreement between
20  Mr. Jaffrey and Mr. Scaminaci?
21    A.  No.
22    Q.  Did you believe that that
23  was prohibited by any other of the
24  documents and agreements that
25  governed the Melody funds?

1        COLE - CONFIDENTIAL
2    A.  No.
3    Q.  Did you believe that
4  Mr. Scaminaci launching Melody
5  Capital Group as a fund which he
6  solely controlled was prohibited by
7  any agreement between Mr. Jaffrey
8  and Mr. Scaminaci?
9    MR. BROCKETT:  Objection to
10  form.
11    A.  No.
12    Q.  Did you believe that it was
13  prohibited by any of the other
14  governing documents -- of the other
15  agreements and documents that
16  governed the Melody funds?
17    A.  No.
18    Q.  Did you believe that
19  Melodeon being contributed to
20  Mr. Scaminaci's GP or to an entity
21  of Mr. Scaminaci's choosing was
22  prohibited by any agreement between
23  Mr. Jaffrey and Mr. Scaminaci?
24    A.  No.
25    Q.  And did you believe that

70 (Pages 274 - 277)

COLE - CONFIDENTIAL

1         COLE - CONFIDENTIAL
2   that was prohibited by any of the
3   agreements and documents that
4   governed the Melody fund?
5      MR. BROCKETT: Objection.
6     A. No.
7     Q. As he gets the document, do
8   you recall you testified earlier
9   that after that ▮▮▮▮▮ letter from
10  Kirkland you concluded that there
11  may be a conflict between MIA and
12  Melody Capital Group?
13     A. Yes.
14     Q. And then you resigned as
15  MIA's general counsel, right?
16     A. And general counsel of
17  Melody Capital Group.
18     Q. Did you every assume your
19  role as general counsel of MIA or
20  did you simply stay as chief
21  compliance officer of MIA?
22     A. I stayed as chief
23  compliance officer.
24     Q. So after the date you
25  resigned as general counsel of MIA,

1         COLE - CONFIDENTIAL
2   MIA was no longer a client of yours
3   in your capacity as a lawyer?
4     A. Correct.
5     Q. And you didn't provide
6   legal advice to MIA after that date?
7     A. Correct.
8     Q. And as you, I think you
9   testified earlier to Mr. Brockett,
10  you never provided legal advice to
11  Mr. Jaffrey in his personal
12  capacity?
13     A. That's correct.
14     Q. Just to put a fine point of
15  it, so we know the timing.
16     (Exhibit 36, Email, Bates
17  AS_00257963, marked for
18  identification, as of this date.)
19     Q. So for the record,
20  Exhibit 36 is an email Bates stamped
21  AS_00257963. Once you've had a
22  moment to review the email just let
23  me know and I'll ask a couple
24  questions.
25     A. Yes.

1         COLE - CONFIDENTIAL
2     Q. So this is an email from
3  yourself to Mr. Scaminaci,
4  Mr. Tanjeloff, Mr. Holmstead,
5  Mr. Benett copying Mr. Hannett,
6  correct -- Ms. Hannett, apologies,
7  correct?
8     A. Yes.
9     Q. And it's dated August 3rd,
10  2020?
11     A. It is.
12     Q. And you say: "Because of
13  the adverse matter between MIA and
14  MCG, I have concluded that I must
15  resign as general counsel of both
16  MIA and MCG."
17     Do you see that?
18     A. Yes.
19     Q. And is it accurate to say
20  that you resigned from MIA as its
21  general counsel on or about
22  August 3rd, 2020?
23     A. Yes.
24     Q. And any -- you would not
25  have provided any legal advice to

1         COLE - CONFIDENTIAL
2   MIA or Palistar after that date?
3     A. Correct.
4     Q. Okay. Now, I think you
5   testified earlier that you reviewed
6   the contribution agreement at some
7   point?
8     A. Yes, I believe I must have,
9   yeah.
10     Q. And -- I apologize.
11     A. It looks like an agreement
12  I would have reviewed.
13     Q. And when you reviewed it,
14  you were the general counsel and
15  chief compliance officer of Melody
16  Capital Partners and Melody Capital
17  Management, right?
18     A. Yes.
19     Q. And in that capacity you
20  owed duties to Melody Capital
21  Partners and Melody Capital
22  Management, right?
23     A. Correct.
24     Q. And if you thought that
25  there was something improper in

COLE - CONFIDENTIAL

1 connection with the contribution
2 agreement as it related to the
3 Melody Capital Management and Melody
4 Capital Partners, you would have
5 said something, right?
6 MR. BROCKETT: Objection.
7 Calls for speculation.
8 Hypothetical.
9 A. Yes.
10 Q. In fact, would you agree
11 that you would have been required to
12 say something?
13 MR. BROCKETT: Same objection.
14 A. Yes.
15 Q. Now, I think you testified
16 earlier and I don't want to put
17 words in your mouth so let me just
18 ask you, were you involved in the
19 formation of Melodeon as an entity?
20 A. Yes.
21 Q. And that was formed as --
22 by Halle Benett, correct?
23 A. It was.
24 Q. And Halle Benett was the

COLE - CONFIDENTIAL

1 owner of Melodeon when it was
2 formed, correct?
3 A. I believe so, yeah.
4 Q. And when you were involved
5 in the formation of Melodeon, you
6 were the general counsel and chief
7 compliance officer of Melody Capital
8 Partners and Melody Capital
9 Management, right?
10 A. Yes.
11 Q. And once again, you owed
12 duties to Melody Capital Partners
13 and Melody Capital Management at the
14 time that Melodeon was formed?
15 A. Yes.
16 Q. And if you thought there
17 was something improper about the
18 formation of Melodeon by Halle
19 Benett under Mr. Benett's ownership
20 you would have said something?
21 MR. BROCKETT: Objection.
22 Calls for speculation.
23 Hypothetical. Speculative.
24 A. If it were a breach of

COLE - CONFIDENTIAL

1 agreements with MCP, yes, and
2 otherwise, yeah.
3 Q. And I think you testified
4 earlier you were the chief
5 compliance officer of Melodeon
6 through either late 2020 or early
7 2021?
8 A. Yes.
9 Q. I want to come back to that
10 in a second.
11 You were also the general
12 counsel and chief compliance officer
13 of Melody Capital Group through at
14 least August 2020, right?
15 A. Yes.
16 Q. And you, in that capacity
17 do you recall did you review
18 marketing presentations that were
19 put together by the folks at MCG?
20 A. I believe I did, yes.
21 Q. And do you recall that the
22 investor presentations that were put
23 together by MCG made clear that Omar
24 Jaffrey would not have an interest

COLE - CONFIDENTIAL

1 in Melody Capital Group?
2 MR. DANNER: Objection.
3 Hypothetical. Calls for
4 speculation.
5 A. I would have to review the
6 decks, but if it's there, yes.
7 Q. Sitting here today, do you
8 think that's not the case?
9 MR. BROCKETT: Same objection.
10 Q. Let me ask a better
11 question.
12 MR. SCHRYVER: You'll still
13 object, but it's fine.
14 Q. Do you have any reason
15 sitting here today to believe that
16 that's not the case?
17 MR. BROCKETT: Same objection.
18 Hypothetical, speculative. There's
19 no indication in the question as to
20 what language you are talking about
21 and, therefore, it's vague and
22 imprecise.
23 A. Let me answer it this way.
24 We would not have, MCG, we would not

72 (Pages 282 - 285)

COLE - CONFIDENTIAL

1      COLE - CONFIDENTIAL
2 have made a representation that
3 Jaffrey was still -- would be a
4 principal, that would not be an
5 accurate statement.
6    Q. Because your understanding
7 while you were the general counsel
8 and chief compliance officer of
9 Melody Capital Group was that
10 Mr. Jaffrey was not a principal of
11 Melody Capital Group?
12    A. That's true.
13    Q. And you didn't think there
14 was anything wrong with that, right?
15    A. No.
16    Q. You didn't think there was
17 anything improper about that?
18    A. No.
19    Q. You didn't resign as Melody
20 Capital Group's chief compliance
21 officer because you thought there
22 was something wrong with that?
23    A. Correct.
24    Q. In fact, you continued as
25 Melody Capital Group's chief

1      COLE - CONFIDENTIAL
2 compliance officer and general
3 counsel until August of 2020?
4    A. Yes. I continued on as
5 chief compliance officer past
6 August.
7    Q. How long if you recall?
8    A. Until the SEC exam was
9 completed.
10    Q. If you thought -- if you
11 had believed that Mr. Jaffrey
12 objected to Melody Capital Group's
13 existence, would you have continued
14 to stay on as general counsel and
15 chief compliance officer of Melody
16 Capital Group?
17    MR. BROCKETT: Objection.
18   Calls for speculation.
19   Hypothetical. Misstates the
20   testimony in the case. It's also
21   vague and imprecise.
22    MR. SCHRYVER: Mr. Brockett.
23    MR. BROCKETT: Go ahead,
24   sorry.
25    A. Mr. Jaffrey didn't dictate

1      COLE - CONFIDENTIAL
2 my employment. I was not an
3 indentured servant to anyone. So I
4 probably would have continued.
5    Q. Even if Mr. Jaffrey said
6 MCG's existence is a violation of
7 XYZ agreement?
8    MR. BROCKETT: Objection.
9   It's hypothetical. It's
10   speculative. It's incomplete. And
11   it misstates the testimony.
12    MR. SCHRYVER: Are you done,
13   Dan? I want to make sure that you
14   are done with your improper
15   objection. Are you done? You are
16   an embarrassment. Utterly
17   embarrassing.
18    Q. Can you answer the
19 question? I apologize for
20 Mr. Brockett.
21    A. I'm not sure what I would
22 have done. That didn't happen. He
23 did not object.
24    Q. He never objected to your
25 knowledge -- you are not aware of

1      COLE - CONFIDENTIAL
2 any objection he lodged to Melody
3 Capital Group's existence?
4    MR. BROCKETT: Objection.
5    A. No.
6    Q. You are not aware of any
7 objection he lodged to the
8 investment strategy pursued by
9 Melody Capital group, are you?
10    MR. BROCKETT: Objection.
11    A. No.
12    Q. And you interacted with
13 Mr. Jaffrey on a daily basis, is it
14 fair to say, while you were general
15 counsel and chief compliance officer
16 at Melody Capital Partners and
17 Melody Capital Management?
18    A. Yes, frequently.
19    Q. And in all of those
20 interactions he never objected to
21 Melody Capital Group's investment
22 strategy?
23    A. Not to my knowledge, no.
24    Q. Okay. You were aware also
25 that Mr. Jaffrey had no -- was not a

73 (Pages 286 - 289)

COLE - CONFIDENTIAL

1 COLE - CONFIDENTIAL
2 principal of Melodeon, right?
3     A.  Yes.
4     Q.  And you were aware that he
5 had no involvement in Melodeon?
6     A.  Yes.
7     Q.  And you were aware of that
8 even while you were the general
9 counsel and chief compliance officer
10 -- I apologize -- while you were the
11 general -- let me ask the question
12 from the start.
13        You were aware that
14 Mr. Jaffrey had no involvement in
15 Melodeon while you were chief
16 compliance officer of Melodeon all
17 the way through the end of 2020 or
18 early 2021?
19     A.  Yes.
20     Q.  And you didn't think there
21 was anything wrong with that, right?
22     A.  No.
23     Q.  And you didn't think that
24 was prohibited by any of the
25 agreements or documents governing

1 COLE - CONFIDENTIAL
2 Melody?
3     A.  No.
4     Q.  And you didn't think there
5 was anything wrong with that or
6 prohibited by the agreements and
7 documents governing the relationship
8 between Mr. Jaffrey and
9 Mr. Scaminaci, right?
10     A.  With respect to which
11 entity?
12     Q.  You being -- your knowledge
13 of -- sorry.  You didn't think there
14 was anything wrong with Mr. Jaffrey
15 having no involvement in Melodeon
16 under the agreements and documents
17 that governed the relationship
18 between Mr. Scaminaci and
19 Mr. Jaffrey?
20     A.  No.
21     Q.  Okay.  I apologize, I
22 wanted to do this while we were on
23 break, but do you mind pulling from
24 that giant stack Exhibits 14 and 15.
25 At least they are consecutive.

1 COLE - CONFIDENTIAL
2     So if you have Exhibit 14 in
3 front of you, that's an email from
4 June 6, 2019 and it's from
5 Mr. Jaffrey to yourself, Ms. Lecamp
6 --
7     MR. BROCKETT:  Where are we?
8 Okay, go ahead.
9     Q.  So it's an email from
10 Mr. Jaffrey to yourself, Ms. Lecamp,
11 and Ms. Hannett, correct?
12     A.  Yes.
13     Q.  And I want to look at some
14 of the language that Mr. Brockett
15 walked you through.  In that
16 paragraph that says:  "Also was
17 surprised to hear the claim today
18 that none of the four musketeers are
19 involved in litigation finance
20 business and that it's only
21 Halle's."
22     Do you see that?
23     A.  Yes.
24     Q.  Then he says:  "But how is
25 being built at Melody," I think he

1 COLE - CONFIDENTIAL
2 means to say how is it being built
3 at Melody, "using Melody" track
4 record, "using Melody resources,
5 track record, name and cash
6 account."
7     Do you see that?
8     A.  Yes.
9     Q.  Is it fair to say that MIA
10 was built at Melody using Melody
11 resources, track record, name and
12 cash accounts?
13     A.  Yes.
14     Q.  And it then says:  "Who is
15 on the hook for all the expenses and
16 under which manager is this going to
17 be done."
18     Do you see that?
19     A.  Yes.
20     Q.  I think we discussed
21 earlier Melodeon agreed to be on the
22 hook for all the expenses incurred
23 in connection with this
24 fund-raising; isn't that right?
25     A.  Yes.  I don't know -- I

74 (Pages 290 - 293)

COLE - CONFIDENTIAL

1    don't remember the date of the
2    reimbursement agreement to June,
3    June -- June 6th of 2019, but, yeah.
4        Q.   I'll represent it was
5    signed in September of 2019 but it
6    was retroactive expenses -- to
7    expenses incurred from the fall of
8    2018.
9        A.   Right.  Which solved the
10   issue raised here.
11       Q.   So turning to Exhibit 15.
12       A.   Okay.
13       Q.   Now, this email
14   Mr. Brockett asked about -- let me
15   wait until Mr. Brockett has it.
16       MR. SCHRYVER:  It's
17   Exhibit 15.
18       MR. BROCKETT:  Okay, go ahead.
19       Q.   So Mr. Brockett asked you
20   some questions about the paragraph
21   the very end of the first page and
22   it begins:  "It's time that
23   everything about MCG..."
24       Do you see that?

*(Note: line numbering begins at 1 as shown)*

COLE - CONFIDENTIAL

1        A.   Yes.
2        Q.   So "It's time that
3    everything about MCG and LBS is put
4    on the table so I can understand
5    where the conflicts are and who is
6    making what decisions with Melody
7    assets and our fund's capital."
8        Do you see that?
9        A.   Yes.
10       Q.   Now, I think you indicated
11   that while you don't recall any such
12   conversations, you know, to the
13   extent Mr. Jaffrey had confusion
14   about LBS and Melodeon and MCG, you
15   likely would have had conversations
16   with him about that?
17       A.   I'm sure.  Along with Terri
18   Lecamp and Celine Hannett.
19       Q.   Would you have attempted to
20   clear up his confusion or would you
21   have left him confused?
22       MR. BROCKETT:  Objection,
23   hypothetical.  Calls for
24   speculation.

COLE - CONFIDENTIAL

1        A.   I think I had at some point
2    described the understanding that
3    Melodeon would be folded underneath
4    MCG.
5        Q.   And did he object to that?
6        A.   I don't recall.
7        Q.   You don't recall if he did
8    or you --
9        A.   I don't recall that he
10   objected or said great.
11       Q.   And in fact, this is dated
12   June 7, 2019.
13       Do you see that?
14       A.   Yes.
15       Q.   A month later there was a
16   memo circulated first in draft form
17   and then in final form to
18   Mr. Jaffrey stating that he would
19   have "no economic interest in the
20   fund's managing LBS."
21       Isn't that right?
22       MR. BROCKETT:  Objection.
23   Mischaracterizes the evidence.
24       A.   So the Advisory Committee

COLE - CONFIDENTIAL

1    memo, yes.
2        Q.   So a month later, that memo
3    was circulated a month after
4    Mr. Jaffrey expressed confusion?
5        A.   Yeah.  I guess.  Depending
6    on the date of the memo, but the
7    memo states that.
8        Q.   Okay.
9        (Exhibit 37, Email, Bates
10   JAF0307875, marked for
11   identification, as of this date.)
12       Q.   This is a bit of a long one
13   so I'll give you a couple minutes to
14   review it.  For the record,
15   Exhibit 37 is a multipage email
16   string Bates stamped JAF0307875.
17       If you could take a look at it
18   and let me know when you've had a
19   chance to review.
20       A.   Okay.
21       Q.   So you are eventually
22   forwarded this email string in the
23   middle of it.  And let's just start
24   there just to orient yourself

COLE - CONFIDENTIAL
1
2    because I want to, you know, look at
3    it from the perspective you would
4    have received it in.  And that email
5    is on the second page, November 8,
6    2019 at 9:35 p.m. from Omar Jaffrey
7    to you.
8        Do you see that?
9    A.  Yes.
10    Q.  And he says: "Jon, I need
11    your help here.  Please see the
12    email trail."
13        Right?
14    A.  Okay.
15    Q.  So let's look at the email
16    trail a little bit.  And the email
17    trail, and I don't want to walk
18    through all of it, it starts with
19    some emails between Neil Collins and
20    a company called ████.
21        Do you see that?
22    A.  Yes.
23    Q.  And now Neil Collins was
24    the chief marketing officer at
25    Melody?

COLE - CONFIDENTIAL
1
2    A.  Yes.
3    Q.  And Neil Collins was also
4    providing services to Melodeon and
5    to Melody Capital Partners, right?
6    A.  Yes.
7    Q.  And, in fact, he was also
8    providing services to MIA?
9    A.  I believe so.
10    Q.  And in fact, Melodeon
11    reimbursed Melody for the time that
12    Neil Collins spent marketing for
13    Melodeon?
14    A.  I don't recall the
15    agreement, but that sounds right.
16    Q.  And so eventually this
17    series of emails is forwarded to
18    Omar Jaffrey and then he and Omar
19    Jaffrey have an exchange.  He being
20    Neil Collins.  And I want to focus
21    on the exchange that's at the bottom
22    of the second page at 2:57 p.m. on
23    November 8, 2019 beginning: "You
24    have made a completely..."
25        Do you see that?

COLE - CONFIDENTIAL
1
2    A.  I'm sorry, can you give me
3    the page number, 876 at the very
4    bottom.
5    Q.  "You have made a completely
6    inaccurate [sic] representation."
7    A.  Okay.
8    Q.  And you see that email, you
9    see that one at 2:57 p.m.?
10    A.  2:57.
11    Q.  Right at the bottom of
12    page --
13    A.  Sorry, sorry, sorry.
14        Okay.
15    Q.  Perfect.  So Mr. Jaffrey
16    says to Mr. Collins: "You have made
17    a completely incorrect" -- I'm
18    saying it wrong.  I'm making a
19    completely incorrect representation.
20    He says: "You have made a
21    completely incorrect representation.
22    You have suggested that Melody is a
23    going concern, that we have launched
24    another fund in litigation finance
25    and that the litigation finance is

COLE - CONFIDENTIAL
1
2    part of a continuing effort at
3    Melody.  This is 100 percent
4    accurate [sic] and undermines what
5    the truth is and what I have shared
6    with all our current and future
7    LPs."
8        Do you see that?
9    A.  Yes.
10    Q.  I apologize I said
11    100 percent accurate, I meant to say
12    "100 percent inaccurate."
13        Do you see that?
14    A.  Yes.
15    Q.  LP, again, that's a
16    reference, generally speaking, in
17    this world to investors?
18    A.  Correct.
19    Q.  And what Mr. Jaffrey is
20    saying here is that Mr. Collins
21    inaccurately represented that
22    litigation finance, that LBS or
23    Melodeon was part of Melody, right?
24        MR. BROCKETT:  Objection.
25    He's not a party to this email so I

COLE - CONFIDENTIAL

1    COLE - CONFIDENTIAL
2    object.  It calls for speculation.
3        A.  So I believe the reference
4    to Melody is the legacy advisor and
5    that the legacy advisor is launching
6    a new fund when, in fact, the
7    advisor was going to wind down the
8    fund and raise new money.
9        Q.  He then says: "This makes
10   me look like a fool/liar, i.e. that
11   I am launching new funds while
12   telling folks that Melody is winding
13   down and that I have no involvement
14   in other go-forward businesses."
15       Do you see that?
16       A.  Yes.
17       Q.  Is that consistent that,
18   with your recollection that he had
19   no involvement with Melodeon?
20       MR. BROCKETT:  Objection.
21   Calls for speculation.
22       A.  No.  This is -- again, the
23   words are that the credit funds at
24   this time, credit funds and telecom
25   funds are winding down.  They are

1    COLE - CONFIDENTIAL
2    not -- the advisor is not launching
3    new funds but I don't understand the
4    next part, that I have no
5    involvement in other go-forward
6    businesses.
7        Q.  Let me ask you about the
8    paragraph that begins: "That's the
9    problem."  So he says: "That's the
10   problem that you have created.  This
11   is not another product.  Melody
12   Capital Partners has no new
13   products.  It is finished and is
14   closing/unwinding."
15       And that's consistent with the
16   notion that Melody Capital Partners
17   is in wind down, right?
18       MR. DANNER:  Objection.  Calls
19   for speculation.
20       A.  Yes, that's right.
21       Q.  Then he continues: "Andres
22   and I are creating new efforts on
23   our own."
24       Do you see that?
25       A.  Yes.

1    COLE - CONFIDENTIAL
2        Q.  And Melodeon was a new
3    effort that was being contributed to
4    Andres, right?
5        A.  Yes.
6        Q.  And it says: "Halle is out
7    of Melody completely and has nothing
8    to do with Melody with LBS."
9        Do you see that?
10       A.  Yes.
11       Q.  What did you interpret that
12   to mean?
13       A.  I don't know.  I don't know
14   what he meant.  He was no longer an
15   employee of MCP at that point, I
16   believe.  And I'm not sure what the
17   status -- again, chronologically I'm
18   not sure the status of the MCG
19   launches were.  I don't recall in
20   November of 2019.
21       Q.  Can you get out -- pull out
22   Exhibit -- you can put that aside.
23   Can you pull out Exhibit 1?  It is,
24   conveniently has a big Exhibit 1 on
25   the front of it.  It's the 2018

1    COLE - CONFIDENTIAL
2    agreement.  I don't know if Dan
3    planned it, but it worked out very
4    well.
5        This is the 2018 agreement we
6    have been discussing at times during
7    today's deposition, right?
8        A.  Yes.
9        Q.  Are you aware of any
10   limitation in the 2018 agreement on
11   what investments could be made in
12   the parallel businesses launched by
13   Mr. Jaffrey and Mr. Scaminaci?
14       A.  No.
15       Q.  Now, I want to ask
16   something.  If you look at paragraph
17   3A of the business plan.  This talks
18   about some sector focuses for the
19   planned go-forward joint Melody
20   business, right?
21       A.  Yes.
22       Q.  And it says: "Focus on
23   growing real estate, FIG and TMT
24   sectors and remain cautious on
25   energy."

77 (Pages 302 - 305)

COLE - CONFIDENTIAL

1     Do you see that?
2    A. Yes.
3    Q. Now, do you know, does MIA
4  conduct credit -- make credit
5  investments in the TMT space?
6    A. I don't know if they do
7  today. They did not when I was
8  involved.
9    Q. Do you know if Carras
10  Holmstead was hired by Palistar to
11  do exactly that?
12    A. That would have been after
13  my time.
14    Q. If, in fact, Mr. Holmstead
15  testified understand oath that his
16  job is to make credit investments in
17  the TMT space at Palistar, in your
18  view would that be a violation of
19  the 2018 agreement?
20    MR. BROCKETT: Objection. No
21  foundation, calls for speculation.
22  Completely and totally improper
23  question by a very junior and very
24  sophomoric lawyer.

COLE - CONFIDENTIAL

1    MR. SCHRYVER: I think the
2  only sophomoric presentation today,
3  and I think everyone in this room
4  will agree with me, is your utterly
5  improper objections. I have never
6  seen anything like it. I don't
7  think you know what you are doing,
8  I really don't, and I think, you
9  know, you should talk to John about
10  it because it's getting
11  embarrassing.
12    Q. Not you, Jon, Mr. Quinn.
13    If, in fact, Mr. Holmstead
14  testified under oath that his job is
15  to make credit investments in the
16  TMT space at Palistar in your view
17  would that be a violation of the
18  2018 agreement?
19    MR. BROCKETT: Same objection.
20    MR. SCHRYVER: Can I finish my
21  objection, Dan, please? That's all
22  I'm asking.
23    MR. BROCKETT: I'm looking at
24  the monitor here and there's a

COLE - CONFIDENTIAL

1  question mark at the end.
2    MR. SCHRYVER: I hadn't
3  finished. She was anticipating
4  because she was saw I was reading
5  it.
6    MR. BROCKETT: Well, I'm just
7  telling you that I see a question
8  mark at the end. Go ahead. I'm
9  not stepping on your question. Go
10  ahead.
11    MR. SCHRYVER: This time maybe
12  you didn't mean to. I'll grant you
13  that.
14    Q. If in fact, Mr. Holmstead
15  testified under oath that his job is
16  to make credit investments in a TMT
17  space at Palistar, in your view
18  would that be a violation of the
19  2018 agreement?
20    MR. BROCKETT: Objection.
21  Calls for speculation. It is a
22  hypothetical question. Asking him
23  to comment on somebody else's
24  testimony without showing him the

COLE - CONFIDENTIAL

1  testimony, completely improper.
2    MR. SCHRYVER: Also sophomoric
3  as well.
4    Q. I apologize.
5    MR. BROCKETT: Indeed.
6  Incredibly sophomoric.
7    Q. Can you answer the
8  question?
9    A. No.
10    Q. Just to be clear, your
11  answer no was not to -- I said can
12  you answer the question. No, it
13  would not be a violation of the 2018
14  agreement?
15    MR. BROCKETT: Same objection.
16    A. That's right. I was
17  answering that question.
18  Mr. Holmstead engaged in secondary
19  credit transactions for MIA Palistar
20  would not be necessarily a violation
21  of this. In fact, the legacy
22  business is dead.
23    Q. And it's been dead since
24  early 2019 -- actually

78 (Pages 306 - 309)

COLE - CONFIDENTIAL

1  November 2018; isn't that right?
2  A.  Probably, yes.  I think the
3  evergreen fund was, the limited
4  partners were withdrawn in late 2019
5  so.  So none of the funds were
6  deploying capital.
7  MR. SCHRYVER:  It's been a
8  very calm enjoyable experience
9  while you've been gone.
10  MR. DANNER:  It's just placid
11  walking in here.
12  MR. SCHRYVER:  I think
13  Mr. Danner needs to supervise us.
14  Q.  If you could turn to
15  Exhibit 18.  Sorry, this is the
16  Kirkland letter if that helps.
17  Do you have it in front of
18  you?
19  So Mr. Brockett asked you a
20  couple questions about this.  And I
21  want to ask you about something in
22  the middle of the third paragraph
23  that begins:  "As you know."  So
24  Mr. Brockett -- Mr. Brockett, I

COLE - CONFIDENTIAL

1  apologize.  Mr. Jaffrey's lawyers at
2  Kirkland & Ellis write Mr. Scaminaci
3  copying you and they say:  "As you
4  know, you signed the agreement with
5  Mr. Jaffrey on September 2, 2018."
6  Do you see that?
7  A.  Is this the first page,
8  third paragraph?
9  Q.  Yes, sir.
10  A.  Got it.  Okay.
11  Q.  And that's a reference to
12  the 2018 agreement we have been
13  discussing for quite a while, right?
14  A.  Yes, I believe so.
15  Q.  "In the agreement," he
16  continues, "you and Mr. Jaffrey
17  agreed to separate your business
18  interests."
19  Do you see that?
20  A.  Yes.
21  Q.  Is that an accurate
22  statement?
23  A.  Yes.
24  Q.  "Mr. Jaffrey agreed to

COLE - CONFIDENTIAL

1  build a TMT centric business at
2  Melody without your involvement."
3  Then he says:  "That business
4  includes a successor TMT-related
5  credit business."  So TMT-related
6  credit business, he says it right
7  there that it's permitted even
8  though TMT credit investments are
9  part of the joint go-forward plan in
10  the business plan in the 2018
11  agreement, right?
12  MR. BROCKETT:  Objection.
13  A.  It states that.  I don't
14  remember what the PPM says.
15  Q.  PPM is?
16  A.  Private placement memo.
17  Q.  For MIA?
18  A.  For MIA funds.
19  Q.  Okay.  He continues, sorry,
20  Mr. Jaffrey's counsel at Kirkland &
21  Ellis continues:  "You," meaning
22  Mr. Scaminaci, "in turn agreed to
23  focus on other parallel business
24  lines of Melody Capital Partners LP

COLE - CONFIDENTIAL

1  and Melody Capital Management LLC,
2  the Melody entities, including
3  credit-related investments in
4  litigation finance, energy and real
5  estate."
6  Do you see that?
7  A.  Yes.
8  Q.  So what Mr. Jaffrey's
9  counsel is saying in this letter is
10  that the 2018 agreement permitted
11  him to make investments in,
12  credit-related investments in
13  litigation finance, energy and real
14  estate?
15  MR. BROCKETT:  Objection.  It
16  misstates the document.  It calls
17  for speculation.  There's no
18  foundation whatsoever for this
19  witness to answer that question.
20  A.  That's what they state.
21  That he could form his own, another
22  advisor focused on parallel business
23  lines in the credit-related
24  investments.

79 (Pages 310 - 313)

COLE - CONFIDENTIAL
1    COLE - CONFIDENTIAL
2        (Exhibit 38, Declaration,
3    marked for identification, as of
4    this date.)
5        Q.   So Mr. Cole, this document,
6    exhibit, marked as 38, this is a
7    copy of the, a declaration filed in
8    this case by Mr. Jaffrey.
9        Do you see that?
10       A.   Yes.
11       Q.   Now, as a lawyer are you
12   familiar with declarations?
13       A.   Yes.
14       Q.   And are you familiar with
15   what it means to declare under
16   penalty of perjury?
17       A.   Yes.
18       Q.   And what does it mean?
19       A.   That all statements are
20   made truthfully and to state
21   otherwise would be a penalty, sort
22   of criminal.
23       Q.   So Mr. Jaffrey, where you
24   see Mr. Jaffrey's signature on the
25   very last page, right?

1    COLE - CONFIDENTIAL
2        A.   Yes.
3        Q.   So when he signed this he
4    swore he was telling the truth,
5    right?
6        A.   Yes.
7        Q.   Now I want to start with
8    paragraph 37.  So it states,
9    Mr. Jaffrey states under oath:
10   "Melody is currently running a full
11   and fair process designed to sell
12   MWI clear of all conflicts with the
13   goal of maximizing value for the
14   telecom funds just as we have always
15   envisioned."
16       Do you see that?
17       A.   Yes.
18       Q.   And MWI, that's a reference
19   to Melody Wireless?
20       A.   Yes, it is.
21       Q.   And to the best of your
22   knowledge and belief is that true?
23       A.   Yes.
24       Q.   And it says, thought
25   continues -- Mr. Jaffrey continues

1    COLE - CONFIDENTIAL
2    under oath:  "Following the receipt
3    of Scaminaci's letter and Digital
4    Colony's offer in July 2020, we
5    accelerated our plans for the sale
6    of MWI by two months and began
7    immediate preparations."
8        Do you see that?
9        A.   Yes.
10       Q.   Is that a true statement to
11   the best of your knowledge and
12   belief?
13       A.   It certainly accelerated
14   plans.  I'm not sure it was two
15   months.
16       Q.   Could it have been more?
17       A.   Could have been.  I'm not
18   sure.  But we certainly started to
19   prepare for a sale process.
20       Q.   And that last sentence he
21   tells the court in this matter under
22   oath to protect the integrity of the
23   sale process Scaminaci, Digital
24   Colony and their advisor TAP have
25   not been permitted to participate to

1    COLE - CONFIDENTIAL
2    date."
3        Do you see that?
4        A.   Yes.
5        Q.   Now just a few days earlier
6    Mr. Jaffrey had actually suggested
7    to you that they should allow
8    Digital Colony and Mr. Scaminaci to
9    make a bid, right?
10       A.   Yes.
11       Q.   Paragraph 40.  It says:
12   "The timetable that had been
13   previously established within Melody
14   and discussed with the telecom funds
15   investors called for a sale process
16   to begin at the end of 2020 with an
17   anticipated disposition in the
18   second quarter of 2021."
19       Do you see that?
20       A.   Yes.
21       Q.   Is that true to the best of
22   your understanding?
23       A.   I believe that my
24   recollection is that that seems to
25   be right.  I think that the second

COLE - CONFIDENTIAL
1  COLE - CONFIDENTIAL
2  quarter of 2021 was in the investor
3  reports as the estimated time of
4  monetization. But I'm not sure if
5  that was the document but.
6  Q. Melody Wireless was sold to
7  Digital -- sorry. The sale of
8  Melody Wireless to Diamond and
9  Sculptor, that closed in June of
10  2021, correct?
11  A. Yes.
12  Q. And that's the second
13  quarter of 2021?
14  A. It is.
15  Q. I want to turn back to
16  paragraph 12 of this sworn
17  declaration of Omar Jaffrey.
18  A. Yes.
19  Q. So there Mr. Jaffrey swears
20  to this court under oath that: "In
21  September 2018 as the investment
22  period for the telecom funds and
23  credit funds was coming to a close
24  Scaminaci and I entered into an
25  agreement effectively separating our

1  COLE - CONFIDENTIAL
2  business interests moving forward."
3  And then he defines it as the 2018
4  agreement.
5  Do you see that?
6  A. Yes.
7  Q. Is that an accurate
8  statement to the best of your
9  belief?
10  A. Yes. I think that's true,
11  although it may be off by a month in
12  terms of not moving forward with the
13  credit, the legacy advisor but,
14  yeah.
15  Q. Meaning Mr. Jaffrey and
16  Mr. Scaminaci agreed not to move
17  forward with the credit funds
18  jointly a month or two after
19  entering into the 2018 agreement?
20  A. Yes. I think this is
21  generally accurate.
22  Q. It then says: "The 2018
23  agreement contemplated that I would
24  build a telecom, media and
25  technology-centric business focused

1  COLE - CONFIDENTIAL
2  on a telecom-related infrastructure
3  and credit investing which would be
4  called Melody Investment Advisors
5  LP, MIA."
6  Do you see that?
7  A. Yes.
8  Q. It then says, it,
9  Mr. Jaffrey under oath to this court
10  says: "Scaminaci would build a
11  parallel business focused on
12  credit-related investments in energy
13  credit, real estate credit and
14  litigation finance credit."
15  Do you see that?
16  A. Yes.
17  Q. So Mr. Jaffrey told this
18  court under oath that the 2018
19  agreement permitted Andres Scaminaci
20  to pursue a parallel business
21  focused on energy, real estate and
22  litigation finance, isn't that true?
23  MR. BROCKETT: Objection to
24  form. Misstates the document.
25  A. Yes, that's what the

1  COLE - CONFIDENTIAL
2  statement says.
3  Q. That's what Mr. Jaffrey's
4  statement says, right?
5  A. Yes.
6  Q. Okay. Paragraph 13,
7  Mr. Jaffrey under oath to this court
8  says: "Pursuant to the 2018
9  agreement Scaminaci created and
10  started marketing two investment
11  firms, one called Melody Capital
12  Group, MCG, and the other Melodeon
13  Capital Partners, Melodeon."
14  Do you see that?
15  A. Yes.
16  Q. And so Mr. Jaffrey told
17  this court under oath that the
18  creation and marketing by
19  Mr. Scaminaci of Melody Capital
20  Group and Melodeon Capital Partners
21  was done: "...pursuant to the 2018
22  agreement."
23  Isn't that right?
24  MR. BROCKETT: Objection to
25  form.

81 (Pages 318 - 321)

COLE - CONFIDENTIAL

1
2     A.   Yes.
3     Q.   He continues, Mr. Jaffrey
4  under oath to this court: "As per
5  our 2018 agreement several Melody
6  sector heads, associates and
7  operating staff worked part-time for
8  Melodeon and MCG."
9     Do you see that?
10    A.   Yes.
11    Q.   And that's an accurate
12 statement?
13    A.   Yes, I think that's
14 accurate.
15    Q.   And so Mr. Jaffrey under
16 oath to this court stated that the
17 work of various Melody sector heads,
18 associates and operating staff for
19 Melodeon and MCG was done, quote,
20 "as per our 2018 agreement"; isn't
21 that right?
22    MR. BROCKETT:  Same objection.
23    A.   Yes.
24    Q.   Now, he then says: "As
25 part of the 2018 agreement Scaminaci

COLE - CONFIDENTIAL

1
2  and I agreed to a provision barring
3  either of us from interfering in
4  other partner's ventures.  We
5  intended this noninterference
6  provision to be broadly construed so
7  that each of us could go our
8  separate ways without competition or
9  obstruction by the other."
10    He then says under oath to
11 this court: "I have abided by my
12 side of the agreement and have not
13 attempted to create any funds in
14 energy, credit, real estate credit
15 or litigation finance credit."
16    Do you see that?
17    A.   Yes.
18    Q.   So Mr. Jaffrey under oath
19 told this court that he believed he
20 was under an obligation not to
21 interfere with Mr. Scaminaci's
22 pursuit of funds in energy, real
23 estate and litigation finance?
24    A.   That's the statement, yes.
25    MR. SCHRYVER:  I'm going to

COLE - CONFIDENTIAL

1
2  take a quick break and see if I
3  have any further questions.
4     THE VIDEOGRAPHER:  We are now
5  off the record.  The time on the
6  video monitor is 5:21 p.m.
7     (Whereupon, there is a recess
8  in the proceedings.)
9     THE VIDEOGRAPHER:  We are now
10 back on the record.  The time on
11 the video monitor is 5:30 p.m.
12    MR. SCHRYVER:  Mr. Cole, I
13 have no -- subject to anything I
14 need to do after Mr. Brockett goes
15 I have no further questions
16 tonight.  I want to thank you again
17 for your taking the time today out
18 of your schedule to talk to us
19 today.  Thank you again and with
20 that I pass to Mr. Brockett.
21 EXAMINATION BY
22 MR. BROCKETT:
23    Q.   Yes.  Just a couple or
24 questions, Jon.  And I also thank
25 you for taking the time to come and

COLE - CONFIDENTIAL

1
2  answer questions today.
3     Could we go back to
4  Exhibit 32, please.  This is the
5  draft presentation to the SEC,
6  right?
7     A.   Yes.
8     Q.   And counsel asked you some
9  questions about this.  Do you recall
10 that?
11    A.   Yes.
12    Q.   And on, I believe it was on
13 page 9, slide 9, he asked you some
14 questions about whether it was
15 indicated that Mr. Jaffrey had any
16 interest in either Melody Capital
17 Group or Melodeon.
18    Do you recall those?
19    A.   Yes.
20    Q.   Okay.  Now, this page
21 doesn't indicate that Mr. Scaminaci
22 has a 5 percent interest in MIA
23 either, does it?
24    A.   It does not.
25    Q.   Okay.  And it doesn't

COLE - CONFIDENTIAL

1       COLE - CONFIDENTIAL
2 mention Mr. Jaffrey's 5 percent
3 interest in funds that may be
4 created by Mr. Scaminaci, correct?
5     MR. SCHRYVER: Objection.
6     A. Correct.
7     Q. Doesn't address the 2018
8 agreement, correct?
9     MR. SCHRYVER: Objection.
10    A. This page, no.
11    Q. So this page doesn't
12 address either of the parties'
13 rights under the 2018 agreement; is
14 that correct?
15    MR. SCHRYVER: Objection.
16    A. That's correct.
17    Q. And that's true with
18 respect to all of the SEC documents
19 that he showed you, isn't it?
20    MR. SCHRYVER: Objection.
21    Q. Let's look at Exhibit 34.
22 Under item 10. There's no reference
23 to Mr. Scaminaci having any interest
24 in Palistar or MIA, right?
25    A. That's correct.

1       COLE - CONFIDENTIAL
2    Q. And there's no indication
3 of Mr. Jaffrey having any rights in
4 any of Mr. Scaminaci's side
5 businesses; is that correct?
6    A. That's correct.
7    Q. And that's also true on
8 page 2 of this document as well,
9 right?
10    A. Page 3?
11    Q. Page 2. Counsel asked you
12 some questions on page 2 as well,
13 the paragraph right before item 5.
14    A. That's item 4, it's on page
15 3.
16    Q. Yes. Counsel asked you
17 some questions about the last
18 paragraph of item 4?
19    A. Yes.
20    Q. Right? And that paragraph
21 doesn't have anything to do with the
22 rights of the parties under the 2018
23 agreement, correct?
24    MR. SCHRYVER: Objection to
25   form.

1       COLE - CONFIDENTIAL
2    A. It does not address it, no.
3    Q. And that's also true with
4 respect to Exhibit 35, right?
5    MR. SCHRYVER: Objection to
6   form.
7    Q. If you look at page 10?
8    A. This is the same page.
9    Q. There's nothing here about
10 the 2018 agreement or any of the
11 parties' respective rights in each
12 others' funds as reflected in that
13 agreement, none of that is set forth
14 here, right?
15    A. That's true.
16    Q. Let's go back to 32, the
17 slide on page 3, the History of
18 Melody.
19    A. I believe that's
20 Exhibit 31.
21    Q. Page 3. Are you with me?
22    A. Exhibit 31.
23    Q. I'm sorry, it's Exhibit 32.
24    MR. SCHRYVER: I think it's
25   actually 31.

1       COLE - CONFIDENTIAL
2    MR. BROCKETT: Is that 31?
3    MR. DANNER: The cover email
4   and the deck got stapled together
5   and marked as one exhibit.
6    Q. So Exhibit 31. Are you
7   with me? This is the slide called
8   History of Melody?
9    A. Yes.
10    Q. Okay. Are you with me?
11    A. Yes.
12    Q. Now, it says in
13 November 2018 they determined not to
14 launch future credit funds jointly.
15 But this doesn't address how that
16 scenario came about, right?
17    A. It does not.
18    MR. SCHRYVER: Objection.
19    Q. It doesn't address whose
20 fault it was, if it was anyone's
21 fault, right?
22    A. No. It just states that
23 they determined not to launch future
24 credit funds jointly.
25    Q. It doesn't determine which

COLE - CONFIDENTIAL
1       COLE - CONFIDENTIAL
2 of the parties didn't want to pursue
3 funds and which of the parties
4 didn't, right?
5    A. It does not.
6    Q. Now, when the parties here
7 decided not to pursue future funds
8 together, that did not create a free
9 for all for either partner to
10 misappropriate assets from the
11 partnership, is that fair?
12    MR. SCHRYVER: Objection.
13    A. Misappropriate assets from
14 the Melody Capital partner?
15    Q. Yeah. Let me ask you --
16    A. Advisor or the funds --
17    Q. Let me ask it to you this
18 way. Well, to the advisor or the
19 funds. You are familiar with the
20 Corporate Opportunity Doctrine,
21 right?
22    A. Yes.
23    Q. When the parties determine
24 in November '19 not to launch future
25 credit funds, that didn't mean that

1       COLE - CONFIDENTIAL
2 the partners could then usurp
3 corporate opportunities of the
4 partnership, right?
5    MR. SCHRYVER: Objection.
6    A. Well, the funds were not
7 deploying capital. There were no
8 opportunities for those funds.
9    Q. Well, was the litigation
10 finance, was that an asset of
11 Melody?
12    MR. SCHRYVER: Objection --
13 sorry.
14    Q. One party was entitled to
15 usurp to the exclusion of the other?
16    MR. SCHRYVER: Objection.
17    Q. And if so under what
18 agreement gave them that right?
19    MR. SCHRYVER: Objection.
20    A. I'm not sure how to answer
21 that question.
22    Q. I think you agreed with me
23 earlier that you know of no
24 agreement or other document that
25 would have given Mr. Scaminaci the

1       COLE - CONFIDENTIAL
2 right to take litigation finance and
3 not to the exclusion of Mr. Jaffrey?
4    MR. SCHRYVER: Objection.
5 Mischaracterizes testimony.
6    A. Okay. So what had
7 potentially been a litigation
8 finance fund under the umbrella of
9 MCP was not pursued.
10    Q. No. I'm asking you --
11    MR. SCHRYVER: Sir, sir, sir.
12 He was not finished. Let him
13 finish his answer.
14    A. So it was no longer an
15 opportunity for MCP, that entity was
16 going to be part of a side advisor
17 of Mr. Scaminaci.
18    Q. Okay, right. What gave
19 Mr. Scaminaci the right to take that
20 opportunity and move it to his side
21 of the ledger, right, without any
22 compensation to Mr. Jaffrey?
23    MR. SCHRYVER: Objection.
24    A. I don't know how to answer
25 that. There's so many assumptions

1       COLE - CONFIDENTIAL
2 in the question posed. So I don't
3 know of an agreement.
4    Q. Okay. Well, I don't think
5 there's any assumptions posed at
6 all. I'm just asking you directly.
7 What -- can you point to any
8 document or legal doctrine or
9 anything that would have given
10 Mr. Scaminaci the right to take the
11 litigation finance opportunity which
12 was developed at Melody and which
13 the parties were working on jointly
14 for over two years and move that to
15 his side of the ledger without
16 compensating Mr. Jaffrey?
17    MR. SCHRYVER: Objection.
18    A. Both partners used assets
19 of Melody Capital Partners to create
20 their side businesses which became
21 their primary businesses. By 2019
22 there was nothing -- there was no
23 opportunity for the legacy advisor
24 because there's been a determination
25 not to launch new funds.

1　　　COLE - CONFIDENTIAL
2　　Q.　And so you think the 2018
3　agreement gave Mr. Scaminaci the
4　right to move the litigation finance
5　business from a jointly owned asset
6　under his new --
7　　A.　I haven't formed --
8　　　MR. DANNER:　You have to let
9　him finish.　Then I have to get my
10　objection in.
11　　THE WITNESS:　Okay.　Sorry.
12　　Q.　Do you think the 2018
13　agreement gave Mr. Scaminaci the
14　right to move the litigation finance
15　business under his new GP?
16　　　MR. SCHRYVER:　Objection.
17　　　MR. DANNER:　Go ahead.
18　　A.　I'm not sure that I formed
19　a legal conclusion.
20　　Q.　That's fine.　Does the 2018
21　agreement say anything about
22　Mr. Scaminaci's rights to pursue a
23　litigation finance fund?
24　　A.　Not to my recollection, no.
25　　Q.　Does it say specifically

1　　　COLE - CONFIDENTIAL
2　that Mr. Jaffrey can pursue a
3　telecom-related fund?
4　　A.　Yeah.　It states that.
5　　Q.　All right.　Can we go back
6　to Exhibit 28.　This is a cover
7　email and a draft of the Investment
8　Memorandum to the Advisory Board and
9　the independent fund representative.
10　　Do you see that?
11　　A.　Yes.
12　　Q.　And I believe counsel asked
13　you did Mr. Jaffrey make any changes
14　to this one paragraph in the
15　handwritten notes that are on this
16　attachment.　Do you recall that
17　question?
18　　A.　Yes.
19　　Q.　Are these comments on this
20　document, is this Mr. Jaffrey's
21　handwriting?
22　　A.　Let's see --
23　　　MR. SCHRYVER:　Objection.
24　　A.　I'm not sure.　Actually it
25　does say:　"My comments attached."

1　　　COLE - CONFIDENTIAL
2　I had just assumed that the
3　attachment had his comments.
4　　Q.　Okay.　Well, if you look at
5　page 5859, there's quite a bit of
6　handwriting at the bottom.　Can you
7　recognize this as Mr. Jaffrey's
8　handwriting?
9　　A.　I don't.
10　　Q.　Okay.　Can you identify
11　Mr. Jaffrey's handwriting if you saw
12　it based on the years you worked
13　together?
14　　A.　I might be, but it's been
15　quite a while.
16　　Q.　Okay.　But as you sit here
17　today, you can't identify this as
18　Mr. Jaffrey's handwriting?
19　　A.　One way or the other, no.
20　　Q.　Look back at 26.　You were
21　asked some questions about this
22　email.　Do you recall that?
23　　A.　Yes.
24　　Q.　And specifically you were
25　asked some questions about

1　　　COLE - CONFIDENTIAL
2　statements in the email about how
3　successful this transaction was?
4　　A.　Yes.
5　　Q.　Okay.　And of course, even
6　though the transaction was
7　successful we won't know whether it
8　could have been more accessible --
9　whether it could have been more
10　successful but-for the conduct of
11　Mr. Scaminaci, is that fair?
12　　　MR. SCHRYVER:　Objection.
13　　A.　I think that's fair.
14　　Q.　And you are very aware that
15　even having conversations with
16　potential acquirers could put a
17　company in play --
18　　　MR. SCHRYVER:　Objection.
19　　Q.　-- right?
20　　A.　It's a private company so
21　it's not a public company.
22　　Q.　But it could have put a
23　company in play in terms of those in
24　the industry who might be a
25　potential buyer, right?

85 (Pages 334 - 337)

COLE - CONFIDENTIAL

1
2     A.   Potentially, yeah.
3     Q.   And talking to enough
4  potential buyers could harm the
5  ability of the company to realize
6  full value?
7        MR. SCHRYVER:  Objection.
8     A.   In my experience and
9  opinion, yeah.  Running a shoddy
10 process could taint a process going
11 forward.
12        MR. BROCKETT:  All right.
13 Nothing further.
14        MR. SCHRYVER:  Just one or two
15 questions.
16     Q.   I think you testified to
17 this earlier, I just want to make
18 absolutely sure.  The 2018 agreement
19 are you aware of it placing any
20 limitations on the investments that
21 Mr. Scaminaci's separate business
22 could pursue?
23        MR. BROCKETT:  Objection.
24 Asked and answered.
25     A.   No.

COLE - CONFIDENTIAL

1
2        MR. SCHRYVER:  No further
3  questions.  Thank you so much.
4        MR. DANNER:  What are you guys
5  doing in terms of designating the
6  transcripts?
7        MR. SCHRYVER:  So far very few
8  have been designated.
9        MR. DANNER:  I think I'm just
10 going to designate to the extent
11 the names of any Melody investors
12 are reflected, designate as
13 confidential and we're available to
14 confer with the parties if that
15 creates any issues.
16        THE VIDEOGRAPHER:  That
17 concludes the testimony today of
18 Mr. Jonathan Cole.  We are now off
19 the record.  The time on the video
20 monitor is 5:47 p.m.
21        (Time noted:  5:47 p.m.)
22
23
24
25

1  ANDRES SCAMINACI vs. OMAR JAFFREY
2  2/6/2024 - JONATHAN COLE
3        ACKNOWLEDGEMENT OF DEPONENT
4     I, JONATHAN COLE, do hereby declare
5  that I have read the foregoing transcript,
6  I have made any corrections, additions, or
7  changes I deemed necessary as noted on the
8  Errata to be appended hereto, and that the
9  same is a true, correct and complete
10 transcript of the testimony given by me.
11
12 _____  _____
13 JONATHAN COLE            Date
14 *If notary is required
15
16    SUBSCRIBED AND SWORN TO BEFORE ME THIS
17 _____ DAY OF _____, 20____.
18
19
20 _____
21 NOTARY PUBLIC
22
23
24
25

1
2  STATE OF NEW YORK      )
3                        ss.:
4  COUNTY OF NEW YORK     )
5
6        I, ERICA L. RUGGIERI, RPR and a
7  Notary Public within and for the State
8  of New York, do hereby certify:
9        That I reported the proceedings
10 in the within-entitled matter, and
11 that the within transcript is a true
12 record of such proceedings.
13        I further certify that I am not
14 related by blood or marriage, to any
15 of the parties in this matter and
16 that I am in no way interested in the
17 outcome of this matter.
18        IN WITNESS WHEREOF, I have
19 hereunto set my hand this 7th day of
20 February, 2024.
21
22
23 _____
24    ERICA L. RUGGIERI, RPR, CSR, CLR
25

86 (Pages 338 - 341)

1
2  ------------- I N D E X -----------------
3  WITNESS                          PAGE
4  JONATHAN COLE
5      By:  Mr. Brockett          6, 324
6           Mr. Schryver          158
7
8  -------------- EXHIBITS ----------------
9  COLE                        FOR I.D.
10  Exhibit 1, Melody Flagship        17
11  Business Plan
12  Exhibit 2, Contribution          26
13  Commitment Agreement, Bates
14  MCP7560 through 7565
15  Exhibit 3, Email, Bates JAF0064   39
16  through 0065
17  Exhibit 4, Memorandum to the New  50
18  Business Investment Committee,
19  Bates Scaminaci 2236 through
20  2272
21  Exhibit 5, Email, Bates JAF5790   54
22  Exhibit 6, Email, Bates Jaffrey   59
23  0239
24
25

1
2  -------------- EXHIBITS --------------
3  COLE                        FOR I.D.
4  Exhibit 19, Email, Bates JAF0359 126
5  through JAF0365
6  Exhibit 20, NDA, Bates 459       152
7  through 464
8  Exhibit 21, Email, Bates CK      154
9  RBCCM1128
10  Exhibit 22, Email, Bates        159
11  AS_00224271
12  Exhibit 23, Email, Bates        180
13  AS_00224476
14  Exhibit 24, Email, Bates        186
15  AS_00258164
16  Exhibit 25, Email, Bates        189
17  JAF0288647
18  Exhibit 26, Email, Bates        191
19  JAF0282081
20  Exhibit 27, Email with          205
21  attachment, Bates AS_00246429
22  Exhibit 28, Email with          214
23  attachment, Bates AS_00215856
24  Exhibit 29, Email with          222
25  attachment, Bates AS_00215923

1
2  -------------- EXHIBITS --------------
3  COLE                        FOR I.D.
4  Exhibit 7, Email, Bates AS_5881   69
5  through 5882, with attachment,
6  Bates 5883 through 5890
7  Exhibit 8, Memorandum, Bates     71
8  AS_5883 through 5890
9  Exhibit 9, Email, Bates AS5_952   74
10  through AS_5954
11  Exhibit 10, Email chain          77
12  Exhibit 11, Email, Bates AS0218   81
13  Exhibit 12, Email, Bates JAF1304  83
14  Exhibit 13, Email, Bates AS_4219  86
15  through 4220
16  Exhibit 14, Email, Bates JAF6293  93
17  Exhibit 15, Email, Bates JAF5520  96
18  through JAF5522
19  Exhibit 16, Email, Bates         101
20  Melodeon 93 through 97
21  Exhibit 17, 2020 Agreement,      111
22  Bates Jaffrey 0266 through 0276
23  Exhibit 18, Letter from Kirkland  116
24  & Ellis to Andres Scaminaci,
25  Bates AS_ 7777 through 7779

1
2  -------------- EXHIBITS --------------
3  COLE                        FOR I.D.
4  Exhibit 30, Email, Bates        224
5  AS_00216083
6  Exhibit 31, Email with          228
7  attachment, Bates JAF0300068
8  Exhibit 32, Email, Bates        239
9  JAF0300064
10  Exhibit 33, Email, Bates        243
11  JAF0281139
12  Exhibit 34, Email with          250
13  attachment, Bates JAF0057555
14  Exhibit 35, Email with          255
15  attachment, Bates AS_00229506
16  Exhibit 36, Email, Bates        279
17  AS_00257963
18  Exhibit 37, Email, Bates        297
19  JAF0307875
20  Exhibit 38, Declaration         314
21
22      *** EXHIBITS ATTACHED ***
23
24
25

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

1
2         INSTRUCTIONS TO WITNESS
3
4         Please read your deposition over
5   carefully and make any necessary
6   corrections.  You should state the reason
7   in the appropriate space on the errata
8   sheet for any corrections that are made.
9         After doing so, please sign the
10  errata sheet and date it.
11        You are signing same subject to
12  the changes you have noted on the errata
13  sheet, which will be attached to your
14  deposition.
15        It is imperative that you return
16  the original errata sheet to the deposing
17  attorney within thirty (30) days of
18  receipt of the deposition transcript by
19  you.  If you fail to do so, the deposition
20  transcript may be deemed to be accurate
21  and may be used in court.
22
23
24
25

1   ANDRES SCAMINACI vs. OMAR JAFFREY
2   2/6/2024 - JONATHAN COLE
3         E R R A T A  S H E E T
4   PAGE_____ LINE_____ CHANGE_____
5   _____
6   REASON_____
7   PAGE_____ LINE_____ CHANGE_____
8   _____
9   REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  JONATHAN COLE          Date
25

| & | | | |
|---|---|---|---|
| **&** 1:20 2:14 3:4 4:20 7:20 8:9 10:7 116:3,8 311:3 312:21 343:24 | **0065** 39:10,12 342:16<br>**0239** 59:20,22 342:23<br>**0266** 111:10,12 343:22<br>**0276** 111:10,12 343:22 | **116** 343:23<br>**11:02** 53:25<br>**11:46** 74:25<br>**11:54** 75:7<br>**12** 40:5 80:22 83:8,10 189:9 189:14 229:5 230:14 239:16 318:16 343:13 | **1633** 2:7<br>**16th** 70:25 74:25<br>**17** 111:8,11 342:10 343:21<br>**18** 11:4 106:7 115:23 116:2 310:16 343:23 |

| 0 | | 1 | |
|---|---|---|---|
| **00215856** 214:11,18 344:23<br>**00215923** 222:12,18 344:25<br>**00216083** 224:19,23 345:5<br>**00224271** 159:11,17 344:11<br>**00224476** 180:15,20 344:13<br>**00229506** 255:4 255:10 345:15<br>**00246429** 205:17,24 344:21<br>**00257963** 279:17,21 345:17<br>**00258164** 186:5 186:10 344:15<br>**00321** 1:10 4:18 | | **1** 17:11,17 137:21 304:23 304:24 342:10<br>**1.3** 142:13<br>**1.5** 203:17<br>**1.625** 199:19 203:19<br>**10** 77:14,24,25 158:5 252:25 253:18 254:5,7 254:9,19,23 261:5 262:19 326:22 328:7 343:11<br>**100** 301:3,11,12<br>**10010** 2:18<br>**10017** 3:7<br>**10019** 2:8<br>**101** 343:19<br>**10:39** 60:7<br>**10:43** 53:20<br>**10:54** 74:18<br>**11** 81:23,24 343:12<br>**111** 343:21 | **120** 41:12<br>**126** 344:4<br>**12:05** 215:11<br>**12:07** 100:24 100:25<br>**12:48** 101:3,8<br>**12th** 39:22 54:17 240:7<br>**13** 86:14,15 321:6 343:14<br>**14** 93:16,18 291:24 292:2 343:16<br>**15** 96:15,17 98:19 158:15 205:24 291:24 294:12,18 343:17<br>**15/16** 215:2<br>**152** 344:6<br>**154** 344:8<br>**158** 342:6<br>**159** 344:10<br>**16** 101:18,19 214:15 222:24 343:19 | **180** 344:12<br>**186** 344:14<br>**189** 344:16<br>**18th** 60:16<br>**19** 126:9,11 330:24 344:4<br>**191** 344:18<br>**1993** 7:16<br>**1:21** 4:18<br>**1:22** 40:5 240:6<br>**1:32** 78:24<br>**1:50** 151:25<br>**1a** 250:25,25 251:3 |

| | | | 2 |
|---|---|---|---|
| | | | **2** 25:24 26:3 90:4 138:13 156:16 211:4 215:17 220:5 223:23 243:2 311:6 327:8,11 327:12 342:12<br>**2.0** 34:9 47:21<br>**2/6/2024** 340:2 347:2<br>**20** 10:12 93:8 98:20 107:14 |

152:20 157:5
158:18 275:9
340:17 344:6
**20.5x** 142:13
151:13 177:13
177:17
**2005** 8:19 9:7
9:20
**2008** 36:21
37:3
**2015** 9:8,16,20
9:21
**2016** 9:21
10:16 12:2
**2018** 10:25
14:3 17:3,16
34:19 37:4
38:22 46:23,25
47:9 51:9,16
52:3,10 67:3,8
67:14 104:21
105:11,13,23
106:10,23
107:4,17 108:3
108:9,11,13
213:3 233:4,20
233:24 234:11
260:2,6 265:16
265:21 275:19
294:9 304:25
305:5,10
306:20 307:19
308:20 309:14
310:2 311:6,13
312:11 313:11

318:21 319:3
319:19,22
320:18 321:8
321:21 322:5
322:20,25
326:7,13
327:22 328:10
329:13 334:2
334:12,20
338:18
**2018-2019**
267:18
**2019** 13:5,15,21
14:4 15:25
23:6 71:2 82:4
83:22 90:5
91:12 94:3
96:7,23 97:3
97:21 108:17
112:9 205:24
215:2 222:25
224:25 235:3
238:6 260:11
267:19 292:4
294:4,6 296:13
298:6 299:23
304:20 309:25
310:5 333:21
**2020** 39:23
40:5 47:10
54:17 56:2
59:3,13 60:3,7
60:17 66:5,9
68:8 94:11
102:7 107:15

107:19 111:11
111:21,23
112:13 123:12
126:3 127:19
134:4 135:9
156:19,21
159:24 160:18
160:20 180:22
181:6 186:10
186:18 189:22
229:5 230:14
239:16 280:10
280:22 284:7
284:15 287:3
290:17 316:4
317:16 343:21
**2021** 14:16
189:9,14 192:7
192:21 193:5
245:9 284:8
290:18 317:18
318:2,10,13
**2022** 15:25
256:22 257:2
**2024** 1:12 4:4
63:22 341:20
**205** 344:20
**21** 1:10 59:14
77:21 154:19
154:22,23
344:8
**214** 344:22
**22** 159:10,15
344:10

**222** 344:24
**2236** 50:21,25
342:19
**224** 345:4
**2272** 50:22,25
342:20
**228** 345:6
**23** 180:14,19
344:12
**239** 345:8
**24** 186:4,8
344:14
**243** 345:10
**24th** 224:24
**25** 189:2,6
344:16
**250** 345:12
**255** 345:14
**26** 191:24
192:5 336:20
342:12 344:18
**27** 205:16,21
344:20
**279** 345:16
**28** 214:10,16,16
335:6 344:22
**29** 143:13
222:11,16
344:24
**297** 345:18
**2:08** 152:6
158:10
**2:17** 158:13
**2:57** 299:22
300:9,10

**2a** 90:25 92:19 247:8 248:5,6 248:7,12 249:5 250:2,6,25 251:3,10,12

**2b** 244:14 245:4 247:9 248:5,6,10,15

**3**

**3** 32:4 39:9,11 104:19,19 142:4 232:11 232:14 251:17 251:22 259:22 327:10,15 328:17,21 342:15

**30** 159:23 224:18,21 345:4 346:17

**300** 200:3,16

**30th** 51:8,15 52:3 230:16

**31** 228:15,19 328:20,22,25 329:2,6 345:6

**314** 345:20

**31st** 60:7

**32** 239:10,13 325:4 328:16 328:23 345:8

**324** 342:5

**33** 243:22 244:2 345:10

**34** 250:9,17 326:21 345:12

**35** 255:3,8 328:4 345:14

**36** 279:16,20 345:16

**362** 201:6

**37** 297:10,16 315:8 345:18

**38** 201:7 314:2 314:6 345:20

**39** 342:15

**3:02** 204:24

**3:15** 205:5

**3a** 90:25 92:20 305:17

**3c** 114:3 115:9

**3rd** 127:19 280:9,22

**4**

**4** 50:21,23 113:5 143:7 144:14 209:15 209:16 249:4 251:18,23 259:21,24 327:14,18 342:17

**40** 317:11

**4219** 86:14,16 343:14

**4220** 86:14,16 343:15

**425** 1:20 3:6 4:20

**459** 152:18,20 344:6

**46** 75:11

**464** 152:19,21 344:7

**4:21** 276:7

**4:37** 276:12

**4:53** 193:5

**4th** 82:4

**5**

**5** 29:8,15 31:13 31:23 32:6 54:9,11 113:6 114:3 145:4 213:9,15 325:22 326:2 327:13 342:21

**50** 213:13 342:17

**5025** 341:22

**51** 2:17

**54** 342:21

**55** 204:20

**5859** 336:5

**5881** 69:20 70:2 343:4

**5882** 69:21 70:2 343:5

**5883** 69:23 70:5 343:6,8

**5890** 69:24 70:5 343:6,8

**59** 342:22

**5952** 74:5

**5954** 74:6,8 343:10

**5:03** 90:5

**5:21** 324:6

**5:30** 324:11

**5:47** 339:20,21

**5th** 83:22 186:10,18 192:7 193:4

**6**

**6** 1:12 4:4 59:18,19,21 252:24 253:19 292:4 342:5,22

**69** 343:4

**6th** 94:2 294:4

**7**

**7** 69:19,25 180:22 296:13 343:4

**7-15-19** 206:12

**71** 343:7

**74** 343:9

**7565** 26:2,5 342:14

**77** 343:11

**7777** 115:25 116:4 343:25

**7779** 115:25 116:5 343:25

**7:10** 97:4

**7th** 96:22 97:3 341:19

**8**

**8** 70:4 256:21
298:5 299:23
343:7
**81** 343:12
**83** 343:13
**86** 343:14
**876** 300:3
**8th** 102:6

**9**

**9** 29:17 74:5,7
75:15 236:25
261:5 325:13
325:13 343:9
**93** 7:17 101:18
101:20 343:16
343:20
**952** 74:8 343:9
**96** 343:17
**97** 101:18,20
343:20
**98** 7:15
**99** 8:15,19
**9:35** 298:6
**9:45** 1:13 4:4
**9:49** 8:3
**9:50** 8:8

**a**

**a.m.** 1:13 4:4
8:3,8 53:20,25
60:7 74:18,25
75:7 97:4
215:11

**abernstein** 2:12
**abided** 323:11
**ability** 338:5
**able** 118:15
119:15 200:5,6
203:18 204:2
**above** 200:4
253:9
**absent** 209:21
**absolutely**
198:20 242:16
338:18
**accelerate**
210:12
**accelerated**
170:6 316:5,13
**accept** 164:9,16
164:24 188:24
**acceptable**
181:24 183:5
**accepted**
163:16 164:19
164:23,25
**access** 130:23
133:12,16,18
141:18 153:2
155:21
**accessible**
337:8
**account** 151:6
293:6
**accounts** 94:25
293:12
**accuracy**
173:14 198:8

201:24 250:4
**accurate** 7:8
23:10,12 41:13
198:13,22
199:23 231:14
233:17 234:4
235:6,8,17
236:24 254:20
280:19 286:5
301:4,11
311:22 319:7
319:21 322:11
322:14 346:20
**accurately**
171:20 172:2,2
172:22
**achieve** 27:13
61:25 102:17
142:21 143:6
146:23 172:20
172:23 178:18
181:16 182:21
202:24
**achieved** 200:3
**achieves**
190:12
**acknowledge...**
340:3
**acquired** 49:25
49:25 52:14
157:4
**acquirers**
150:22 337:16
**acquisition**
116:18 119:7

119:16 123:9
140:5 156:9
161:3 208:4,10
**acquisitions**
169:14
**acting** 14:25
15:2
**action** 5:4
17:15 115:2
121:7
**actions** 124:6
127:24 128:2
139:15 148:8
148:15
**actively** 52:5
87:7 88:8 90:9
90:19
**activities**
128:25 130:14
235:12 253:2
254:13 260:13
**activity** 254:13
**actual** 176:2
**actually** 25:6
26:12 39:24
70:11 117:5
123:5 129:24
151:16 166:3
179:9 202:5
233:11,13
239:23 242:18
257:3 259:16
309:25 317:6
328:25 335:24

add 212:17,20
added 211:12
  212:5 214:7
  217:21 219:23
  221:13
additions 340:6
address 78:19
  85:4 208:4
  326:7,12 328:2
  329:15,19
addressed 55:3
  55:6 112:15
  113:20 115:6
addresses
  89:23,24
addressing
  79:4 92:10
  96:3
administer 5:2
administrative
  82:22,25
adv 244:14,21
  244:24 246:4
  246:24 247:19
  249:4 251:4,10
adva 244:22
adverse 280:13
advice 91:2
  117:23 149:23
  168:11 279:6
  279:10 280:25
advise 187:6
advised 124:10
  129:5

advising
  122:21
advisor 13:4,12
  13:24 14:7
  21:3,8 23:14
  24:9 25:11
  27:21 33:17
  34:3,14 43:12
  43:16,17,18,19
  44:2 62:18
  67:6 82:18
  99:3,6 107:22
  109:4,11
  110:10 114:18
  121:13,14
  122:16 184:20
  224:4 229:21
  229:23,24
  230:25 236:16
  238:6 249:23
  252:4,10
  254:14 256:6
  268:20 273:14
  274:3 275:24
  302:4,5,7
  303:2 313:23
  316:24 319:13
  330:16,18
  332:16 333:23
advisors 16:9
  64:9 66:8 99:9
  99:11 106:5,25
  108:16 109:3
  122:10,20
  215:24 216:3

232:22 237:14
  237:21 244:24
  252:3 257:5
  261:12 265:6
  320:4
advisory 50:10
  70:14,16,20
  72:6 77:10,11
  124:13 125:18
  161:20,23
  162:3,11,14
  163:11,17,22
  164:25 165:23
  165:24 166:4,6
  166:13 167:7
  184:5,9,13
  193:14,15
  207:16 208:2
  215:6 217:22
  225:20 251:18
  251:24 273:23
  273:24 296:25
  335:8
affairs 108:2
affiliate 13:2,6
  24:8 27:6
  90:12 249:17
  249:18 254:15
  258:7 273:8
  274:22 275:2,5
affiliated 12:8
  24:20,22 55:18
  57:25 62:19
  63:11 88:14
  133:6,20 154:9

211:14,17
  273:14 274:9
  274:14 275:14
affiliates
  138:17 237:6
  249:14 253:8
affiliation
  24:25 154:6,14
  274:12
affiliations
  5:11 253:3
affirmatively
  163:7
afternoon
  205:6
aggressive
  178:11,23
ago 110:8
  128:4,5
agree 4:11 49:5
  52:2 59:7
  89:11 92:15
  96:6 106:8
  132:3 133:21
  137:8 144:22
  163:20 183:13
  202:18 203:7
  243:12 268:25
  272:21,25
  273:18 282:11
  307:5
agreed 36:20
  38:5,16,21
  58:18 59:6,8
  62:22,23

104:22 105:23
106:10,19
107:3 108:11
112:21 113:25
136:21 233:5
257:2 260:3
293:21 311:18
311:25 312:23
319:16 323:2
331:22
**agreement**   17:4
17:16 18:3,6
19:5,20 25:7,8
25:25 26:4
27:3,10 28:16
30:21 31:15
32:24 34:20
35:12 36:24
37:6 38:20,22
41:3 44:7,14
45:4,14,21,24
46:6,19,23,25
46:25 47:10,11
47:18 58:19,25
59:6 60:17
67:8,14 68:9
69:3,11 81:19
82:14 89:20,25
90:25 91:10,17
92:5,6,14,20,24
105:14,16
106:11,22,23
108:8,12
110:12 111:11
111:21,25

112:3,6 113:2
113:21 114:10
114:22 126:4
134:4 135:9
153:6 155:11
155:16 192:20
192:22 198:6
210:6 213:3
233:20 238:15
242:6,8,11
256:25 258:19
262:7 264:3,9
264:13 265:16
265:22 273:20
274:23 275:19
276:19 277:7
277:22 281:6
281:11 282:3
288:7 294:3
299:15 305:2,5
305:10 306:20
307:19 308:20
309:15 311:5
311:13,16
312:12 313:11
318:25 319:4
319:19,23
320:19 321:9
321:22 322:5
322:20,25
323:12 326:8
326:13 327:23
328:10,13
331:18,24
333:3 334:3,13

334:21 338:18
342:13 343:21
**agreements**
44:9 81:7
113:12,14
125:15 131:15
135:10 136:9
137:24 151:7
179:25 226:6
226:13,16,18
264:22 276:24
277:15 278:3
284:2 290:25
291:6,16
**ahead**   168:16
168:19 207:21
259:5 264:7
287:23 292:8
294:19 308:9
308:11 334:17
**akin**   8:16,18,25
10:6,8
**allegation**
120:8
**alleged**   174:12
**allocation**
112:11 156:25
**allow**   97:15
317:7
**allowed**   19:23
20:3
**allowing**
152:25
**amended**   209:7
210:11

**amendments**
113:11,17
210:21
**amidst**   181:18
**analyst**   131:11
**anchor**   78:10
81:8,20 89:25
92:14,24
125:19 273:12
274:23 275:9
276:2
**andre**   253:12
**andres**   1:5 4:16
5:22 9:25
24:13 27:7
40:14 41:6
42:24 62:25
79:13 84:7,8
84:14 85:19,19
86:9 88:17
91:14 116:4
127:13 154:10
158:24 182:17
182:19 190:5
190:23 208:20
211:19 240:25
241:9 252:7
258:13 271:2
303:21 304:4
320:19 340:1
343:24 347:1
**andres's**   243:9
248:16
**andrew**   2:11
5:21

annual 244:25
answer 21:22
 42:22 49:7,21
 62:13 87:16
 88:12 118:5
 121:3 160:9
 173:2 178:4
 243:14 247:25
 285:24 288:18
 309:8,12,13
 313:20 325:2
 331:20 332:13
 332:24
answered
 49:18 120:25
 156:2 179:11
 338:24
answering
 309:18
anticipated
 110:2 111:4
 211:9,13
 317:17
anticipating
 308:4
anton 3:15 4:22
anyone's
 329:20
anyway 195:17
apologies
 192:16 214:16
 227:9 280:6
apologize
 247:15 255:16
 274:4 281:10

288:19 290:10
291:21 301:10
309:5 311:2
apparently
 77:17 250:25
appear 248:17
appearance 5:8
appearances
 5:10
appeared 80:5
appears 74:3
 155:19 206:15
 207:12 223:21
appended
 340:8
applied 89:20
appointed
 70:23
apprising
 195:21
approach
 124:20 181:24
appropriate
 346:7
approval 135:3
 245:23 264:15
approved 84:7
 85:19 125:17
 136:24 165:22
 166:5 264:2
approximately
 105:12 128:5
april 15:25
 245:8

area 135:7
areas 273:10
argumentative
 179:11
██████ 166:22
 166:23 167:2
 225:13
arrangement
 50:6
arrive 80:22
as0218 81:23
 81:25 343:12
as5 74:8 343:9
██████
 225:14
aside 197:7
 226:5 304:22
asked 18:15
 26:17 29:24
 49:18 99:20
 116:23 117:16
 117:17,23
 118:22 119:5
 120:10,24
 121:4 124:5
 135:14,19
 145:6 146:12
 156:2 179:11
 179:21 195:14
 225:22,25
 228:7 229:21
 230:6 240:4
 245:21,22
 247:13,15
 248:14 272:15

294:15,20
310:20 325:8
325:13 327:11
327:16 335:12
336:21,25
338:24
asking 7:2
 28:11 40:21
 45:13 126:15
 168:18 190:5
 190:23 259:5
 307:23 308:23
 332:10 333:6
asks 41:23
 241:21
assert 138:21
asserting 118:8
asserts 137:24
assess 130:6
 145:7,13,16,16
assessment
 92:16 173:19
asset 66:19
 67:10,16,24
 68:9,21 331:10
 334:5
assets 68:25
 97:12 123:9
 135:12 136:23
 137:10 142:7
 143:3,6,12
 148:21 150:15
 151:2 156:25
 171:10 172:3,8
 177:13,17

202:13,14,23
266:3,4,6
267:2,10 295:8
330:10,13
333:18
**assign** 180:10
**associates**
322:6,18
**assume** 22:19
87:15 136:21
278:18
**assumed** 14:13
59:12 336:2
**assumes** 168:15
176:14 221:21
263:23 264:6
**assuming** 18:22
**assumption**
63:5
**assumptions**
332:25 333:5
**assures** 190:20
**attach** 251:3
**attached** 69:22
73:21 74:14
102:9 127:12
206:10,23
219:12,16,19
257:11 259:8
335:25 345:22
346:13
**attaches** 162:7
**attachment**
70:9 159:16
160:6,10

205:17,22,23
214:11,17
220:5 222:12
222:17 228:16
228:20 229:14
250:10,18
251:22 255:4,9
335:16 336:3
343:5 344:21
344:23,25
345:7,13,15
**attempt** 34:6
58:13 134:25
**attempted**
295:20 323:13
**attempting**
33:23 35:9
100:5 143:11
**attention** 18:7
18:11 71:10
96:25 119:13
123:7,17
129:15 200:20
**attorney** 5:13
346:17
**attorneys** 2:5
2:15 3:5
**auction** 148:25
**audio** 4:9 7:22
**august** 9:19,20
66:8 127:19
180:22 181:5
186:10,18
280:9,22
284:15 287:3,6

**auspices**
265:21
**authority** 44:19
45:2 164:4,9
245:15,17
**authorization**
125:3
**authorized** 5:2
124:20 125:6
125:22 133:22
134:25 136:11
137:4 138:15
**authors** 52:16
**available** 163:2
245:5 246:16
246:19,22,23
247:10 248:8
339:13
**avenue** 1:20
2:17 3:6 4:21
**avoid** 81:3,14
**aware** 26:14
28:2 29:3 45:3
45:14,20,23
46:5,18,24
48:17 63:23
69:10,12 81:11
81:17 95:25
96:5 108:7
119:6 120:2,3
120:3 123:19
125:2 166:9,16
167:10,20
168:9,20
178:25 179:5

179:12 226:11
288:25 289:6
289:24 290:4,7
290:13 305:9
337:14 338:19
**awareness**
122:14

**b**

**back** 8:7 17:24
30:4 53:24
100:21 101:7
152:5 158:16
167:12 196:2
205:4 209:15
276:11 284:10
318:15 324:10
325:3 328:16
335:5 336:20
**background**
7:13 41:20
111:24
**backwards**
159:2
**banker** 149:4
170:11,15
171:22 172:6
204:9
**bankers** 149:12
149:23
**barring** 323:2
**based** 78:18
92:11 130:22
143:21 145:8
149:22 217:10
336:12

**basically** 131:3
**basis** 62:7
　105:18 132:7
　143:19 151:10
　151:18 289:13
**bates** 17:13
　25:25 26:4
　39:11 50:25
　54:11 59:21
　69:23,25 70:4
　74:7 77:16
　81:24 83:10
　86:15 93:18
　96:17 101:19
　111:10,12
　115:24 116:4
　126:11 152:20
　154:23 159:10
　159:16 180:14
　180:19 186:4,9
　189:2,8 191:24
　192:6 205:17
　205:23 214:11
　214:17 222:12
　222:17 224:18
　224:22 228:16
　228:20 239:10
　239:14 243:22
　244:3 250:10
　250:18 255:4,9
　279:16,20
　297:10,17
　342:13,15,19
　342:21,22
　343:4,6,7,9,12

343:13,14,16
343:17,19,22
343:25 344:4,6
344:8,10,12,14
344:16,18,21
344:23,25
345:4,7,8,10,13
345:15,16,18
**bearing** 115:24
**bears** 25:25
　111:9
**began** 128:4
　316:6
**beginning** 5:12
　14:3 209:16
　299:23
**begins** 183:23
　200:21,25
　202:9 203:3
　209:18 211:7
　239:24 294:23
　303:8 310:24
**behalf** 5:15,18
　5:22,24 117:8
　121:5 126:6
　135:10 163:20
　187:4
**behavior** 100:4
　134:14 148:23
　150:8
**belief** 315:22
　316:12 319:9
**believe** 13:15
　18:8,14 19:6
　20:16,20 23:16

24:18 25:7
26:19 27:9
28:17 31:11
32:19 56:2
58:20,22 59:2
63:15 64:10
65:13 66:17
67:7 68:24
69:16 74:19
75:15 77:5
78:9 79:25
88:19 92:9,11
92:17 93:10,12
94:11 97:24
103:20 110:6,8
119:10 123:11
123:15 124:17
125:5 129:7
132:14,22
133:9 134:24
139:24 140:16
141:7 143:21
143:24 147:2
149:22 150:6
151:6 156:12
160:19 161:2
161:15 166:18
166:18 180:13
183:23 187:7
188:16 192:23
193:24 218:7,9
219:9 227:7,17
234:12,16
236:24 245:16
248:2 249:16

259:18 260:21
261:3 262:3
264:12 268:9
268:10 275:12
276:16,22
277:3,12,18,25
281:8 283:4
284:21 285:16
299:9 302:3
304:16 311:15
317:23 325:12
328:19 335:12
**believed** 30:6
　95:9 191:14
　212:23 287:11
　323:19
**belonging**
　155:23
**benefit** 187:12
**benefits** 22:17
**benett** 21:24
　22:3 23:3
　24:13 27:4,12
　27:17 28:2,23
　29:7,11 37:18
　48:11 54:15
　57:2,5 58:6,7
　58:14,18 59:5
　63:17,24 66:11
　80:25 81:12
　86:4,8,25 87:6
　206:6 208:20
　211:20 227:5
　227:13 238:10
　258:19 271:25

280:5 282:23 282:25 283:20

**benett's** 283:20

**benson** 2:4 5:20

**bernstein** 2:11 5:21

**best** 13:25 139:16 150:4 181:16 234:4 259:15 265:19 315:21 316:11 317:21 319:8

**better** 195:23 247:14 285:11

**bid** 128:9 149:21 176:8 191:16 317:9

**bidders** 174:8 174:11,24 175:8 176:4,23 188:15,23 204:6

**bidding** 149:19 176:3,3 190:7 190:25 191:3 203:25

**bids** 203:12,16 204:2

**big** 304:24

**biggest** 137:9

**billion** 142:13 199:19 203:17 203:19

**bills** 168:23 169:6

**binding** 32:18 32:24 114:9 133:23

**biographical** 245:6 246:14

**biolog** 246:13

**biologic** 246:14

**bit** 168:21 172:5 178:20 179:15 194:15 247:13 276:14 297:13 298:16 336:5

**blackline** 206:23

**blackstone** 123:14,18 124:2,20 125:23 128:8 128:11 129:10 129:16 160:17 161:6,12 165:6

**blind** 97:14

**blood** 341:14

**board** 70:17,20 72:6 77:10,11 124:13 125:18 161:20,24 162:3,11,15 163:11,17,23 164:25 165:23 165:24 166:4 166:13 167:7

184:5,9,13 193:14,15 207:16 208:2 215:6 217:23 225:20 335:8

**board's** 166:6

**boards** 50:10 70:14

**body** 194:14 225:10

**boil** 188:22

**boiling** 149:13

**bonuses** 112:10

**boss** 98:4

**bottom** 73:10 73:15 74:11 75:5,8,9 89:9 97:2 142:5 220:5 299:21 300:4,11 336:6

**bound** 243:7

**breach** 28:7,16 42:6,12 118:12 175:21 241:19 242:2,7 275:18 283:25

**breached** 139:4 176:11

**breaching** 218:24

**break** 50:15 53:15 80:23 98:10 151:21 172:5 204:21 276:4 291:23

324:2

**bree** 222:20 223:6

**broadly** 323:6

**broadway** 2:7

**brochure** 246:9 246:12 248:8 248:10

**brockett** 2:19 5:14,14 6:11 6:15 17:10 25:23 39:8 50:17,20 53:14 53:17 59:17 69:18 80:11,17 98:12,17 100:14 101:10 117:10,13,24 118:7,13,18 151:20 157:18 158:17 159:8 168:14 171:13 172:11 175:22 176:13,25 177:20,23 178:8 179:10 179:23 180:6 180:12 182:6 182:10,12 183:10,18 185:7,16,20 186:2 191:17 199:8 200:13 213:16 216:18 216:25 217:13

218:12,17,18
218:22 219:4
220:17 221:19
221:23 222:10
227:15 228:3,7
231:9,15,22
232:6 240:4
241:11 246:7
247:4,22
253:16 258:23
260:25 261:25
263:21 264:5
264:16 266:10
266:17,23
267:8 275:20
277:9 278:5
279:9 282:7,14
283:22 285:10
285:18 287:17
287:22,23
288:8,20 289:4
289:10 292:7
292:14 294:15
294:16,19,20
295:23 296:23
301:24 302:20
306:21 307:20
307:24 308:7
308:21 309:6
309:16 310:20
310:25,25
312:13 313:16
320:23 321:24
322:22 324:14
324:20,22

329:2 338:12
338:23 342:5
**broke** 276:14
**brought** 98:9
**build** 20:4,13
202:23 312:2
319:24 320:10
**built** 20:9,17,22
30:19 94:23
95:11 96:9
175:6 292:25
293:2,10
**bullet** 209:18
211:6,8,12
212:6,8 232:13
233:3 235:10
237:2 257:24
259:25 262:22
**burning** 215:11
**business** 17:12
17:18 20:4,8
20:12,17,21,25
21:5 30:3,19
34:22 35:11,24
36:16 37:7,15
37:20 38:5,23
39:4 44:19
46:5 48:25
49:5 50:24
51:7 52:9
55:12,13 60:24
61:3,5,11,20
62:9 64:24
65:7,10 66:25
67:8,13,21

68:8,12,14,15
69:5 89:3
94:18 95:15
96:9 103:23
105:17,24
106:9 107:4,11
108:10 115:12
128:9 137:7
150:25 151:3
172:17 174:18
205:11 208:8
208:10 251:18
251:24 292:20
305:17,20
309:23 311:18
312:2,4,6,7,11
312:24 313:23
319:2,25
320:11,20
334:5,15
338:21 342:11
342:18
**businesses** 30:8
32:7 302:14
303:6 305:12
327:5 333:20
333:21
**buy** 143:12
161:14
**buyer** 185:14
198:6 337:25
**buyers** 131:14
134:20 144:3
338:4

**buying** 124:3

**c**

**c** 1:15 2:2,11
3:2 6:6 101:4
193:11
**call** 25:24 56:5
197:3 221:24
**called** 6:6 12:17
21:14 116:19
119:9 179:22
235:23 267:23
298:20 317:15
320:4 321:11
329:7
**calls** 176:14
177:24,25
185:17,21
217:2,14
218:13 221:20
241:13 263:22
264:17 266:11
267:9 282:8
283:23 285:4
287:18 295:24
302:2,21
303:18 306:22
308:22 313:17
**calm** 310:9
**candor** 199:12
**capacity** 57:17
120:14,15
216:6 256:7
279:3,12
281:19 284:17

**capital** 9:14
11:11,12 12:7
13:8,11,17,22
14:11,21 15:12
20:15,25 24:11
25:10,12,20
26:25 27:5,20
30:7,11 33:7
33:10,23 35:10
36:4 43:5,9,10
43:14,24 46:13
46:16 47:15
49:3 54:23
55:17,19 63:12
65:24 66:2,7
71:19 82:15
90:11,21 96:14
97:13 99:4
102:22 109:9
110:10 113:8
114:17 116:11
117:8,9,21
118:9,14
120:19 121:11
122:24 127:7,8
132:23 133:3,8
133:8 153:7,10
153:14,25
154:4,5,13,22
155:8,12,16,21
179:16 187:4
192:14,17
196:17,18
209:12 211:15
211:25 212:13
215:22,23
216:2 221:4
224:6 226:7
227:12,24
229:11 232:19
232:20 236:4
238:4 244:19
245:12 246:24
247:20 251:4
252:9 257:14
257:24 258:7
259:12 269:10
269:10,21,21
270:3,9,9,17,19
270:20,25
271:16,16
272:3,4 273:18
273:19 274:10
274:17 275:2,5
275:14,15
277:5 278:12
278:17 281:16
281:16,20,21
282:4,5 283:8
283:9,13,14
284:14 285:2
286:9,11,20,25
287:12,16
289:3,9,16,17
289:21 295:8
299:5 303:12
303:16 310:7
312:25 313:2
321:11,13,19
321:20 325:16
330:14 331:7
333:19
**career** 7:12
156:19 157:13
157:17
**careful** 173:12
**carefully** 346:5
**carras** 79:5
211:21 306:10
**carried** 85:12
147:3
**carry** 31:13,23
32:6 147:13,24
148:9
**case** 4:17 88:24
90:18 285:9,17
287:20 314:8
**cash** 21:14
94:25 95:14
142:14 143:4,5
143:14 151:4,5
151:13 208:17
293:5,12
**cast** 131:7
**cause** 209:20
**caution** 117:5
120:13,20
**cautious**
305:24
**cc'd** 116:9
**cco** 11:8 14:22
15:3,5 18:22
31:10 53:13
57:17 59:9,12
60:23 62:22
64:13 65:12,20
65:25 196:16
197:10,11
198:2,7
**cease** 128:18,24
**ceased** 235:12
236:10 260:12
**celine** 60:12
65:14 86:25
87:4 93:12
98:5 223:3
295:19
**centered**
203:16
**centric** 312:2
319:25
**ceo** 103:23,25
**certain** 50:8
70:21 107:11
141:8,9 146:23
179:22 209:20
226:9 242:16
262:23
**certainly** 11:7
16:7 23:21
31:6 50:6
67:12 68:25
71:7 99:24
120:7 138:15
141:21 202:6
245:20 316:13
316:18
**certainty**
203:19

**certificates**
83:3
**certifications**
83:4
**certify** 341:8,13
**cesar** 44:4
**cetera** 220:2
**cfo** 223:4
**chain** 73:18
74:11 75:17
77:15,25 78:5
86:19 343:11
**chance** 39:15
180:23 182:13
186:14 189:11
192:9 214:19
225:3 250:19
297:20
**change** 10:19
10:22 11:6
18:21 19:9
75:23 151:10
172:16 207:4,7
210:9,23 347:4
347:7,10,13,16
347:19
**changed** 10:24
11:4,7,16
16:10 213:23
231:25
**changes** 207:9
207:11 335:13
340:7 346:12
**changing** 151:3

**characterizati...**
48:19,21
114:14 147:8
**charge** 84:9
226:24
**chatting** 60:11
**cheap** 148:6
**cheaply** 143:12
**check** 157:22
**chief** 10:25
11:21 12:22,24
13:19 14:13
15:17,23 47:16
48:6 53:6,9
60:20 83:17
87:14,18,20
88:2 116:10
117:19 120:16
127:5 128:16
196:8 215:21
245:11 256:8
264:24 265:4
269:7,9 270:2
270:8 271:10
271:15 278:20
278:22 281:15
283:7 284:5,13
286:8,20,25
287:5,15
289:15 290:9
290:15 298:24
**choosing** 243:9
277:21
**chronologica...**
304:17

**chronology**
58:21,23
100:10 110:14
121:15 129:25
230:5
**circulated**
72:20 296:17
297:4
**circulating**
73:12
**circumstance**
247:18
**circumstances**
57:10
**city** 4:21
**ck** 344:8
**claim** 94:15
116:15,25
118:23 119:22
292:17
**claiming** 31:22
**claims** 145:7,13
**class** 267:10
**clear** 16:12
32:11 110:15
130:9 165:17
191:13 210:15
210:15 211:24
218:15,19
220:13 284:24
295:21 309:11
315:12
**clearly** 212:19
**client** 12:6
14:19 15:4

118:15 279:2
**clients** 15:6
**close** 18:8
178:17 236:15
318:23
**closed** 41:11
318:9
**closing** 303:14
**cloudbreak**
82:7,9,10,21
244:11,13
**clr** 341:24
**cole** 1:18 4:15
6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
39:14 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1,3
55:1 56:1 57:1
58:1 59:1,18
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1

| | | | |
|---|---|---|---|
| 69:1,19 70:1 | 144:1 145:1 | 212:1 213:1 | 279:1 280:1 |
| 71:1 72:1 73:1 | 146:1 147:1 | 214:1 215:1,21 | 281:1 282:1 |
| 74:1,5 75:1 | 148:1 149:1 | 215:25 216:1 | 283:1 284:1 |
| 76:1 77:1,23 | 150:1 151:1 | 217:1 218:1 | 285:1 286:1 |
| 78:1 79:1 80:1 | 152:1,8 153:1 | 219:1,6,11 | 287:1 288:1 |
| 81:1,22 82:1 | 154:1 155:1 | 220:1 221:1 | 289:1 290:1 |
| 83:1,7 84:1 | 156:1 157:1 | 222:1,6 223:1 | 291:1 292:1 |
| 85:1 86:1,13 | 158:1 159:1 | 224:1,23 225:1 | 293:1 294:1 |
| 87:1 88:1 89:1 | 160:1 161:1 | 226:1 227:1 | 295:1 296:1 |
| 90:1 91:1 92:1 | 162:1 163:1 | 228:1,6,22 | 297:1 298:1 |
| 93:1,16 94:1 | 164:1 165:1 | 229:1 230:1 | 299:1 300:1 |
| 95:1 96:1 97:1 | 166:1 167:1 | 231:1 232:1 | 301:1 302:1 |
| 98:1 99:1 | 168:1 169:1 | 233:1 234:1 | 303:1 304:1 |
| 100:1 101:1,17 | 170:1 171:1 | 235:1 236:1 | 305:1 306:1 |
| 102:1 103:1 | 172:1 173:1 | 237:1 238:1 | 307:1 308:1 |
| 104:1 105:1 | 174:1 175:1 | 239:1 240:1 | 309:1 310:1 |
| 106:1 107:1 | 176:1 177:1 | 241:1 242:1 | 311:1 312:1 |
| 108:1 109:1 | 178:1 179:1 | 243:1 244:1,2 | 313:1 314:1,5 |
| 110:1 111:1,8 | 180:1,18,21 | 245:1 246:1 | 315:1 316:1 |
| 112:1 113:1 | 181:1 182:1 | 247:1 248:1 | 317:1 318:1 |
| 114:1 115:1,23 | 183:1 184:1 | 249:1 250:1 | 319:1 320:1 |
| 116:1 117:1 | 185:1 186:1,7 | 251:1 252:1 | 321:1 322:1 |
| 118:1,4 119:1 | 186:11 187:1 | 253:1 254:1 | 323:1 324:1,12 |
| 120:1 121:1 | 188:1 189:1,6 | 255:1 256:1 | 325:1 326:1 |
| 122:1 123:1 | 190:1 191:1 | 257:1 258:1 | 327:1 328:1 |
| 124:1 125:1 | 192:1,4 193:1 | 259:1 260:1 | 329:1 330:1 |
| 126:1,9 127:1 | 194:1 195:1 | 261:1 262:1 | 331:1 332:1 |
| 128:1 129:1 | 196:1 197:1 | 263:1 264:1 | 333:1 334:1 |
| 130:1 131:1 | 198:1 199:1 | 265:1 266:1 | 335:1 336:1 |
| 132:1 133:1 | 200:1 201:1 | 267:1 268:1 | 337:1 338:1 |
| 134:1 135:1 | 202:1 203:1 | 269:1 270:1 | 339:1,18 340:2 |
| 136:1 137:1 | 204:1 205:1,6 | 271:1 272:1 | 340:4,13 342:4 |
| 138:1 139:1 | 206:1 207:1 | 273:1 274:1 | 342:9 343:3 |
| 140:1 141:1 | 208:1 209:1 | 275:1 276:1,13 | 344:3 345:3 |
| 142:1 143:1 | 210:1 211:1 | 277:1 278:1 | 347:2,24 |

colleague 5:25
collectively
138:16
collins 298:19
298:23 299:3
299:12,20
300:16 301:20
colony 126:20
127:13 129:19
130:12 131:20
138:20 143:11
145:8 149:17
149:24 150:21
151:12 152:25
152:25 160:12
162:19 166:3
166:11,11
168:11 170:5
170:13 176:7
177:9,12,15,21
181:10,21
183:7 184:18
185:3 188:17
189:20 190:6
190:20,24
191:2,2,16
200:8,12 201:8
201:11 230:9
316:24 317:8
colony's 150:7
164:5 316:4
come 18:6,10
31:19 100:20
119:12 123:6
123:16 129:14

149:20 204:7
284:10 324:25
coming 121:2
318:23
comment 18:16
135:15 308:24
comments
73:24,25
127:15 206:20
215:5,11,15,16
219:16 335:19
335:25 336:3
commission
231:8
commitment
25:25 26:4
342:13
committee
50:24 51:8
52:9 67:3
136:25 213:21
213:24 296:25
342:18
common
193:11
communicate
182:8
communicated
160:11 182:4
communication
198:4
communicati...
131:19 192:15
192:17 196:21
196:25 197:9

198:9,12,16,23
267:21
companies 12:8
133:6,20 151:9
company 9:2,4
9:6,11 11:15
12:17 13:3,7
14:6 21:9,13
23:16 49:24
61:6,11,14
83:18 88:6
113:12 116:19
119:8 135:2
143:9 148:25
162:21,24
181:21 196:12
255:24 268:21
268:22 298:20
337:17,20,21
337:23 338:5
company's
93:4 184:21
compensate
268:7
compensated
268:14,15
compensating
333:16
compensation
112:7,12
128:12 216:4
332:22
competition
178:13,25
323:8

competitive
139:18 204:10
complete 250:3
254:24 340:9
completed
287:9
completely
97:14 299:24
300:5,17,19,21
304:7 306:23
309:2
compliance
11:2,21 12:22
12:25 13:20
14:14 15:17,24
47:16 48:7
53:6,9 60:20
82:11,23 83:2
83:6 87:15,18
87:20 88:2
116:11 117:20
120:16 127:6
128:17 196:8
196:10 215:21
245:12 256:8
264:24 265:4
269:7,9 270:2
270:8 271:10
271:15 272:8
278:21,23
281:15 283:8
284:6,13 286:8
286:20 287:2,5
287:15 289:15
290:9,16

| | | | |
|---|---|---|---|
| **compliant**  83:5 | 19:1 20:1 21:1 | 116:1 117:1 | 182:1 183:1 |
| **complicates** | 22:1 23:1 24:1 | 118:1 119:1 | 184:1 185:1 |
| 64:6 | 25:1 26:1 27:1 | 120:1 121:1 | 186:1 187:1 |
| **computers** | 28:1 29:1 30:1 | 122:1 123:1 | 188:1 189:1 |
| 226:22 | 31:1 32:1 33:1 | 124:1 125:1,22 | 190:1 191:1 |
| **concern**  300:23 | 34:1 35:1 36:1 | 126:1 127:1 | 192:1 193:1 |
| **concerned** | 37:1 38:1 39:1 | 128:1 129:1 | 194:1 195:1 |
| 60:12 91:7 | 40:1 41:1 42:1 | 130:1 131:1 | 196:1 197:1 |
| **concerning** | 43:1 44:1 45:1 | 132:1,4,12 | 198:1 199:1 |
| 45:6 47:4 | 46:1 47:1 48:1 | 133:1,12,18,24 | 200:1 201:1 |
| **concessions** | 49:1 50:1 51:1 | 134:1 135:1 | 202:1 203:1 |
| 208:15,16 | 52:1 53:1 54:1 | 136:1 137:1 | 204:1 205:1 |
| **concluded** | 55:1 56:1 57:1 | 138:1,18 139:1 | 206:1 207:1 |
| 65:22 278:10 | 58:1 59:1 60:1 | 139:3 140:1 | 208:1 209:1 |
| 280:14 | 61:1 62:1 63:1 | 141:1,19,22 | 210:1 211:1 |
| **concludes** | 64:1 65:1 66:1 | 142:1 143:1 | 212:1 213:1 |
| 248:25 339:17 | 67:1 68:1 69:1 | 144:1 145:1 | 214:1 215:1 |
| **conclusion** | 70:1 71:1 72:1 | 146:1 147:1 | 216:1 217:1 |
| 28:12 31:20 | 73:1 74:1 75:1 | 148:1 149:1 | 218:1 219:1 |
| 42:15,17 | 76:1 77:1 78:1 | 150:1 151:1 | 220:1 221:1 |
| 134:21 171:24 | 79:1 80:1 81:1 | 152:1 153:1 | 222:1 223:1 |
| 172:7,9 177:25 | 82:1 83:1 84:1 | 154:1 155:1,22 | 224:1 225:1 |
| 334:19 | 85:1 86:1 87:1 | 156:1 157:1 | 226:1 227:1 |
| **conditions** | 88:1 89:1 90:1 | 158:1 159:1 | 228:1 229:1 |
| 210:3 | 91:1 92:1 93:1 | 160:1 161:1 | 230:1 231:1 |
| **conduct**  306:5 | 94:1 95:1 96:1 | 162:1 163:1 | 232:1 233:1 |
| 337:10 | 97:1 98:1 99:1 | 164:1 165:1 | 234:1 235:1 |
| **conducted** | 100:1 101:1 | 166:1 167:1 | 236:1 237:1 |
| 130:3,13 | 102:1 103:1 | 168:1 169:1 | 238:1 239:1 |
| **confer**  339:14 | 104:1 105:1 | 170:1 171:1 | 240:1 241:1 |
| **confidential** | 106:1 107:1 | 172:1 173:1 | 242:1 243:1 |
| 6:1 7:1 8:1 9:1 | 108:1 109:1 | 174:1 175:1 | 244:1 245:1 |
| 10:1 11:1 12:1 | 110:1 111:1 | 176:1 177:1 | 246:1 247:1 |
| 13:1 14:1 15:1 | 112:1 113:1 | 178:1 179:1 | 248:1 249:1 |
| 16:1 17:1 18:1 | 114:1 115:1 | 180:1 181:1 | 250:1 251:1 |

252:1 253:1
254:1 255:1
256:1 257:1
258:1 259:1
260:1 261:1
262:1 263:1
264:1 265:1
266:1 267:1
268:1 269:1
270:1 271:1
272:1 273:1
274:1 275:1
276:1 277:1
278:1 279:1
280:1 281:1
282:1 283:1
284:1 285:1
286:1 287:1
288:1 289:1
290:1 291:1
292:1 293:1
294:1 295:1
296:1 297:1
298:1 299:1
300:1 301:1
302:1 303:1
304:1 305:1
306:1 307:1
308:1 309:1
310:1 311:1
312:1 313:1
314:1 315:1
316:1 317:1
318:1 319:1
320:1 321:1

322:1 323:1
324:1 325:1
326:1 327:1
328:1 329:1
330:1 331:1
332:1 333:1
334:1 335:1
336:1 337:1
338:1 339:1,13
**confidentiality**
139:5
**confirm** 57:4
**conflict** 50:8
71:21 75:24
79:12 121:17
122:11,14
140:21 157:7
162:22 208:19
212:23 269:15
270:14 278:11
**conflicted**
183:24
**conflicts** 50:9
72:4 79:5
97:11 140:15
145:17 146:14
184:4 217:20
226:3 295:6
315:12
**confront** 134:6
**confronted**
134:9
**confused** 40:9
240:12 295:22

**confusion** 84:8
97:20 295:14
295:21 297:5
**connection**
77:22 122:22
122:23 169:10
179:17 204:13
208:9 228:11
282:2 293:23
**consecutive**
291:25
**consensus**
184:7
**consent** 114:10
115:3 124:13
124:15 126:5
129:7 135:3
136:14 137:6
161:20,23
163:16 164:22
166:7 206:11
209:10 225:12
226:2 245:18
**consents**
225:12,15
**consequences**
198:15
**consider** 67:15
67:20 68:7,19
**consideration**
140:10
**consist** 130:18
**consistent**
203:23 233:16
302:17 303:15

**constituted**
81:21
**constitutes**
81:10 90:2
**construed**
323:6
**consultant** 9:18
**consulting**
82:11,13 125:9
163:22
**consumer** 9:4
**consummated**
209:4
**cont'd** 3:2
101:9
**contacted**
130:6 131:14
176:2,5
**contain** 198:17
**contained**
132:11 141:10
**contains**
209:19
**contemplated**
160:24 161:7
161:12 208:25
210:5 319:23
**contemplates**
52:10
**contemporan...**
182:25
**contents**
231:13 247:3
**context** 181:19

continuation
  128:3
continue   4:10
  62:22 65:25
  108:14
continued
  141:23 195:9
  235:2 260:10
  286:24 287:4
  287:13 288:4
continues
  75:18 138:14
  184:16 201:14
  203:10 223:15
  240:23 303:21
  311:17 312:20
  312:22 315:25
  315:25 322:3
continuing
  107:10 301:2
continuity's
  63:4
contract   31:2
  31:18 32:18
  44:17 126:6
  259:3 273:11
contracts
  273:10
contractual
  42:6,12 139:5
  241:19 242:2
contractually
  243:7
contrary
  153:21

contribute   27:4
  62:23
contributed
  25:9 27:19,23
  28:23 33:7
  41:4,25 42:10
  42:22 63:25
  110:22 238:17
  241:23 243:8
  262:9 277:19
  304:3
contributing
  28:3
contribution
  25:6,24 26:3
  27:18 28:8
  41:3 58:19,24
  59:6 110:12
  242:6,7,11
  258:18,21
  281:6 282:2
  342:12
control   21:9
  25:14 89:15
  91:14 109:16
  110:3,21
  154:16 210:10
  210:24 237:16
  249:15 256:6
  256:11 261:14
  274:16
controlled
  23:14,15 24:10
  24:23 27:6,24
  28:4,24 29:7

29:11 34:14
  40:14 41:5
  42:23 43:21,23
  50:2,3 62:25
  86:4,7,9,12
  87:6 89:4
  90:16,17 109:6
  113:14 153:11
  209:11,12
  211:19 212:2
  238:19 240:25
  241:9 243:15
  249:2 252:5
  253:10 258:15
  262:11 270:25
  271:7,25 273:2
  276:18 277:6
controls   109:17
  109:18,22
  114:8,18
  208:21 252:17
convenience
  98:13
conveniently
  304:24
conversation
  19:7 56:25
  57:8 76:16,24
  79:19 125:14
  160:21 161:16
  161:17 165:9
  165:14 182:22
conversations
  4:8 19:10
  72:21 73:2

97:23,25 98:6
  105:8 124:25
  142:17 165:18
  178:12,24
  179:4 295:13
  295:16 337:15
coo   128:16
copied   162:6,16
  166:3 197:4
  224:14
copy   207:13
  256:17 257:11
  314:7
copying   159:20
  180:21 181:4
  222:21 229:3
  244:10,12
  280:5 311:4
core   92:2,8
corporate   8:12
  8:21 23:24
  145:25 146:3
  330:20 331:3
correct   6:23
  8:17,20 9:12
  12:18,19 15:21
  15:22 16:2,3
  16:15,16,19,20
  16:23,24 22:6
  22:9,10,13,17
  22:23 23:7
  24:14,15 25:4
  28:25 29:9
  30:9 33:25
  36:22 37:10,16

37:21 38:6,25
39:19,20,23
40:2,19 42:7
42:24,25 43:2
43:13 44:10,11
44:22,23 47:23
51:9,14,22
53:3 54:24
55:22 56:6,7
58:4,17 59:3,4
63:2,8 72:13
72:18 74:18
76:6 78:14
79:7,16,17,23
82:8 83:19,22
84:21 86:10,21
91:4,5 93:9
95:21 101:24
105:15,18,20
105:25 106:11
107:5,16 108:3
108:18 109:23
110:17,24
111:6 127:16
127:19 129:13
137:6 140:6
148:12 149:11
149:19 153:8,9
153:12,13,17
153:19,25
154:7,14
155:17,24
156:3,10
163:10,24
166:8,25

170:21 171:6
175:18 183:11
184:15 186:24
186:25 192:18
192:19 221:6
221:11 227:22
233:2 238:25
239:2 242:8,12
243:2,13
244:20 251:7
252:19,22,23
254:2,3 257:6
260:20 263:6
265:7,10,13,16
269:12 270:5
270:11 271:3,8
275:7,17 279:4
279:7,13 280:6
280:7 281:3,23
282:23 283:3
286:23 292:11
301:18 318:10
326:4,6,8,14,16
326:25 327:5,6
327:23 340:9
**corrected**
174:25
**corrections**
340:6 346:6,8
**correctly** 40:18
41:14 63:17
65:16 128:20
139:8
**corrects** 243:6

**correspond**
188:14
**corresponded**
188:17
**counsel** 4:15
5:9 6:4 9:5
10:4,25 11:21
14:23 15:17
16:8 53:9
60:22 93:14
113:7 116:10
117:19 120:16
121:11 124:4
125:4 127:3
128:16 146:2,3
167:17 168:5,8
169:9,18,23
170:19 186:24
187:4 188:9
196:8 215:25
245:10,11
256:8 264:25
265:4 269:6,8
269:25 270:7
271:14 278:15
278:16,19,25
280:15,21
281:14 283:7
284:13 286:7
287:3,14
289:15 290:9
312:21 313:10
325:8 327:11
327:16 335:12

**counterclaim**
1:6,9 2:6,16
**counterparties**
175:15
**county** 77:19
341:4
**couple** 7:12
152:13 180:25
186:17 187:23
211:3 230:10
244:7 255:19
257:21 279:23
297:14 310:21
324:23
**course** 162:25
164:12 337:5
**court** 1:2 4:24
6:3 77:23
221:25 222:2
316:21 318:20
320:9,18 321:7
321:17 322:4
322:16 323:11
323:19 346:21
**covenants**
209:20
**cover** 69:20
73:9 101:23
126:14 162:8
206:2 250:20
329:3 335:6
**covers** 43:25
**create** 19:24
69:4 106:5
113:2 204:9

323:13 330:8
333:19
**created** 23:18
32:7 57:23
102:18 107:21
144:5 303:10
321:9 326:4
**creates** 339:15
**creating** 303:22
**creation** 30:15
321:18
**credit** 21:2,4
33:24 34:4,8
34:11,17 35:5
35:15,16 38:4
38:17,24 46:3
46:17 47:6,21
67:9,23 69:8
103:2 104:14
108:21 109:12
142:3 171:21
193:8,21 194:3
208:5,22
232:24 233:25
234:10,14,19
236:8 260:7
268:18 302:23
302:24 306:5,5
306:17 307:16
308:17 309:20
312:6,7,9
313:4,13,24
318:23 319:13
319:17 320:3
320:12,13,13

320:14 323:14
323:14,15
329:14,24
330:25
**criminal**
314:22
**csr** 341:24
**culmination**
202:11
**current** 301:6
**currently**
265:11 274:10
315:10
**custodian** 84:9
**cut** 219:3
**cv** 1:10 4:18

**d**

**d** 1:15 2:9
342:2
**daily** 289:13
**dan** 5:14 6:14
98:8 117:6
158:15 168:18
178:3 185:23
266:19 288:13
305:2 307:22
**daniel** 2:19
**danielbrockett**
2:20
**danner** 3:8
5:23,23 50:14
50:19 53:16
80:21 86:11
98:8 285:3
303:18 310:11

310:14 329:3
334:8,17 339:4
339:9
**data** 131:13
132:9,11 139:2
153:2 171:20
172:15 173:23
174:16 175:13
**date** 17:19 26:6
39:13 48:18
49:4,10 50:5
51:3 54:13
59:23 70:3,6
74:9 78:3 82:2
83:12 86:17
93:20 96:19
101:21 111:14
116:6 126:13
152:22 154:25
159:12 180:16
186:6 189:4
192:2 205:19
214:13 222:14
224:20 228:18
239:12 243:24
250:12 255:6
256:21 278:24
279:6,18 281:2
294:2 297:7,12
314:4 317:2
340:13 346:10
347:24
**dated** 51:15
70:25 83:21
94:2 96:22

97:3 102:6
127:18 159:23
180:21 186:10
189:9 192:7
205:24 222:24
224:24 230:10
239:15 280:9
296:12
**dates** 94:9
**david** 131:11
146:17 222:20
**day** 41:12
229:15,18
257:11 340:17
341:19
**days** 64:24
130:2 186:17
187:24 317:5
346:17
**dead** 309:23,24
**deal** 140:14
185:3
**dealt** 47:2,14
112:6,14
**decide** 164:4
**decided** 33:18
48:12 234:20
236:21 330:7
**decision** 236:6
237:10 261:8
**decisions** 97:12
162:24 235:11
260:12 295:7
**deck** 102:13
232:10 257:22

259:6,8 329:4
**decks** 197:18
285:7
**declaration**
314:2,7 318:17
345:20
**declarations**
314:12
**declare** 314:15
340:4
**decline** 164:11
**deemed** 90:12
90:23 91:8
340:7 346:20
**deep** 231:5,5
**default** 209:23
210:6,10,25
**defendant** 1:6,9
2:6,16
**defined** 232:17
232:18 273:11
**defines** 232:14
319:3
**definition**
91:18 273:13
**delaware** 82:16
**departure**
44:10
**depending** 48:2
297:6
**deploy** 236:4
**deployed**
236:16
**deploying** 36:4
310:7 331:7

**deponent** 340:3
**deposed** 6:17
**deposing**
346:16
**deposition** 1:17
4:14,19 54:3
101:12 152:8
305:7 346:4,14
346:18,19
**der** 155:4,7
**deregistered**
27:22 33:11,12
33:20 248:22
**described**
296:3
**describing**
173:21
**designate**
339:10,12
**designated**
213:22,24
339:8
**designating**
339:5
**designation**
184:19
**designed**
315:11
**desist** 128:18
128:24
**desk** 226:24
**detail** 35:2
51:19
**details** 95:18
160:23

**deterioration**
115:12
**determination**
234:8 333:24
**determine**
173:13 329:25
330:23
**determined**
93:7 130:24
233:24 234:17
237:13 260:6
261:11 329:13
329:23
**determining**
72:7
**detrimental**
151:15
**develop** 22:8
**developed**
21:19,24,25
22:3,21 23:22
34:7 67:22
69:6 95:11
267:16 333:12
**developments**
195:21 257:16
**dialogue**
181:20 183:6
194:25
**diamond**
192:13,16
318:8
**dictate** 287:25
**different** 46:14
62:18 174:7

195:7 233:11
233:22 245:3
**differently**
147:11
**difficult** 135:6
**dig** 242:17
**digital** 126:20
129:19 130:12
131:20 143:11
149:17,24
150:6,21
151:11 152:24
152:25 160:12
164:5 166:2,10
166:11 168:10
170:5,13 176:7
177:9,12,15,21
181:9,21 183:7
184:18 185:3
188:17 189:20
191:2,16 200:4
200:8,11 201:8
201:11 230:8
316:3,23 317:8
318:7
**digitalbridge**
130:12 149:17
152:18
**dinner** 65:3
**direct** 96:24
118:4 200:20
**directed** 112:23
112:25 113:16
**direction** 88:17

**directions**
113:6
**directly** 214:4
333:6
**director** 10:18
**directors** 30:13
**disadvantage**
139:19
**disagreed**
247:2
**disagreement**
138:22 139:10
**disalvo** 256:15
**disapproved**
246:3
**disclose** 138:15
217:19 249:20
**disclosed** 50:10
99:4 184:3
249:5 250:2
268:14
**disclosing**
138:25
**disclosure**
70:13 107:9
249:13 250:3
254:7,8
**disclosures**
245:23 250:8
**discourage**
58:7,14
**discover**
132:10
**discuss** 19:3
119:15 121:19

124:21 125:6
140:12 141:15
163:2 192:10
**discussed** 50:11
76:2,11,18
79:10 134:11
142:24 161:10
163:13 166:10
166:19 168:10
293:20 317:14
**discussing**
121:24 122:2
174:20 215:8
305:6 311:14
**discussion**
37:24 89:18
123:12,13,18
160:15
**discussions**
19:14 80:25
81:7 97:19
126:19 128:7
143:17
**disposition**
317:17
**dispute** 119:21
122:5 201:24
**disruptive**
149:25
**disseminate**
175:20 176:18
**disseminated**
176:23
**dissolved** 27:22
33:11,13,21

248:24 258:13
**distinctions**
92:8
**distribute**
74:14
**district** 1:2,3
**divide** 248:5
**doctrine**
330:20 333:8
**document** 17:2
17:8,11 18:24
19:16,23 20:3
26:8,10,15,18
26:20,22 27:15
32:4 38:22
50:15 52:17,21
69:2,13 75:25
77:14 96:2
106:13 110:7
111:9,17 114:2
117:11 152:17
192:4 207:11
226:5 239:9,18
241:13 242:19
250:13 254:17
278:7 313:17
314:5 318:5
320:24 327:8
331:24 333:8
335:20
**documentation**
66:22 93:13
134:18
**documents**
46:11 113:22

124:18 152:14
188:12 276:24
277:14,15
278:3 290:25
291:7,16
326:18
**doing** 8:12,21
63:18 84:15
307:8 339:5
346:9
**dollars** 148:3
**dormant**
248:22
**double** 165:15
**draft** 126:16
127:12 206:16
212:18,21
221:14 228:8
230:15,18
231:25 240:8
259:24 260:18
261:20 296:17
325:5 335:7
**drafted** 26:11
44:7 71:4,6
82:4 111:18
**drafting** 18:3
26:13 52:20
**draw** 172:7
**drinks** 65:2
**drive** 202:15
203:18
**duly** 6:7
**dunn** 146:17

**dupe** 82:13
**duties** 199:14
  199:16 281:20
  283:13
**duty** 48:6
  199:12,12

**e**

**e** 1:15 2:2,2 3:2
  3:2 6:6 101:2,2
  101:4 342:2
  347:3,3,3
**earlier** 58:25
  153:22 160:14
  165:5 168:22
  170:4,22 171:2
  177:7 179:15
  228:7 230:6
  239:18 258:18
  260:18 272:15
  278:8 279:9
  281:5 282:17
  284:5 293:21
  317:5 331:23
  338:17
**early** 123:12
  160:17 181:5
  284:7 290:18
  309:25
**easements**
  267:23
**economic** 44:8
  71:15,19 72:23
  73:4 79:21
  84:24 212:7,9
  212:13 213:19

  219:24 220:8
  220:24 221:4
  224:2,5 296:20
**economics** 45:6
  45:17 46:2,4
  47:2,13 79:14
  85:5 88:21
  93:2 213:6
  249:6,21 252:8
  252:16,22
  253:13,25
  274:24
**edit** 216:12,13
  219:12
**edits** 211:3
  219:20 221:17
  222:7
**effect** 64:18
  144:25 157:9
**effective** 66:5
**effectively**
  107:20 235:25
  236:3 254:12
  257:25 272:9
  318:25
**effectuating**
  125:15
**efficient** 272:10
  272:13
**effort** 79:15
  84:10 202:13
  301:2 304:3
**efforts** 80:3
  81:12 84:5
  128:19 135:2

  234:24 260:8
  303:22
**egregiously**
  218:25
**either** 27:5
  32:21 37:14
  47:4 62:19
  63:9 65:7
  114:8 120:17
  132:14 134:16
  164:24 181:23
  183:3 197:24
  207:5 208:12
  209:7 218:15
  245:25 246:25
  275:6 284:7
  323:3 325:16
  325:23 326:12
  330:9
**elaborate** 17:6
**ellis** 116:3,8
  311:3 312:22
  343:24
**else's** 217:15
  308:24
**email** 39:9,11
  39:15,17,21,25
  40:4,21 54:9
  54:11,14 59:19
  59:21,25 60:6
  69:20,25 73:9
  73:11,17 74:7
  74:11,12,16,21
  74:24 75:6,14
  75:21 77:15,15

  77:25 78:5,19
  78:22 81:23,24
  82:3 83:8,10
  83:14 84:23
  85:4 86:15,19
  86:23 90:5
  93:18,22 96:17
  96:21 97:3
  101:19,23
  126:11,15
  127:11 154:20
  154:21,23
  155:4 159:10
  159:14,15,19
  162:7,8 180:14
  180:18,19
  181:3,15 182:7
  182:25 183:4
  185:22 186:4,9
  186:16,17,21
  186:22 189:2,7
  189:13,24,24
  189:25 191:24
  192:5,25 193:2
  194:14 196:7
  205:16,21,22
  206:2,4,9
  214:10,15,17
  214:20,23
  215:4 219:13
  219:14 222:11
  222:16,19
  224:15,18,22
  225:6,11
  228:15,20,23

229:2,15
239:10,14,22
239:24 240:3,8
243:22 244:2,3
244:9 245:10
250:9,17,20
251:2,5 255:3
255:8,12,18
256:14,16,16
279:16,20,22
280:2 292:3,9
294:14 297:10
297:16,23
298:4,12,15,16
300:8 301:25
329:3 335:7
336:22 337:2
342:15,21,22
343:4,9,11,12
343:13,14,16
343:17,19
344:4,8,10,12
344:14,16,18
344:20,22,24
345:4,6,8,10,12
345:14,16,18
**emails** 28:20
130:20,21,21
130:24 197:3
298:19 299:17
**emanuel** 2:14
5:15,18
**embarrassing**
288:17 307:12

**embarrassment**
288:16
**employed**
11:10,15,17
13:17 14:10,20
266:15 267:5
269:20
**employee** 9:22
10:16 22:4,8
53:2 270:18
272:2 304:15
**employees**
11:14 22:12
51:21,25 112:7
115:4 249:7,22
262:24 268:4,8
268:12 272:7
**employment**
288:2
**encouraged**
182:19
**energy** 35:23
305:25 313:5
313:14 320:12
320:21 323:14
323:22
**enforce** 190:21
**engage** 65:8
146:6 148:9
187:3
**engaged** 65:8
128:7 143:2
145:15 309:19
**engagement**
123:4

**engages** 198:15
**engaging** 191:9
**enjoyable**
310:9
**ensure** 114:25
**enter** 114:9
125:14 133:23
190:6,24
**entered** 105:13
153:23 155:15
156:5 169:18
179:17 192:21
226:7 238:15
256:25 262:7
264:14,22
318:24
**entering** 198:5
319:19
**enterprise**
199:19 203:17
**entertained**
149:21
**entire** 12:7 69:5
144:16
**entities** 25:17
50:2 61:23
113:23 114:8
114:18 126:7
131:23 135:11
175:25 237:7
263:16 313:3
**entitled** 17:11
31:23 237:5
275:24 331:14
341:10

**entity** 11:9
14:23 15:8,19
16:14 24:17
27:21,24 28:3
28:24 30:18
33:20 34:13
41:5 42:10,23
55:20 62:24
63:7,10,11
64:2 90:16
120:18 132:19
132:22 133:2,5
133:11 140:5
153:11 156:9
211:18 238:18
243:8,15
248:23 258:15
262:10 277:20
282:20 291:11
332:15
**envisioned**
315:15
**equity** 90:14
200:22 201:2,5
201:25
**eric** 79:4
211:20
**erica** 1:21 4:25
341:6,24
**errata** 340:8
346:7,10,12,16
**erwin** 155:4
**esq** 2:9,11,19
2:21 3:8,10

**essentially**
112:11 114:6
144:11
**established**
317:13
**estate** 35:22
305:23 313:6
313:15 320:13
320:21 323:14
323:23
**estimated**
318:3
**estimates**
141:25
**et** 219:25
**evaluate** 187:5
214:2
**evaluating**
188:19
**evangelista**
3:15 4:22
**eve** 150:16
**event** 184:6
198:4 209:22
210:6,10,24
**eventually** 93:6
149:16 297:22
299:16
**evergreen**
235:24 236:2
310:4
**everyone's**
99:25 159:6
**evidence**
168:16 176:15

176:22 178:7
221:21 263:23
264:6 296:24
**evidently**
123:13 135:17
155:9
**exact** 35:11,19
56:11
**exactly** 14:14
35:2 37:23
38:23 59:11
123:24 142:25
157:10 306:12
**exaggerated**
147:9,10
**exam** 98:25
99:17 100:3,10
229:20 230:10
287:8
**examination**
6:10 59:15
64:6,14,18
65:15,22 101:9
102:3 158:19
195:5,7,25
248:25 257:13
259:11 324:21
**examine** 99:9
**examined** 6:8
64:9 99:13
231:2
**examiners**
99:20
**examines** 99:3

**example**
263:19
**exchange** 59:25
231:8 299:19
299:21
**excluded** 191:3
191:6,11
**exclusion**
331:15 332:3
**excuse** 218:18
**execute** 34:6
35:9 108:10
**executed**
111:22 112:4
152:24
**executing**
153:6
**execution**
226:13
**exhaustive**
203:4
**exhibit** 17:11
17:14,17 25:24
26:3 30:5,5
39:9,11 50:21
50:23 54:9,11
59:18,19,21
69:25 70:4
74:4,7,17 75:5
75:15 77:14,17
77:20,21,25
81:24 83:8,10
86:15 93:18
96:15,17
101:19 111:8

111:11 116:2
126:11 152:20
154:19,22,23
159:10,15
180:14,19
186:4,8 189:2
189:6 191:24
192:5 205:16
205:21 214:10
214:15,16,16
222:11,16
224:18,21
228:15,19
239:10,13
243:2,22 244:2
250:9,17 255:3
255:8 279:16
279:20 292:2
294:12,18
297:10,16
304:22,23,24
310:16 314:2,6
325:4 326:21
328:4,20,22,23
329:5,6 335:6
342:10,12,15
342:17,21,22
343:4,7,9,11,12
343:13,14,16
343:17,19,21
343:23 344:4,6
344:8,10,12,14
344:16,18,20
344:22,24
345:4,6,8,10,12

345:14,16,18
345:20
**exhibits** 291:24
342:8 343:2
344:2 345:2,22
**existed** 122:15
**existence** 26:15
287:13 288:6
289:3
**exit** 201:15
202:2
**expect** 162:21
232:7
**expectations**
142:19
**expected**
169:21 232:2
238:17 262:9
**expenses** 95:2
226:10,20
227:2 268:19
293:15,22
294:7,8
**experience**
310:9 338:8
**expertise**
103:16
**explain** 23:11
248:21
**express** 28:15
32:20 99:14
100:2
**expressed**
297:5

**extended**
235:22
**extension**
208:13 209:8
**extent** 46:15
68:17 87:25
151:11 295:14
339:10

**f**

**f** 1:15 101:2
273:19
**fact** 52:15 53:5
109:22 153:20
153:22 154:11
164:15 170:12
172:14 187:16
189:18 202:8
210:21 217:18
217:19,25
227:18 261:23
262:14 263:4,9
264:2 268:11
272:5 282:11
286:24 296:12
299:7,10 302:6
306:15 307:14
308:15 309:22
**facts** 28:10
31:18 42:16
63:24 91:13
92:11 147:7
168:15 176:15
221:21 260:23
263:23 264:6

**factual** 217:19
**factually** 41:13
**fail** 346:19
**fair** 27:7 48:18
111:5 114:13
122:12 130:15
179:7 190:25
206:22 223:17
274:18 289:14
293:9 315:11
330:11 337:11
337:13
**fairness** 204:12
**fall** 91:17 92:12
273:13 294:8
**falls** 273:12
**false** 150:19,23
**familiar** 17:22
26:9 167:13,21
194:5 200:2
205:13 226:5,6
314:12,14
330:19
**far** 28:21 29:4
91:6 97:13
199:23 233:17
339:7
**fault** 329:20,21
**fcc** 13:12
**february** 1:12
4:4 23:6 59:3
82:4 83:22
160:20 235:3
256:21 260:11
341:20

**federal** 218:23
**feel** 160:6
**felt** 212:22
**fiduciaries**
198:20
**fiduciary**
198:22 199:2,7
199:16
**field** 134:19
**fig** 305:23
**figuratively**
215:13
**figure** 100:16
100:20
**file** 206:10
245:17
**filed** 17:14
77:17,19,21
83:4 247:9
248:7,12 314:7
**files** 141:8,8,10
**filing** 150:15
**final** 18:9
127:12 224:11
296:18
**finance** 21:10
21:12,17,18
23:5,21 35:22
37:17 45:7,12
45:18 47:5,21
48:13 49:11
51:12 52:4,12
61:8,15 66:12
66:18 72:11
79:22 84:19,25

85:8,18 86:3
89:3 94:17
95:10 96:8
235:2 236:9
260:9 292:19
300:24,25
301:22 313:5
313:14 320:14
320:22 323:15
323:23 331:10
332:2,8 333:11
334:4,14,23
**financed** 52:12
**financial** 51:19
76:20 125:23
131:25 132:12
133:25 141:18
150:20 153:15
155:22 171:3,4
184:19 252:25
**financially** 5:4
**find** 73:20
74:13,17
130:22 131:9
135:21 188:23
**fine** 53:17 54:4
76:9 239:21
259:4,4 279:14
285:14 334:20
**finish** 185:19
266:18,21
307:21 332:13
334:9
**finished** 266:24
303:13 308:4

332:12
**firing** 115:4
**firm** 10:2 82:11
145:22 167:14
246:9,11
**firms** 148:6
321:11
**first** 7:14,18
10:17 18:6
30:5 34:20,21
55:2,14 60:10
70:8 73:19
74:23 75:10,18
78:22 79:4
86:23 96:21
102:21 123:6
125:9 127:22
127:25 136:6
189:20 194:16
196:3 209:17
211:4 221:7
229:15,18
232:13 237:2
244:9 257:11
294:22 296:17
311:8
**firsthand**
119:25 176:21
177:6 179:2
**five** 131:17,21
189:19
**fix** 174:11,12
**flagship** 17:12
17:17 34:22
342:10

**flawed** 144:17
**flaws** 171:18
174:12
**flip** 144:10
242:20
**floor** 178:14,15
179:13
**flow** 142:14
143:4,5,14
151:4,5,13
**focus** 36:8 40:3
71:9 78:21
96:21 299:20
305:22 312:24
**focused** 124:18
313:23 319:25
320:11,21
**focuses** 305:18
**folded** 48:3
110:9 296:4
**foldered** 63:6
**folks** 159:20
215:2,5 222:21
223:10 224:24
244:10,13
255:19 284:20
302:12
**following**
183:14,15
193:6 196:4
197:20 235:11
237:9 260:11
261:7 316:2
**follows** 6:9
101:5 197:22

**fool** 302:10
**footnote** 137:19
137:21 138:5,6
**forced** 148:24
**foregoing**
145:9 340:5
**forget** 13:2
131:15
**form** 30:23
85:5 103:10
104:7 107:13
108:23 110:19
119:18 125:11
126:24 133:15
148:18 168:15
172:12 182:14
183:19 185:8
185:17,21
191:18 199:9
200:14 216:19
218:13 220:18
221:20 227:16
228:4 231:16
231:23 241:12
246:4 247:19
251:10 254:10
258:24 259:24
261:2 262:2
263:22 275:24
277:10 296:17
296:18 313:22
320:24 321:25
327:25 328:6
**formalized**
79:13

**formally**
  158:21
**formation**
  30:15 40:16
  52:11 241:3
  282:20 283:6
  283:19
**formed** 108:17
  151:9 211:15
  237:22 238:6
  258:14 282:22
  283:3,15 334:7
  334:18
**forming** 106:24
**forth** 34:25
  36:13,16 37:7
  39:3 44:8
  45:16,21 46:22
  51:18 67:13
  68:8 90:24
  105:17 114:2
  328:13
  ████████ 40:17
  78:7,13 81:3
  81:14 89:19
  91:9 92:3,15
  93:8 211:7
  225:13 273:21
  275:9
**forward** 37:10
  38:16 84:4
  105:18 112:10
  129:9,11
  162:22 233:7
  234:18 237:12

  237:24 260:5
  261:10 302:14
  303:5 305:19
  312:10 319:2
  319:12,17
  338:11
**forwarded**
  297:23 299:17
**found** 120:6
  131:10,17
  132:15 136:2
  143:25 147:7
  171:17 173:22
  174:21 175:12
  176:10
**foundation**
  33:15 103:19
  114:24 123:2
  230:2 241:14
  266:11 267:9
  306:22 313:19
**founder** 90:19
  238:3,9 252:7
  253:12
**founders** 252:6
  253:11
**founding** 43:3
**four** 94:16
  128:5 212:2
  216:12 292:18
**frame** 267:18
**frankly** 117:14
**free** 160:6
  330:8

**frequently**
  289:18
**fresh** 159:6
**friend** 9:25
**front** 92:22
  195:24 250:14
  262:18 292:3
  304:25 310:18
**fu** 2:21 5:17,17
**full** 9:22 10:15
  11:14 127:22
  127:25 143:7
  208:14,17
  210:13 315:10
  338:6
**fully** 236:16
**fulsome** 148:20
**function** 70:13
  82:22,25 83:6
**functions** 88:3
  92:23
**fund** 19:24
  21:3,4,12,17
  22:12,22 23:5
  23:17,22 31:7
  31:25 34:12
  37:18,25 45:7
  45:12,18 46:11
  48:23 52:13,14
  57:24 64:14
  70:14,17,22
  72:10,11,15
  79:15 80:7
  81:9,10,21
  82:18 85:8

  90:3,14,15,22
  90:23 91:8,15
  91:18,23 92:2
  92:3,8,10,13
  93:3 103:7
  124:18 128:13
  139:18 157:4
  167:9 168:8
  196:13,14
  208:3,5,5
  234:25 235:12
  235:13,24
  236:2,5,7,11,18
  236:18,23
  260:9,13,14
  265:14 267:22
  269:19 272:16
  273:6,10,19,22
  276:17 277:5
  278:4 293:24
  300:24 302:6,8
  310:4 332:8
  334:23 335:3,9
**fund's** 97:13
  136:13 139:17
  295:8 296:21
**funds** 23:15
  33:18,19,25
  34:4,12,16
  35:5 38:4,17
  38:25 46:3,18
  47:7 50:3
  67:10,23 69:8
  70:20,24 71:17
  89:3 92:9

103:17 107:19
107:21 138:16
141:23 160:3
167:5 193:16
193:18 194:2,3
194:5 197:14
208:23 212:11
220:10,15
221:2,9 223:4
224:4 232:23
232:24,25
233:25 234:10
234:14,19
235:19,21
236:8,14,18
256:2 260:7
268:18 274:3
276:25 277:16
302:11,23,24
302:25 303:3
310:6 312:19
315:14 317:14
318:22,23
319:17 323:13
323:22 326:3
328:12 329:14
329:24 330:3,7
330:16,19,25
331:6,8 333:25
**further** 189:15
230:2 233:23
260:5 324:3,15
338:13 339:2
341:13

**future** 32:6
171:4 233:25
234:10 235:14
236:8 260:7,14
301:6 329:14
329:23 330:7
330:24

**g**

**gavin** 2:9 5:19
158:23
**gc** 53:12 65:24
87:19 196:15
196:16 197:10
198:2,10
**general** 9:5
10:25 11:21
14:23 15:16
16:8 53:8
71:16 104:10
104:11 113:7
116:10 117:19
120:15 121:11
124:4 125:4
127:3 128:16
135:7 188:9
196:7 211:17
212:10 215:25
219:25 220:9
220:14,25
221:8 224:2
245:9,11 256:8
264:24 265:3
269:6,8,25
270:7 271:14
278:15,16,19

278:25 280:15
280:21 281:14
283:7 284:12
286:7 287:2,14
289:14 290:8
290:11
**generally** 51:6
115:11 160:23
207:6 226:17
272:18 301:16
319:21
**generating**
35:19 181:18
**generation**
35:4 38:4,17
38:24 46:2,17
47:6 67:9,23
69:7
**getting** 40:20
149:11 191:7
273:9 307:11
■ 225:13
**giant** 291:24
**give** 7:8 31:3
156:8 157:24
158:14,15
171:21 174:22
174:25 182:13
229:22 239:8
297:14 300:2
**given** 75:6
100:9 162:22
174:11,21
175:14 197:12
208:15 226:2

331:25 333:9
340:10
**gives** 245:5
**global** 203:4
**go** 4:12 7:23
8:24 9:13,23
10:8 30:4 41:9
42:20 65:11
79:8 83:7 84:4
100:15 102:12
105:18 157:24
162:3,7 168:16
168:19 207:21
209:15 234:21
236:25 239:3,5
241:17 264:7
287:23 292:8
294:19 302:14
303:5 305:19
308:9,10
312:10 323:7
325:3 328:16
334:17 335:5
**goal** 315:13
**goals** 35:3,25
190:12 201:16
202:2
**goes** 34:25
73:18 75:25
84:13 89:2
94:21 95:16
139:14 203:10
324:14
**going** 4:3 21:2
29:25 34:3,5

34:11 36:7
37:9 46:7 49:6
49:14 50:18
51:5 67:4 95:3
95:10 96:9,20
97:14,20 98:11
98:16,19
100:17 102:3
112:10 117:4
129:9,11
141:15 157:8
158:25 162:22
176:18 187:3
194:16 196:2
204:20 208:2
222:3 233:7
235:19 236:4
237:12,24
239:4,6,7
260:5 261:10
266:20 293:16
300:23 302:7
323:25 332:16
338:10 339:10
**goldberg**  1:20
3:4 4:20
▮▮▮▮▮▮
148:24 149:5
174:5 175:7
188:7 191:9
204:7
**good**  4:2 6:12
6:13 10:12
149:4 205:6
243:19 257:18

**governance**
44:25 46:10
112:14,15
113:5,20
190:15
**governed**  46:10
276:25 277:16
278:4 291:17
**governing**
113:22,25
210:7 277:14
290:25 291:7
**gp**  69:4 84:15
90:13 256:12
277:20 334:15
**graduated**  7:14
**grant**  308:13
**great**  185:4,5
296:11
**greatly**  142:7
**groome**  223:11
223:13,14
**ground**  142:14
143:4 151:4,13
229:25
**group**  20:15,25
25:10,12 27:5
27:20 30:7,11
33:7,10,24
35:10 46:13,16
55:19 63:12
65:25 66:2,7
71:20 96:14
109:9 110:10
112:8 116:12

117:9,21
118:10,14
120:4,19
121:12 122:24
133:3,19
137:10 153:7
153:10,14,25
154:4,5,13
155:12,16,21
179:17 185:14
211:25 212:14
221:5 224:6
258:2 270:3,17
270:25 277:5
278:12,17
284:14 285:2
286:9,11
287:16 289:9
321:12,20
325:17
**group's**  211:15
286:20,25
287:12 289:3
289:21
**grow**  202:13
**growing**  305:23
**growth**  202:15
**gschryver**  2:10
**gueikian**  44:4,5
44:14,18,25
103:13
**guess**  215:13
218:2 229:25
247:11 256:4
297:6

**guidance**  184:8
**guide**  188:13
**guided**  188:6
**guidelines**
36:11
**gump**  8:16,18
8:25 10:6,9
**guys**  80:12
339:4

**h**

**h**  6:6 101:4
347:3
**half**  34:21
**halle**  21:24
24:13 54:15
55:3,7,8,16
56:12 60:23
62:8,23 84:4
86:4,7,24
93:11 94:18
208:20 211:20
227:5 238:10
271:25 282:23
282:25 283:19
304:6
**halle's**  292:21
**hand**  185:24
341:19
**handful**  228:9
**handwriting**
335:21 336:6,8
336:11,18
**handwritten**
219:20 221:17
222:7 335:15

| | | | i |
|---|---|---|---|

**hannett** 87:4
222:20 223:3
229:4 243:5
256:19 280:5,6
292:11 295:19
**happen** 93:14
111:4 236:19
258:13 288:22
**happened**
40:24 41:10
65:18,21 85:23
107:25 110:17
110:24 182:23
187:17 247:7
**happening**
41:19 111:4
**happens** 41:24
241:22
**happily** 65:12
**harm** 338:4
**header** 229:14
**heads** 55:12
322:6,17
**hear** 94:15
292:17
**heard** 56:3
**heavy** 82:24
**heck** 216:17
**hedge** 90:14
**heightened**
122:13
**held** 1:19 273:4
**help** 25:16
130:6 218:21
219:5 298:11

**helped** 22:7
**helpful** 17:8
150:17
**helping** 83:5
188:10,13
**helps** 310:17
**hereof** 138:17
**hereto** 340:8
**hereunto**
341:19
**hesitated** 11:13
**high** 209:17
**higher** 143:6
149:21 150:3
151:17,18
204:11
**highest** 150:3
182:21
**highlight** 95:20
**hire** 148:24
**hired** 149:4
306:11
**historically**
107:24
**history** 33:9
229:24 328:17
329:8
**hmm** 168:24
**hogan** 145:15
145:21,21
146:5,22 147:2
147:12,23
148:9 168:22
168:25 169:8
188:7

**hold** 12:21 33:3
171:14 182:12
**holding** 93:4
**holmstead**
211:21 214:2
280:4 306:11
306:15 307:14
308:15 309:19
**holwell** 1:19
3:4 4:20
**honest** 199:13
274:4
**hook** 94:25
293:15,22
**hoped** 142:20
**hopefully**
259:18
**hopes** 142:19
**hoping** 178:18
**hour** 50:16,18
80:16
**hours** 158:4
**hsgllp.com** 3:9
3:11
**hundreds**
148:2,5
**hypothetical**
177:24 246:8
247:6,23
263:24 264:18
282:9 283:24
285:4,19
287:19 288:9
295:24 308:23

**i.d.** 342:9 343:3
344:3 345:3
**i.e.** 90:13
302:10
**ic** 50:11 206:11
███████ 298:20
**identification**
17:19 26:6
39:13 51:2
54:12 59:23
70:3,6 74:9
78:2 81:25
83:11 86:17
93:19 96:19
101:21 111:13
116:6 126:13
152:22 154:25
159:12 180:16
186:6 189:4
192:2 205:18
214:12 222:13
224:20 228:17
239:12 243:24
250:11 255:5
279:18 297:12
314:3
**identified**
79:11 174:13
232:4
**identify** 336:10
336:17
**identifying**
72:4

**ifr** 206:11
225:23
**ifrs** 74:15 76:2
207:16 215:7
223:7,12,20
224:10 225:8
225:12,20
**ii** 234:14,14
267:23
**illustrious** 7:12
**immediate**
316:7
**immediately**
128:17
**impact** 177:14
177:18
**impacted** 150:8
**imperative**
187:8 346:15
**implement**
141:2
**implicated**
213:4
**implication**
108:25 164:14
213:5
**import** 225:19
**importance**
198:8
**important**
148:19 231:12
250:5,7 254:17
254:22
**imprecise**
285:23 287:21

**improper**
266:20 281:25
283:18 286:17
288:14 306:23
307:6 309:2
**inaccuracies**
198:17
**inaccuracy**
231:24 232:5
**inaccurate**
135:22 136:3
231:19 300:6
301:12
**inaccurately**
301:21
**incidents**
115:14
**include** 115:9
184:17 227:5,8
**included** 224:9
250:24
**includes** 232:18
312:5
**including** 72:10
105:9 115:3
138:19 159:21
193:7,20
222:21 232:24
313:3
**incomplete**
288:10
**inconsistent**
139:16
**incorrect**
136:19 137:15

138:7,11
300:17,19,21
**increase** 201:7
204:2
**incredibly**
309:7
**incurred**
293:22 294:8
**indentured**
288:3
**independent**
70:14,17,22
72:15 147:3
181:22 183:8
183:16 184:20
185:5 187:3,7
187:9,18 208:3
335:9
**indicate** 325:21
**indicated** 73:3
160:14 165:4,7
170:3,22 171:7
177:7 226:25
258:17 295:11
325:15
**indication**
285:20 327:2
**individual**
167:21
**individually**
12:11,14
**individuals**
162:6 212:2
227:19 256:10
256:13

**industry**
149:25 253:2
337:24
**inform** 84:4
136:3
**information**
51:19,20
125:23 132:4
132:12 133:13
133:17,18,25
138:18 139:3
141:11,19,22
153:15 155:22
161:18 175:9
176:18 191:8
229:25 245:6
246:14 254:18
254:23
**infrastructure**
201:22 267:6
267:22 320:2
**initial** 206:16
**initially** 19:8
**initiate** 136:11
137:4 148:20
**initiated**
145:19
**initiating** 138:2
**inserted** 114:22
115:18
**insignificant**
88:21
**inspection**
41:21

instance 43:22
115:4 196:24
234:19 248:3
instances 197:7
institutions
131:25
instructed
113:10 128:18
128:23 129:2
instructions
85:12 346:2
integrity
140:25 190:13
316:22
intend 55:16
127:13
intended 56:12
231:5 323:5
intent 63:15
interacted
146:7 175:16
289:12
interactions
289:20
interest 24:17
29:9,16 31:24
71:16,19,21
72:5 73:4
76:20 79:6,12
79:21 84:24
139:16 140:4
185:15 208:19
212:10,13
213:19 219:25
220:9,24 221:4

224:2,5 238:23
273:5 284:25
296:20 325:16
325:22 326:3
326:23
interested 5:5
35:18 195:18
341:16
interests 72:23
311:19 319:2
interfere
323:21
interfered
116:17 119:23
interference
120:9
interfering
117:2 118:25
323:3
interject 49:15
internal 10:4
130:4 139:2
internally
131:2,6
interpret
304:11
interpretation
31:3
introduce
239:4
inure 187:11
invested 266:7
266:8
investigation
130:4,13,18

134:8 146:13
147:4 148:10
investing 71:18
212:12 220:11
220:15 221:3,9
224:4 320:3
investment
13:4,12,23
14:7 16:9 21:3
21:8 23:14
24:9 43:11,15
50:24 51:8
52:9 62:18
66:8 67:2
69:22 70:10,12
71:17 73:13
79:15 80:7
82:17 90:15
99:6 104:23
106:3,5,20,25
108:16 109:2
109:11 112:8,8
112:13 136:25
141:5 144:9
149:4,12,23
170:11,15
171:22 172:6
172:10,13,19
172:25 173:16
174:13 204:9
207:14,14,25
211:16 212:11
213:21,24
215:24 216:3
220:10,14

221:2,8 223:18
224:3 233:6
237:11,14,21
237:23 238:6
247:20 252:3,4
252:10 257:4
260:4 261:9,12
265:6 266:14
267:4,16 289:8
289:21 318:21
320:4 321:10
335:7 342:18
investments
136:13 265:25
305:11 306:6
306:17 307:16
308:17 312:9
313:4,12,13,25
320:12 338:20
investor 67:18
78:10 81:8,20
89:25 92:14,25
125:19 167:4
194:7 273:12
274:23 276:2
284:23 318:2
investors 22:11
88:5 128:14
139:17 142:2
145:3 149:14
150:5 163:3
167:8 174:23
181:17 187:11
187:20 193:23
196:21 197:2,9

197:13,18
198:9,16 199:3
199:6,7,13
245:5 246:16
246:18,22,23
247:19 248:9
248:12 267:12
267:12 268:18
301:17 317:15
339:11
**invests** 266:2,5
267:3
**involved** 21:9
25:19 30:14
52:20,22,25
55:11 61:14
87:7,21 88:8
90:9,20 94:17
104:14,17
131:4 187:13
188:4 196:22
282:19 283:5
292:19 306:9
**involvement**
16:25 17:25
88:22 136:14
141:4 188:8
197:8 290:5,14
291:15 302:13
302:19 303:5
312:3
**involving** 78:5
86:19 119:8,21
119:24 165:10
179:19

**issue** 80:10
117:15 213:18
241:10 294:11
**issued** 57:5
204:13
**issues** 7:22
40:12,15 76:10
77:4 95:21
112:14,16
121:17 122:14
210:22 240:15
240:19 241:2
275:25 339:15
**item** 249:4,16
251:18,23
252:25 253:18
254:5,7,9,19,23
326:22 327:13
327:14,18
**items** 132:17

**j**

**j** 6:6 101:4
**jaf0057555**
250:10,18
345:13
**jaf0064** 39:9,12
342:15
**jaf0281139**
243:23 244:4
345:11
**jaf0282081**
191:25 192:6
344:19
**jaf0288647**
189:3,8 344:17

**jaf0300064**
239:11,15
345:9
**jaf0300068**
228:16,21
345:7
**jaf0307875**
297:11,17
345:19
**jaf0359** 126:9
126:12 344:4
**jaf0365** 126:10
126:12 344:5
**jaf1304** 83:9,11
343:13
**jaf5520** 96:16
96:18 343:17
**jaf5522** 96:16
96:18 343:18
**jaf5790** 54:10
54:12 342:21
**jaf6293** 93:17
93:19 343:16
**jaffrey** 1:8 4:17
5:16,18 6:15
12:14 15:20
16:22 17:4
18:12 19:4,11
19:19,23 24:16
31:13 32:5,22
36:20 37:9
38:3,15 39:18
39:22,25 40:4
40:8,21 41:2
41:17,23 44:12

44:21 45:5,15
45:25 46:19
47:4,19 54:16
56:3,6,8 59:19
59:22 60:2,6
60:10 62:20
71:15,20 72:8
72:21 73:2
74:2 76:6,8,16
76:19 77:2
79:20 83:14,24
84:23 85:6
90:8,17 93:23
94:14 95:8,16
96:3,7,22 97:7
97:19 103:11
103:21,22
104:21 105:9
106:18 108:8
109:7,16,22
111:9,12
112:18 114:7
116:16,25
118:24 119:15
121:20 123:20
124:16 125:2,9
126:15 127:10
134:11 135:4
136:3,18
137:14,24
140:13 141:6
142:17 143:9
145:6 159:20
164:6,7,16
169:2,5 173:4

173:7 180:21
181:4 183:4
185:2 187:25
190:2,22 193:3
193:4 195:14
199:2 212:3,7
212:9 213:6,12
213:25 214:7
214:24 216:15
216:23 217:11
218:7,10
219:13,15,24
220:8 221:16
222:6 223:25
224:14 229:3
230:19,22
232:3 233:5
234:8 237:10
237:22 238:24
240:6 241:21
242:10 243:3
244:12 245:19
246:2 247:2,21
248:14 251:6
252:6,21
253:11,24
256:17 259:23
260:2,19 261:8
261:19 263:20
265:15,18
268:24 271:7
273:3,4,20
274:15 275:23
276:17,20
277:7,23

279:11 284:25
286:3,10
287:11,25
288:5 289:13
289:25 290:14
291:8,14,19
292:5,10
295:14 296:19
297:5 298:6
299:18,19
300:15 301:19
305:13 311:6
311:17,25
314:8,23 315:9
315:25 317:6
318:17,19
319:15 320:9
320:17 321:7
321:16 322:3
322:15 323:18
325:15 327:3
332:3,22
333:16 335:2
335:13 340:1
342:22 343:22
347:1
**jaffrey's**  31:24
85:11 97:2
109:3 119:22
121:13 137:6
164:21 243:18
264:15 269:19
311:2 312:21
313:9 314:24
321:3 326:2

335:20 336:7
336:11,18
**jammed**  97:15
**jan**  9:19
**january**  9:21
10:16 54:17
56:2 59:2
94:11,13 189:9
189:14
**jersey**  1:23
**job**  7:18 306:17
307:15 308:16
**john**  307:10
**join**  9:17
**joined**  8:15
12:2
**joint**  108:10
305:19 312:10
**jointly**  107:5
107:11 109:16
234:2,10 236:8
260:7 319:18
329:14,24
333:13 334:5
**jon**  6:12 76:2
80:13 98:14
127:11 146:16
298:10 307:13
324:24
**jonathan**  1:18
4:15 215:20
339:18 340:2,4
340:13 342:4
347:2,24

**josh**  173:4,18
**july**  39:22 40:5
60:3,7 66:5
70:25 74:25
102:6 159:23
189:22 205:24
215:2 222:24
224:24 229:5
230:14,16
235:22 239:16
240:7 256:25
316:4
**june**  94:2 96:7
96:22 97:3,21
192:24 292:4
294:3,4,4
296:13 318:9
**junior**  306:24

**k**

**kang**  131:10,11
132:10 144:6
**kaplan**  82:6
**kasowitz**  2:4
5:20
**kasowitz.com**
2:12
**kasowitz.com.**
2:10
**kaufman**  146:8
146:11
**keep**  98:11,15
98:18 274:4
**key**  193:7,20
257:15

**kill** 176:19
178:13,24
**kind** 11:5 65:7
100:16,19
158:25 209:17
265:25
**kirkland** 116:3
116:8 278:10
310:17 311:3
312:21 343:23
**knew** 216:23
263:20,25
**know** 6:14 7:11
10:5 11:3
13:14 20:7
22:25 27:16,23
28:21,22 29:10
30:24 38:8,14
48:4,6 58:10
58:12 62:4
63:20 64:22
66:16 69:2
71:5 77:20
81:18 85:15,25
87:16,21 88:11
98:24 105:7
112:23 115:21
119:10 122:19
123:23 124:24
127:14 131:3
137:7,9 142:25
143:18 147:9
148:6 153:21
156:22 157:7
159:2 175:5

178:16 179:8
180:24 181:9
182:22,23
186:13 188:6
189:10 192:8
194:5,10
195:12,15
210:19 214:20
217:11 218:23
222:3 225:2
226:16 228:24
230:7 233:18
237:2 239:20
240:18,20,22
242:20 244:5
244:23 245:22
247:8 249:25
251:20 253:3
255:12 258:11
265:24 266:13
267:3,11,15,20
268:22 272:16
273:4 279:15
279:23 293:25
295:13 297:19
298:2 304:13
304:13 305:2
306:4,7,10
307:8,10
310:24 311:5
331:23 332:24
333:3 337:7
**knowledge**
88:7 120:2
136:14 141:4

177:6 179:3
258:14 288:25
289:23 291:12
315:22 316:11
**known** 10:11
17:15 34:8
47:22 61:7
111:20 265:8,9
265:11 274:6
**knows** 141:14

**l**

**l** 1:15 6:6 101:4
193:11 341:6
341:24
**lacks** 123:2
**land** 160:3
███████
116:19 119:2,9
119:14,24
120:5 121:24
278:9
**language** 136:8
212:18,21
218:20 233:10
260:18 261:18
285:21 292:14
**large** 131:6
167:8
**late** 59:13 60:2
284:7 310:5
**laughing** 217:5
**launch** 34:4
233:25 234:9
234:25 236:7,8
236:22 260:7,8

329:14,23
330:24 333:25
**launched**
234:15 265:15
265:17 267:19
272:22 273:6
300:23 305:12
**launches**
304:19
**launching**
150:16 276:17
277:4 302:5,11
303:2
**law** 7:14,18
21:14 148:6
167:13
████████ 205:8
205:12 206:11
207:18,23
208:7,10,21
214:4 215:6
217:24 223:19
225:15,23
**lawsuit** 150:15
**lawyer** 14:25
15:9 16:14,19
16:22 279:3
306:25 314:11
**lawyers** 118:11
311:2
**lays** 39:3
**lbs** 61:5 71:18
84:6,19 97:9
97:21 205:11
207:23 209:21

211:13 212:12
216:7 220:11
220:15 221:3,9
224:4 295:4,15
296:21 301:22
304:8
**lead** 181:20
**leading** 14:7
181:21,23
183:8,16
184:21 231:10
231:16
**learn** 55:23
**learned** 128:6
143:10
**lecamp** 18:13
83:15 93:24
123:20 229:4
256:18 292:5
292:10 295:19
**led** 144:16
**ledger** 332:21
333:15
**left** 8:25 44:6
44:15,18 78:22
295:22
**legacy** 24:20
25:3 48:13,25
49:12 57:21
63:10 64:14,15
67:6,10,16,24
68:6,10,20,21
107:19 121:5
154:6 232:23
302:4,5 309:22

319:13 333:23
**legal** 9:10
10:18 16:5,5
26:25 28:11
31:3,19 117:23
145:7,13
177:24 184:20
187:3 188:10
205:11 216:6
279:6,10
280:25 333:8
334:19
**legally** 114:9
**legitimate**
139:20
**lender** 209:3
**lenders** 209:10
209:11
**letter** 54:19
57:6,11 89:20
90:25 91:9,16
92:14,20
115:24 116:2,7
120:7 122:13
123:4 126:8,16
126:18 127:12
135:14,15,22
137:12 142:5
142:11 160:10
162:7,19
163:14 182:18
184:4 278:9
310:17 313:10
316:3 343:23

**level** 209:17
268:17
**leverage** 36:13
**lexington** 1:20
3:6 4:21
**liability** 113:12
**liar** 302:10
**lifting** 82:24
**likely** 97:24
98:7 295:16
**limit** 27:11
239:7 258:21
**limitation**
305:10
**limitations**
338:20
**limited** 113:11
138:19 193:25
194:2,6 235:24
310:4
**line** 199:20
201:15 202:2
206:8 347:4,7
347:10,13,16
347:19
**lines** 312:25
313:24
**liquidator**
255:25
**liquidators**
256:4
**liquidity**
181:18
**list** 249:3,17

**listed** 52:16
**lists** 67:18
**literally** 215:12
**litigation** 21:11
21:17,18 22:22
23:4,17,21
37:17,25 45:7
45:12,18 47:5
47:20 48:12,23
49:11 51:12
52:4,11 61:8
61:11,15 66:12
66:18 72:10
79:22 82:18
84:19,24 85:7
85:17 86:3
89:3 94:17
95:10 96:8
195:20,22
234:25 236:9
260:9 292:19
300:24,25
301:22 313:5
313:14 320:14
320:22 323:15
323:23 331:9
332:2,7 333:11
334:4,14,23
**little** 98:11
168:21 178:20
179:15 189:18
194:14 247:12
274:2 276:14
298:16

live 266:21
llc 90:13,22
  187:5 257:14
  313:2
llp 1:20 2:4,14
  3:4
loan 22:2 35:15
  208:6,8,14
  209:9,19 210:7
loans 34:15
  35:19 68:3
  209:7 210:12
  210:22
location 4:19
lock 156:7
  179:24
lodged 289:2,7
long 7:11 8:9
  14:10 59:10
  147:12 160:7,8
  191:19 202:22
  268:13,16,20
  287:7 297:13
longer 49:2
  98:11 147:15
  251:2 258:6
  274:14,16,21
  274:25 275:4
  279:2 304:14
  332:14
look 17:20
  25:15 28:19
  32:3 34:19
  39:15 50:12
  51:4 74:4,10

74:20 93:16
  95:17 104:18
  113:5 117:17
  126:8,16
  127:21 135:13
  135:15 136:6
  138:13 142:4
  153:5 154:18
  155:2 159:14
  160:5,7,8
  181:14 183:21
  206:2 209:14
  215:10 219:12
  223:23 229:13
  239:23 252:24
  257:23 259:20
  261:4 262:4
  268:2 292:13
  297:18 298:2
  298:15 302:10
  305:16 326:21
  328:7 336:4,20
looked 186:18
  221:14 239:25
looking 110:6
  116:24 118:23
  120:11 156:15
  259:22 307:24
looks 26:9
  155:14 281:11
loop 84:14
loose 274:2
los 44:20 90:12
lot 82:22,23,24
  200:16 250:25

lovells 145:16
  145:22 146:5
  146:22 147:3
  147:13,24
  148:9 168:22
  169:2,9 188:7
lower 171:10
lp 52:12 71:20
  82:16 193:22
  206:11 211:15
  212:14 224:6
  238:5 252:3,9
  257:25 301:15
  312:25 320:5
lpac 193:6,11
  196:4 197:20
lps 68:20 70:21
  78:20 193:7,8
  193:20,20
  196:5 197:21
  301:7
lunch 65:4
  80:12,14,19
  98:9,20 182:16
luncheon
  100:25

**m**

m 273:18
m&a 146:18
  169:9,13,19
  170:19
made 27:18
  40:10 73:25
  74:2 80:3
  99:12 106:22

123:19 156:22
  172:9 188:18
  207:7 228:10
  236:7 240:13
  245:24 246:21
  246:23 257:12
  258:22 259:10
  284:24 286:2
  299:24 300:5
  300:16,20
  305:11 314:20
  340:6 346:8
madison 2:17
main 55:12
  92:23
maintain
  140:24
major 151:8
majority 273:5
make 70:8
  75:23 113:11
  113:17,19
  134:25 156:17
  191:16 221:17
  222:7 229:21
  242:15,17
  265:25 288:13
  306:5,17
  307:16 308:17
  313:12 317:9
  335:13 338:17
  346:5
makes 211:24
  302:9

**making** 83:3
  97:11 195:18
  257:16 295:7
  300:18
**man** 219:3
**manage** 37:9
  44:19 83:5
**managed** 62:17
  89:4 90:15
**management**
  43:9,10,24
  47:14 87:8,22
  88:5,9,23
  89:14 90:10,11
  90:21,22 91:15
  99:5 127:8
  133:8 141:14
  187:5 192:18
  196:18 205:12
  229:11 232:19
  244:19 245:13
  246:24 251:5
  256:5 257:4,14
  259:12 268:17
  268:21,22
  269:11,22
  270:10,19
  271:17 272:3
  274:10,16
  275:6,16
  281:17,22
  282:4 283:10
  283:14 289:17
  313:2

**manager** 64:15
  71:17 88:4
  95:3 211:16
  212:11 220:10
  220:15 221:2,9
  272:17 293:16
**managers**
  64:16
**managing**
  10:17 21:4
  30:13 64:13
  90:13 230:25
  296:21
**mandate**
  245:21
**march** 15:25
  126:3
**marco** 167:22
  167:24
**marco's** 167:25
**marison** 9:2,3
**mark** 17:10
  25:23 39:8
  54:9 59:18
  69:18 77:13
  96:15 111:7
  115:23 143:12
  154:19 185:25
  256:15 308:2,9
**marked** 17:18
  26:5 39:12
  51:2 54:12
  58:25 59:22
  70:2,5 74:8
  78:2 81:25

83:11 86:16
  93:19 96:18
  101:20 111:13
  116:5 126:12
  152:21 154:24
  159:11 180:15
  186:5 189:3
  191:25 205:18
  214:12 222:13
  224:19 228:17
  239:11 243:23
  250:11 255:5
  279:17 297:11
  314:3,6 329:5
**market** 143:5
  150:13,19
  151:14 171:12
  177:15 178:10
  178:22
**marketing**
  35:25 38:9,10
  38:12 66:23,24
  143:22,23
  144:4,7 197:16
  198:18 234:14
  234:24 236:17
  260:8 284:19
  298:24 299:12
  321:10,18
**markets** 154:22
  155:8
**markups** 180:5
**marriage**
  341:14

**masotti** 168:2,3
  168:3,4
**materials** 38:9
  38:10,13 66:23
  66:24 143:22
  143:23,24,25
  144:4,8 197:16
  198:19 234:15
**matter** 4:16
  6:16 72:23
  73:7 84:20
  103:16 120:12
  121:19 122:5
  129:25 280:13
  316:21 341:10
  341:15,17
**matters** 9:10
  64:6 98:2
  113:20,25
  190:15 227:14
  228:2
**maximization**
  145:2
**maximize**
  144:18 187:10
  187:19
**maximizing**
  315:13
**mcg** 20:14 25:9
  25:13 27:20
  40:11,13,17
  41:5,11,25
  42:23 62:24
  97:8,21 177:3
  213:19,20

220:20 237:20
238:3 240:14
240:25 241:4,8
241:23 243:7
243:14 248:17
248:21 258:13
262:25 263:12
280:14,16
284:20,24
285:25 294:24
295:4,15 296:5
304:18 321:12
322:8,19
**mcg's** 288:6
**mcm** 107:22
132:24 133:7
229:7,10
244:14,18
264:10,14
**mcm's** 138:16
249:4
**mcp** 26:24
249:7,22 264:9
264:10,14
284:2 304:15
332:9,15
**mcp7560** 26:2
26:4 342:14
**mean** 25:5
30:24 43:20
61:18 64:7
80:15 98:12
106:17 117:8
117:10 141:20
144:24 158:6

163:19 165:19
190:19 210:17
217:7,18 218:2
218:14 231:4
246:12 249:11
258:5 263:14
267:18 304:12
308:13 314:18
330:25
**meaning** 19:12
19:20 30:20
31:2,14 55:16
91:9 92:2
106:4 141:9
190:23 268:17
312:22 319:15
**means** 43:21
64:8 293:2
314:15
**meant** 37:4
64:11 77:3
98:13 190:4
301:11 304:14
**media** 4:13
319:24
**meet** 65:2
158:21
**meeting** 18:14
77:7 79:10
80:10 83:2
**meetings** 50:11
**melanie** 181:11
**melen** 223:11
**melissa** 2:21
5:17 37:2

**melissafu** 2:22
**melodeon**
12:18,21,25
13:8,10,17,22
14:10,20 15:8
16:13,14 20:21
21:6,7 23:5,13
23:25 24:4,7
24:12,17,20
25:4,11,17
26:23 27:2,4
28:3,24 29:6
29:25 30:6,15
30:18,18 31:7
31:12 40:10,11
40:13,17 41:4
41:24 42:9
45:11 48:14
49:13 50:3,4
54:23 55:9,17
56:13,21 57:18
58:8 60:13,21
60:22 61:6
62:24 63:5,25
65:13 66:13
81:3,13 82:15
87:5 88:9,14
88:18 89:21
91:7,25 93:7
101:18,20
110:3,8 208:21
213:14 215:22
216:5,6,7,12,17
216:24 217:9
218:8 219:10

220:16,19
221:10 226:8
226:21 227:2,4
227:11,14,18
227:21,23
228:2 238:4,14
238:16,24
240:13,14,19
240:24 241:4,8
241:22 248:17
249:2,3,6,8,22
249:24 252:8
252:11,16,18
252:22 253:7
253:14,25
257:24 258:16
262:6,8,25
263:13,18
264:4,10,23
271:11,24
277:19 282:20
283:2,6,15,19
284:6 290:2,5
290:15,16
291:15 293:21
295:15 296:4
299:4,10,13
301:23 302:19
304:2 321:12
321:13,20
322:8,19
325:17 343:20
**melodeon's**
238:14 262:6

| | | | |
|---|---|---|---|
| **melody** 9:14,17 | 90:21,23 91:8 | 155:23 157:3 | 229:11 232:14 |
| 9:23 11:9,11 | 91:18,22 92:2 | 159:3 160:2,12 | 232:19,19,24 |
| 11:12,18,25 | 92:10,13 93:3 | 161:3,5 162:11 | 235:11 236:10 |
| 12:7 16:9 | 94:23,23 95:11 | 163:21 164:3 | 236:21 237:6 |
| 17:12,17 20:10 | 96:10,14 97:12 | 165:11 167:5 | 237:16 244:18 |
| 20:14,15,25 | 99:4,24 100:6 | 167:18 168:6 | 245:12 246:24 |
| 21:20 22:5,9 | 101:24 102:11 | 168:13,25 | 247:20 251:4 |
| 22:13,16,22 | 102:22,25 | 169:4,6,10,17 | 252:2 256:2,9 |
| 23:17,22 24:4 | 103:7,25 104:5 | 169:22,23 | 257:14 258:2,7 |
| 24:5,7,11,21 | 104:8,9,10 | 170:5,14,16,18 | 259:12 260:12 |
| 25:3,10,12,20 | 109:2,9,17 | 170:19 171:5 | 260:24 261:14 |
| 26:24 27:5,20 | 110:9 113:7 | 173:10 174:3 | 261:24 262:16 |
| 30:7,11 31:7,9 | 114:17 116:11 | 174:22 175:10 | 262:23 263:5 |
| 33:7,10,23 | 117:8,9,20 | 176:6,24 177:2 | 263:11 264:23 |
| 34:8,22 35:10 | 118:9,14 | 177:4,16 | 264:25 265:2,6 |
| 37:9,19 39:19 | 120:19 121:5 | 179:16,19 | 266:6,7,9,15 |
| 43:3,5,8,10,14 | 121:11 122:23 | 180:11 183:6 | 267:6,7,13,23 |
| 43:22,23 46:13 | 123:10 125:8 | 185:12 187:4 | 268:4,7,12,15 |
| 46:16 47:15,17 | 125:24 126:21 | 187:17 188:6 | 268:18 269:9 |
| 48:3,14 49:3 | 127:7,8,9 | 189:21 192:12 | 269:10,20,21 |
| 49:12 51:13,20 | 129:17 132:4 | 192:22 193:12 | 270:3,8,9,17,18 |
| 51:24 52:6,11 | 132:13,20,23 | 193:16,23 | 270:19,24 |
| 52:25 53:6,8 | 132:24 133:3,6 | 196:9,17,18 | 271:15,16 |
| 55:18,19 56:13 | 133:7,8,9,13,25 | 197:10 198:2 | 272:2,3,15,17 |
| 56:22 57:19,21 | 134:23 135:11 | 198:15 199:18 | 272:23 273:6,9 |
| 57:22,24 58:9 | 138:17 139:21 | 200:6,7 201:20 | 273:10,19 |
| 61:22 63:6,10 | 140:13 142:8 | 201:21 203:25 | 274:10,17,20 |
| 63:10,11,25 | 142:18 145:23 | 204:14 208:22 | 275:2,5,14,15 |
| 65:24 66:2,7,7 | 146:2,19 | 209:2,12 210:2 | 276:25 277:4 |
| 66:19 67:10,16 | 147:23 148:8 | 211:14,25 | 277:16 278:4 |
| 67:24 68:10,21 | 148:14,23 | 212:13 215:23 | 278:12,17 |
| 68:22 69:6 | 150:9 153:7,10 | 215:24 216:2,3 | 281:15,16,20 |
| 71:19 81:9,10 | 153:14,16,25 | 221:4 223:4 | 281:21 282:4,4 |
| 81:21 84:5,5 | 154:4,5,7,13,16 | 224:6 226:7 | 283:8,9,13,14 |
| 86:20 90:2,10 | 155:11,16,20 | 227:5,11,24 | 284:14 285:2 |

286:9,11,19,25
287:12,15
289:2,9,16,17
289:21 291:2
292:25 293:3,3
293:4,10,10
295:7 298:25
299:5,11
300:22 301:3
301:23 302:4
302:12 303:11
303:16 304:7,8
305:19 312:3
312:25 313:2,3
315:10,19
317:13 318:6,8
320:4 321:11
321:19 322:5
322:17 325:16
328:18 329:8
330:14 331:11
333:12,19
339:11 342:10
**melody's** 25:19
138:25 139:7
169:9 199:3
202:10 208:24
209:18,19
210:7
**member** 90:13
154:12 166:12
**members**
162:10,14
167:6 172:24

**memo** 52:9
71:12 72:3,19
73:20 74:13
76:18 80:6,6
206:11 207:25
209:17 215:6
223:24 224:10
224:12 225:7
225:22 296:17
297:2,3,7,8
312:17
**memorandum**
50:23 51:7
69:22,23 70:4
70:10,12 71:11
73:13 207:15
223:19 335:8
342:17 343:7
**mention** 252:20
326:2
**mergers** 169:14
**merit** 190:3
**message** 165:20
**met** 65:4
**mia** 109:3,6,18
109:22 119:6
121:14 157:4
237:19 252:4
253:7,10
262:25 263:12
265:9,25 266:2
266:5 267:3,12
268:5,7,13,14
268:15 269:7
271:6,6 272:21

272:25 273:6
273:18,24
274:6 276:15
276:17 278:11
278:19,21,25
279:2,6 280:13
280:16,20
281:2 293:9
299:8 306:4
309:20 312:18
312:19 320:5
325:22 326:24
**mia's** 266:13
267:4,15
278:15
**microphones**
4:6
**middle** 195:4
200:24 241:18
297:24 310:23
**midnight**
215:12
**million** 200:3
200:16 201:6
**mind** 159:6
217:15 291:23
**mine** 9:25
**minority**
238:13 262:5
**minute** 25:16
**minutes** 98:20
100:19 158:5
158:15,18
204:20 297:14

**misappropriate**
330:10,13
**misappropria...**
139:6
**mischaracteri...**
48:16 92:5
96:12 106:13
241:12 296:24
332:5
**mischaracteri...**
49:19
**misconduct**
128:4
**misrecollected**
154:3
**misspoke**
150:24 274:14
**misstates**
171:14 221:22
258:25 264:7
287:19 288:11
313:17 320:24
**misunderstood**
218:4
**mkv** 1:10 4:18
**model** 150:21
150:24 151:2,4
151:5,10 171:9
171:16,25
172:8,15,17
173:20,21
174:2,8,10,19
175:2,6,12,20
176:9,22 202:5

**modeling**
149:11 171:21
174:18 191:8
**models** 150:13
150:19 171:2
171:11 173:13
**modify** 80:4
**moment** 17:20
205:25 228:23
244:6 251:19
255:11,16
279:22
**monetization**
318:4
**money** 200:16
201:11 268:22
302:8
**monitor** 8:3,8
53:20,25
100:24 101:8
151:25 152:6
158:8 204:24
205:5 276:7,12
307:25 324:6
324:11 339:20
**month** 9:16
296:16 297:3,4
319:11,18
**months** 105:12
105:22 128:4,5
149:9 183:14
189:14,19
316:6,15
**morning** 4:3
6:12,13

**motion** 49:16
77:18
**motions** 77:22
**mouth** 177:11
282:18
**move** 38:16
48:12 49:6
66:12 69:5
170:9 234:18
319:16 332:20
333:14 334:4
334:14
**moved** 23:4,18
23:24 49:11
149:6
**moving** 93:2
100:18 319:2
319:12
**multipage**
192:5 297:16
**multiple**
142:25
**multiples** 143:6
**musketeers**
94:16 292:18
**mute** 4:8
**mwi** 201:16,19
202:3 315:12
315:18 316:6

**n**

**n** 1:15,15 2:2
3:2 6:6,6 101:2
101:2,2,4,4
342:2

**name** 4:22
16:10 44:4
94:24 158:22
167:25 206:9
293:5,11
**named** 167:21
**names** 131:22
339:11
**narrow** 117:7
**nature** 32:23
197:6,8
**nbc** 52:8
**nda** 130:25
132:8 152:20
152:23 153:7
175:17,21
176:11 177:22
190:12,21
191:20 344:6
**ndas** 131:2,18
131:21 132:2
132:18 133:23
153:23 156:4
179:16 180:11
**near** 190:14
**necessarily**
47:25 48:9
198:3 309:21
**necessary**
340:7 346:5
**need** 84:6
100:19 115:8
160:8 198:22
204:6 219:6
222:2 298:10

324:14
**needed** 10:3
140:13,17
225:14
**needs** 222:5
310:14
**negatives**
165:16
**negotiate** 214:3
**negotiation**
18:2
**negotiations**
257:8
**neil** 298:19,23
299:3,12,20
**neither** 89:4
114:6,25
**net** 131:6
**network** 141:9
**never** 16:13,17
16:21 60:21
64:23 65:6
88:16 99:3
100:11 110:17
110:24 165:25
166:4 219:2
234:15 279:10
288:24 289:20
307:6
**nevertheless**
246:5
**new** 1:3,21,21
1:23,23 2:8,8
2:18,18 3:7,7
4:21 30:7

50:24 51:7
52:8 57:22
64:16 66:25
75:14 77:18,22
79:14 90:22
107:21 108:16
137:7 175:6
211:7 236:5,7
302:6,8,11
303:3,12,22
304:2 333:25
334:6,15 341:2
341:4,8 342:17
**newly**  211:15
**nice**  158:21
**nile**  55:25 56:5
94:6,10
**non**  1:18
**noncircumvent**
156:14,16
**noncontraven...**
180:3
**nondisclosure**
131:15 155:11
155:15
**noninterferen...**
323:5
**notary**  1:22 6:8
340:14,21
341:7
**note**  4:5 79:9
193:6 196:4
197:20,22,22
199:6,17,20

**noted**  101:3
253:9 339:21
340:7 346:12
**notes**  335:15
**notice**  225:11
**noticing**  5:12
**notion**  303:16
**november**
104:21 105:11
105:23 106:7
108:2,9 233:12
233:24 234:11
234:17 260:6
298:5 299:23
304:20 310:2
329:13 330:24
**number**  101:23
131:16 159:20
171:18 204:7
204:11 214:25
224:24 257:15
300:3
**nyu**  7:14

**o**

**o**  1:15 6:6,6
101:2,2,2,4,4
**oath**  5:3 7:5
54:6 101:15
152:11 306:16
307:15 308:16
315:9 316:2,22
318:20 320:9
320:18 321:7
321:17 322:4
322:16 323:10

323:18
**object**  49:15,17
110:18 120:21
285:14 288:23
296:6 302:2
**objected**  62:14
287:12 288:24
289:20 296:11
**objection**  21:21
22:14,18,24
23:8 24:3 27:8
28:6,9 29:2
30:10,22 31:16
32:13,25 33:8
33:14 34:2,10
35:7,14 36:23
37:11,22 38:7
38:18 39:2
42:13 45:8
47:8,24 48:8
48:15 51:23
52:7 53:4
57:12 62:3,10
63:13,19 64:3
64:21 66:15,20
67:11,17,25
68:11,16,23
69:9,15 72:12
72:17 73:6
76:22 78:8
79:24 80:8
81:5,16 85:2,9
85:14,21 86:2
86:6,11 87:24
88:15 89:13,22

91:11,21 92:4
94:8 95:13
96:11 98:3
99:18 100:7,12
103:9,18 104:6
104:16 105:19
106:12 107:6
107:12 108:4
108:22 110:19
112:5,20
113:18 114:12
114:15,23
115:10,19
119:17 121:21
122:18,25
124:23 125:10
126:2,23
129:23 130:19
132:6,21
133:14 134:3
134:15 135:5
135:24 137:18
138:8 139:12
142:22 143:20
144:12 147:5
148:11,17
149:2 150:10
153:18 154:2,8
154:15 155:18
155:25 156:11
156:20 157:15
168:14 171:13
171:14 172:11
175:22 176:13
176:25 177:20

177:23 178:8
179:10 180:6
180:12 182:6
182:10,14
183:10,18
185:7,16,20
191:17 199:8
200:13 213:16
216:18,25
217:6,13
218:12 220:17
221:19 222:10
227:15 228:3
231:9,15,22
232:6 241:11
246:7 247:21
247:22 258:23
260:25 261:25
263:21 264:5
264:16 266:10
266:17 267:8
275:20 277:9
278:5 282:7,14
283:22 285:3
285:10,18
287:17 288:8
288:15 289:2,4
289:7,10
295:23 296:23
301:24 302:20
303:18 306:21
307:20,22
308:21 309:16
312:13 313:16
320:23 321:24

322:22 326:5,9
326:15,20
327:24 328:5
329:18 330:12
331:5,12,16,19
332:4,23
333:17 334:10
334:16 335:23
337:12,18
338:7,23
**objections** 5:6
119:4 247:5
266:20 307:6
**objective** 187:9
187:18
**obligation**
323:20
**obligations**
118:11 139:6
**oboler** 173:4,6
**obstruction**
323:9
**obvious** 122:8
208:17,18
**obviously**
40:24 81:18
122:7 150:4
188:20,21
212:25,25
**occur** 258:10
**occurred**
169:25 178:7
179:9 181:8
182:24 258:12

**ocean** 188:22
**oceans** 149:13
**october** 51:8,15
52:3 53:11
**offer** 129:19
130:3,7,11
140:3,9 142:6
142:12 144:17
150:7 159:4
160:12 162:14
163:6,9,12,13
163:14 164:5
164:10,10,11
164:17 166:3
168:11 170:5
170:13 176:8
181:10,19
187:6 188:19
188:20,25
189:20 198:19
201:8 230:8,11
316:4
**offered** 180:10
200:4,8,12
201:12
**officer** 11:2,22
12:22,25 13:20
14:14 15:18,24
47:17 48:7
53:6,10 60:21
83:18 87:15,19
87:21 88:2
116:11 117:20
120:16 127:6
128:17 196:8

196:11 215:22
245:12 256:9
264:24 265:5
269:7,9 270:3
270:8 271:10
271:15 278:21
278:23 281:15
283:8 284:6,13
286:8,21 287:2
287:5,15
289:15 290:9
290:16 298:24
**offices** 1:19
**officially**
196:15
**offshore** 70:24
**oh** 53:10 161:4
186:2 214:15
**oil** 215:12
**okay** 7:17
11:20 14:9,24
15:4,7 16:12
17:24 18:5,10
18:23 19:2
20:24 23:11,20
24:12 25:22
33:22 34:5
37:6 38:11
39:5 46:12
50:14 54:8
59:24 62:14
70:7 71:13,24
74:10 75:16
77:12 78:4,16
78:21 79:3

89:10 91:6,24
92:15 93:15
98:17 101:17
102:20 106:7
111:3 113:24
121:25 125:4
130:17 131:8
147:22 152:10
153:20 157:18
157:20 181:2
189:12 192:11
192:25 194:13
200:23 214:22
219:11 224:17
225:5 228:14
228:25 232:12
233:15 236:12
243:5,19 244:8
253:5 254:4
255:2,14 261:6
267:25 281:4
289:24 291:21
292:8 294:13
294:19 297:9
297:21 298:14
300:7,14
311:11 312:20
321:6 325:20
325:25 329:10
332:6,18 333:4
334:11 336:4
336:10,16
337:5
**omar**  1:8 4:17
5:16,18 75:22

79:11 103:21
115:21 159:19
173:3 181:14
212:3,6,9
219:24 220:8
223:25 252:5
253:10 269:19
271:7 273:3,3
276:16 284:24
298:6 299:18
299:18 318:17
340:1 347:1
**once**  6:21 29:23
65:4 155:20
180:23 251:19
279:21 283:12
**ongoing**  128:11
**open**  185:12
**opened**  262:10
**operating**
61:13 83:18
322:7,18
**operation**  87:8
**operational**
87:22 88:22
90:10,20 91:14
**operations**
236:11
**opinion**  204:13
338:9
**opportunities**
117:3 331:3,8
**opportunity**
9:24 21:18
23:23,24 47:5

48:13 49:11
51:12 52:4
61:8 66:13,18
67:2 79:23
116:17 119:2,8
119:24 120:5
330:20 332:15
332:20 333:11
333:23
**optimal**  272:6
**orally**  182:9
**order**  130:6
161:22 187:10
187:19 242:20
**organize**
237:13 261:11
**orient**  297:25
**original**  346:16
**originally**  43:3
**originate**  34:15
**originated**
208:6
**originating**
34:13
**origination**
22:2 68:3
**originations**
35:16
**outcome**  5:5
76:20 341:17
**outside**  56:13
58:8 82:10
91:17 92:12
93:3,14 168:8
169:18,22

**outstanding**
210:23
**overview**
102:11,22
229:23 257:18
**owed**  281:20
283:12
**own**  19:24
37:14 69:4
106:5 130:4
153:15 275:24
303:23 313:22
**owned**  15:20
24:12 29:6
42:10 238:18
334:5
**owner**  238:13
262:5 283:2
**ownership**  25:2
29:12 213:13
238:23 283:20

**p**

**p**  2:2,2 3:2,2
122:20 193:11
**p.m.**  40:5 78:24
90:5 100:24,25
101:3,8 151:25
152:6 193:5
204:24 205:5
240:6 276:7,12
298:6 299:22
300:9 324:6,11
339:20,21
**page**  32:4
34:21 39:9

40:3 54:9
59:19 69:20
71:10 73:15,19
74:23 75:10,18
77:15 78:22
81:23 83:8
96:21 104:19
113:5 114:3
115:24 116:7
127:22 136:7
138:13 142:4
143:7 144:14
145:4 154:20
154:21 155:3
156:16 189:7
203:13 209:14
209:16 211:4,6
213:20 215:17
220:5 223:23
236:25 239:23
241:18 244:3
251:9,16,22
252:24 253:18
294:22 298:5
299:22 300:3
300:12 311:8
314:25 325:13
325:20 326:10
326:11 327:8
327:10,11,12
327:14 328:7,8
328:17,21
336:5 342:3
347:4,7,10,13
347:16,19

**pages** 203:11
228:9 232:10
**paid** 22:20
119:14 227:11
**palistar** 15:12
15:15,19,24
16:6,11 265:12
274:6,9,15,19
274:25 275:10
275:13 281:2
306:11,18
307:17 308:18
309:20 326:24
**palmas** 44:20
90:13
**paragraph**
71:14 89:8
96:25 114:3
127:23,25
136:7 143:8
144:15 145:5
162:18 181:15
183:22,22
200:21 202:9
203:2,9 219:23
220:7 221:12
221:18 222:8
223:24 251:17
251:20,23
292:16 294:21
303:8 305:16
310:23 311:9
315:8 317:11
318:16 321:6
327:13,18,20

335:14
**parallel** 20:4,8
20:12 30:19
305:12 312:24
313:23 320:11
320:20
**parentheses**
252:11
**parse** 172:4
**part** 15:20 67:4
67:5,13 68:6
72:3 99:15
100:4 171:23
172:18 173:9
188:9 221:7
244:14 248:5,6
248:10,12,15
249:5 250:2,6
250:24 251:10
251:12 266:8
267:7 301:2,23
303:4 312:10
322:7,25
332:16
**partially** 24:9
24:23
**participant**
161:13 176:17
**participate**
191:21 316:25
**participating**
149:18 162:23
**particular**
115:17 167:2

**parties** 4:11
35:2 36:7 44:8
44:16 45:17
105:13 106:8
107:3,10 123:8
130:25 134:2
138:19 153:24
156:6 242:25
326:12 327:22
328:11 330:2,3
330:6,23
333:13 339:14
341:15
**partner** 37:14
71:16 104:12
114:11 115:2
124:16 126:5
132:23 141:23
146:9 194:6
211:17 212:10
219:25 220:9
220:14,25
221:8 224:3
230:25 330:9
330:14
**partner's** 25:21
44:3 323:4
**partners** 9:15
11:11,12 12:8
13:8,11,18,22
14:11,21 24:11
26:25 33:17
35:9 43:4,5,14
46:7 47:15
49:3 54:24

55:17 82:16
103:15 112:3
113:8 114:17
114:21 115:9
115:17 117:9
127:8 133:9
135:8 137:8
146:16 193:25
194:2 196:17
196:25 209:13
215:23,23
216:2 226:8
227:12,24
232:20 235:24
238:5 252:9
257:25 258:8
268:23 269:10
269:21 270:9
270:20 271:16
272:4 274:17
275:3,15
281:16,21
282:5 283:9,13
289:16 299:5
303:12,16
310:5 312:25
321:13,20
331:2 333:18
333:19
**partnership**
82:16 330:11
331:4
**parts** 245:4
251:3

**party** 1:18 5:3
125:20 136:10
153:6 156:8
204:18 242:11
243:4 301:25
331:14
**pass** 151:22
152:16 157:19
159:8 324:20
**past** 235:21
287:5
**path** 184:18
**paul** 167:14,17
167:22 168:4,7
168:12
**pause** 234:3
**pay** 31:12
81:14 93:7
147:23 168:25
**paying** 22:16
81:3 268:19
**pdf** 215:14
**pe** 234:14
235:21
**penalty** 314:16
314:21
**penultimate**
145:5
**people** 78:6
101:24
**percent** 29:8,15
29:18 31:13,23
32:6 93:8
201:7 213:9,13
213:15 275:9

301:3,11,12
325:22 326:2
**percentage**
29:12
**perez** 223:10
**perfect** 242:24
300:15
**perform** 268:4
**performance**
171:5
**performing**
268:12
**period** 12:7,24
233:22 269:5
270:2 318:22
**perjury** 314:16
**permit** 191:15
**permitted**
312:8 313:11
316:25 320:19
**persistent**
202:12
**person** 110:3
249:2,15
**personal**
279:11
**personally**
169:3 200:15
**personnel** 84:6
226:21 227:3,3
262:23 263:11
**persons** 237:16
261:14
**perspective**
25:20,21 45:17

208:6 298:3
**pertaining**
153:16
**pesner** 186:12
**phones** 4:9
**phrase** 272:19
**physical** 272:7
**pick** 4:7
**piece** 209:9
275:10
**place** 4:11
37:21 176:7
**placement**
312:17
**placid** 310:11
**placing** 338:19
**plain** 136:8
**plaintiff** 1:6,9
2:6,16 4:16
**plan** 17:12,18
34:22 35:11,24
37:7,8,20 38:5
38:23 39:4
46:5 67:8,13
67:21 68:8,12
68:14,15 69:6
105:24 106:9
107:4 108:11
144:18 305:17
312:10,11
342:11
**planned** 62:16
109:12 305:3
305:19

plans 105:17
235:13 260:14
316:5,14
platform 23:6
23:25 48:14
49:12 58:9
66:14 95:12
96:10 273:7
play 337:17,23
players 178:9
178:21
please 4:5,8 5:7
6:3 17:21
73:20 74:13,14
84:3 185:18
194:9 207:21
218:25 298:11
307:22 325:4
346:4,9
point 12:17
13:10 14:17
20:9 28:14
29:15 38:15
53:7,11,13
99:7 103:12
117:6 137:12
157:14 164:8,8
164:15 170:17
191:2 197:14
211:6,8,12
231:3,5 235:20
273:17 279:14
281:7 296:2
304:15 333:7

pointed 172:13
points 37:2
267:25 268:3
pollute 171:12
polluted 150:12
150:18
pool 202:23
poor 247:16
portfolio 21:9
21:13 23:15
25:14 36:10
49:23 50:2
61:6 124:3
161:4,5 196:12
posed 333:2,5
position 26:22
26:24 54:23
121:9 122:16
166:5
positions
121:10 122:10
237:15 261:13
possibility
170:24 171:8
possible 19:9
239:8
post 140:5
156:9
potential 50:9
72:4 75:24
79:5,12,20
116:18 119:7
119:16 123:9
124:21 125:7,7
126:21 131:13

134:20 144:3
149:14 160:16
165:10 166:11
174:8,11,23,23
175:8,14
179:18 188:15
198:14 208:18
213:18 217:20
226:3 246:18
267:21 337:16
337:25 338:4
potentially
35:23 64:17
91:25 124:2
125:18 131:18
150:12 151:15
332:7 338:2
ppm 312:15,16
practice 136:2
praj 3:11
precipitated
115:8 230:9
precise 42:21
49:4 157:24
243:14 273:16
precisely 43:8
precluded
137:25 149:18
preference
80:13
preliminary
66:23
premium 201:7
preparations
316:7

prepare 147:14
170:9 316:19
prepared 28:12
31:4 96:2
preposterous
49:16
present 3:14
5:9 12:3
presentation
228:10 229:8
229:16,19,22
230:8 231:4,6
231:13,20
232:5 240:8
257:12,17
259:10,15
261:20 268:3
307:3 325:5
presentations
197:18 284:19
284:23
presented 50:8
66:25 76:9
91:13 92:12
134:19 147:6
163:9 166:2,14
168:12 170:14
181:10 189:21
210:18 230:11
231:7 259:17
260:19,23
261:19
press 194:17
presumably
175:23 193:17

| | | | |
|---|---|---|---|
| **presumed** 263:25 | **priority** 99:8 | 139:20 140:18 | **products** 9:4 |
| **pretty** 32:11 | **prishika** 3:10 | 140:19,24,25 | 303:13 |
| 156:23 | 5:25 | 141:5,11,16 | **professionals** |
| **previously** | **private** 4:7 | 143:2 144:16 | 112:9,13 |
| 317:13 | 90:14 312:17 | 145:20 146:20 | **profit** 36:17 |
| **price** 142:20 | 337:20 | 148:20,25 | 144:10 |
| 182:21 | **privilege** | 149:5,10 150:8 | **profits** 46:8,21 |
| **priest** 7:20 8:10 | 117:14 118:8 | 150:16 151:16 | 47:20 72:9 |
| 10:7 | 118:12,13 | 157:6 165:3 | **programs** |
| **primarily** | **privy** 142:16 | 170:7,10,10 | 272:9 |
| 146:7 | **probably** 13:5 | 174:5,25 176:6 | **prohibited** |
| **primary** | 18:8 71:6 | 176:16,20 | 125:13 165:8 |
| 333:21 | 80:15,20,21 | 177:2,18 | 276:19,23 |
| **principal** 55:9 | 87:13 88:25 | 181:23 182:20 | 277:6,13,22 |
| 55:10 58:3 | 89:17 103:21 | 183:8,16 184:7 | 278:2 290:24 |
| 104:4 124:11 | 110:14 131:16 | 184:21 185:5 | 291:6 |
| 129:6 161:19 | 149:6 159:5 | 185:12 187:6,7 | **projections** |
| 165:22 238:4 | 202:21 226:14 | 187:10,18 | 141:25 171:4 |
| 238:15 262:7 | 242:9 247:10 | 188:2,5,8,11,13 | **promoting** |
| 286:4,10 290:2 | 267:17 288:4 | 188:22 189:15 | 144:8 |
| **principally** | 310:3 | 190:12,14,16 | **promotion** 11:5 |
| 55:11 | **problem** | 191:4,7,11 | **prompted** |
| **principals** | 117:25 241:16 | 195:19,23 | 122:8,9 |
| 24:10 58:2 | 303:9,10 | 203:3 315:11 | **pronounced** |
| 68:25 103:14 | **procedure** 6:23 | 316:19,23 | 244:22 |
| 113:15 236:21 | **proceed** 6:5 | 317:15 338:10 | **proper** 133:12 |
| 245:7 246:15 | **proceeding** 5:7 | 338:10 | 149:10 |
| 254:14 | **proceedings** | **processes** 150:2 | **properly** 91:3 |
| **prior** 49:19 | 8:5 53:22 | 178:11 | **proposal** |
| 74:17,20 | 152:3 205:2 | **produced** | 162:25 |
| 114:10 119:14 | 276:9 324:8 | 38:10 117:11 | **proposed** |
| 129:19 203:13 | 341:9,12 | 147:18,20 | 216:13 |
| 226:13 230:15 | **process** 131:5 | 152:17 | **proposing** |
| 234:12 256:24 | 134:22 136:12 | **product** 303:11 | 163:15 |
| | 137:5 138:2 | | |

**proprietary**
68:4,5,9
**protect** 316:22
**protecting**
190:13
**provide** 82:14
102:10 117:23
125:22 132:3
150:20 206:19
226:18,19
230:2 249:7
257:18 262:24
279:5
**provided**
133:24 134:10
227:4 249:23
254:18,23
263:15,18
279:10 280:25
**provides** 82:21
**providing**
122:21 263:12
269:18 270:16
271:5,23 299:4
299:8
**provision** 114:5
114:21 115:9
115:18 156:14
156:16 180:3
323:2,6
**provisions**
89:24 91:16
92:22 141:3
156:7 179:24

**public** 1:22 6:8
337:21 340:21
341:7
**pull** 304:21,23
**pulling** 291:23
**purchase** 100:6
125:8 126:21
205:10 207:23
**purchased**
157:3
**purchaser**
162:20
**purchasers**
125:24
**purpose** 18:18
112:2 237:14
254:4 261:12
**pursuant** 91:15
133:23 175:16
238:16 262:8
321:8,21
**pursue** 104:22
105:24 106:3,6
106:19 107:4
107:10 108:18
109:12 120:5
233:6 236:9
237:11,23
260:3 261:9
320:20 330:2,7
334:22 335:2
338:22
**pursued** 48:23
48:24 49:2
52:6 68:18

109:5,7 289:8
332:9
**pursuing** 46:16
106:9 119:7
184:18 234:25
260:9
**pursuit** 69:7
323:22
**put** 37:20 51:25
72:2 97:9
112:19,22
131:3 139:17
152:14 177:11
226:4 230:4
235:7 279:14
282:17 284:20
284:23 295:4
304:22 337:16
337:22
**putting** 71:25

**q**

**quarter** 317:18
318:2,13
**quarters** 211:5
**question** 17:25
49:4,8,9,18
106:15 117:7
118:21 160:9,9
175:11 218:4
219:5 223:22
230:6 247:14
247:16 248:15
254:16 264:18
266:19 285:12
285:20 288:19

290:11 306:24
308:2,8,10,23
309:9,13,18
313:20 331:21
333:2 335:17
**questions** 7:2
7:13 19:18
40:22 96:4
99:20 152:15
168:18 180:25
205:7 214:21
218:21 225:4
228:8 230:3
240:5 244:7
255:13 257:22
272:14 279:24
294:21 310:21
324:3,15,24
325:2,9,14
327:12,17
336:21,25
338:15 339:3
**quick** 151:20
204:21 324:2
**quickly** 158:2
**quinn** 2:14
5:15,17 307:13
**quinnemanue...**
2:20,22
**quite** 23:9
51:22 117:13
141:12 311:14
336:5,15
**quote** 117:19
202:2 322:19

| r | | | |
|---|---|---|---|
| **r** 2:2 3:2 101:2 347:3,3 | 138:9 139:8 210:13,16 212:8 251:20 251:25 254:11 259:3 340:5 346:4 | 40:20 45:19 47:12 52:19 56:16 57:3,7 58:15 59:11 62:5,6,15 72:24,25 73:8 | 336:22 |
| **raise** 33:18,19 33:24 235:13 260:14 302:8 | | | **recalled** 213:3 |
| | | | **receipt** 316:2 346:18 |
| | | | **receive** 128:12 |
| **raised** 99:23 294:11 | **reading** 213:22 249:19 308:5 | 80:24 95:24 97:22 100:13 | **received** 130:3 130:10 175:10 176:8 298:4 |
| **raising** 197:14 235:12 236:5 236:11 260:13 293:24 | **reads** 223:25 | 113:3 115:20 116:21 119:5 119:21 120:22 120:23 121:23 121:25 122:4 123:4 133:10 135:23 137:17 138:9,23 147:16,19,22 147:25 157:10 160:22 167:24 | **receives** 216:4 |
| | **ready** 54:2 80:15,20 101:11 151:22 152:7 239:20 | | **receiving** 173:15 175:9 |
| | | | **recess** 8:4 53:21 100:25 152:2 204:25 276:8 324:7 |
| **raj** 3:10 5:25 | **real** 35:21 49:17 305:23 313:5,14 320:13,21 323:14,22 | | |
| **ran** 103:6 146:21 177:2,3 177:4 203:3 | | | |
| **range** 13:5 | | | **recognize** 26:7 59:24 70:9 78:4 93:22 111:15 336:7 |
| **rather** 161:8 205:22 230:12 | **realize** 338:5 | 180:4 182:11 182:15,16 191:5,10 199:25 202:4,5 208:12 216:20 226:23 228:6 234:7 242:13 247:17 248:3 259:2 267:14 267:24 272:18 278:8 284:18 284:22 287:7 295:12 296:7,8 296:10 299:14 304:19 325:9 325:18 335:16 | |
| **rbc** 154:21 155:8,14 | **really** 50:18 70:13 88:3 98:14 145:17 188:10 307:9 | | **recognizing** 188:18 |
| | | | **recollection** 14:2 76:15 144:13 156:13 171:19 178:16 180:9 203:24 204:4 210:20 213:2 226:15 234:5 302:18 317:24 334:24 |
| **rbccm1128** 344:9 | **reason** 7:7 42:2 57:13 151:17 201:23 219:8 241:24 285:15 346:6 347:6,9 347:12,15,18 347:21 | | |
| **rbccm1928** 154:24 | | | |
| **reach** 144:2 184:6 | | | |
| **reached** 273:21 | | | |
| **reaction** 56:17 134:13 | **reasonable** 191:15 | | **recommend** 164:24 |
| **read** 18:23,25 19:2 40:18,24 41:14 65:16 76:23 91:2 128:20 137:15 | **reasons** 99:2 | | **recommendat...** 184:8,17 |
| | **recall** 19:13,17 26:12 27:15 | | |

**record** 4:3,12
5:11 7:23 8:2,7
22:23 23:2
53:19,24 94:24
100:15,23
101:7 151:24
152:5,15
157:22 158:22
159:13 165:16
169:15 178:3
180:18 186:7
189:6 192:4
204:23 205:4
205:20 210:15
214:14 222:15
224:21 228:19
239:14 250:16
255:7 276:6,11
279:19 293:4,5
293:11 297:15
324:5,10
339:19 341:12
**recorded** 4:14
**recording** 4:10
**recuse** 140:9
163:7
**recused** 163:25
**recusing** 163:8
**redline** 206:24
207:2,3,10
213:23
**refer** 92:19
110:5 155:10
275:8

**reference** 60:16
96:13 109:21
193:22,24
194:21 216:11
217:9 218:8
233:19 238:22
253:23 301:16
302:3 311:12
315:18 326:22
**referenced**
248:11
**references**
237:19
**referencing**
218:11 238:10
**referred** 17:3
179:23
**referring** 13:7
61:4 82:20
106:21 110:11
173:2 201:10
205:9,10,14
213:8 218:20
242:5 275:11
**refers** 79:18
137:23 193:13
**reflect** 150:14
150:25 171:20
172:3,15,16,22
**reflected**
113:21 174:16
174:17 207:10
328:12 339:12
**reflects** 207:7

**refrain** 162:23
**refresh** 76:14
239:19
**regarding**
75:23 85:17
119:2 156:18
186:23
**regardless**
169:24
**registered** 13:3
13:11,23 14:6
43:11,15,18
82:17 99:5
108:16 109:10
211:16 224:3
238:5 252:4,10
**registration**
41:12 43:25
**regroup** 100:16
**reid** 7:20 8:9
10:7
**reimburse**
169:5
**reimbursed**
227:20,23
264:4 299:11
**reimbursement**
226:9,20,25
227:4 264:8,21
294:3
**reject** 188:25
**relate** 162:24
**related** 5:3
99:12 125:19
204:18 226:20

227:14 228:2
282:3 312:5,6
313:4,13,24
320:2,12 335:3
341:14
**relates** 190:15
215:4
**relating** 161:11
171:3 207:18
223:19 225:23
226:8 227:2
**relationship**
88:4 115:13
146:9 217:23
249:18 291:7
291:17
**relationships**
68:20 253:7
254:15
**release** 194:17
**released** 247:18
248:11
**reliant** 110:10
**relied** 173:18
**rely** 173:16
**relying** 43:17
43:19,25
**remain** 305:24
**remained**
210:23
**remaining**
164:3
**remember** 50:5
56:10 57:9
71:24 131:22

294:2 312:15

**renegotiate** 151:8 164:10

**reorient** 143:3

**repaid** 208:9,16

**repay** 208:13

**repeat** 45:9 106:15

**replace** 211:6

**report** 147:14 147:17,20 244:25 256:9

**reported** 341:9

**reporter** 4:24 6:3 159:9 185:24

**reporting** 142:2

**reports** 197:12 318:3

**reposition** 202:14

**represent** 6:15 158:23 216:5 250:22 259:9 294:5

**representation** 286:2 300:6,19 300:21

**representations** 40:9 173:14,17 240:12

**representative** 166:22 167:4 335:9

**representatives** 70:15,18,21,23 72:16 78:11,13 80:7 167:8 208:3

**represented** 12:10,13 15:8 15:11 16:13,18 16:22 146:19 216:7 261:23 262:15 263:5 263:10 301:21

**representing** 4:23

**represents** 201:6

**request** 163:18 208:11

**requested** 115:22 168:11

**require** 124:12 124:15

**required** 31:12 115:15 148:14 209:3,10 282:12 340:14

**requirements** 83:2 254:7,9

**requires** 27:3 41:4

**requiring** 129:6 156:7 161:19

**resell** 143:13

**resign** 64:17 65:12,24 121:8 121:9 122:9 280:15 286:19

**resignation** 54:20 57:6,11 57:14

**resigned** 14:12 14:17 58:16,18 60:23 65:19 66:6 278:14,25 280:20

**resigning** 54:22

**resisting** 63:18 63:21

**resolved** 40:12 240:15,20

**resources** 84:6 94:24 293:4,11

**respect** 24:19 35:4 44:9 45:11,25 47:20 72:15 88:13,17 90:2 100:5 113:4 114:16 116:24 118:23 122:15 124:6 136:12 157:13 212:24 249:14 276:2 291:10 326:18 328:4

**respective** 253:8 328:11

**respond** 40:25 60:19 188:24

190:10 241:25 248:20

**responding** 240:7

**responds** 87:5

**response** 41:17 129:7 194:15 243:18 249:3

**responsible** 9:9 99:16

**responsive** 49:8 254:6

**restrict** 141:17

**restricted** 141:8,13

**restrictions** 90:24 92:18

**result** 33:19 80:2 146:24 148:15 170:4 181:17

**results** 134:7 134:10

**resume** 54:2 101:11 152:7

**resumed** 101:5

**retain** 169:17

**retained** 169:22 170:14 170:18

**retaining** 186:23 237:15 261:13

**retirement** 166:23 167:3

**retroactive**
294:7
**return** 346:15
**review** 26:18
26:21 27:14
31:5 81:19
134:17,17
146:12 173:12
180:17,24
186:8,14 189:5
189:11 192:3,9
197:11,12
214:20 225:3
226:12 228:23
230:24 243:25
244:6 245:23
246:20 250:20
255:12,16
279:22 284:18
285:6 297:15
297:20
**reviewed** 26:19
71:7 123:5
130:20 137:12
138:10 195:4
197:5,16,17,24
239:17 281:5
281:12,13
**reviewing**
31:18 188:11
188:12
**revise** 82:13
**revised** 73:20
74:13 102:10

**right** 8:16
10:14 14:5,9
22:15 31:11,25
32:3,8 34:23
35:5,20,25
36:4,8,11,14,17
37:15 38:17
41:7,17,21
43:12,16 44:15
46:13,15 51:13
51:16 53:2,7
54:8 55:4
59:17 60:8,13
60:17 61:9,16
62:25 63:7,12
66:2,12 69:4
69:14 70:10
71:2 72:11
74:2 75:7
77:13 79:6
80:16 81:22
82:7 83:13,15
83:25 84:16,20
85:20 86:5,13
86:18 87:2,23
89:6,21 90:6
93:15,21 94:3
95:18 98:21,22
99:25 102:18
102:22 103:4
104:13,18
105:14 107:17
107:18,23
108:14,21
109:5,13,19

111:7 113:8,12
114:16 116:12
121:15 126:22
127:6 135:13
135:16 137:11
137:16 138:2
140:10 141:21
141:24 142:14
144:11 148:10
155:5,12
158:11 159:24
163:23 164:11
164:13,22
165:2 168:23
173:25 175:17
177:22 181:6
185:6 186:19
189:16 192:14
200:24 206:6,7
206:17,25
207:16,24
209:4 210:8
212:3 215:2
216:13 217:17
219:20 220:16
220:24 222:8
222:25 229:5,8
230:5,12,19
231:8 232:20
232:25 239:25
242:6 251:10
252:18 256:19
259:12,19
261:20 264:4
265:6,12

266:22 269:11
270:4,10 271:2
271:11,17,20
272:5 274:7
275:6,11,12
278:15 281:17
281:22 282:6
283:10 284:15
286:14 290:2
290:21 291:9
293:24 294:10
296:22 298:13
299:5,15
300:11 301:23
303:17,20
304:4 305:7,20
309:17 310:2
311:14 312:7
312:12 314:25
315:5 317:9,25
321:4,23
322:21 325:6
326:24 327:9
327:13,20
328:4,14
329:16,21
330:4,21 331:4
331:18 332:2
332:18,19,21
333:10 334:4
334:14 335:5
337:19,25
338:12
**rights** 72:8
326:13 327:3

327:22 328:11
334:22
**ripple** 64:18
**risk** 36:10
176:17 179:6,7
179:8,9
**role** 11:8 12:16
12:20 14:13
16:5 18:22
19:8 27:2
59:12,14 60:13
63:4 65:13,20
88:2 104:4
122:19 128:11
156:8 162:21
198:2 276:15
278:19
**roles** 11:25
196:20
**roman** 32:4
**room** 131:13
132:9,11 153:2
173:24 175:13
307:4
**roughly** 158:4
**round** 203:12
203:15,20
204:6
**rounds** 203:25
204:5
**routine** 99:21
99:22
**row** 229:14
**rpr** 341:6,24

**rubric** 198:21
**ruggieri** 1:22
4:25 341:6,24
**rules** 218:23
**run** 134:22
139:19 140:19
148:24 149:5
149:10 150:9
165:2 174:5
184:20 188:21
**running** 141:6
315:10 338:9

**s**

**s** 2:2 3:2 101:2
101:2,2 347:3
███████ 175:7
191:9 204:8
**sailing** 55:25
56:4
**sake** 63:5
250:23
**salary** 22:17
**sale** 136:23
141:16 146:19
149:25 151:16
169:10,23
170:6,15,19
174:4,24 176:5
181:22,23
183:9,17
184:22 185:5
188:11 198:5
316:5,19,23
317:15 318:7

**sales** 128:19
136:11 137:5
138:2 139:20
142:20 170:9
177:18 189:15
203:3
**sam** 14:12 22:7
55:4,7,9,16
59:12 60:23
62:9 65:20
73:11 75:7
84:4 227:6
**sat** 64:12
**saving** 250:23
**saw** 136:17
165:25 187:23
260:18 261:18
308:5 336:11
**saying** 87:5
100:13 105:22
130:10 151:12
177:12,16
178:21 184:13
187:25 190:2
191:22 213:12
213:14 217:8
300:18 301:20
313:10
**says** 32:5,9
36:25 40:8
60:10 65:23
70:11 73:20
74:12 76:8
84:3 85:16,22
91:22 94:14

97:7 102:24
108:15 109:15
114:6 127:10
127:23 128:15
136:7 137:3,3
142:12 143:9
144:15 162:19
181:16 183:12
184:3 190:3
193:5 194:9,16
196:3 197:19
199:17 201:5
203:15 209:19
211:8,13 212:5
212:6,8 213:21
219:15,24
220:8,21,24
229:15 233:4
233:13,23
234:23 235:10
235:22 237:9
238:2 240:11
241:7,18 243:6
245:10 248:16
252:2 253:6,9
259:25 261:7
262:22 292:16
292:24 293:14
298:10 300:16
300:20 302:9
303:9 304:6
305:22 312:4,7
312:15 315:24
317:11 319:22
320:8,10 321:2

321:4,8 322:24
323:10 329:12
**scale** 202:13
**scaminaci** 1:5
4:17 5:22 9:25
10:5,12 12:11
16:18 17:5
19:15,19 20:3
20:8,18,22
23:4 24:14,24
25:2 27:7,25
28:4,25 29:8
29:13,15,20,23
30:9,12,14,20
31:22 32:7,21
33:22 35:8
36:20 37:8
38:2,15 39:6
42:11,24 44:13
44:21 45:5,16
45:24 46:20
47:3,19 48:11
50:21,25 54:16
57:23 58:4
62:20 64:19
66:11 69:3,13
72:9 78:23
85:7 86:10,25
87:6 88:8 89:5
90:9,18 99:15
103:12 104:22
105:10 106:19
108:9 109:17
110:2,21
112:18 114:7

116:4,9,16
117:2 118:25
119:13,23
122:2,22 123:7
123:14,17,25
124:19 125:5
125:21 128:6
128:10,24
129:5 130:11
131:12,20
132:3 133:22
134:7 136:10
137:13,25
139:4 140:4,20
141:3,16
143:10 144:5
145:8,14
148:16 150:20
152:24 153:11
153:23 154:10
154:12 156:5,8
156:17 158:24
159:19 160:11
160:16 161:11
161:13,21
162:13 163:15
165:6,25
166:10 167:11
168:10 171:9
175:16 180:5
180:20 181:5
181:13 182:4
185:11 186:11
186:23 187:24
206:6 208:20

211:19 214:25
228:12 230:24
232:3 233:5
234:9 237:11
237:22 238:13
238:19 245:19
246:2,25
249:21 251:6
252:7,15,17
253:12 256:18
258:20 260:3
261:9 262:5,11
268:25 271:2
273:21 275:25
276:20 277:4,8
277:23 280:3
291:9,18
305:13 311:3
312:23 316:23
317:8 318:24
319:16 320:10
320:19 321:9
321:19 322:25
325:21 326:4
326:23 331:25
332:17,19
333:10 334:3
334:13 337:11
340:1 342:19
343:24 347:1
**scaminaci's**
77:18 100:4
104:4 109:10
121:12 124:6
126:19 127:23

128:2 130:14
134:14 139:15
140:14 148:7
148:22 150:7
230:7 277:20
277:21 316:3
323:21 327:4
334:22 338:21
**scan** 116:14
**scenario**
329:16
**schedule** 149:6
324:18
**school** 7:14,19
**schryver** 2:9
5:19,19 7:21
21:21 22:14,18
22:24 23:8
24:3 27:8 28:6
28:9 29:2
30:10,22 31:16
32:13,25 33:8
33:14 34:2,10
35:7,14 36:23
37:11,22 38:7
38:18 39:2
42:13 45:8
47:8,24 48:8
48:15 49:14
51:23 52:7
53:4 57:12
62:3,10,13
63:13,19 64:3
64:21 66:15,20
67:11,17,25

68:11,16,23
69:9,15 72:12
72:17 73:6
76:22 78:8
79:24 80:8,14
80:19 81:5,16
85:2,9,14,21
86:2,6 87:24
88:15 89:13,22
91:11,21 92:4
94:8 95:13
96:11 98:3,22
99:18 100:7,12
103:9,18 104:6
104:16 105:19
106:12 107:6
107:12 108:4
108:22 110:18
112:5,20
113:18 114:12
114:15,23
115:10,19
117:4,12,16
118:2,9,17
119:3,17
120:13,20,24
121:21 122:18
122:25 124:23
125:10 126:2
126:23 129:23
130:19 132:6
132:21 133:14
134:3,15 135:5
135:24 137:18
138:8 139:12

142:22 143:20
144:12 147:5
148:11,17
149:2 150:10
153:18 154:2,8
154:15 155:18
155:25 156:11
156:20 157:15
157:21,25
158:6,11,14,20
158:23 168:17
178:2 185:18
185:23 204:19
217:16 218:17
218:22 221:23
247:24 253:18
266:18,25
276:3 285:13
287:22 288:12
294:17 307:2
307:21 308:3
308:12 309:3
310:8,13
323:25 324:12
326:5,9,15,20
327:24 328:5
328:24 329:18
330:12 331:5
331:12,16,19
332:4,11,23
333:17 334:16
335:23 337:12
337:18 338:7
338:14 339:2,7
342:6

**scope** 11:7
**scott** 3:8 5:23
**sculptor** 192:17
  318:9
**sdanner** 3:9
**sdny** 4:18
**searches**
  130:23
**seat** 64:12
**sec** 33:21 41:20
  43:11 59:16
  64:5,10 65:21
  98:24 99:2,8
  99:17 100:3
  102:3 107:9
  110:16 194:10
  194:22,25
  195:5,15,18,24
  228:10 229:8
  229:15,20
  230:9 231:14
  238:5 240:9
  244:25 245:2
  245:18 246:5
  246:10 248:7
  248:13,24
  249:14 250:8
  251:14 254:18
  257:12 259:10
  259:17 260:24
  261:23 262:15
  263:5,10 268:2
  287:8 325:5
  326:18

**sec's** 228:11
  257:13 259:11
**second** 7:24
  35:4 38:3,16
  38:24 40:3
  46:2,17 47:6
  67:9,22 69:7
  71:10,14 73:15
  136:7 143:7
  144:15 155:2
  182:13 199:20
  203:20 204:6
  223:24 234:18
  236:17 239:23
  242:19 267:22
  284:11 298:5
  299:22 317:18
  317:25 318:12
**secondary**
  34:17 35:16
  309:19
**secretary** 9:6
**secrets** 139:7
**section** 248:16
  254:5
**sections** 92:19
**sector** 305:18
  322:6,17
**sectors** 36:7
  305:24
**secure** 128:8
**securities**
  198:19 231:7
**see** 42:3 55:21
  60:25 70:7

71:22 73:14,22
75:2,4,6,19
76:3,12 78:25
84:11 87:9
94:19 95:5
97:5,16 102:14
104:24 117:14
118:20 126:14
136:15 137:20
139:22 142:9
143:15 144:20
145:10 151:21
153:3 159:18
163:4 181:25
183:25 184:10
184:23 187:14
190:8,17 193:9
194:11,19
199:21 201:3
201:17 202:16
203:5,21
206:13 207:4
209:24 211:10
211:22 212:15
214:5 215:18
216:9 219:17
219:22 220:12
222:19 224:7
225:17 232:15
233:8,14 235:4
235:15 237:17
238:7,20
240:16 241:5
241:20 242:3
242:24 243:10

243:16,20
244:16 248:13
248:18 249:9
251:10 252:12
253:15,21
255:21 256:22
257:19 258:3
259:24 260:15
261:15 262:12
263:2,8,10
280:17 292:22
293:7,18
294:25 295:9
296:14 298:8
298:11,21
299:25 300:8,9
301:8,13
302:15 303:24
304:9 306:2
308:8 311:7,20
313:7 314:9,24
315:16 316:8
317:3,19 319:5
320:6,15
321:14 322:9
323:16 324:2
335:10,22
**seek** 184:7
**seeking** 65:8
**seem** 226:23
**seems** 96:7
317:24
**seen** 176:9,21
178:6 195:20
233:12 239:9

307:7
**sell** 135:2,12
137:9 148:21
148:25 185:12
188:5 192:22
200:5,6 315:11
**sema4** 255:20
255:23 256:10
257:2,3,8
**send** 127:13
**sending** 76:17
155:3 230:18
230:21
**sense** 24:6 70:8
99:12
**sensitive** 4:6
**sent** 117:18
162:13 184:4
193:6 196:3
197:19,25
206:16 207:15
224:10 225:7
230:23 259:23
**sentence** 55:15
107:3 137:15
137:20 138:14
196:3 200:25
203:10 233:17
233:21 249:12
316:20
**sentiment**
182:3
**separate** 31:24
106:25 109:4
234:21 237:13

237:20 261:11
311:18 323:8
338:21
**separately**
37:13 104:23
106:4,20 233:7
237:12,24
248:6 260:4
261:10
**separates**
220:23
**separating**
318:25
**september**
10:24 36:21
37:3 60:16
106:10 233:4
233:13 260:2
294:6 311:6
318:21
**series** 7:2 33:24
219:19 299:17
**servant** 288:3
**serve** 60:20
62:22 65:25
167:17 168:5
**served** 9:5
15:16 31:9
60:22 63:4
269:24 271:9
**serves** 215:21
215:25
**services** 61:12
82:15,19
205:11 249:8

249:24 262:25
263:12,15,18
264:21 269:19
270:17 271:6
271:24 299:4,8
**serving** 57:16
**set** 25:17 27:12
34:25 35:11
44:7 46:22
67:13 68:8
90:24 98:9
105:17 114:2
131:12 132:10
234:18 328:13
341:19
**sets** 35:25 36:3
36:6,10,13,16
37:7 45:16,21
51:18 178:14
**seven** 99:7
202:12
**several** 30:12
322:5
**shaded** 147:11
**shape** 85:5
**share** 31:13
32:6 46:8
118:16 194:17
252:21 253:25
**shared** 128:13
272:7 301:5
**shares** 249:5
252:8,15
253:13

**sharing** 46:20
79:13
**sheet** 32:17,23
346:8,10,13,16
**shoddy** 338:9
**short** 123:11
160:21 161:16
165:20 169:13
**shorthand**
108:6 173:23
193:12 201:19
229:10
**show** 17:7
18:20 249:18
**showed** 18:12
326:19
**showing** 18:19
151:17 254:12
308:25
**shuster** 1:19
3:4 4:20
**sic** 36:21 300:6
301:4
**side** 37:15
142:3 161:14
188:10 208:22
208:23 222:4
269:19 323:12
327:4 332:16
332:20 333:15
333:20
**sides** 140:22
**sign** 126:5
162:4 209:2
225:22 346:9

**signature**
245:11 314:24
341:22
**signed** 18:9
130:25 131:14
131:23 132:18
132:19 154:4
225:21 294:6
311:5 315:3
**significant**
202:12
**signing** 135:10
346:11
**similar** 266:5
266:14 267:5
**simply** 278:20
**single** 189:7
244:3
**sir** 28:8 101:12
111:15 311:10
332:11,11,11
**sit** 7:9 27:16
28:21 29:4,20
29:22 42:9,18
63:23 336:16
**sitting** 179:2
264:12 285:8
285:16
**situation** 28:22
163:2
**six** 8:11 131:18
131:21 149:8
**sizeable** 169:19
**skip** 259:5

**slide** 104:19
105:21 107:24
108:15 197:17
228:9 232:11
232:14 237:5
259:20,21,22
259:24 261:4
262:19 325:13
328:17 329:7
**slides** 102:10
102:12,17,21
**small** 134:19
141:13
**sold** 34:15
163:21 185:14
192:13 199:18
318:6
**sole** 164:8
**solely** 44:20
46:4 276:18
277:6
**solicited** 22:11
**solved** 294:10
**solving** 190:14
**somebody**
176:10 240:21
308:24
**somewhat**
25:18
**soon** 182:17
**sophomoric**
306:25 307:3
309:3,7
**sorry** 9:20 37:2
45:9 53:10

59:2 62:12
68:13 86:24
89:7 94:13
106:14 129:24
137:14 161:4
173:5 176:3
183:22 186:3
193:3 217:5
218:3 219:11
220:3,4 236:13
244:11 251:21
255:15 274:13
287:24 291:13
300:2,13,13,13
310:16 312:20
318:7 328:23
331:13 334:11
**sort** 314:21
**sought** 181:16
**sounded**
117:21
**sounds** 200:2
299:15
**southern** 1:3
**space** 226:22
272:8 306:6,18
307:17 308:18
346:7
**speak** 77:6,6,8
185:9
**speaking**
107:24 190:5
301:16
**speaks** 107:16

**spearheaded**
93:13
**specialty** 21:10
35:22 52:12
**specific** 61:25
97:22 115:14
204:3 226:15
273:17
**specifically**
40:23 81:17
112:25 115:21
121:23 123:3
123:21 142:11
146:10 175:5
191:10 264:9
334:25 336:24
**specifics**
123:23
**speculate** 99:10
**speculation**
176:14 177:25
185:17,21
217:2,14
218:13 221:20
241:13 263:22
264:17 266:11
267:9 282:8
283:23 285:5
287:18 295:25
302:2,21
303:19 306:22
308:22 313:18
**speculative**
217:3,17 246:8
247:5,23

283:24 285:19
288:10
**spencer** 173:5
**spencer's**
173:19
**spend** 31:17
**spent** 227:13
227:25 299:12
**spin** 56:12
61:21
**spinning** 58:8
**split** 268:25
**spoke** 80:9
124:7 165:5
213:18
**spoken** 129:15
129:21
**spun** 257:25
274:19
**ss** 341:3
**stack** 239:6,7
291:24
**staff** 194:18,22
195:21,24
229:21,22
257:13 259:11
322:7,18
**stamp** 26:2
69:23 111:10
**stamped**
159:16 180:19
186:9 189:8
192:6 205:23
214:18 222:17
224:22 228:21

239:15 244:4
250:18 255:9
279:20 297:17
**stamps** 17:13
77:16
**stapled** 329:4
**start** 158:25
161:9 187:9,25
191:7 236:17
290:12 297:24
315:7
**started** 13:21
30:8,12 187:17
236:12 316:18
321:10
**starting** 159:3
232:10
**starts** 39:21,24
60:5 73:10
101:22 186:21
188:5 189:24
189:25 193:2
203:11 298:18
**state** 5:7,10
32:15 55:2,14
77:23 108:2
217:15 313:21
314:20 341:2,7
346:6
**stated** 110:23
138:6 322:16
**statement** 62:7
71:13,25 72:22
80:5 87:12
88:20 89:12

104:20 106:17
110:25 136:18
138:22 139:11
143:8,19
144:23 145:6
201:25 202:19
235:18 286:5
311:23 316:10
319:8 321:2,4
322:12 323:24
**statements**
95:8 314:19
337:2
**states** 1:2,23
32:14 36:15
37:12,13 128:2
185:22 241:15
297:8 312:14
315:8,9 329:22
335:4
**stating** 90:6
296:19
**status** 304:17
304:18
**stay** 59:7,8
65:14 278:20
287:14
**stayed** 59:14
278:22
**steed** 166:20,21
167:3
**step** 167:11
194:16
**stepping**
308:10

**steps** 61:25
140:13
**steve** 146:8,18
**steve's** 146:16
**steven** 186:12
**stop** 106:8
157:19 218:25
222:3,5
**strategic**
202:15
**strategies**
102:25 104:23
106:3,6,20
107:11 108:18
108:20 233:6
237:12,24
260:4 261:10
**strategy** 34:7
35:3 67:21
103:2,3 104:14
104:15 109:5,8
109:12 235:2
236:10 260:10
266:14 267:4
289:8,22
**strike** 39:6
45:22 49:7,16
127:24
**string** 186:9
189:7,25 192:6
193:2 205:22
206:5 214:20
214:23 239:14
239:22 244:3
297:17,23

**struck** 207:5
**structure** 40:16
62:16 81:2,12
93:5 241:3
**structuring**
68:5
**stub** 209:8
**stuff** 209:15
**subject** 90:24
103:16 160:2
206:8 229:7
244:14 324:13
346:11
**submission**
245:17
**submitted**
246:4,6,10,17
251:13
**subscribed**
340:16
**subsequent**
19:10 56:25
76:17 134:17
**subsequently**
108:17 132:15
**subsidiary**
11:15
**substance**
32:16 56:11
123:24 129:3
157:11 177:10
216:16
**substantially**
200:11

**success** 202:7
**successful**
162:20 200:9
202:10,21
337:3,7,10
**successor** 312:5
**suggest** 42:17
**suggested** 10:2
300:22 317:6
**sullivan** 2:14
**sum** 177:10
**summary**
144:16
**supervise**
310:14
**supplement**
244:15
**suppose** 108:24
**supposed** 56:22
85:18
**sure** 14:2,15
17:7 23:13
29:12 37:23
45:10 53:16
56:15 63:14
68:2,18 78:18
83:3 98:5,7
100:9 110:13
113:19 118:2
125:20 134:11
141:12 149:8
166:20 173:3
186:15 187:22
195:19 206:24
218:14 262:21

288:13,21
295:18 304:16
304:18 316:14
316:18 318:4
331:20 334:18
335:24 338:18
**surprise** 56:19
**surprised**
94:15 292:17
**surrounding**
57:10
**swear** 6:3
**swears** 318:19
**swore** 315:4
**sworn** 6:7
318:16 340:16
**system** 166:23
167:3
**systems** 166:24

**t**

**t** 1:15 6:6 101:2
101:4 122:20
347:3,3
**table** 97:9
222:5 295:5
**taint** 338:10
**tainted** 144:17
**take** 4:11 17:20
25:15 49:5
50:12,14 51:4
53:15 60:24
61:19 62:2,9
80:12 98:10
106:21 113:17
115:2 118:6

139:10 140:14
147:12 149:9
151:6,20
159:14 160:6
172:20 204:21
254:10 256:5
257:3 259:6
276:3 297:18
324:2 332:2,19
333:10
**taken** 4:15
49:24 93:2
150:5
**takes** 88:20
**talk** 10:2 29:22
30:2 65:9
307:10 324:18
**talked** 123:25
168:21 179:15
**talking** 123:8
129:18 217:12
276:14 285:21
338:3
**talks** 142:6
233:22 305:17
**talotta** 146:16
**tanjeloff**
211:20 213:25
280:4
**tap** 122:20
127:14 138:20
145:8 316:24
**tape** 139:2
171:20 172:15
174:16

**targets** 36:3,17
**tax** 81:4
**taxonomy**
132:16
**tcf** 171:21
174:17
**team** 105:8
141:14,14
146:18 171:23
172:10,13,19
172:25 173:9
173:16 174:14
**technically**
256:4
**technology**
319:25
**telecom** 103:3,6
103:17,23
104:15 108:21
109:5,7 160:3
167:5,9 178:10
178:22 193:16
193:18,25
232:25 266:2,4
266:6 267:2,22
302:24 315:14
317:14 318:22
319:24 320:2
335:3
**tell** 48:10 56:9
121:6 123:22
124:14 128:23
136:18 138:4
146:22 240:18
254:11

**telling** 183:4
185:2 302:12
308:8 315:4
**tells** 316:21
**tensions** 204:10
**term** 32:17,23
190:14 206:25
236:2,15
**termination**
44:24
**terms** 19:4,7
44:24 48:2
66:22 67:18
81:9,20 89:14
120:11 122:21
130:7 134:5
135:8 141:25
142:20 149:10
209:6 235:22
319:12 337:23
339:5
**terri** 18:13
83:15,17,25
93:23 98:5
123:20 127:11
295:18
**testified** 6:9
101:5 129:4
153:21 171:2
278:8 279:9
281:5 282:16
284:4 306:16
307:15 308:16
338:16

| | | | |
|---|---|---|---|
| **testifying** 177:8 | 147:6,16 148:4 | 331:22 333:4 | 116:7 158:4 |
| **testimony** 7:9 | 148:19 156:21 | 334:2,12 | 211:5 230:12 |
| 49:19 171:15 | 156:23 157:10 | 337:13 338:16 | 255:19 |
| 221:22 258:25 | 157:17 158:17 | 339:9 | **thursday** 90:4 |
| 264:7 287:20 | 160:15 164:12 | **third** 44:3 | **tier** 113:13 |
| 288:11 308:25 | 165:4 170:3,8 | 73:15 123:8 | **till** 9:20 |
| 309:2 332:5 | 171:24 177:9 | 127:22 134:2 | **time** 4:9 5:8 8:2 |
| 339:17 340:10 | 178:2,20 | 138:18 153:24 | 8:7 9:22 10:15 |
| **text** 207:4 | 179:22 180:7,8 | 156:6 162:18 | 11:14,16 12:2 |
| **thank** 77:12 | 182:17 187:21 | 181:15 233:3 | 12:24 14:5 |
| 324:16,19,24 | 190:3,4,10 | 236:18 259:25 | 20:5,5,9 27:11 |
| 339:3 | 191:21 198:21 | 310:23 311:9 | 31:6,17 38:5 |
| **thanks** 243:19 | 200:2 202:20 | **thirty** 346:17 | 49:10 51:22 |
| 273:15 | 206:9 213:17 | **thought** 29:17 | 53:19,24 55:11 |
| **theoretically** | 216:21 226:22 | 31:5,6 99:19 | 61:10 64:10 |
| 157:2 | 230:5 242:14 | 102:11 150:25 | 65:3,3 67:3 |
| **thesis** 267:16 | 247:7,13 | 170:23 171:8 | 80:11 83:4 |
| 267:17 | 249:19 257:17 | 191:19 202:6 | 88:13 95:9 |
| **thing** 49:17 | 258:17 264:19 | 231:18 235:8 | 97:8 99:9 |
| **things** 36:19 | 267:19 269:13 | 266:23 281:24 | 100:23 101:3,7 |
| 147:8 148:13 | 269:17 270:12 | 283:17 286:21 | 111:2 124:22 |
| **think** 7:21 13:4 | 270:15,23 | 287:10 315:24 | 127:2 129:8 |
| 14:15 23:9 | 271:4,19,22 | **thoughts** | 139:25 142:23 |
| 28:18 30:17 | 279:8 281:4 | 127:15 | 149:9 151:24 |
| 33:9 46:9 | 282:16 284:4 | **thousands** | 152:5 157:14 |
| 48:22 55:10 | 285:9 286:13 | 148:3,5 | 157:22 158:7,7 |
| 81:6 96:13 | 286:16 290:20 | **threaten** | 158:12 159:2 |
| 98:8 99:6 | 290:23 291:4 | 157:12,16 | 160:25 166:15 |
| 100:8,9 110:20 | 291:13 292:25 | **threatened** | 167:16,16 |
| 112:9 115:5,11 | 293:20 295:11 | 157:17 | 168:5,6 170:12 |
| 115:13 118:10 | 296:2 307:2,4 | **threats** 156:18 | 171:11 182:5 |
| 118:19 121:2 | 307:8,9 310:3 | 156:23 | 191:6,12,14 |
| 121:14 125:12 | 310:13 317:25 | **three** 12:4,5 | 195:2 196:7 |
| 131:17 134:9 | 319:10,20 | 43:3 65:5 | 202:22 204:23 |
| 137:8 138:24 | 322:13 328:24 | 77:15 115:24 | 205:4 208:13 |

209:2 216:23
227:12,20,24
233:22 234:13
235:9 245:8
257:7 258:20
259:7 263:8
264:3,20 265:5
267:18,25
268:4,8,15
269:5,16 270:2
271:10 272:13
276:6,11,16
283:15 294:23
295:3 299:11
302:24 306:14
308:12 318:3
322:7 324:5,10
324:17,25
339:19,21
**timeline** 170:6
**times** 6:20 65:5
143:13 216:12
218:9 305:6
**timetable**
317:12
**timing** 37:24
38:8 279:15
**title** 10:15,19
11:4,6 12:20
16:5 18:21
**titles** 11:25
12:5
**tmt** 19:24 31:25
119:7 173:9
305:23 306:6

306:18 307:17
308:17 312:2,5
312:6,9
**today** 7:9 11:18
27:17 28:22
29:5,21,22
42:9,18 63:23
64:20 76:11
94:15 179:2
228:7 256:7
264:13 275:16
285:8,16
292:17 306:8
307:3 324:17
324:19 325:2
336:17 339:17
**today's** 305:7
**todd** 82:6,12
**together** 18:13
51:25 69:19
112:19,22
191:8 211:18
236:23 284:20
284:24 329:4
330:8 336:13
**told** 40:11 65:6
105:5,7 110:16
122:6 161:21
240:14,21
320:17 321:16
323:19
**tonight** 324:16
**took** 65:20
121:7 147:15
166:4 176:7

191:6 202:22
202:24 255:25
**top** 42:21 74:24
75:22 219:14
**topic** 100:18
**torres** 2:4 5:20
**totally** 306:23
**touch** 29:19
**touched** 159:5
**tower** 143:4
151:5,9
**track** 22:23
23:2 94:24
293:3,5,11
**trade** 139:7
**trail** 298:12,16
298:17
**trans** 161:25
**transaction**
8:22 50:7
76:21 121:24
124:11,12,15
124:21 125:7
125:16,20
129:6,11
140:22 146:4
156:24 160:17
160:24 161:8,9
161:19 165:7
165:10,21,22
166:12 179:18
200:22 202:9
202:11,22
204:14,18
205:8 207:19

207:20,22
208:25 209:21
210:4 212:24
214:3 216:8
223:20 225:16
225:24 226:2
258:10,12
337:3,6
**transactions**
34:17 35:17
169:19 309:20
**transcript**
340:5,10
341:11 346:18
346:20
**transcripts**
339:6
**transmittal**
223:18
**trees** 250:24
**tried** 60:24
61:19,21 62:9
102:16
**tries** 139:19
**trigger** 209:22
210:5
**triggered** 99:17
100:3
**trip** 94:10
**true** 24:2 35:13
46:12 63:2
72:14 87:11
88:20 89:12
93:11 110:25
128:22 150:14

180:13 187:21
254:19 286:12
315:22 316:10
317:21 319:10
320:22 326:17
327:7 328:3,15
340:9 341:11
**truth** 301:5
315:4
**truthful** 7:8
**truthfully**
314:20
**try** 58:7 61:24
170:24 178:13
178:24 204:10
242:18 274:4,5
**trying** 30:16
81:2 106:16
120:4 131:4
172:23 188:21
218:5 219:4
236:13
**tucked** 40:13
240:24 241:8
**turn** 90:17
102:20 232:9
251:9,16
262:19 310:15
312:23 318:15
**turning** 294:12
**twice** 65:5
**two** 34:20 39:9
69:19,20
102:25 105:12
105:22 108:15

113:14 140:19
154:21 158:15
203:11 204:5
316:6,14
319:18 321:10
333:14 338:14
**typical** 204:4
**typically**
134:23 169:17
196:23 197:24
236:14

**u**

**ultimate**
256:12
**ultimately**
25:13 33:21
48:24 65:19
125:17 146:15
146:18 147:17
149:3 162:2
164:18 165:21
171:17 174:3
180:7 192:12
220:19 252:5
253:10 255:24
**um** 168:24
**umbrella** 24:5
24:7 31:8 49:2
56:23 57:18,20
57:21 67:6
199:15 272:16
272:18,23
332:8
**unable** 33:17

**unauthorized**
128:7,19
**unaware** 96:8
**uncertain**
181:19
**under** 7:5 23:5
24:5,7 31:8
32:4 40:13
46:13 49:2
54:6 56:22
57:18,20,21
59:15 61:6
63:6 67:5 69:5
91:13 92:13
95:3 101:15
107:21 109:4
109:11 126:3
132:2,23 133:2
133:7 134:4
135:8 136:8
152:11 190:11
190:21 191:20
198:21 199:15
207:6 240:24
241:8 251:18
251:23 252:25
254:5,19,23
265:15,21
272:17,22
273:11,12,13
273:19,22
274:23 283:20
291:16 293:16
307:15 308:16
314:15 315:9

316:2,21
318:20 320:9
320:18 321:7
321:17 322:4
322:15 323:10
323:18,20
326:13,22
327:22 331:17
332:8 334:6,15
**underline**
207:6
**undermines**
144:18 301:4
**undermining**
144:25
**underneath**
25:9,12 48:3
48:24 61:22
93:4 110:9
296:4
**understand**
6:22,25 7:4
19:22 20:2
21:16 29:14
30:17 31:21
54:5 55:15
95:7 97:10
101:14 106:16
131:5 146:14
152:10 163:12
199:24 217:22
217:23 218:6
219:9 263:17
263:19 295:5
303:3 306:16

**understanding**
29:5 33:16
63:16 77:2
140:7 195:13
198:25 216:22
217:10 248:23
259:16 265:20
286:6 296:3
317:22
**understood**
37:5 62:17
132:16 191:23
218:10
**undervalued**
172:8
**undervaluing**
142:7
**unfair** 48:20
**unit** 4:13
**united** 1:2
**unpack** 178:19
247:12
**unsanctioned**
128:9
**unwinding**
303:14
**upper** 113:13
**upset** 156:24
**urquhart** 2:14
**usa** 255:20
**use** 33:23
226:21 227:2
231:5
**used** 22:25
144:2 171:9,11

174:4 175:3,4
175:7 193:12
227:21 248:6
272:19 333:18
346:21
**using** 22:22
94:23 293:3,4
293:10
**usurp** 331:2,15
**utterly** 288:16
307:5

**v**

**vague** 121:22
142:23 150:11
285:22 287:21
**validate** 145:17
**valuation**
151:19 178:15
178:17
**valuations**
139:2
**value** 144:19
145:2 150:14
172:3,22
187:10,19
199:19 200:22
201:2,6,16,25
202:3,15,25
203:17,18
315:13 338:6
**valued** 143:3
151:12 171:10
177:13,16
**van** 155:4,7

**various** 136:9
215:5 322:17
**vast** 273:4
**vdr** 171:17,25
173:22 174:21
176:10
**venture** 46:21
**ventures** 323:4
**verbally** 77:6,8
80:4
**veritext** 4:23,25
**version** 102:12
259:19
**versus** 4:17
**verticals** 35:20
**vested** 44:20
**video** 4:10,14
8:3,8 53:20,25
100:24 101:8
151:25 152:6
158:8 204:24
205:5 276:7,12
324:6,11
339:19
**videographer**
3:15 4:2,24 6:2
7:25 8:6 53:18
53:23 100:22
101:6 151:23
152:4 157:23
158:3,9,13
204:22 205:3
276:5,10 324:4
324:9 339:16

**videotaped**
1:17
**view** 28:15
32:21 33:4
39:5 42:8
66:10 91:24
99:14 100:3
140:17 165:12
165:17 198:7
198:11 199:11
275:19 306:19
307:17 308:18
**viewed** 149:24
202:7
**views** 90:6
**viii** 32:5
**violating**
177:22
**violation** 288:6
306:19 307:18
308:19 309:14
309:21
**virtual** 131:13
173:23 175:13
**visit** 119:14
**voice** 76:10
77:3
**voiced** 80:9
**voort** 155:4,7
**vs** 340:1 347:1

**w**

**wait** 294:16
**waived** 180:5
210:2,11

waiver 209:22
walk 180:25
  211:3 298:17
walked 292:15
walking 310:12
walled 140:17
  140:23
walling 141:3
want 7:22 31:2
  53:14 71:9
  75:23 80:12,18
  98:10,18
  114:21 117:6
  152:14 158:25
  172:4 173:11
  177:10 178:19
  181:14 185:2,4
  190:6,24
  194:13 205:7
  211:2 215:10
  219:12 221:24
  221:25 232:9
  234:3 236:22
  236:25 239:5
  241:17 242:17
  247:12 248:4
  251:16 257:21
  259:6 282:17
  284:10 288:13
  292:13 298:2
  298:17 299:20
  305:15 310:22
  315:7 318:15
  324:16 330:2
  338:17

wanted 44:13
  44:16 112:3,18
  115:17 146:23
  218:2 291:22
wathen 14:13
  22:7 37:19
  59:12 65:20
  73:11,19 74:24
  75:7 76:17
  206:5,15 227:6
  227:13
way 73:18 75:8
  75:9 81:13
  84:7,14 85:5
  183:3 195:13
  211:5 247:14
  272:11 285:24
  290:17 330:18
  336:19 341:16
ways 234:21
  323:8
week 181:9
  225:7
weekend
  132:15 134:17
  145:19
weeks 147:16
  230:10,12
weigh 184:14
weiss 167:14,17
  167:22 168:4,7
  168:12
welcome
  239:19

went 9:2,14
  47:12 158:10
  ███████ 21:14
  22:2 49:23,24
  52:13 61:17
  205:12 207:24
  208:7 210:7
whatsoever
  313:19
whereof 341:18
whispering 4:7
wholly 238:18
  262:10
wind 107:20
  197:15 302:7
  303:17
winding 302:12
  302:25
wireless 100:6
  104:2,9 123:10
  125:8,25
  126:22 127:9
  129:17 132:5
  132:13,25
  133:10,13
  134:2 139:21
  142:8,18
  146:20 153:16
  154:17 155:23
  157:3 159:3
  161:3,5 163:21
  165:11 169:11
  169:24 170:16
  170:20 171:5
  174:4 176:6,24

177:17 179:19
  183:7 185:13
  188:6 192:13
  192:22 196:9
  196:11,15
  199:18 200:7
  201:20,21
  203:25 204:14
  266:6,7,16
  267:6,13
  315:19 318:6,8
wireless's
  162:11
withdraw
  41:12
withdrawn
  179:14 235:25
  310:5
witness 1:18
  3:5 5:24 6:4,7
  62:12 98:13,15
  117:5 151:22
  152:16 157:19
  157:20 313:20
  334:11 341:18
  342:3 346:2
word 172:21
  194:7
words 32:16
  56:11 111:25
  157:9 177:11
  185:9 203:13
  216:16 282:18
  302:23

| | | | z |
|---|---|---|---|

**work** 8:13,22
10:3 11:7
15:14 145:18
145:23 146:17
147:13,24
173:7,8 182:20
202:24 234:13
268:5,13
322:17
**worked** 7:20
9:18 81:8
131:11 305:3
322:7 336:12
**working** 37:19
38:3 51:21
149:12 172:18
172:19 227:14
227:25 333:13
**world** 301:17
**worldwide** 9:3
**write** 107:8
222:2 311:3
**writes** 181:13
**writing** 80:4
83:24 98:4
**written** 44:7,14
45:4,14,21,23
47:18 69:10
96:2 147:20
217:4,6,7
**wrong** 42:17
94:12 263:11
268:11 269:14
269:18 270:13
270:16,24

271:5,20,23
286:14,22
290:21 291:5
291:14 300:18
**wrote** 41:7,16
54:15 61:2
76:5 90:5
105:3 110:7
199:5 218:6

| x |
|---|

**x** 1:4,11 342:2
**xyz** 288:7

| y |
|---|

**yeah** 26:9
35:15,15 36:15
42:14 49:6
50:17 51:24
53:12 57:15
58:22 62:11
63:2,14 67:4
68:17 74:3
75:13 89:10,16
89:17,17 92:6
93:10,11 95:15
96:14 104:10
108:5,25
111:23 112:15
113:15 115:6
117:12 129:18
130:8 132:7
144:24 150:23
156:15 160:20
162:4 164:12
165:12 170:8

170:11 175:4
175:23 179:12
180:2 186:2,15
187:22 188:12
191:19 200:18
202:20 207:2
207:21 210:8
210:12,13
213:17 220:6
220:20,22
224:11 227:10
230:15 231:17
232:7 233:19
236:14 241:16
242:9 243:3
253:22 256:3,5
263:14 268:16
272:12 281:9
283:4 284:3
294:4 297:6
319:14 330:15
335:4 338:2,9
**year** 94:12
195:10 202:12
249:4
**years** 8:11
10:12 99:7
110:7 333:14
336:12
**york** 1:3,21,21
1:23 2:8,8,18
2:18 3:7,7 4:21
77:19,22 341:2
341:4,8

| z |
|---|

**zak** 173:4
**zakerin** 173:5,6
**zakutansky**
78:17,24

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS

## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.